1             IN THE UNITED STATES DISTRICT COURT
          FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
2                      SOUTHERN DIVISION

3

4   CATINA PARKER, as Personal
    Representative of the Estate
5   of Leonard Parker, Jr.,
    Deceased,
6        Plaintiff,

7

    VERSUS         CIVIL ACTION NO: 1:21-cv-00217-HSO-BWR
8

9   THE CITY OF GULFPORT, a
    municipal corporation; JASON
10  CUEVAS in his individual and
    official capacity; and JOHN
11  DOE OFFICERS #1 - 5 in their
    official and individual
12  capacities,
         Defendants.

13

14

15

16      VIDEOTAPED DEPOSITION OF JASON CUEVAS

17

18      Taken at the offices of Copeland, Cook,
        Taylor & Bush, P.A., 200 East Beach
19      Boulevard, Building 5, Gulfport,
        Mississippi, on Wednesday, June 14,
20      2023, beginning at 9:16 a.m.

21

22

23

24

    REPORTED BY:  F. DUSTY BURDINE, CSR #1171
25  McCORKLE LITIGATION SERVICES, INC.

Exhibit "5"



Jason Cuevas 06/14/2023

1  the brightest setting.  You actually have to hold

2  the button down for it to reduce the power.  And

3  it also had a feature where if you double click

4  the activation button, it would go into a strobe

5  mode.

6      Q.   And what did you use the strobe mode

7  for?

8      A.   Typically to gain attention from people

9  to show that something was changing in their sight

10  to gather attention.

11      Q.   Do you recall what you were doing before

12  you were informed that your presence may be

13  required at the scene of the incident?

14      A.   I do not.

15      Q.   Do you recall any of the other dispatch

16  calls or activities you were involved in on shift

17  before you responded to the scene of the incident?

18      A.   No, ma'am.

19      Q.   Okay.  At some point do you recall

20  receiving a dispatch call that informed you there

21  was a potential disorderly to investigate?

22      A.   Yes, ma'am.

23      Q.   What do you recall -- strike that.

24          Do you recall if you received a dispatch

25  call, a call to your phone or information on the



1    computer or something like that?

2        A.   It was through dispatch, through the

3    police radio.

4        Q.   Okay.  Does your vehicle have a computer

5    system?

6        A.   Yes, ma'am, it did.

7        Q.   Okay.  And do you ever receive

8    information along with radio calls on that system?

9        A.   Yes, ma'am.

10       Q.   Do you ever recall viewing on the

11   computer system any information regarding this

12   call?

13       A.   No, ma'am.  I was so close to the call

14   that I didn't need to look at the MDT.  I was able

15   to listen to dispatch.

16       Q.   Do you remember where you were?

17       A.   Exactly when the call came out, no,

18   ma'am.

19       Q.   Do you remember the general area?

20       A.   It was on the east -- the -- it's called

21   the eastern side of A3.

22       Q.   What do you recall hearing when the

23   radio call came through?

24       A.   They said there was a disorderly male at

25   a residence that was trying to fight people at the

Exhibit "5"

1  residence who appeared to be intoxicated.

2      Q.   And you were informed of one individual;

3  is that right?

4      A.   Yes, ma'am.

5      Q.   Were you given any description of what

6  the individual looked like?

7      A.   I don't recall that I was actually given

8  the description by dispatch.  I just remember they

9  said there was a -- they said 29 male -- a ~~single~~ signal

10  29 male, which means disorderly, and that -- I

11  think they even stated there were no weapons

12  involved from what dispatch received.

13      Q.   Do you recall hearing the race of the

14  individual that you'd be investigating?

15      A.   No, ma'am.

16      Q.   And were you specifically assigned to

17  this call or did you know you were assigned to it

18  because of your location in A3?

19      A.   I remember being assigned to the call

20  and -- because the officer that worked the

21  neighboring area, his area partner who rides in a

22  separate vehicle was at the station, so he would

23  have had to have responded by himself without

24  another officer.

25      Q.   And did you have an area partner that



1  dispatched to that call.

2       Q.   Did you ask any follow-up questions or

3  get any additional information?

4       A.   I did not ask any follow-up questions

5  and I don't recall getting any more information.

6       Q.   Did you then travel to the scene?

7       A.   Yes, ma'am.

8       Q.   How long did that take you?

9       A.   Not very long, like -- I couldn't give

10  you an exact number, like a time frame.

11       Q.   Do you believe it was less than 10

12  minutes?

13       A.   Yes, ma'am.

14       Q.   Do you recall approximately how much

15  distance you traveled to get there?

16       A.   I'd be guessing if I gave you a distance

17  on that one.

18       Q.   Were you in the same neighborhood, if

19  you can recall?

20       A.   Was I in the same neighborhood as what?

21       Q.   As the scene.

22       A.   No, ma'am.

23       Q.   As you headed to the scene, do you

24  recall if you turned on your lights and sirens?

25       A.   I did not turn on my lights or sirens.



Jason Cuevas 06/14/2023

1       Q.   Do you remember why?

2       A.   Because it didn't warrant a -- what we

3   would say a Code 2 response, which is activating

4   lights and sirens.

5       Q.   And based on your experience, what is a

6   Code 2 response?

7       A.   Typically like an accident involving

8   injuries, a person with a firearm, a person with a

9   knife, a shooting, ag assault, murder, those kind

10  of calls.

11      Q.   Okay.  And then is there a code number

12  that would have applied to your response to the

13  scene?

14      A.   Yes, ma'am.  It would be Code 1.

15      Q.   And can you describe what Code 1 is?

16      A.   Driving the speed limit with no lights

17  or sirens activated.

18      Q.   And what kind of calls warrant a Code 1

19  response?

20      A.   It could be property crimes where

21  there's no suspect on the scene, non-violent

22  crimes where like emergency assistance wasn't

23  necessary at a quick pace.

24      Q.   Okay.  And would it be fair to say that

25  a drunken disorderly would be within the bounds of

Exhibit "5"

Jason Cuevas 06/14/2023

1  Code 1?

2        A.   Yes, ma'am.

3        Q.   At any point before you got to the

4  scene, were you aware of any other units

5  responding as well?

6        A.   The only other officer I knew that was

7  dispatched was Officer Brewer.

8        Q.   And do you recall knowing whether or not

9  Officer Brewer was assigned as the primary officer

10  on the scene or if he was a backup for you?

11        A.   Typically they just assign multiple

12  officers to a call.  They don't say which ones are

13  primary or backup.

14        Q.   So what was your understanding of your

15  role when you arrived on scene?

16        A.   To make initial contact with the

17  complainant.

18        Q.   And where -- strike that.

19             Is it your understanding that you parked

20  east of the residence that you were sent to?

21        A.   Yes, ma'am.

22        Q.   Do you recall if you arrived from east

23  of the residence or west of the residence?

24        A.   Like which direction I came in from?

25        Q.   Yes.

Jason Cuevas·06/14/2023

1        A.   Yes, ma'am.  I came in from east of the

2   residence.

3        Q.   Okay.  Do you recall if -- strike that.

4             Do you recall when you turned onto the

5   street?

6        A.   Like time-wise?

7        Q.   No.  I'm sorry.  That was a very unclear

8   question.  Let me strike that and try again.

9             Do you recall how you turned onto the

10  street, from where?

11       A.   From Oak Avenue.

12       Q.   Okay.  And then from Oak Avenue where

13  did you turn to get to the residence?

14       A.   Like what direction?

15       Q.   No.  What was the street name?

16       A.   Oh, 25th Street.

17       Q.   25th Street, okay.  So you turned right

18  on Oak to go down 25th Street; is that right?

19       A.   No, ma'am.

20       Q.   No.  Go ahead.

21       A.   So I came down Railroad Street, which is

22  south of 25th Street.  I turned north onto Oak

23  Avenue.  And as I was approaching the intersection

24  where Oak Avenue and 25th Street are, I then

25  turned west, which would have been left, onto 25th

Exhibit "5"

1    Street.

2         Q.   I see, okay.  And then at some point you

3    parked your vehicle; is that right?

4         A.   Yes, ma'am.

5         Q.   Before you parked as you approached the

6    address that you were being sent to -- strike

7    that.

8              Let's start there.  Do you recall what

9    the address was?

10        A.   It was 210 25th Street.

11        Q.   So as you approached 210 25th Street, do

12   you recall observing any individuals outside in

13   the general vicinity of the house?

14        A.   Yes, ma'am.

15        Q.   And who do you -- and let me be very

16   specific.  I'm talking about before you parked, do

17   you recall observing anyone?

18        A.   Before I parked, no, ma'am.  I just

19   heard people talking.  I didn't actually visually

20   see anyone.

21        Q.   Okay.  And what exactly did you hear?

22        A.   I just heard like a bunch of talking

23   very loudly.  It was right before I turned onto

24   25th Street.  I had my driver's side window down

25   and I was able to hear some sound coming from my



1    left down 25th Street.

2        Q.   Did you hear -- were the voices --

3    strike that.

4            Could you tell if the voices were

5    excited or if there was some conflict occurring?

6        A.   It sounded like so because it was so

7    many people it sounded like were talking.  It was

8    like multiple voices very loud.

9        Q.   Could you make out any of the words that

10   were being said?

11       A.   No, ma'am.

12       Q.   And you said your driver's side window

13   was open?

14       A.   Yes, ma'am.

15       Q.   Do you recall if your passenger side

16   window was open?

17       A.   I don't recall.  I just know I rolled

18   down my driver's side window so I could hear

19   better.

20       Q.   And as you turned onto 25th Street, do

21   you recall if your headlights were on?

22       A.   I really don't know if they were on or

23   off.

24       Q.   When you -- strike that.

25            Do you recall if your vehicle on

Exhibit "5"



1  February 1st, 2020 had automatic headlights or if

2  you had to turn them on and off yourself?

3      A.   It had multiple settings that you could

4  go automatic or manually on.  Usually I just had

5  them set to automatic until I respond to a call

6  since I was on night shift, and I would manually

7  turn them off.

8      Q.   Okay.  And when you had them on

9  automatic, if you left your vehicle and closed the

10 door, would the lights turn off at that point or

11 would it take a few more seconds for them to turn

12 off?

13     A.   Oh, no.  They would stay -- the

14 automatic feature was just for like at certain

15 times of day, it would come on.  But typically

16 when responding to a call, especially at night

17 shift for a disorderly, I would have -- I would

18 turn my lights off as I was like parked.

19     Q.   Okay.  And do you recall doing that on

20 February 1st, 2020?

21     A.   Yes, ma'am.

22     Q.   Okay.  Do you remember if you turned

23 your lights off as you were parking or after you

24 had stopped?

25     A.   I believe it was either as I was parking

1  or once I was already parked.

2      Q.   Before you turned off your headlights,

3  did they illuminate any people right in front of

4  you?  Did you observe anyone in the headlights?

5      A.   No, ma'am.

6      Q.   And then as you parked, were you able to

7  observe where the voices were coming from?

8      A.   Once I was out of the vehicle, I was

9  able to.

10      Q.   Okay.  So before you got out, you

11  couldn't tell where the voices were?

12      A.   No, ma'am.

13      Q.   Do you remember why you parked where you

14  chose to park?

15      A.   Yes, ma'am.

16      Q.   And why was that?

17      A.   It was a more tactical approach to where

18  I was parked.  I wasn't illuminated by a street

19  light.  It gave me a better vantage point to

20  approach the call from to gain more information

21  about the situation that was going on at the

22  residence.  And also -- so that way, since I

23  wasn't familiar with that exact street, it would

24  give me a little more distance and time to verify

25  which residence I needed to be responding to.



1        Q.   Do you know what address you pulled

2   near -- strike that.

3             Do you know what address you parked the

4   closest to?

5        A.   At the time, I didn't know what address

6   I was parked near.

7        Q.   Do you know now?

8        A.   I know it was like two houses east of

9   the residence, if I remember correctly.

10       Q.   Okay.  Do you recall seeing any street

11  lights on 25th Street?

12       A.   I believe so, yes, ma'am.

13       Q.   And where do you recall seeing a street

14  light on 25th Street?

15  MR. BRUNI:

16            I couldn't hear that question.

17  MR. WHITFIELD:

18            Where does he recall the street lights

19  being.

20       A.   I couldn't tell you exactly where they

21  were.  I knew that the road was illuminated, but I

22  couldn't tell you exactly where the poles were

23  positioned.  I know that where I parked, I wasn't

24  under one of the street lights because it was a

25  darker area.

Exhibit "5"

1    MS. RAVEENDRAN:

2        Q.   And I believe at some point you had to

3    use your flashlight to look at the mailbox

4    addresses; is that right?

5        A.   Yes, ma'am.

6        Q.   So do you recall if there were street

7    lights anywhere between where you parked and 210

8    East 25th Street?

9        A.   I don't remember if there were.  I just

10   knew I was using a flashlight to illuminate

11   mailboxes to see if I could read the numbers off

12   of them.

13       Q.   Would you agree that it was generally

14   dark at the time?

15       A.   Yes, ma'am.

16       Q.   And is it fair to say that the street

17   wasn't illuminated fully?

18       A.   Yeah.  Not the entire street was

19   illuminated, no, ma'am.

20       Q.   So now I'm going to ask you questions

21   about when you got out of the car.

22       A.   Yes, ma'am.

23       Q.   Once you got out of the vehicle, what

24   was your plan of approaching the residence?

25       A.   Basically first to gather my location by



1  checking the mailboxes to see if I was in the

2  general vicinity.  And then once I had verified

3  where I was and how much further I needed to go to

4  the residence, it would be to approach the

5  residence and make contact with the incident,

6  basically.

7      Q.   Once you got out of the vehicle, did you

8  have anything in your hands?

9      A.   I had my flashlight.

10     Q.   Okay.  At that time you did not have

11  your firearm in your hand; is that right?

12     A.   Yes, ma'am.

13     Q.   And why is that?

14     A.   I didn't feel a need to have my firearm

15  out at that point.

16     Q.   Would it be fair to say that you weren't

17  investigating a violent crime?

18     A.   They did state that the subject was

19  trying to fight people, which is a form of

20  violence.  So, I mean, yes, a violent crime.

21     Q.   But you weren't aware of anyone having

22  been injured at that point; is that fair?

23     A.   I was not aware of anyone being injured.

24     Q.   Okay.  And you were never made aware of

25  any weapons on the scene?



1  vehicle.  But like I said, I didn't actually

2  search the inside of it.

3      Q.   And then regarding the other individuals

4  on scene, did you ever see any of them with any

5  weapons that you identified?

6      A.   No, ma'am.

7      Q.   Okay.  Once you got out of the vehicle,

8  were you able to see where the voices you were

9  hearing were coming from?

10     A.   Yes, ma'am.  I believe that it was the

11 residence basically two houses down from where I

12 was parked.  There was lights on the porch and

13 people were outside talking loudly amongst each

14 other, basically arguing.

15     Q.   About how far away were you from 210?

16     A.   I was two houses from there, like -- so

17 my car was parked at the corner.  And each lot --

18 I don't know how big they are, but it was the

19 corner house, one more house, and then the next

20 one was 210.

21     Q.   Do you think you were further than a

22 football field away?

23     A.   I couldn't really tell you.

24     Q.   No problem.  Sometimes we all watch

25 enough football that we can tell those kind of



1    things.

2        A.   I'm not really a sports fan, honestly.

3        Q.   Okay.  Like if you look at a football

4    field long enough, it just becomes a point of

5    reference.

6             All right.  So once you got out of the

7    vehicle and you could see some individuals, were

8    you able to make out what they were wearing or

9    whether they were male or female from your vantage

10   point?

11       A.   No, ma'am.

12   MR. WHITFIELD:

13           Object to the form.

14   THE WITNESS:

15           Sorry.

16   MR. WHITFIELD:

17           Object to the form.

18   MS. RAVEENDRAN:

19       Q.   Based on your understanding -- strike

20   that.

21           At that point when you saw the

22   individuals, could you tell if they were in a yard

23   of a house?

24   MR. WHITFIELD:

25           Object to the form.  You can answer.



Jason Cuevas 06/14/2023

1        A.    You said from my perspective, I could

2    see what?

3    MS. RAVEENDRAN:

4        Q.    If you were able to see people, could

5    you tell if they were in a yard?

6        A.    In a yard?

7        Q.    Yes.

8        A.    I knew they were in front of the house.

9        Q.    Okay.

10       A.    What I -- at that point I believe it was

11   210.

12       Q.    Okay.  So at that point did you head

13   straight to the house or did you do something else

14   first?

15       A.    I was kind of watching to see what was

16   going on because of the commotion in case there

17   was, you know, someone fighting or anything to try

18   and gather information about the whole incident

19   and how to approach it.

20       Q.    And while you were observing -- strike

21   that.

22            Did you make any observations of what

23   the individuals were doing and -- well, that's my

24   whole question.

25       A.    I was able to observe a vehicle that was

Exhibit "5"



1    slowly trying to back out of the driveway and

2    there were other people there that were watching

3    the vehicle as it was backing out.

4        Q.   And was anyone outside of the vehicle

5    fighting as far as you could tell?

6        A.   No, ma'am.  I did not observe anyone

7    fighting outside the vehicle.

8        Q.   Okay.  Did you observe any of the

9    individuals outside of the vehicle helping to

10   direct the vehicle?

11       A.   I don't recall seeing anyone direct the

12   vehicle.

13       Q.   Is there anything specific you recall

14   about who was -- well, strike that.

15           Can you describe any of the people that

16   were outside of the vehicle?

17       A.   I just -- I could see figures because of

18   how far away it was.  I could just see individual

19   figures in the yard.  I couldn't actually tell

20   what they truly looked like.

21       Q.   Okay.  Could you tell what they were

22   wearing?

23       A.   No, ma'am.

24       Q.   Okay.  Was there light shinning on the

25   individuals outside of the vehicle from the house



1    or from another source?

2        A.   The front porch did have a light on it,

3    yes, ma'am.

4        Q.   Okay.  Do you know how many people were

5    outside of the vehicle?

6        A.   No, ma'am.

7        Q.   Once you were outside of your car, could

8    you make out what anyone was saying?

9        A.   No.  When I first was walking up, I just

10   could hear yelling still.

11       Q.   I want to talk again -- strike that.

12            At some point did you look away from --

13   strike that.

14            Did you go directly then to 210?

15       A.   I started to walk towards 210, correct.

16       Q.   Where were you when you started to walk

17   towards 210?

18       A.   I was on the north side of 25th Street.

19   There was like a little driveway just west of my

20   car.

21       Q.   So were you on the driveway or were you

22   on the street?

23       A.   No.  I wasn't on the street.  I was kind

24   of off to the side of the street, like not

25   actually on the asphalt.

Exhibit "5"



Jason Cuevas 06/14/2023

1    Q.   Okay.  And were you looking at any of

2  the mailboxes?

3    A.   Yes, ma'am.  The white mailbox ahead of

4  me.

5    Q.   Why were you looking at the mailbox?

6    A.   Without my -- or from the distance, I

7  couldn't tell what the last digit on that mailbox

8  was.  And I was trying to make sure if I was --

9  needed to be on the even or the odd side of the

10  street because typically the addresses are -- one

11  side is even, one side is odd.  I was just trying

12  to verify to make sure that was the correct

13  residence I needed to be going to.

14    Q.   Okay.  So would it be fair to say that

15  you believe that where the individuals were where

16  you were headed that you were verifying that?

17    A.   Yes, ma'am.

18    Q.   What did you have to -- strike that.

19         You said you had trouble seeing the

20  mailbox number; is that right?

21    A.   Yes, ma'am.

22    Q.   Did you do anything to help you see what

23  was on the mailbox?

24    A.   Yes, ma'am.  I illuminated it with my

25  flashlight.



Jason Cuevas 06/14/2023

1  driveway; is that what you're asking me?

2  MS. RAVEENDRAN:

3       Q.   It would have been north.  All right.

4  Let me start over.

5       A.   I'm sorry.

6       Q.   So once you had parked, you got out of

7  the vehicle, right?

8       A.   Uh-huh.  Yes, ma'am.  Sorry.

9       Q.   Okay.  And would it be fair to say that

10 you had to walk west on 25th to get around your

11 vehicle and then you went towards the driveway to

12 the right?

13 MR. WHITFIELD:

14          Object to the form.

15      A.   I walked west from my parked vehicle and

16 went to the north side of the road towards that

17 mailbox.

18 MS. RAVEENDRAN:

19      Q.   Okay.  And when you were looking at the

20 mailbox, you were on the driveway already?

21 MR. WHITFIELD:

22          Object to the form.

23      A.   I couldn't recall if I was actually on

24 the driveway when I was looking at the mailbox

25 because I don't know how wide it was.  I know that

Exhibit "5"



1  -- I had seen the mailbox from the time I got out

2  of the car and all the way up until when I got to

3  the mailbox itself.

4  MS. RAVEENDRAN:

5       Q.   Do you know what the address was for the

6  mailbox that you were looking at?

7       A.   I don't recall the actual numbers.  I

8  remember I just had trouble reading the last one,

9  the last actual digit.  I could see the 2 and the

10  0 on there very easily, but the last one was like

11  either dark or something was messed up with it,

12  but I couldn't actually read it.

13      Q.   And you said it was a white mailbox?

14      A.   Yes, ma'am.

15      Q.   Were there any lights on -- strike that.

16           Did you observe any lights that were on

17  for the house that the mailbox corresponded to?

18      A.   I couldn't -- I don't remember if there

19  was lights on it or not, honestly.

20      Q.   Fair to say there wasn't enough light

21  for you to make out the last digit on the mailbox?

22      A.   Yes, ma'am.

23      Q.   Do you wear glasses?

24      A.   No, ma'am.

25      Q.   When you were looking at the mailbox,



1  the headlights -- strike that.

2          When you were looking at the mailbox,

3  were your headlights on?

4      A.   No, ma'am, they were not.  Once I was

5  out of the vehicle, there was no headlights on the

6  vehicle.

7      Q.   And I just want to clarify.  When you

8  were looking at the white mailbox, where were you

9  standing?

10     A.   I had seen it from the time I parked to

11  even when I got out of my vehicle, I had noticed

12  it there.  And that's when I was going to it to

13  verify what number it was.

14     Q.   When you had your flashlight out looking

15  at that last number on the white mailbox, do you

16  remember if you were standing in the driveway, the

17  street or the grass?

18     A.   I mean, I illuminated it all the way up

19  until like when I was walking to it to see if I

20  could see it from the distance I was at.  And

21  since I couldn't, I just kept walking closer and

22  closer to it.

23     Q.   Okay.  So from the position where you

24  were closest to the white mailbox, do you remember

25  where you were standing?

1    MS. RAVEENDRAN:

2         Q.   Yes.

3         A.   I don't recall anyone talking to me, no,

4    ma'am.

5         Q.   After you got out of the vehicle before

6    the shooting occurred, did you attempt to make any

7    statements or commands to the individuals who were

8    outside of 210?

9         A.   Other than the people in the vehicle or

10   just -- okay.  Yeah.  The people at the house

11   you're talking about?

12        Q.   Yes.

13        A.   I didn't make any statements to them,

14   any of the people that were actually at the house

15   other than the verbal commands I gave to the

16   driver of the vehicle.

17        Q.   Did you utilize any kind of intercom or

18   radio system from your vehicle to make any

19   announcements after you arrived at the

20   intersection of 25th and Oak Street?

21        A.   I did not.

22        Q.   What was the next thing you recall doing

23   after you were looking at the white mailbox to

24   determine the address?

25        A.   I observed the truck backing out of the

Exhibit "5"

Jason Cuevas 06/14/2023

1    driveway and strike the mailbox to the south of

2    25th Street.

3         Q.   Where exactly -- strike that.  Did you

4    see -- strike that also.

5              When you say "the truck," are you

6    referring to the GMC Sierra that was being driven

7    by Mr. Parker?

8         A.   Yes, ma'am.

9         Q.   When you first saw the GMC, do you

10   recall whether it was in a driveway, grass or the

11   street?                <span style="color:red">It appeared to me that it was in the driveway of 210 25th</span>

12        A.   ~~It was in the driveway of 210 25th~~

13   Street.

14        Q.   When you first observed the GMC, could

15   you tell how many passengers were in the car?

16        A.   No, ma'am.

17        Q.   Could you tell if the driver was male or

18   female?

19        A.   No, ma'am.

20        Q.   And could you tell the race of anyone in

21   the vehicle?

22        A.   No, ma'am.

23        Q.   Could you see the reverse lights of the

24   vehicle?   <span style="color:red">When it was backing out of what appeared to me as the driveway</span>

25        A.   ~~When it was backing out of the driveway~~



1  of 210, I could see the reverse lights.

2      Q.   Were you parallel with the GMC when you

3  saw it backing out of the driveway?

4  MR. WHITFIELD:

5          Object to the form.

6  MR. BRUNI:

7          Same objection.

8      A.   I was east of the residence and it was
backing out south from what appeared to be the driveway which runs
9  ~~backing out south from the driveway which runs~~

10 north and south.  So to say if I was exactly

11 parallel, I don't know, but that's where my

12 location was.  I was east of the vehicle, or east

13 of the residence the vehicle was leaving, and it

14 was backing out southward.

15 MS. RAVEENDRAN:

16     Q.   And you were facing westward?

17     A.   Yes, ma'am.

18     Q.   Do you remember where you were standing

19 when you first saw the GMC backing out of the

20 driveway?

21     A.   It was while I was walking up to the

22 mailbox, like walking to the direction of the

23 mailbox to get a better view of it with my

24 flashlight.

25     Q.   Okay.  And do you know if you were

Exhibit "5"



1  standing on the driveway of the house with the

2  white mailbox in the grass or on 25th Street?

3      A.   I don't know if I was on the asphalt or

4  the grass.  I know I was between the distance from

5  my car actually to the mailbox because I was

6  walking pretty much aligned to that mailbox when I

7  first saw it backing out.

8      Q.   Okay.  Can you describe the GMC, what

9  you remember seeing of that vehicle?

10      A.   I saw a dark colored truck, like a

11  full-size truck.

12      Q.   Did you notice how big the cab was?

13      A.   I couldn't tell you if it was like a

14  four door or if it was an extended cab at the time

15  when I first saw it.

16      Q.   You said that you observed the GMC

17  backing out of the driveway and strike a mailbox;

18  is that right?

19      A.   Yes, ma'am.

20      Q.   Can you describe the mailbox, color,

21  size, anything like that?

22      A.   I couldn't tell you the color.  I just

23  know -- because it was so dark.  I just -- I could

24  audibly hear the sound of the impact and visually

25  see it hitting the mailbox.  I could just see the

Jason Cuevas 06/14/2023

1  shape of it, like a silhouette.

2      Q.   And did you observe whether the mailbox

3  moved?

4      A.   Yes, ma'am.

5      Q.   What did you observe the mailbox doing?

6      A.   When it was struck by the vehicle, it

7  appeared to have been pushed back, like leaning

8  back more than it was before it was hit.

9      Q.   Okay.  Did it fall over completely?

10      A.   No, ma'am.

11      Q.   Could you tell if the mailbox was pushed

12  into the ground -- well, strike that.  Before the

13  vehicle struck the mailbox, could you tell if the

14  mailbox -- strike that also.

15           At any point while you were on scene,

16  did you observe if the mailbox that the GMC struck

17  was pushed into the ground or on a cement block of

18  some kind?

19      A.   I was too far away to --

20  MR. WHITFIELD:

21           Object to the form.

22  COURT REPORTER:

23           You've got to repeat your answer,

24  please.

25  THE WITNESS:

Exhibit "5"

Jason Cuevas 06/14/2023

1              I was too far away to be able to see how

2    it was mounted or how it was positioned in the

3    ground.  I just could see that it was there.

4    MS. RAVEENDRAN:

5         Q.   Okay.  At any point while you were on

6    scene, did you go look at the mailbox that the GMC

7    struck?

8         A.   No, ma'am.

9         Q.   Can you describe the sound you heard

10   when the GMC hit the mailbox?

11        A.   It was just like the sound of contact.

12   I don't know really -- other than to say like

13   something hitting something, like a vehicle

14   hitting something.

15        Q.   Did you hear the sound of any glass

16   breaking?

17        A.   I don't remember hearing glass breaking.

18        Q.   And do you recall hearing any sound of

19   something shattering on the vehicle?

20        A.   I don't really -- I don't remember

21   hearing anything shatter.

22        Q.   How -- strike that.

23             Could you tell how fast the GMC was

24   going when it backed out of the driveway and

25   struck the mailbox?

Exhibit "5"

When it was backing out of what appeared to be the driveway

1    A.    ~~When it was backing out of the driveway,~~

2  it was going fairly slow because it looked like it

3  was having to maneuver around maybe other vehicles

4  or something.  So it was going relatively slow to

5  be able to maneuver through all the -- whatever

6  was in the yard.

7    Q.    Were there cars in there?

8    A.    Of 210 25th Street, yes, ma'am.

9    Q.    Could you tell -- well, strike that.

10        Did the GMC start at the top of the

11  driveway for 210 25th Street or was it somewhere

12  down the driveway?

13  MR. WHITFIELD:

14        Object to the form.

15  MR. BRUNI:

16        Same objection.

17    A.    When I saw it, it was -- I don't know

18  where the top of the driveway started, but it was

19  like -- there was a couple of cars that were

20  parked east of it in the yard, and then the truck,

21  I could just see it slowly backing out.  It was

22  like past the chain-link fence, or whatever fence

23  they had there at the south part of the residence,

24  the yard.  And it was slowly backing out from

25  there until it got past the chain-link and



1  continued on until it hit the mailbox.

2  MS. RAVEENDRAN:

3       Q.   Have you ever received any information

4  that made you believe that the GMC was parked in

5  the grass?

6       A.   Of 210, like where it was parked there?

7       Q.   Yes.

8       A.   No, ma'am.  I didn't receive any

9  information.

10      Q.   When you first saw the GMC, it was

11 already moving; is that right?

12      A.   Yes, ma'am.

13      Q.   So you never saw where it was parked; is

14 that fair?

15      A.   Correct.

16      Q.   Once the GMC made contact with the

17 mailbox on the south side of the street, did you

18 see the GMC stop?

19      A.   Yes, ma'am, it stopped.  As soon as it

20 hit the mailbox, it came to a stop.

21      Q.   Okay.  And then did you at some point

22 see the reverse lights go off?

23      A.   Yes, ma'am.

24      Q.   Do you remember if that was before or

25 after it made contact with the mailbox?

Exhibit "5"

1    A.   It was after because the vehicle had

2  stayed stationary.  For a second, I actually

3  believed that the driver was gonna get out to

4  check the damage.  That's why I went to make

5  contact with the vehicle.

6    Q.   Okay.  So you saw that the vehicle had

7  stopped at that point?

8    A.   Yes, ma'am.

9    Q.   Okay.  Did you see brake lights on the

10  GMC after the reverse lights went off?

11    A.   I could see the reflection like off of

12  the actual mailbox.  That's how I was able to see

13  the reverse lights as well.  Because it was so

14  close to the mailbox, I could see the white light.

15  And then when the white light turned off, that's

16  how I knew the reverse lights were off.

17    Q.   Okay.  And then did you see any red

18  lights reflecting off the mailbox after the

19  reverse lights turned off?

20    A.   Yeah.  I couldn't tell if it was the

21  brake lights or if it was just the running lights.

22    Q.   Did you observe if the GMC had its

23  headlights on?

24    A.   Yes, ma'am, it did.

25    Q.   Okay.  And at the time the GMC made



1  contact with the mailbox, its headlights were

2  facing towards 210 25th Street; is that right?

3       A.   Not -- I don't know if it was directly

4  at the 210 25th Street.  It was almost kind of

5  like at an angle so the person could come back

6  onto the road eastbound on 25th.

7       Q.   Were you within the path of the

8  headlights when the GMC made contact with the

9  mailbox?

10      A.   No, ma'am.

11      Q.   So at the time that the GMC made contact

12 with the mailbox on the south side of the street,

13 had you remained by the mailbox on the north side

14 of the street?

15      A.   When it made contact with it, I started

16 -- once it made contact with the mailbox is when I

17 veered my path towards the vehicle to make contact

18 with it.

19      Q.   So before it made contact with the

20 mailbox -- strike that.

21           Before the GMC made contact with the

22 mailbox, you were still by the mailbox on the

23 north side of the street?

24      A.   I was still walking towards the mailbox,

25 yes.

Exhibit "5"



Jason Cuevas  06/14/2023

1        A.    No, ma'am.

2        Q.    At some point -- strike that.  Can you

3    describe the path -- strike that.

4              When you started in a southwestern

5    direction towards the GMC, were you walking into

6    the street at that point?

7        A.    Yes, ma'am.  I had to cross the street

8    to get -- because they were on the south side.

9        Q.    Did you see the GMC move after you

10   started walking?

11       A.    Yes, ma'am.

12       Q.    What did you see the GMC do after you

13   started walking?

14       A.    It began to travel slightly northeast

15   onto the roadway and then turn to the right of its

16   direction of travel to get straight onto 25th

17   Street going eastbound.

18       Q.    Is 25th Street a two-way street there?

19       A.    There's no markers on the road, so I

20   don't know if you could classify it as two-way

21   street.

22       Q.    Can you go in both directions on 25th

23   Street?

24       A.    Yeah.  It's just a skinnier road.  You

25   just have to be careful when you do it.



1      Q.   Is there parking allowed on both sides

2  of 25th Street?

3  MR. BRUNI:

4          Object to the form.

5      A.   I don't know what you define as like

6  allowed.  It seemed to be that some of the yards,

7  like some of the residence, they either had their

8  own dedicated area for, I guess, their guests on

9  the north side.  That's the way it appeared for

10  208, the house just east of 210 as well as 210.

11  But from what I recall on the south side, I didn't

12  see any kind of like dedicated areas for parking.

13  MS. RAVEENDRAN:

14      Q.   Other than your police vehicle, did you

15  observe any other vehicles parked on the street on

16  25th Street?

17      A.   I don't recall seeing any vehicles

18  parked on the street of 25th Street at that time.

19      Q.   Once the GMC turned eastbound on 25th,

20  did you see if it was staying on the right side of

21  25th Street?

22      A.   Did I see if it was what?  You say

23  saying or staying?

24      Q.   Staying on the right side.

25  MR. BRUNI:



Jason Cuevas  06/14/2023

1          Object to form.

2      A.   It was more or less trying to maneuver

3  its way down it looked like the middle of 25th

4  Street coming eastbound.

5  MS. RAVEENDRAN:

6      Q.   Did you continue walking when you saw

7  the vehicle turn eastbound?

8      A.   Yeah.  'Cause at the point that I saw

9  the vehicle leaving, I assumed that the vehicle

10  was just going to slow roll up to me so I could

11  make contact with the driver, since I was already

12  illuminating the truck to let them know that I was

13  there and to stop the vehicle.  So I was still

14  kind of coming up to where they would see me so I

15  could make contact with the driver.

16      Q.   Where were you when you started -- well,

17  strike that.

18          Can you describe what you were doing

19  with the flashlight again?

20      A.   Yes, ma'am.  So initially I had it in

21  the just on mode so it was at its highest power

22  and on shinning at the vehicle once I saw it

23  leaving from the mailbox.  Because I believed at

24  that point he committed the misdemeanor crime of

25  leaving the scene of an accident causing property

Exhibit "5"



1    damage.

2            So as I went to make contact with the

3    vehicle, as it kept slow rolling, I activated it

4    -- activated the strobe function to illuminate and

5    show that there was a visible change in the

6    drivers's vision so that they would be alerted to,

7    oh, there's something in my path or to the left of

8    my path so that I could -- that they would see me.

9        Q.    When did you first raise your flashlight

10   up to point it at the GMC?

11       A.    As soon as it was leaving from the

12   mailbox.

13       Q.    And where were you located at the moment

14   that you pulled your flashlight up to illuminate

15   the GMC?

16       A.    I was toward the center of 25th Street.

17       Q.    And where was the GMC at that point?

18       A.    It was coming eastbound.  It had just

19   pulled out from the mailbox and gotten

20   straightened up on the road.

21       Q.    When did you turn on the strobe

22   function?

23       A.    Once it actually made it straight onto

24   25th Street and continued, that's when I started

25   the strobe function on the flashlight.



1        A.   It was continuing eastbound on 25th

2   Street.

3        Q.   And where were you standing at that

4   point?

5        A.   Standing at the center of the roadway

6   waiting for the vehicle to pull up next to me.

7        Q.   Is it fair to say you saw the vehicle

8   pulling towards your direction at that point?

9        A.   Yes, ma'am.

10        Q.   And why did you remain in the roadway?

11        A.   Because I -- the way it looked, that the

12   vehicle was gonna -- since it was going slow at

13   the time, it was going to just drive up to me so

14   that I could make a stop, kind of like when you're

15   directing traffic, so that I could speak with the

16   driver.

17        Q.   Did you say anything at that point?

18        A.   Yes, ma'am.  I was telling the vehicle

19   -- I was telling the driver to stop the vehicle.

20        Q.   What were you saying exactly?

I said, stop the vehicle, stop the vehicle, police, stop the vehicle.

21        A.   ~~I said, stop the vehicle, sir, stop the~~
Before I gave the commands, I

22   ~~vehicle.  At which point after the first stop, I~~

23   pulled out my firearm so that I would have a

24   second flashlight, which I have a light on my

25   Glock 17.  So that I had one as strobe and then



1  one was actually just like staying on.

2  As I stated, once the vehicle continued, I said, stop
   ~~Once the vehicle continued, I said, stop~~

3  the vehicle, stop the vehicle, police, stop the
   vehicle. Right after I gave those commands of

4  ~~vehicle.  Right before I gave those commands of~~

5  stop the vehicle, stop the vehicle, police, stop

6  the vehicle is when I heard the vehicle

7  accelerate, or the RPMs pick up on the vehicle, at

8  which point I started backpedaling towards the

9  south side of the road to get out of the path of

10  the vehicle.

11      Q.   Why did you start backpedaling towards

12  the south side of the road?

13      A.   I was actually already closer to that

14  part of the road.  And I assumed that if I got out

15  of the roadway, that the vehicle would be able to

16  pass by me on what would have been my right side,

17  on the truck's right side as well.

18      Q.   So I want to break that down a little

19  bit.

20      A.   Yes, ma'am.

21      Q.   Where were you when you started saying,

22  stop the vehicle?

23      A.   In the roadway of 25th Street.

24      Q.   Were you closer to the north or south

25  side of the street?

Exhibit "5"



1        A.   I was like right at the center, but

2   towards more of the south side of the road.

3   MS. RAVEENDRAN:

4            Okay.  I'm going to mark Exhibit 49 --

5   MR. WHITFIELD:

6            Hey, Bhavani, did you say you're going

7   to mark 29?

8   MS. LIND:

9            49.

10  MS. RAVEENDRAN:

11           49.

12  MR. WHITFIELD:

13           49, okay.

14  MS. RAVEENDRAN:

15           I think you're at 49.

16  MR. WHITFIELD:

17           Yeah.  I think we're up to --

18  MS. LIND:

19           49.

20  MR. WHITFIELD:

21           -- 49.

22  MS. RAVEENDRAN:

23           And for the record, I'm going to show PL

24  Parker 1057.

25  MS. LIND:

Exhibit "5"



1           You can go off the record.  Thank you.

2    VIDEO TECHNICIAN:

3           All right.  We're going off the record

4    at 10:55.

5                 (Off the record.)

6    VIDEO TECHNICIAN:

7           We are back on record at 11:01.

8    MS. RAVEENDRAN:

9           Okay.  Thank you.  Thanks, everyone for

10   your assistance here.

11       Q.   Officer Cuevas, if you could mark with a

12   number "1" where you were when you were stopped,

13   looking at the mailbox on the north side of the

14   street?

15       A.   (Witness complying.)

16       Q.   And if you could hold that up for the

17   videographer, please.

18       A.   (Witness complying.)

19       Q.   Okay.  Thank you.  And then moving

20   forward, can you mark with a "2" where you were

21   located when you started saying, stop to the

22   vehicle?

23       A.   (Witness complying.)

24       Q.   Can you hold that up for her?

25       A.   Sorry.



Jason Cuevas 06/14/2023

1        Q.   And for the record, you've mark a "1"

2   and a "2" on Exhibit 49 and you're holding it up

3   for the videographer?

4        A.   Yes, ma'am.

5        Q.   Okay.  Thank you.  And then if you could

6   -- well, let me ask you first, do you know where

7   you were when you started backpedaling?

8        A.   I couldn't tell you exactly where I was.

9   All I could see is like the vehicle itself, like

10   that's all I was focused on.  But --

11        Q.   If you don't know, that's okay.

12   MR. WHITFIELD:

13           Don't write.  Don't write yet.  Until

14   she asks you, don't write anything on that

15   exhibit.

16   THE WITNESS:

17           Okay.

18   MS. RAVEENDRAN:

19        Q.   So, yeah, what I'm trying to ask you is,

20   is it possible for you to identify where you were

21   when you started backpedaling?  And if not, that's

22   okay.  I'm just asking.

23        A.   Based on this, no.  It's like there's --

24   because it's just like black and white.  There's

25   no landmarks or anything.  There's nothing to give

Exhibit "5"

1  me a reference of where I was at at the time, what

2  I remember seeing.

3       Q.   Okay.  Well, I appreciate that.  So you

4  can put the marker down for now.  We might revisit

5  that, but I don't want you to mark it if it's not

6  something you can identify.  That's okay.

7            All right.  So if we can go back to when

8  you were backpedaling.  Before you started

9  backpedaling, did you ever observe whether the

10  tires were going straight or in another direction?

11       A.   When I started backpedaling, I noticed

12  that the tires were -- like the vehicle was

13  actually turning to its right toward the direction

14  that I was actually backpedaling to.

15       Q.   So you were backpedaling towards the

16  south side of the street and you saw the tires

17  turn towards the south as well; is that right?

18       A.   Yes, ma'am.

19       Q.   Could you describe the angle of the

20  tires?

21       A.   No.  It was more or less like I could

22  see that the vehicle like was actually moving

23  towards my direction.  And for that to happen, the

24  tires would have to be turned toward my direction.

25       Q.   Okay.  So you don't remember actually



Jason Cuevas 06/14/2023

1  observing the tires themselves; you saw the car

2  moving towards you?

3      A.   Yeah.  Like the vehicle was actually

4  turned towards me, which the tires would have to

5  be turned towards me to actually keep on straight

6  ahead with me.

7      Q.   Okay.  So would it be fair to say that

8  you don't have an observation of the angle of the

9  tires?

10     A.   That would be fair.

11     Q.   And when you are referencing tires, are

12 you talking about the front tires, the back tires

13 or all four?

14     A.   The -- what I'm referring to is -- that

15 would have to be turning would have been the front

16 tires.

17     Q.   Where was the car located on 25th Street

18 when you saw the tires turning towards you?

19     A.    It was coming more towards the south --

20 it was on like the south side of the road and

21 started coming off into the grass.  That's when I

22 realized that it was actually turning south.

23     Q.   Where in relation to the driveway of 210

24 25th Street was the car when you started to notice

25 it turning to the south?

Jason Cuevas 06/14/2023

1  if you can mark approximately where you think the

2  vehicle was located when it started turning in

3  your direction, understanding that this Exhibit 49

4  is not drawn to scale.

5      A.   (Witness complying.)

6  MR. WHITFIELD:

7          So she wanted you to put -- did you say

8  an "A"?

9  THE WITNESS:

10          I thought you said a rectangle.

11  MR. WHITFIELD:

12          A rectangle, that's right.

13  MS. RAVEENDRAN:

14          A rectangle with an "A."

15  THE WITNESS:

16          Okay.

17  MS. RAVEENDRAN:

18          Do you mind just holding up whatever

19  you've drawn for the videographer?

20  MR. WHITFIELD:

21          Put an "A" below it with an arrow to it.

22  There you go.  Because you can't put an "A" in

23  there and still make it out.

24  THE WITNESS:

25          Because this is way off with this

Exhibit "5"



1  because there's like nothing there.  It's just

2  like a bunch of lines.

3  MS. HARTON:

4           Maybe he can circle the new ones.

5  MS. RAVEENDRAN:

6           Yes.  Why don't we do that.  Thank you.

7       Q.   Why don't you circle the two that you

8  just --

9       A.   I'll use the red to circle.

10      Q.   -- made, the "1" and "2", with a red

11  circle.  Okay.

12  MR. WHITFIELD:

13           He's done it.  Let me show you what he's

14  done.

15  MS. RAVEENDRAN:

16           All right.  Thank you.

17      Q.   So can you clarify to us where -- strike

18  that.

19           Can you clarify the "1" and "2" that you

20  put the red circles around what you are signifying

21  by doing that?

22      A.   What I was -- what was the last part?

23  I'm sorry.

24      Q.   What are you indicating by the "1" and

25  "2" that are circled with the red circle?

 1          A.   My position -- the "1" would be when I

 2     first started seeing the vehicle when it backed

 3     out and hit the -- hit the mailbox.

 4          Q.   Okay.

 5          A.   And then the "2" is the point at which I

 6     began giving the commands of stop the vehicle,

 7     stop the vehicle, police, stop the vehicle while I

 8     was backpedaling.

 9          Q.   Okay.  Thank you.  Now I'd like you to

10     mark with a number "3" where you ended up when you

11     stopped backpedaling.

12          A.   (Witness complying.)  You might not be

13     able to see it since it's in black.

14          Q.   And can you hold that up for the camera?

15          A.   Do you want me to circle it with red or

16     -- because it's kind of hard to see.

17          Q.   Well, hopefully we'll only have one

18     number "3," so you don't need to circle it.

19     MR. WHITFIELD:

20               I will tell you -- let me show you,

21     Bhavani.  The thing that's making it difficult is

22     these Sharpies have got like a tip on it that's

23     not very -- it's not like a pinpoint.  And it's

24     making it hard to put numbers on a document and

25     still make it make sense.

1          So here's what he did, and I guess his

2    question is, is do you want him to circle the "3"

3    in red like he did the later "1" and "2"?

4    MS. RAVEENDRAN:

5          No.  That's okay.

6    MR. WHITFIELD:

7          Can you see where he put the "3"?

8    MS. RAVEENDRAN:

9          I can, yes.  Thank you.

10   MR. WHITFIELD:

11         Okay.  All right.

12   MS. RAVEENDRAN:

13     Q.   By the time you ended at number "3" on

14   Exhibit 49, you had already used your flashlight

15   on the truck; is that right?

16     A.   Yes, ma'am.

17     Q.   While you were backpedaling, did you do

18   anything other than try to move out of the way?

19   MR. BRUNI:

20         Object to the form.

21   MR. WHITFIELD:

22         Join.

23     A.   What do you mean?

24   MS. RAVEENDRAN:

25     Q.   What were you doing as you were



1  backpedaling?  Were you saying anything, doing

2  anything with your hands?

3      A.   Yeah.  I still had the flashlight

4  pointed at the truck to kind of say, hey, here I

5  am, and I was giving the verbal commands, police

6  -- or stop the vehicle, stop the vehicle, police,

7  stop the vehicle.

8      Q.   Are you saying please stop the vehicle

9  or police?

10     A.   No.  Sorry.  Police, stop the vehicle.

11     Q.   Okay.  Thank you.  And when you said you

12  were backpedaling and you still had the

13  flashlight, was the flashlight in strobe mode or

14  another mode?

15     A.   No.  It was still in strobe mode.  I was

16  like kind of doing like this, so it was still on.

17     Q.   Okay.  And where were you when you took

18  your firearm out of the holster?

19     A.   Where was I when what?

20     Q.   You had mentioned that at some point you

21  had the flashlight and the firearm; is that right?

22     A.   Oh, yes, ma'am.  Yes, ma'am.

23     Q.   Where were you -- without marking the

24  paper.  If you could verbally tell me, where you

25  were when you took out your firearm?



1      A.   So I was coming across pretty much right

2  where number "2" was.  Because I had -- when I

3  walked up, once the vehicle kept going, that's

4  when I started backpedaling, like, hey, stop the

5  vehicle, stop the vehicle.  And when the vehicle

6  wasn't stopping, that's when I was on the side of

7  the vehicle.  So right before I gave out the

8  commands, I pulled my firearm out giving those

9  verbal commands.

10     Q.   When you referenced the number "2," did

11  you mean the number "2" with the red circle or the

12  number "2" without a red circle?

13     A.   The one with the red circle, yes, ma'am.

14     Q.   Okay.  Could you tell how far you were

15  from the GMC when you pulled out your firearm?

16     A.   I couldn't give you an exact distance,

17  but it wasn't super far away.  It wasn't like, you

18  know, 100, 200 yards or anything like that.

19     Q.   Was it less than five feet?

20     A.   When I first pulled out my firearm?

21     Q.   Yes.

22     A.   No.  It was a little bit further than

23  five feet because I gave the verbal commands as I

24  was backpedaling before I discharged my firearm.

25     Q.   Once you saw the vehicle turning



Jason Cuevas· 06/14/2023

1    southbound, why didn't you change your direction

2    to move northbound?

3    MR. WHITFIELD:

4              Object to the form.  I objected to the

5    form.  That's all I did.

6    THE WITNESS:

7              Okay.

8    MR. WHITFIELD:

9              If you can answer the question, answer

10   the question.

11        A.   Because I had already tried to take the

12   path to get out of the vehicle's pathway, which I

     figured ceding the road to the vehicle would be

13   ~~figured seeding the road to the vehicle would be~~

14   the smartest option, so that I would get out of

15   the roadway so the vehicle could travel down the

16   roadway.  And if I would have went back north I

17   would have been more in the roadway than I was if

18   I would have just continued a little bit more

19   south to get out of the roadway.

20   MS. RAVEENDRAN:

21        Q.   And if we can go back to when you

22   removed -- strike that.

23              When you first took your firearm out, do

24   you recall if you were to one of the sides of the

25   vehicle or in front of the vehicle?

Jason Cuevas  06/14/2023

1        A.    No.  I was more in front of the vehicle.

2        Q.    Were you directly in front of the

3   vehicle, closer to the passenger side or the

4   driver's side, if you know?

5        A.    I was like directly in front of the

6   vehicle, like where basically the logo is on the

7   front of the truck.

8        Q.    At some point did you turn on your

9   weapon light?

10       A.    Yes, ma'am.  When I immediately pulled

11  it out, that's when I activated my weapon light.

12       Q.    After you backpedaled, what happened?

13       A.    I observed the vehicle continuing to

14  follow me towards the roadway, at which point I --

15  after I had given the verbal commands and the

16  vehicle continued to follow me, I discharged my

17  firearm three times.

18       Q.    Where were you standing when you

19  discharged your firearm?

20       A.    Directly in front of the truck.

21       Q.    Were you in the grass, were you on the

22  road, if you recall?

23       A.    Well, I discharged it three times as I

24  was moving, so I couldn't tell you exactly where I

25  was for each one of them.  I just remember I was

Exhibit "5"

1  continuing to move as I was discharging my weapon.

2      Q.   Okay.  So you -- strike that.  When you

3  discharged your first -- strike that.

4          When you first fired your weapon, were

5  you directly in front of the GMC?

6      A.   Yes, ma'am.

7      Q.   And then you moved towards the passenger

8  side of the GMC; is that right?

9      A.   I moved southward, like directly -- not

10  towards the passenger of the vehicle.  I wasn't

11  going towards the vehicle.  I was going directly

12  south of where I was, basically backpedaling to

13  the south of the road.

14      Q.   Okay.  And you discharged three times;

15  is that right?

16      A.   Yes, ma'am.

17      Q.   Could you mark with a number "4" where

18  you discharged for the third time?

19      A.   I don't know if it's going to fit on

20  there.

21  MR. WHITFIELD:

22          Yeah.  The -- I guess he could put it

23  down there, but, Bhavani, look at the dilemma that

24  he's in because there's just really no space to

25  really put it in there.  I guess you could make an

Exhibit "5"

1  arrow and point.

2  MS. RAVEENDRAN:

3         Yeah.  If you want to draw a line with a

4  little arrow at the end to where number "4" is and

5  then put the "4" at the end of the arrow, that's

6  totally fine.

7  MR. WHITFIELD:

8         Why don't you use --

9         Can he use a pen just to get some

10  definition out of it, my pen?

11  MS. RAVEENDRAN:

12         Absolutely, yeah.

13      A.   The easiest way is -- like the vehicle

14  stopped after the third shot, which is when I

15  stopped.  So, I mean, number "3" marked where I

16  was when the vehicle came to a stop, so that would

17  be where I discharged my third round.

18  MS. RAVEENDRAN:

19      Q.   Okay.  That's fine.

20      A.   I don't want to write a "4" over the top

21  of the "3."

22      Q.   Yeah.  That makes total sense.  So

23  number "3" is where you were when you discharged

24  for the third time; is that right?

25      A.   Yes, ma'am.

Jason Cuevas 06/14/2023

1          Q.   Okay.  And when you fired your Glock for

2    the first and second time, would it be fair to say

3    that this was between number "2" and number "3"?

4          A.   Yes, ma'am.  That would be fair.

5          Q.   Okay.  And I'm referencing the "2"

6    without the red circle?

7          A.   The one without the red circle?

8          Q.   Here, let me start over just so it's

9    clear.  Can you, using the numbers on the sheet,

10   explain to us where you would have been when you

11   fired your weapon for the first and second time?

12         A.   So do you see where the "7" is and then

13   you have that little red triangle and then -- I

14   don't know if that's a 12 or what that is.  Like

15   do you see where the suspect vehicle is, then you

16   have some kind of number right above it?  I don't

17   know if that's a number or if that's something

18   else that goes to the diagram.

19         Q.   Sure.

20         A.   So I would say between where that little

21   mirror is on the truck, between like that part of

22   the fender to the "3," in between that small

23   distance is where I fired.  Because it was very --

24   it was in rapid succession.  It was pretty quickly

25   when I -- how I fired.

1        Q.   Okay.  And when you reference the "3,"
2   are you talking about the "3" that you marked?
3        A.   Oh, yes, ma'am.  Sorry.  Yes, ma'am.
4        Q.   So between the yellow "7" and what you
5   marked as "3"?
6        A.   I don't know if you can see it on the
7   truck.  There's like a "1" and a "2" just barely
8   on it.  Do you see that?
9        Q.   Yes.  Very little ones.  Yes, I see
10   those.
11        A.   Yeah.  I would say between there and the
12   "3" would be where I discharged my firearm the
13   first time to the last time.
14        Q.   Okay.  So just to be clear, you
15   discharged your firearm between -- strike that.
16             Between the little "1" and the "2" that
17   are on the diagram that you did not add to the
18   diagram and the number "3" that you added to the
19   diagram is where you believe the three shots
20   occurred; is that fair?
21   MR. BRUNI:
22             Wait a minute.  There's a "1" and a "2"
23   that --
24   MR. WHITFIELD:
25             It's on the -- let me make sure we're

Exhibit "5"

1        Q.   I think their sticker is in a different

2    place than mine, so that's the best I can help.

3    I'll just reference the picture itself.

4        A.   Okay.

5        Q.   You're able to see the yield sign in the

6    back of the picture?

7        A.   Yes, ma'am.  There's two of them.

8        Q.   Okay.  And those yield signs are at the

9    intersection of 25th and Oak; is that right?

10       A.   Yes, ma'am.

11       Q.   And you turned left onto 25th from Oak;

12   is that correct?

13   MR. WHITFIELD:

14            When he approached?

15   MS. RAVEENDRAN:

16       Q.   Yes.  When you approached.

17       A.   Yeah.  I was coming northbound on Oak

18   Avenue and turned left onto 25th Street.

19       Q.   Okay.  And you see that there is a tree

20   and some bushes to the right of your squad vehicle

21   where it's parked; is that right?

22       A.   To the north side of the patrol car,

23   yes.

24       Q.   Okay.  And then if you continue forward

25   in the picture, there's a drive on the north side

1              After you fired your weapon for the

2    third time, what happened next?

3         A.   I observed the vehicle immediately come

4    to a stop, like very abruptly.

5         Q.   Did you see brake lights?

6         A.   I couldn't see the rear of the vehicle.

7         Q.   How far into the grass -- well, strike

8    that.

9              Was the GMC in the grass when it

10   stopped?

11        A.   From where I was standing, I observed it

12   to be in the grass, yes, ma'am.

13        Q.   All right.  I'm going to show you what

14   we'll mark as 50, Exhibit 50, Plaintiff's Exhibit

15   50.

16   MR. WHITFIELD:

17             What number was it, Bhavani?

18   MS. RAVEENDRAN:

19             Plaintiff's Exhibit 50.

20   MR. WHITFIELD:

21             Actually I don't think we're calling

22   them plaintiff's or defendants'.  I think we're

23   just calling them like exhibit whatever number.

24   MS. RAVEENDRAN:

25             No problem.  Sorry.

Exhibit "5"



1        A.    Just the headlights on the vehicle were

2    like very bright.

3        Q.    Oh, so the headlights of the vehicle

4    were facing you and they were too bright for you

5    to see beyond them; is that fair?

6        A.    Yes, ma'am.

7        Q.    Do you know if your flashlight beam made

8    it so that the driver of the GMC couldn't see

9    beyond the flashlight beam?

10   MR. BRUNI:

11            Object to form.

12       A.    I have no way of knowing that.

13   MS. RAVEENDRAN:

14       Q.    Would you agree that it's possible?

15   MR. WHITFIELD:

16            Object to the form.

17   MR. BRUNI:

18            Object to form.

19       A.    Like I said, I have no way of making an

20   opinion on what the driver could or couldn't see.

21   MS. RAVEENDRAN:

22       Q.    Once the shooting was over, could you

23   tell if either the driver or the passenger were

24   injured in some way?

25       A.    Initially I couldn't tell whether either

Exhibit "5"



1      A.    That I was involved in a shooting.

2      Q.    Did you give them information regarding

3   how the shooting occurred or did you just tell

4   them that you were in a shooting incident?

5      A.    I just notified -- it was my birth

6   mother, my father and my wife that I was actually

7   in a shooting.

8      Q.    Okay.  But did you relay any details of

9   what happened?

10      A.    No, ma'am.

11      Q.    At any time did you have any information

12   to believe the GMC Sierra was stolen?

13      A.    At the time, no, ma'am.

14      Q.    At any time do you believe the GMC got

15   over five miles per hour while you observed it?

16      A.    I perceived that it did get -- it was

17   faster than five miles an hour.

18      Q.    At what point?

19      A.    Right before I gave the commands of

20   stopping the vehicle, that's when I heard the

21   engine rev up, the RPMs pick up on it, and it

22   started to accelerate from the speed it was going

23   prior to that.

24      Q.    Other than your observations, you didn't

25   have a way to measure the speed at that time; is



1        Q.    And at the first point that you walked

2   in front of the GMC's path, did you believe it was

3   safe at that time?

4   MR. BRUNI:

5              Object to the form.

6   MR. WHITFIELD:

7              Join.

8        A.    I didn't actually walk directly into the

9   front of the GM's path as much as when I was

10  walking towards the center of the road because I

11  assumed the vehicle was just gonna come to a stop

12  so I could make contact with them.

13  MS. RAVEENDRAN:

14       Q.    Okay.  So up until the time that you

15  believe the vehicle was going to make a stop, you

16  had assessed that it was safe to be in the

17  roadway?

18       A.    Yes, ma'am.

19       Q.    And based on the type of call that you

20  were responding to, did you assess that it was

21  appropriate to not have your police lights and

22  sirens on when you parked your vehicle?

23       A.    Yes, ma'am.

24       Q.    How did you assess whether or not the

25  GMC was a threat on scene?



1    A.   Once it increased its speed, once it

2   began to accelerate and then once it started

3   turning towards me to the direction I was moving

4   to get out of its way is when I deemed that it was

5   a threat.

6    Q.   Would you agree that as a police officer

7   you can't fire your firearm at an individual that

8   doesn't pose a deadly threat or a threat of bodily

9   harm to you?

10    A.   There is other reasons why you can other

11   than just posing a direct threat to myself.  It

12   also includes others.

13    Q.   Sure.  So would you agree as a police

14   officer that you can't employ a firearm against an

15   individual who doesn't pose a threat to you or

16   other individuals?

17   MR. BRUNI:

18         Object to the form.

19   MR. WHITFIELD:

20         Join.

21    A.   There's case law on that including like

22   felony flight.  There's multiple other cases where

23   you can.  I'm not saying that's what occurred in

24   this case, just --

25   MS. RAVEENDRAN:



Jason Cuevas 06/14/2023

1      Q.   Okay.  So if an individual is not

2   suspected of a felony and does not pose a threat

3   to you or other individuals, would you agree that

4   it would be inappropriate as a police officer to

5   use deadly force?

6   MR. WHITFIELD:

7            Object to the form.

8   MR. BRUNI:

9            Same.

10     A.   There's just -- there's so many

11  different nuances of what you can -- when you can

12  and can't use deadly force.  It's like a very

13  small question to be able to give a generalized

14  answer to it.

15  MS. RAVEENDRAN:

16     Q.   Would you consider a firearm deadly

17  force when discharged?

18     A.   Yes, ma'am.

19     Q.   Would you agree that on February 1st,

20  2020, if the vehicle did not pose a deadly threat

21  to you, it would have been inappropriate to

22  discharge your firearm?

23  MR. BRUNI:

24            Object to the form.

25  MR. WHITFIELD:



Jason Cuevas 06/14/2023

 1          Join.

 2      A.   To base what would have been at the time

 3  versus what actually happened would be kind of

 4  inappropriate almost because -- based upon the

 5  perception of what happened at that time.

 6  MS. RAVEENDRAN:

 7      Q.   So what happened on the scene made you

 8  believe it was appropriate to discharge your

 9  firearm striking Mr. Parker's vehicle?

10      A.   When I went to get out of the path of

11  the vehicle to allow it to go past me in a safe

12  manner, once it accelerated and then began turning

13  in towards my path of travel where I was trying to

14  go, that's when I deemed that it was appropriate

15  to use deadly force.

16      Q.   Why?

17      A.   To defend my life because I had -- I had

18  perceived a threat to cause serious bodily injury

19  or death to myself, at which point I was -- felt

20  by policy and by case law that I was justified in

21  employing deadly force against a threat.

22      Q.   Would it be fair to say that had you not

23  felt threatened by deadly force you would not have

24  shot your gun?

25  MR. BRUNI:

Exhibit "5"

1           Object to form.

2       A.   I mean, if I wouldn't -- if I didn't

3   feel a threat towards myself, then I wouldn't use

4   deadly force, if that's what you're asking.

5   MS. RAVEENDRAN:

6       Q.   Yes.  In these circumstances.

7       A.   Yeah.

8       Q.   Have you ever -- strike that.

9           Have you ever shot at a motor vehicle

10  striking a vehicle at any time?

11      A.   No, ma'am.

12      Q.   Have you ever had to discharge your

13  firearm at any previous incident before February

14  1st, 2020?

15  MR. WHITFIELD:

16          Object to the -- okay.  So that is

17  probably behind the qualified immunity issues,

18  Bhavani, and I would instruct the witness not to

19  answer.

20  MS. RAVEENDRAN:

21          All right.  I would just ask, Bill -- I

22  understand your position, but if the answer is

23  that he's never fired his weapon, you know, before

24  this incident striking a person, then that would

25  kind of close that issue for the whole case.

Exhibit "5"

1              CERTIFICATE OF COURT REPORTER

2         I, F. DUSTY BURDINE, Court Reporter and Notary

3    Public, in and for the County of Harrison, State of

4    Mississippi, hereby certify that the foregoing

5    pages, and including this page, contain a true and

6    correct transcript of the testimony of the witness,

7    as taken by me at the time and place heretofore

8    stated, and later reduced to typewritten form by

9    computer-aided transcription under my supervision,

10   to the best of my skill and ability.

11        I further certify that I placed the witness

12   under oath to truthfully answer all questions in

13   this matter under the authority vested in me by the

14   State of Mississippi.

15        I further certify that I am not in the employ

16   of, or related to, any counsel or party in this

17   matter, and have no interest, monetary or

18   otherwise, in the final outcome of the proceedings.

19        Witness my signature and seal, this the

20   _____ day of _____, 2023.

21

22

23        _____

24        F. Dusty Burdine, CSR #1171
          My Commission Expires 4/22/25

25

Exhibit "5"



<u>WITNESS SIGNATURE SHEET</u>

I, JASON CUEVAS, do solemnly swear that I have read the foregoing pages (numbering 1 through 162) and that the same is a true and correct transcript of the testimony given by me at the time and place hereinbefore set forth, with the following corrections:

| <u>PAGE:</u> | <u>LINE:</u> | <u>SHOULD READ:</u> | <u>REASON FOR:</u> |
|---|---|---|---|
| 33 | 9 | said there was a – they said 29 male – a signal | 4 |
| 65 | 12 | It appeared to me that it was in the driveway of 210 25th | 3 |
| 65 | 25 | When it was backing out of what appeared to me as the driveway | 3 |
| 66 | 9 | backing out south from what appeared to be the driveway which runs | 3 |
| 70 | 1 | When it was backing out of what appeared to be the driveway | 3 |
| 81 | 21-22 | I said, stop the vehicle, stop the vehicle, police, stop the vehicle. Before I gave the commands, I | 2 |
| 82 | 2 | As I stated, once the vehicle continued, I said, stop | 1 |
| 82 | 4 | vehicle. Right after I gave those commands of | 2 |
| 105 | 13 | figured ceding the road to the vehicle would be | 4 |
| 123 | 13 | I couldn't tell if they were open or | 4 |

Exhibit "5"

| PAGE: | LINE: | SHOULD READ: | REASON FOR: |
|-------|-------|--------------|-------------|
| 135 | 21 | sergeant.  That's when Officer Krauss, he | 4 |
| 136 | 2 | went with Officer Krauss as he directed me away | 4 |

_____
JASON CUEVAS

## NOTARIZATION

I, Erin Geist_____, notary public for the State of Mississippi, Harrison County,

do hereby certify that JASON CUEVAS, personally appeared before me this the 25th day of

July, 2023.

My commission expires:

★ STATE OF MISSISSIPPI ★
ERIN GEIST, NOTARY PUBLIC
HARRISON COUNTY
MY COMMISSION EXPIRES APRIL 18, 2027
COMMISSION NUMBER 347860

_____
NOTARY PUBLIC

## LEGEND FOR REASONS GIVEN FOR DEPOSITION CHANGES

1.   Additional clarification of answer was necessary upon reading the deposition.

2.   Additional clarification and explanation was necessary as a result of reading and reviewing the deposition and determining upon reading the deposition that the answer was not entirely complete when given.

3.   Clarification of answer was necessary as a result of reading and reviewing the deposition and subsequently confirming that the fact as testified was in error when given at the deposition.

4.   Typographical error, proper name error, or grammatical error.

5.   Discovery of additional information since deposition requires modification.

6.   Other: _____
     _____
     _____



Exhibit "5"

PL PARKER 001057