**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF MISSISSIPPI**
**SOUTHERN DIVISION**

**CATINA PARKER, as Personal Representative**
**of the Estate of Leonard Parker, Jr., Deceased**                    **PLAINTIFF**

**VERSUS**                                    **NO.1:21-cv-00217-HSO-RHWR**

**The CITY OF GULFPORT, a municipal**
**corporation; JASON CUEVAS, in his individual**
**and official capacity; and JOHN DOE OFFICERS**
**#1-5 in their official and individual capacities**              **DEFENDANTS**

**MEMORANDUM BRIEF IN SUPPORT OF THE MOTION OF CUEVAS**
**FOR SUMMARY JUDGMENT ON THE BASIS OF QUALIFIED IMMUNITY**

COMES NOW the Defendant, Jason Cuevas, by and through his counsel of record,

Copeland, Cook, Taylor & Bush, P.A., and submits his Memorandum Brief in Support of his

Motion for Summary Judgment on the Basis of Qualified Immunity, and would show unto the

Court the following, to wit:

## I.  BACKGROUND

In the Second Amended Complaint[1], the Plaintiff, Catina Parker ("Plaintiff"), as personal

representative of the Estate of Leonard Parker, Jr., has asserted a 42 U.S.C. §1983 claim for

excessive force in violation of the Fourth Amendment of the United States Constitution.  [Doc.

30].  The events in question occurred in Gulfport, Mississippi, during the early morning hours of

---

[1] On October 6, 2023, the Plaintiff filed a Motion for Leave to file a Third Amended Complaint [Doc. 128], the allegations of which they claim "conform" to the discovery.  However, the entirety of the Second Amended Complaint was completely scrapped and re-written in this proposed Third Amended Complaint and this Defendant has objected to the Plaintiff's Motion accordingly.  To amend the Second Amended Complaint so drastically, just prior to the dispositive motion deadline on qualified immunity, is completely unfair and grossly prejudicial.  The arguments presented herein are based on the allegations contained in the Second Amended Complaint, as well as the story that has unfolded based on the limited discovery conducted on the issue of qualified immunity.

1

February 1, 2020 between the Defendant, Jason Cuevas ("Officer Cuevas"), a police officer of the Gulfport Police Department, and Leonard Parker, Jr. ("Parker").

As to the events leading up to the shooting, several individuals, including Parker, were attending a birthday party at the home of Stephanie Baldwin, who resided at 210 25th Street, Gulfport, MS. The party began during the evening hours of Friday, January 31, 2020. By all accounts, alcohol was served and many of the guests were drinking, including Parker.[2] (MBI Case File Report, Bates 2, 9, 13-14, 16, 19, Ex. "1"; DP Markray, pp. 68-73, Ex. "13"). As the evening proceeded, one of the guests, Tremaine Markray, became belligerent, obnoxious and aggressive with several guests, including his own girlfriend (Kimberly Bonds), so much so that Maxine Owens, another guest at Stephanie's house, called 911 at 2:49:47 a.m. and asked for police assistance with the escalating situation. (MBI Case File Report, Bates 102-03, Ex. "1"; 911 Call, Ex. "2"; DP Markray, pp. 46-49, 68-69, 73-76, Ex. "13"). Maxine stated that "Terrence", a black male, was "fighting everybody", that he was wearing a gray shirt and gray jogging pants, that there had been drinking and she was not aware of any weapons. (MBI Case File Report, Bates 102-03, Ex. "1"; 911 Call, Ex. "2"). Officer Cuevas and another nearby officer (Brewer) were dispatched to the scene. (MBI Case File Report, Bates 102-03, Ex. "1"; Cuevas Audio Interview, Ex. "6"; Cuevas Video Interview, Ex. "7"; DP Cuevas, pp. 31-33, Ex. "5").

Before Cuevas arrived, Parker had convinced Markray to leave with Parker, with the intent of taking Markray to a hotel to "sleep it off". (DP Markray, pp. 66, 76-77, 126-27, Ex.

---

[2] Parker's Blood Alcohol Concentration after his death was 0.185, well over twice the legal limit in the State of Mississippi. (MBI Case File Report, Toxicology Report Bates 37, Ex. "1").

"13").  Parker was driving his dark color 2014 GMC Sierra pick up truck and Markray sat in the front passenger seat.  (Id., p. 66).

About five minutes after the 911 call was placed[3], Officer Cuevas had parked his police cruiser and was approaching on foot to the area where he believed the call had originated.  Even before he got out of his car, he could hear "loud voices" coming from this same direction.  To arrive, Officer Cuevas drove north on Oak Avenue, turned left (west) on 25th Street, and then parked his patrol vehicle on the north side of 25th Street, just west of its intersection with Oak Avenue.  Officer Cuevas did not activate his blue lights or siren to proceed to the scene or when he parked his vehicle.[4]  (Int. Ans. No. 17, Ex. "4"; Cuevas Audio Interview, Ex. "6"; Cuevas Video Interview, Ex. "7"; DP Cuevas, pp. 35-42, 116, Ex. "5").

Officer Cuevas exited his patrol vehicle and determined the direction where the voices appeared to be coming from, which was about two houses down from where he parked his car.  He then proceeded westbound on foot on 25th Street, searching for the address of the "drunk and disorderly" call by looking at the numbers on a white color mailbox located on the north side of the road.  (DP Cuevas, pp. 42-45, 47, 55-57, Ex. "5"; MBI Scene Photos, Bates 35, 54, 60, 66, Ex. "14").  The street was dark and Officer Cuevas had to illuminate the mailbox with his flashlight in order to see the address.  (DP Cuevas, pp. 42-45, 47, 55-57, Ex. "5").  While Officer Cuevas continued on foot westbound on 25th Street, the sound of the commotion ahead became

---

[3]  Cuevas arrived on scene at 2:55:19 a.m.  (MBI Case File Report, Bates 103, Ex. "1").  Brewer arrived on scene at 2:55:55 a.m., about 36 seconds later than Cuevas.  (Id.).

[4]  Officer Cuevas testified that not only was this was a more tactical approach to give him a better vantage point to approach the call to gain more information about the situation that was occurring at the residence, it would also give him some distance and time to verify which residence he needed to respond since he was not familiar with this exact street.  (DP Cuevas, pp. 41-42, Ex. "5").

louder and he noticed a dark colored truck backing out of what he thought was a driveway onto 25th Street.[5] Officer Cuevas observed the truck back into a mailbox located on the south side of the street (later learned to be 213 25th Street – the home of Michelle Desroche). He believed the truck was leaving from the residence that had reported the "drunk and disorderly" male. (Id., pp. 48-52, 64-70). While still in the street, Officer Cuevas started walking towards the truck to make contact with the driver, thinking that the driver was going to stop since he had just hit a mailbox. (Id., pp. 71-73). At the same time, Officer Cuevas was shining his flashlight towards the truck to get the driver's attention. (Id., p. 78).

While Officer Cuevas was in the middle of the street and in route to the truck that was now on the south side of 25th Street, where it had stopped after striking a mailbox, the truck pulled forward from the mailbox, straightened out and then began to proceed eastbound on 25th Street, angling in his direction. (DP Cuevas, pp. 76-78, Ex. "5"). Officer Cuevas activated the strobe on his flashlight and then removed his firearm from the holster and utilized the weapon light, all in an effort to get the driver's attention, because he assumed that the driver would see him and would stop. (Id., pp. 78-79, 102-103, 145-46). Officer Cuevas also identified himself as **police** and gave several commands for the driver to **stop the vehicle**. Officer Cuevas specifically recalls yelling: *"Stop the vehicle! Stop the vehicle! Police! Stop the vehicle!"* (Id., pp. 81-82, 103, 141). In spite of his visible presence and verbal commands, the truck continued to drive towards Officer Cuevas. Cuevas contends that the headlights became brighter as the truck tracked

---

[5] According to the investigation records and scene photographs, the truck backed out of the front yard of Stephanie Baldwin based on the tire marks left behind in the grass. (MBI Biloxi Report, Bates 6, Ex. "1"; MBI Scene Photos 133, 135, Ex. "14").

closer to him and that he heard the engine rev up and appeared to pick up speed in his direction, which he perceived was faster than 5 mph. (Id., pp. 82-83, 103, 141, 146).

Officer Cuevas then tried to back peddle out away from the middle of the road, moving towards the south side of the road, which at that moment was closer to him. (Id., pp. 92-94 and Ex. 49 to DP). He states that the headlights of the truck, which were very bright, followed him towards the south side of the road and he felt that the truck constituted a threat of harm or death to himself such that he recalls firing consecutive shots in quick succession from his service weapon toward the driver of the truck. (Id., pp. 94-95, 98, 100, 101, 103-110, 124, 145-149). Officer Cuevas testified that after he discharged the last shot toward the vehicle, the vehicle came to a noticeable and abrupt stop. (Id., p. 118). "Shots fired" were reported to Dispatch at 2:55:49 a.m., essentially 30 seconds after Officer Cuevas arrived to 25th Street. (MBI Call Sheet Report, Bates MBI 102-03, Ex. "1").

In light of the position taken by the Plaintiff through their designated expert witness, John Stamm, P.E., of which is a separate Motion *In Limine* (Daubert Motion) is being filed, a simulation video was developed that demonstrates the view that Officer Cuevas described in both his post-event interview with the MBI and in his deposition testimony. (Affidavit Cuevas, Ex. "8"). This simulation demonstrates what Officer Cuevas perceived and/or witnessed from the time that the truck being driven by Parker had backed into the mailbox located at 213 25th Street, and then proceeded to pull forward and eastbound on 25th Street, until the truck had come to a stop on the south side of the road, with its passenger side wheels in the grass and its driver side wheels on the roadway. (Id.). The Court should note the darkness of the night depicted in the simulation video that Officer Cuevas faced, as well as the headlights coming at him from the Parker truck. (Id.).

In the Second Amended Complaint, the Plaintiff alleges that at the time Officer Cuevas fired his weapon, Parker's vehicle "*was creeping forward in a neutral gear[6] at a low rate of speed – approximately two to three miles per hour – without acceleration.*" [Doc. 30, ¶28]. The Plaintiff alleges that at the time Officer Cuevas fired his weapon, "he was standing to the side of ... Parker's vehicle, which was angled on a trajectory away from his person" and that "he was not standing in the vehicle's path." [Id., ¶¶29-30]. It is the Plaintiff's position that the vehicle driven by Parker did not pose "a significant threat of death or serious physical injuries" to Officer Cuevas. [Id., ¶42]. Officer Cuevas disagrees and further, based on the objective evidence collected from the scene, was clearly in front of the moving truck at the time the shots were fired, as demonstrated below.

The issues in this case boil down to what occurred in the 30 seconds that followed Officer Cuevas' arrival to 25th Street. Specifically, the location of Officer Cuevas in relation to Parker's truck at the time the shots were fired and whether Parker's truck was moving in the direction of Officer Cuevas or if it was stopped. Other than perhaps Tremaine Markray, Parker's passenger, no other alleged eye witness can testify as to what Officer Cuevas would have seen from his perspective as these alleged witnesses were standing, more or less, either on the front lawn or the front porch of Stephanie Baldwin's house and their view would have been limited to the rear and/or driver's side of Parker's truck. And, no matter how the Plaintiff tries to reshape her claims, the objective, physical evidence collected at the scene clearly demonstrates that Officer

_____

[6] There is no demonstrable proof that the vehicle was in "neutral." While the officer and the witnesses differ on the speed of the vehicle before the shooting, the clear, demonstrable and uncontroverted proof is that the vehicle was in "D" [Drive]. "Drive" is not a "neutral gear." (MBI Biloxi Report, Bates 5-6, Ex. "1"; MBI Scene Photos 208, 213, 214, Ex. "14").

6

Cuevas was at the front of the truck and the truck was moving at him at the time the shots were fired.

The investigation of this matter was spearheaded by the Mississippi Bureau of Investigation ("MBI"). (MBI Case File Report, pp. 1-21, 28, 37, 85-88, 89, 92-93, 99-100, 102-105, Ex. "1"). The Biloxi Police Department Crime Scene Unit ("BPD CSU") processed the scene and collected and examined the physical evidence, including the truck driven by Parker. (MBI Biloxi Report, pp. 1-3, 6-12, 33, 37-38, 43, 46-48, Ex. "3"). On scene, investigators noticed that even though the 2014 GMC Sierra truck driven by Parker was stopped with its passenger side wheels on the grass and the driver side wheels on the asphalt, the truck was still in "D" or "Drive" with the driver's side door open. Even though the truck was still in "Drive", the truck was not moving forward. (Id., pp. 5-6). The radio was also playing at a moderate volume. (Id., p. 7). CSU Investigators noted that the truck was stopped slightly off the roadway in the yard of 207 25th Street, which would have been east-southeast of the address from where the truck had departed previously and east-southeast of where those witnesses who claimed to be outside in the yard or on the porch of 210 25th Street, with the passenger side tires in the grass and the truck was touching a large bush on the back passenger side. (Id.). Numerous photographs were taken by Biloxi CSU both at the scene and at the CSU Garage, some of which are being used for this Motion. (MBI Scene Photos, 33, 35, 45, 54, 60, 66, 68-69, 80, 82, 84, 87, 91, 94, 99, 105, 107, 109, 113-14, 119, 120, 122, 127, 129, 131, 133, 135-36, 139, 159, 173, 178, 181, 186, 197, 202, 204, 206, 208, 213, 214, 218, 224, 226, 232-33, 238, 239, 241-42, 247, Ex. "14"; MBI CSU Garage Photos, 2, 11, 77-90, 96, 98, 102, 105-06, Ex. "15"). In addition, based on the physical evidence locations and measurements taken at the scene, Biloxi CSU Investigators prepared a Scene Diagram. (MBI Biloxi Report 66, Ex. "2").

Investigator Brandon Teates with the BPD CSU was deposed regarding his investigation at the scene and his findings with regard to the bullet defects in Parker's truck. (DP Teates, pp. 31-44 and Ex. 35, Ex. "9"). After Parker's truck was moved to the BPD for further analysis, Teates placed flight path rods and marked the bullet defects. (Id., pp. 48-58, 63-79, 81 and Exs. 36, 37, 38, 39). With regard to Defect 1/1A, the bullet hole found in the hood of the truck, Teates explained that this bullet was moving, based on the officer's perspective, from the driver's side to the passenger's side at a very slight angle of 5 degrees. In other words, Officer Cuevas would have been located in a cone area of 5 degrees outward from the vertical plane of the center of this hood defect. (Id., pp. 59-62, 84, 100-101). The bullet holes in the windshield cannot give Teates information regarding where Officer Cuevas was located at the time of the shooting due to the characteristics that a bullet hole makes in windshield glass. (Id., pp. 71, 74-76). Therefore, only Defect 1 can be used to determine trajectory. (Id., p. 83). As far as sequencing, Teates can say that as far as the windshield defects, Defect 3 came before Defects 2 and 4, but he cannot say whether Defect 2 occurred before or after Defect 4. And, there is no way for Teates to determine where Defect 1 (the hood defect) fit into the sequence. (Id., pp. 76-78). Teates was questioned regarding the location of the bullet casings recovered at the scene. (Id., pp. 84-86, 90-92 and Ex. 41). Teates explained that the casing were found at the front of the vehicle, with one being right under bumper off to the right, almost at the passenger side. (Id., p. 92). Teates explained that typically, the casings will eject to the right of the weapon. (Id., pp. 93-94). Here, the casings were found to the left of the 5 degree cone area described herein. (Id., pp. 94-95 and Ex. 38). While Teates agrees that Parker's truck was moving during the shooting, he cannot determine where Parker's truck was pointing and where Officer Cuevas was located when the shooting

occurred.  (Id., pp. 96-101).  Teates confirmed that there was no way to determine the speed of Parker's truck.  (Id., pp. 101-102).

Because Teates did not have the ballistics reconstruction training needed to make a determination where Officer Cuevas was located at the time of the shooting, and to further examine the issue of whether the Parker truck was moving at the time of the shooting, Officer Cuevas retained James P. Molinaro and Howard Ryan as experts in the fields of shooting incident and/or crime scene reconstruction and ballistics.[7]  (Affidavit Molinaro, Ex. "10"; Affidavit Ryan, Ex. "11").  Unlike Investigator Teates, Molinaro and Ryan have additional qualifications where they are able to determine the location of Officer Cuevas in relation to Parker's truck and whether the truck was moving at the time of the shooting.  (Id.; Id.).  Based on their review of the scene and vehicle photographs, which depict the bullet defects to the 2014 GMC Sierra driven by Parker and the Glock Model 17, 9 mm pistol used by Officer Cuevas, they determined the number of shots fired, where Officer Cuevas was located when the shots were fired, and whether the vehicle driven by Parker was moving at the time the shots were fired. Specifically, their opinions are: (1) Officer Cuevas discharged his Glock Model 17 pistol a total of four times; (2) Officer Cuevas's location and position were at the front of the GMC Sierra at the time he fired the four shots (same as Teates); (3) The sequence of the four shots fired by Officer Cuevas cannot be determined to any degree of certainty (same as Teates); (4) The bullet fired by Officer Cuevas which produced Defect D-1 to the hood and corresponding Defect D-1A to the driver's side wiper arm likely never entered into the passenger compartment of the GMC Sierra; (5) The bullet fired by Officer Cuevas which produced Defect D-2 to the front laminated

---

[7]  The Plaintiff did not retain an expert in the field of shooting incident and/or crime scene reconstruction or ballistics.

9

glass windshield and corresponding perforating Defect D-2A to the interior front dashboard are consistent in location, position, and flight path with being responsible for the gunshot graze wound to Mr. Parker's left index finger; (6) There were two other bullets fired by Officer Cuevas, one of which produced perforating Defect D-3 to the front laminate windshield and corresponding ricochet Defect D-3A to the interior front dashboard, and the other which produced perforating Defect D-4 to the front laminated windshield, and these bullet defects are consistent in location, position, and trajectory with being responsible for either the penetrating gunshot wound to Mr. Parker's left cheek or for the penetrating defect to the front driver's seat headrest; (7) The location of the three cartridge cases found on scene are consistent with the forward movement of the vehicle during the shooting and/or immediately after the shooting before the vehicle came to a complete stop with the vehicle transmission in DRIVE as its final position; (8) The physical evidence at the scene and the bullet defects on the vehicle produced as a result of the shots fired by Officer Cuevas, together with the location of the gunshot wounds to Parker, are consistent with Officer Cuevas directing his gunfire at the operator of the GMC Sierra to stop the threat perceived by Officer Cuevas of the vehicle driving directly at him; and, (9) The physical evidence at the scene and the bullet defects on the vehicle produced as a result of the shots fired by Officer Cuevas, together with the location of the gunshot wounds to Parker, are consistent with the description of the shooting incident given by Officer Cuevas to investigating authorities, with the exception of the number of shots fired (he recalls three shots fired). (Affidavit Molinaro, Ex. "10"; Affidavit Ryan, Ex. "11").

Michelle Desroche, who lived at 213 25th Street at the time of the February 1, 2020 incident at issue and is a disinterested witness, heard certain of the events, as set forth in her Affidavit testimony. (Affidavit Desroche, Ex. "12"). Desroche's testimony is summarized as

follows: (1) She was at home during the evening hours of January 31, 2020 and witnessed several vehicles parked at the home located at 210 25th Street, which was directly across the street; (2) During the early morning hours of February 1, 2020, she was standing in the screened-in porch area of her house, smoking a cigarette; (3) From where she was standing in her screened in porch near the door, she could not see the house or the yard of 210 25th Street; (4) She heard a male screaming at someone, so she propped open the screen door at her carport to see if she could figure out what was going on as it was well after 2:00 a.m. and she was worried that the screaming would wake her elderly neighbors; (5) The man was screaming "Fu_k that bi_ch ... fu_k that bi_ch ... that's why I treat you like I do ..."; (6) She could also hear women's voices, but could not make out what they were saying; (7) She heard a different male voice trying to diffuse the situation and said something to the effect of "come on, man ... get in the car ..."; (8) She heard vehicle doors shutting; (9) She heard a vehicle back out quickly and then heard a loud "wham!" noise; (10) She thought the vehicle hit the light pole located near one of her neighbors, which is the direction the sound came from; (11) She later learned that her mailbox had actually been hit and may have been knocked over; (12) She then heard the vehicle immediately accelerate to leave and proceed eastbound on 25th Street and as it did so, it made a louder than normal revving sound when it pulled out, where it made a slightly gravelly sound of a tire moving quickly; (13) Seconds later, she heard four gunshots; (14) She cannot say one way or the other if there were any voices or voice commands before she heard the gunshots because her focus was on the vehicle hitting an object and because where she was standing, her house may have blocked noise from what was occurring east of her house; (15) She cannot say where any object or any person was located at the time the gunshots were fired; and, (16) After she heard the gunshots, she ran inside her house, looked out the front living room window, and saw a

vehicle near her property line with her neighbors to the east, but could not make out what kind of vehicle it was.  (Id.).

Perhaps the most confusing witness is Tremaine Markray, who was actually sitting in the passenger seat of Parker's truck.  Markray has now given three different versions of his "story", ruining any credibility he may have.[8]  Following the incident, Markray was placed in the back of a patrol car assigned to Officer Cook with the Gulfport Police Department, until he could be brought to the station to meet with the MBI Investigators.  While in the back of the patrol car, Markray told Officer Cook:  "I don't mean no disrespect man, ... I told that dude to stop.  I said man slow down the police standing right there.  He kept going, that's why he's shot man.  They wasn't wrong man.  He kept going.  I told him to stop."  (Cook Dash Camera at 49:04, Ex. "16"). While Markray was alone and sitting/waiting in the back seat of the patrol car **by himself**, he uttered similar statements several times **to himself**, including: "I told that ... to stop man", "I done told him to stop though", "But they weren't wrong, I told that ... to stop".  (Cook Dash Camera at 56:01, 57:22, 1:05:55, Ex. "16").

Then, while he was at the police station, Markray was interviewed by MBI Investigator Brad Garrett.  (Audio Markray Interview, Ex. "17"; Video Markray Interview, Ex. "18"). Markray's interview can be summarized as follows: (1) After Parker backed out, Markray saw a police officer with a flashlight in the street; (2) From inside the truck, Markray heard the police

---

[8]  Markray gave a statement to MBI Investigator following the incident.  Markray was deposed by counsel during discovery of this matter on May 22, 2023.  Recently, **on August 18, 2023**, Plaintiff's counsel produced a "recording" of a conversation that Markray had with Catina Parker by telephone that appears to have occurred between his statement to the MBI and his deposition (i.e., some time in the past three (3) years).  Counsel for Officer Cuevas previously attempted to depose the Plaintiff, Catina Parker, but Plaintiff's attorneys refused and claimed she had no discoverable knowledge related to qualified immunity.  It is unknown if Markray was aware of this statement and defense counsel was not able to question him about this recording since it was not produced until much later (i.e., produced **after** Markray's deposition).

officer give several commands for Parker to "Stop the vehicle!"; (3) Parker just looked ahead and did not stop; (4) The truck was not going fast, by his estimate maybe 2 or 3 mph; (5) Markray then heard the gun shots; (6) The police officer was in front of the truck, more towards the driver's side, when the shots were fired; and, (7) Markray stated that if he was the police officer, he probably would have thought that he was about to be run over too. (Id.; Id.). The interview then concluded. The video however kept filming from inside the interview room after the investigators left. As before when in the backseat of the patrol car, Markray began talking to himself. (Video Markray beginning at 32:40, Ex. 18). Markray kept repeating to himself that all Parker had to do was stop and that the police officer was not wrong because he was about to get hit with the truck. (Id. at 34:34, 35:28).

At Markray's deposition, which was, again, over three (3) years after his extemporaneous and unsolicited comments and his official interview to MBI as part of the State's investigation into this incident, he did a complete "180°" on what he said not only to himself in the patrol car and in the interview room, but also to what he told MBI Investigator Garrett. Markray now "remembers" that after Parker had backed out, he claims to have seen multiple police officers, but no police cars (which has no basis in the objective evidence). (DP Markray, pp. 86-87, Ex. "13"). He states he knew it was the police because of the flashlight that he saw. (Id., p. 87). Markray now also testifies that he did not hear the officer give any commands like "stop", which is odd given that what he previously told Investigator Garret (and told himself) that he recalled the officer saying is identical to what Officer Cuevas told Investigator that he said to the truck passengers. (Id., pp. 88, 96-97, 114). He also stated that he lied to Investigator Garrett and that Parker was stopped prior to the police officer shooting because miraculously, he saw Parker put the truck in "Park". (Id., pp. 35, 92-99, 101). Again, Markray's new found memory does not

match the physical evidence at the scene.  Markray told defense counsel at his deposition that he lied to Investigator Garrett because he was "scared" and was "afraid for his life" even though he admits not one person threatened him.  (Id., pp. 89-95, 101-13).  Markray does at least admit from the police officer's perspective, it probably looked like he was going to be hit by the truck, but then back tracks from that admission to saying the officer could have gotten out of the way.  (Id., pp. 117-20, 128).  Markray's new found memory is not credible and Officer Cuevas suggests that the most credible words out of Markray's mouth were those stated while he sat by himself in the back of the patrol car and while he sat by himself in the interview room, where no one could possibly have been a threat to him.

The physical evidence, statements given, and the uncontroverted expert testimony shows that Officer Cuevas was at the front of a moving truck at the time the shots were fired.  There is no credible evidence to the contrary and this Court should find that not only did Officer Cuevas not use excessive force, but that his actions were constitutionally proper.

## II.  SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a); Sims v. City of Moss Point, 2022 U.S. Dist. Lexis 50655 *7 (S.D. Miss. 2022).  If the movant satisfies this burden, the nonmoving party must "go beyond the pleadings and designate specific facts showing that there is a genuine issue for trial."  Sims, 2022 U.S. Dist. Lexis 50655 at *7 (quoting Little v. Liquid Air Corp., 37 F.3d 1069, 1075 (5th Cir. 1994)) (internal quotes omitted).  "A dispute is genuine if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  Id. (quoting Dyer v. Houston, 964 F.3d 374, 379 (5th Cir. 2020) (internal quotes omitted).

"A good-faith assertion of qualified immunity alters the usual summary judgment burden of proof, shifting it to the plaintiff to show that the defense is not available." Sims, 2022 U.S. Dist. Lexis 50655 at *7 (quoting Orr v. Copeland, 844 F.3d 484, 490 (5th Cir. 2016). Thus, now that Officer Cuevas has pled the defense of qualified immunity, the burden of proof shifts to the Plaintiff to negate this defense. Craig v. Martin, 49 F.4th 404, 409 (5th Cir. 2022) (citing King v. Handorf, 821 F.3d 650, 653 (5th Cir. 2016).

### III. ARGUMENT

Government officials performing discretionary functions are accommodated "with a qualified immunity, shielding them from civil damages liability as long as their actions could reasonably have been thought consistent with the rights they are alleged to have violated." Anderson v. Creighton, 483 U.S. 635, 638 (1987). "Somewhat more concretely, whether an official protected by qualified immunity may be held personally liable for an allegedly unlawful official action generally turns on the 'objective legal reasonableness' of the action . . . assessed in light of the legal rules that were 'clearly established' at the time it was taken." Id. at 639 (citing Harlow v. Fitzgerald, 457 U.S. 800 (1982). Under this standard, it must be determined whether the Plaintiff has alleged the violation of a clearly established constitutional right. If this Court finds a right to be clearly established, then the Court examines the "objective legal reasonableness" of the officer's conduct under the circumstances, "in light of clearly established law and the information the [] officer[] possessed." Anderson, 483 U.S. at 640; see also, Gutierrez v. City of San Antonio, 139 F.3d 441 (5th Cir. 1998). The order of this test is not mandatory and "judges of the district courts ... [are] permitted to exercise their sound discretion in deciding which of the two prongs of the qualified immunity analysis should be addressed first .

. . .” <u>Byrd v. Cornelius</u>, 52 F.4th 265, 271 (5th Cir. 2022)(quoting <u>Pearson v. Callahan</u>, 555 U.S. 223, 236 (2009)).

**A.** **Officer Cuevas Did Not Violate A Constitutional Right of Parker.**

The Plaintiff claims Officer Cuevas used unconstitutionally excessive force when he shot and killed Parker in violation of the Fourth Amendment. "The Fourth Amendment creates a 'right to be free from excessive force during a seizure.'" <u>Byrd</u>, 52 F.4th at 270 (quoting <u>Poole v. City of Shreveport</u>, 691 F.3d 624, 627 (5th Cir. 2012). To establish a claim of excessive force under the Fourth Amendment, the Plaintiff must demonstrate: "(1) injury, (2) which resulted directly and only from a **use of force that was clearly excessive**, and (3) the excessiveness of which was **clearly unreasonable**." <u>Byrd</u>, 52 F.4th at 270 [emphasis added]. <u>See also</u>, <u>Ramos v. Taylor</u>, 2022 U.S. Dist. Lexis 227519 *18 (W.D. Tex. 2022). Where, as here, an injury is uncontested (i.e., death), this Court need only consider the second and third elements. <u>Jackson v. Gautreaux</u>, 3 F.4th 182, 186 (5th Cir. 2021). "There can be no question that apprehension by the use of deadly force is a seizure subject to the reasonableness requirement of the Fourth Amendment." <u>Tennessee v. Garner</u>, 471 U.S. 1, 7 (1985).

"Inquiry into the reasonableness requirement balances the amount of force used with the need for that force under an objective standard." <u>Sims</u>, 2022 U.S. Dist. Lexis 50655 at *9 (citing <u>Graham</u>, 490 U.S. at 395)). Generally, to determine whether a use of force was objectively reasonable under the Fourth Amendment, courts are required to pay careful attention to the facts and circumstances of each particular case, including: (1) the severity of the crime at issue, (2) whether the suspect poses an immediate threat to the safety of the officers or others, and (3) whether the suspect is actively resisting arrest or attempting to evade arrest by flight. <u>Byrd</u>, 52 F.4th 270 (citing <u>Graham v. Connor</u>, 490 U.S. 386, 396 (1989)). "'[W]here the officer has

16

probable cause to believe that the suspect poses a threat of serious physical harm, either to the officer or to others, it is not constitutionally unreasonable to prevent escape by using deadly force.'" <u>Sims</u>, 2022 U.S. Dist. Lexis 50655 at *9; <u>see also</u>, <u>Wilson</u>, 26 F.4th at 713.

Because of the difficulty of "split second judgments", "[t]he 'reasonableness' of a particular use of force **must be judged from the perspective of a reasonable officer** on the scene, **rather than with the 20/20 vision of hindsight**." <u>Sims</u>, 2022 U.S. Dist. Lexis 50655 at *9 (quoting <u>Graham</u>, 490 U.S. at 396) (emphasis added); <u>see also</u>, <u>Wilson</u>, 26 F.4th. at 713. This means that the "overarching question is 'whether the officers' actions are **objectively reasonable** in light of the facts and circumstances confronting them." <u>Id</u>. (emphasis added).

Here, the key question facing the Court is whether Officer Cuevas was in imminent danger when he fired his service weapon at Parker's truck.

### 1. Deadly Force in Context of Shooting at Suspect Inside a Vehicle.

The Fifth Circuit has recently discussed the issue of shooting at a suspect in a "fleeing vehicle" in <u>Irwin v. Santiago</u>, 2021 U.S. App. Lexis 31692 *5 (5th Cir. 2021). In this context, the "most important" factor that is considered is "whether the suspect poses an immediate threat to the safety of the officers or others." <u>Id</u>. at **5-6 (citing <u>Garner</u>, 471 U.S. at 396; <u>Malbrough v. Stelly</u>, 814 F. App'x 798, 803 (5th Cir. 2020)). In this case, the only "pedestrian" in the area at the time Officer Cuevas shot at Parker's truck was Cuevas himself, narrowing the issue even further – that is, whether Officer Cuevas could reasonably believe that Parker's truck posed a serious threat of harm to him. Notably, "the threat of harm inquiry does not ask whether the officer was harmed, only **whether he could reasonably perceive a threat of serious physical harm**." <u>Harmon v. City of Arlington</u>, 16 F.4th 1159, 1164 n.3 (5th Cir. 2021) (emphasis added).

In the Fifth Circuit, two particular facts have emerged as highly relevant to determine whether a moving vehicle poses an immediate threat to a police officer: "the limited time the officers had to respond and the closeness of the officers to the projected path of the vehicle." Irwin, 2021 U.S. App. Lexis 31692 at *6 (citing Hathaway v. Bazany, 507 F.3d 312, 321 (5th Cir. 2007)). Specific evidence examined in the Irwin case included the plaintiff's failure to heed the officers' commands to stop, the officers' positions, and the period of time it took for the officers' to perceive and react to the direction of the plaintiff's vehicle. Irwin, 2021 U.S. App. Lexis 31692 at *7.

The physical evidence confirms that Parker was driving intoxicated – over twice the legal limit – and had already hit a mailbox with his truck. Officer Cuevas testified, and Markray confirmed by his statements to himself and to the MBI investigators, that Parker failed to heed Cuevas' multiple commands to stop. As it relates to Officer Cuevas' position in relation to Parker's truck, both Investigator Teates and experts Molinaro and Ryan have confirmed, based on the physical evidence at the scene, that Officer Cuevas was at the front driver's side of Parker's truck. Further, experts Molinaro and Ryan have shown, based on the physical evidence from the scene, that the Parker truck was moving toward Officer Cuevas, who was moving towards the south side of the road, at the time the shots were fired. Officer Cuevas tried to get out of the way by moving to the south side of the road (as confirmed by the undisputed resting location of the casings), but Parker's truck continued to follow him and Officer Cuevas perceived that he was in immediate danger of harm.

    **2.**     **Fifth Circuit Law Confirms the Position of Officer Cuevas and Plaintiff Has No Evidence to the Contrary.**

Reasonableness of an officer shooting at a vehicle has been discussed by the Fifth Circuit. In Fraire v. City of Arlington, 957 F.2d 1268, 1270-71 (5th Cir. 1992), an officer chased a car until it struck a curb. The driver then backed up toward the officer's car and sped away. Id. at 1271. The officer chased again; the driver crashed again; and, the driver sped away again. Id. Eventually, the driver turned around and drove toward the officer. Id. The officer fired one shot and killed the driver. Id. at 1271-72. The Fifth Circuit held that the officer did not violate the Fourth Amendment because he reasonably attempted to defend himself against the driver. Id. at 1274-77. Similarly, the proof in the case at bar shows that Parker drove towards Officer Cuevas.

In Hathaway v. Bazany, 507 F.3d 312 (5th Cir. 2007), an officer stopped a car and started walking to the driver's-side window. Id. at 316. When the officer was about 8 to 10 feet from the car, the driver suddenly accelerated toward him. Id. As soon as the officer realized he wasn't able to get out of the car's path, he drew his firearm and fired one bullet at the car, killing the driver. Id. The vehicle struck the officer on his leg. Id. The officer did not know if he fired the weapon before, during, or immediately after he was struck by the vehicle. Id. The Fifth Circuit held that the officer responded reasonably "in firing his weapon when threatened by a nearby accelerating vehicle, even if, owing to the limited time available to respond, the shot was fired when or immediately after the officer was hit." Id. at 322. Similar to Officer Cuevas, he attempted to get out of the path of the driver, but the truck accelerated towards him.

In Hathaway, the Fifth Circuit cited to the case of Herman v. City of Shannon, 296 F. Supp. 2d 709, 713 (N.D. Miss. 2003). There, a police officer fired his weapon at a truck that "gunned" its engine and accelerated towards the officer. The truck had been pursued by police after failing to comply with a traffic stop. The truck ultimately came to rest as it was attempting to turn around on a county road. Id. at 711. Two patrol cars surrounded it, and the officers

19

exited their patrol cars with their guns drawn.  Id.  The truck then accelerated towards an officer standing within three feet of the truck.  Id.  The officer was struck by the truck and fired two shots, injuring the passenger in the truck.  Id.  The district court found the response to be reasonable, given the officer's limited time to react to an evident threat.  Id. at 713.  Again, similar to Officer Cuevas, Parker directed his truck towards Officer Cuevas, who attempted to get out of the way before firing his service weapon.

Sanchez v. Edwards, 433 F. App'x 272, 275-76 (5th Cir. 2011) is another case discussing the reasonableness of shooting the driver of a vehicle that is being used as a weapon.  There, two officers surveilling a residence approached Sanchez's vehicle after he pulled into a neighboring driveway.  Id. at 273.  The officers ordered Sanchez to stop, but he reversed the vehicle into the street, put the car into drive, and accelerated in the direction of Banquer, one of the officers.  Id.  Both officers fired their service weapons; the vehicle struck Banquer, and three shots struck Sanchez.  Id. at 274.  The Fifth Circuit affirmed the district court's grant of summary judgment for the officers, concluding that "the officers['] decision to use deadly force was reasonable under the circumstances" because of the "short period of time in which [they] had to react to Sanchez's abrupt change of direction and Banquer's obvious peril given his position in front of the vehicle." Id. at 273, 275-76.  Likewise, this Court should find that deadly force was reasonable under the circumstances faced by Officer Cuevas.

The Fifth Circuit was also faced with a situation involving the shooting of an individual in a vehicle in Malbrough v. Stelly, 814 F. App'x 798, 803 (5th Cir. 2020).  There, Campbell was in his GMC Yukon with two friends outside his home when police arrived to execute a search warrant.  Officers surrounded the Yukon, shouted commands for the occupants to exit, and pulled one of Campbell's friends out onto the ground.  Campbell refused to exit, threw the

Yukon in reverse, smashed into the police cruiser parked behind him, then switched gears and took a hard left turn, attempting to flee while surrounded by officers. Officer Ware was either bumped to the ground or fell. The officers fired and Campbell was hit. The key question in Malbrough was "whether it would have appeared to a reasonable officer on the scene that Ware, or other officers, or bystanders were in danger." Id. at 805. The plaintiff "need[ed] to show that Ware (as well as the other officers and bystanders) were far enough away from the Yukon and its path, as it moved forward, that no reasonable officer could have thought anyone was in danger." Id. The Fifth Circuit agreed with the district court that it was objectively reasonable to respond with force, even if Ware had not been struck by the vehicle because Ware went to the ground near the Yukon, it was announced an officer was down, and the firing did not take place until the officers saw Ware go to the ground near the fleeing vehicle. Id.

Applying Malbrough to the present case, this Court should find that based on the testimony of Cuevas, the physical evidence collected on the scene, the testimony of Investigator Teates, the affidavit testimony of the disinterested witness (Michelle Desroche), the ballistics experts, and the initial uncorrupted statements of Tremaine Markray, Parker did not respond to the commands of Officer Cuevas to stop, that Officer Cuevas was at the front of Parker's truck and tried to get out of the way, and that Parker continued to drive towards Officer Cuevas, who at that point, felt that his safety was threatened. In fact, Markray stated that if he was the police officer, he probably would have thought that he was about to be run over too and that the officer was not wrong.

Summary judgment was denied in K.B. Adams, 480 F. Supp. 3d 746 (S.D. Miss. 2020). There, the officers claimed that the decedent turned her vehicle and was headed toward and posed a threat to another officer's life. In opposition, the plaintiff presented expert testimony (of

William M. Harmening) to show that none of the shot's trajectories support a claim that the officers shot at the front of the car as it headed towards them. Rather, the trajectory of the six shots were aimed at the rear driver window and were fired from behind as the decedent drove away. Therefore, the district court denied the summary judgment on qualified immunity and held that resolution of this genuine issue was for the jury to decide.

Here, the total opposite is true. First, not only did Investigator Teates agree based on the physical evidence that Officer Cuevas was in front of Parker's truck at the time the shots were fired, but also, so did retained expert witnesses Molinaro and Ryan. Additionally, based on the physical evidence, expert witnesses Molinaro and Ryan found that the evidence supports Officer Cuevas' account of events that the Parker vehicle was moving towards him at the time the shots were fired. The Plaintiff has presented no expert testimony to the contrary.

More recently, the Fifth Circuit decided the case of Edwards v. Oliver, 31 F.4th 925 (5th Cir. 2022), wherein it affirmed the district court's denial of summary judgment based on a factual dispute as to whether the car in question was an actual threat to the officer. The facts of Edwards are important. On April 29, 2017, 15-year-old Edwards attended a house party with his two brothers and two friends. Around 11 p.m., Balch Springs PD officers Oliver and Gross arrived to the house in response to a 911 call about possible underage drinking. The partygoers dispersed and the boys returned to their parked cars on the same street as the house (Baron Drive), but further east, near a T-intersection with Shepherd Lane. Edwards' brother, Vidal, sat in the driver's seat, Edwards sat in the front passenger seat, and then three others sat in the back. While the officers were in the house talking with the party host, gunfire erupted from a parking lot on the east side of the T-intersection. Officer Gross exited the house and walked east. Officer Oliver existed the house and walked to his squad car to retrieve his semi-automatic rifle before

walking east.  While Vidal drove his car slowly, in reverse, toward the T-intersection, Officer

Gross, approaching on foot, yelled at the car to stop.  Officer Oliver began jogging toward the

intersection where Officer Gross was located.  Once Vidal got into the intersection, he put the car

in drive and proceeded southbound on Shepherd Lane.  What happened next was disputed by the

parties.

Officer Oliver argued that Vidal accelerated toward Officer Gross.  The Plaintiffs claimed

that the vehicle was not close to Officer Gross when it proceeded forward and that Officer Gross

was never in the path of the vehicle.  When Officer Oliver arrived at the intersection, the car was

accelerating past Officer Gross.  Officer Oliver then fired five shots at the car's passenger side as

it headed southbound on Shepherd Lane, away from the officers in the T-intersection.  The first

shot by Officer Oliver was made shortly after Officer Gross was close to the back passenger side

window to hit it with his pistol, breaking the window.  One of the bullets struck 15 year old

Edwards in the head, killing him.

On appeal, the Fifth Circuit stated that the extent of the car's threat to Officer Gross is the

factual question at the heart of this case, and was genuinely disputed.  Officer Oliver described

that the car accelerated towards/near/by Officer Gross.  The plaintiffs asserted that Officer Gross

was never in the path of the vehicle, that he was toward the back of or behind the car, and **that

the car was moving away from Officer Gross when Officer Oliver fired his shots**.  The body

camera footage also raised a fact question about the car's threat of harm to Officer Gross because

it shows the car was moving away from him.  The Fifth Circuit held that the resolution of this

factual dispute is material because it affects both whether Oliver's use of force was reasonable

and whether the force he used violated clearly established law.  Here though, the objective

physical evidence conclusively shows that **Officer Cuevas was in front of Parker's moving**

**truck at the time the shots were fired**.  There is no factual dispute of the physical evidence and therefore, summary judgment is appropriate.

**B.      CONDUCT OF CUEVAS OBJECTIVELY, LEGALLY REASONABLE UNDER THE CIRCUMSTANCES IN LIGHT OF THE CLEARLY ESTABLISHED LAW AS OF FEBRUARY 1, 2020.**

This second prong has two sub-parts.  First, the Plaintiff must establish that the right in question was "clearly established" at the time of the February 1, 2020 events.  Second, the Plaintiff must also show that the actions taken by the officer were "objectively legally reasonable".  Anderson, 483 U.S. at 641.

For a right to be "clearly established", "[t]he contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right." Anderson v. Creighton, 483 U.S. 635, 640 (1987).  "It is not the defendants' burden to identify clearly established law showing that they *did not* violate the plaintiffs' constitutional rights. Rather, it is the plaintiffs' burden to provide clearly established law that put the officers on notice that they *did* violate the plaintiffs' constitutional rights – and the plaintiffs' burden is heavy." Dawes v. City of Dallas, 2022 U.S. Dist. Lexis 143342 *22 (N.D. Tex. 2022) (citing Vann v. City of Southaven, 884 F.3d 307, 310 (5th Cir. 2018); Harmon v. City of Arlington, 16 F.4th 1159, 1165 (5th Cir. 2021)).  Further the case law should not define the law at a high level of generality.   Dawes, 2022 U.S. Dist. Lexis 143342 at *14 (quoting Vann, 884 F.3d at 310). While this does not mean that "a case directly on point" is required, "existing precedent must have placed the statutory or constitutional question beyond debate."  Ashcroft v. al-Kidd, 563 U.S. 731, 741 (2011). "[T]he dispositive question is whether the violative nature of particular conduct is clearly established."  Id.

As has been explained, "[t]he specificity requirement assumes special significance in excessive force cases, where officers must make split-second decisions to use force." Harmon, 16 F.4th at 1165. "[O]vercoming qualified immunity is especially difficult in excessive-force cases." Morrow v. Meachum, 917 F.3d 870, 876 (5th Cir. 2019). "[P]olice officers are entitled to qualified immunity unless existing precedent squarely governs the specific facts at issue." Harmon, 16 F.4th at 1166 (quoting Kisela v. Hughes, 138 S. Ct. 1148, 1153 (2018)).

As to the second sub-part, "the determination whether it was objectively legally reasonable . . . will often require examination of the information possessed by the searching officials." Anderson, 483 U.S. at 641. The "relevant question . . . is the objective (albeit fact-specific) question whether a reasonable officer could have believed [the actions] to be lawful, in light of clearly established law and the information the searching officers possessed." Id. The subjective beliefs of the officer are not relevant. Id. This means that "even when a defendant's conduct actually violates a plaintiff's constitutional rights, **the defendant is entitled to qualified immunity if the conduct was objectively reasonable**." Fraire v. Arlington, 957 F.2d 1268, 1273 (5th Cir. 1992) (emphasis added).

### 1.    Officer in Path of Vehicle May Have Been Clearly Established.

For the Plaintiff to survive summary judgment here, it must have been clearly established as of February 1, 2020 that the Fourth Amendment *prohibited* Officer Cuevas' conduct in the specific situation he faced; i.e., shooting at a vehicle accelerating towards him. The Plaintiff must point to case law where a defendant police officer was shown to have acted unreasonably under very similar circumstances. The Plaintiff cannot discharge this burden in the case *sub judice*.

As established, the objective physical evidence is clear that Officer Cuevas was in front of Parker's vehicle as it was moving forward and it even followed him towards the south side of the road when Officer Cuevas tried to get out of the way. Fifth Circuit case law in place at the time of the February 1, 2020 events holds that where a police officer shoots at a car moving directly at him, no Fourth Amendment violation occurs. In other words, the Fifth Circuit finds the officer's actions reasonable under those circumstances. The cases that were in place at the time of the February 1, 2020 events were discussed in the Section above and include Hathaway v. Bazany, 507 F.3d 312 (5th Cir. 2007) and Sanchez v. Edwards, 433 F. App'x 272 (5th Cir. 2011). There are factual differences in these cases to the present set of facts. If the Court considers them to be notable differences, then the issue is not clearly established. If the Court does not consider there to be notable differences, then these cases are helpful to the reasonableness argument. Either way, given the facts of Hathaway and Sanchez, this Court should find that the Plaintiff cannot overcome the "clearly established" element in her favor.

**2.      Objective Legal Reasonableness of Cuevas' Conduct.**

Additionally, this Court must determine whether a reasonable officer would have believed the actions taken by Officer Cuevas were lawful based on the information he possessed (in addition to the clearly established law). The Fifth Circuit has explained that to determine the objective legal reasonableness of an officer's conduct, the trial court examines whether "a reasonable officer could have believed [their conduct] to be lawful, in light of clearly established law and the information the [] officers possessed." Gutierrez v. City of San Antonio, 139 F.3d 441, 447 (5th Cir. 1998) (quoting Anderson, 483 U.S. at 641). The Supreme Court has instructed that "the information an officer possesses when that officer takes an action impacts upon the

objective legal reasonableness of the officer's conduct." Id. at 449 (citing Anderson, 483 U.S. at 641).

In the present case, the information "known" to Officer Cuevas included the information he received from Dispatch following the 911 call, in which he was advised of a drunk and disorderly black male. Additionally, factual information "observed" by Officer Cuevas on the scene is important, including him hearing loud, argumentative voices and seeing a truck back up and hit a mailbox. Also important are all the various ways that Officer Cuevas tried to get the Parker truck to stop by use of flashlights (1 and then 2) and by commands. Officer Cuevas was faced with what he believed to be a non-compliant driver, that may be drunk, that already hit a mailbox, was not following his commands to stop, the engine revved and the truck moved directly towards him and continued to do so even as Officer Cuevas tried to get out of the way by backpedaling towards the south side of 25th Street. Under all of these circumstances, it is clear that the actions of Parker threatened to cause serious bodily injury or death to Officer Cuevas and his response was reasonable and appropriate under the Constitution and case law.

## IV. CONCLUSION

While it is tragic that Leonard Parker, Jr. was shot and ultimately died, this Court is "obligated, in circumstances such as these – 'tense, uncertain, and rapidly evolving' – to give allowance 'for the fact that police officers are often forced to make split-second judgments' about the amount of force needed to confront a dangerous situation." Malbrough v. Stelly, 814 Fed. Appx. 798, 806 (5th Cir. 2020) (quoting Graham, 490 U.S. at 396-97). There is no doubt, based on the physical evidence and the witness and expert testimony, that it was reasonable for Officer Cuevas to believe that his life was in danger and the force he used was neither excessive nor

unconstitutional.  For all of these reasons, this Court should find that Officer Cuevas is entitled to qualified immunity and the Plaintiff's Second Amended Complaint should be dismissed.

Respectfully submitted, this the 16th day of October, 2023.

**JASON CUEVAS**

BY:  COPELAND, COOK, TAYLOR & BUSH, P.A.

BY:  /S/ WILLIAM E. WHITFIELD, III
Mississippi Bar No. 7161
/S/ KAARA L. LIND
Mississippi Bar No. 10604

## CERTIFICATE OF SERVICE

I hereby certify that on October 16, 2023, I electronically filed the foregoing with the

Clerk of the Court using the ECF system which sent notification of such filing to the following:

Charles R. Mullins, Esq.
Courtney Sanders, Esq.
Coxwell & Associates, PLLC
P.O. Box 1337
Jackson, MS 39215
chuckm@coxwelllaw.com
courtneys@coxwelllaw.com
and
Nicolette A. Ward, Esq.
Bhavani K. Raveendran, Esq.
Javier Rodriguez, Jr., Esq.
Samantha A. Harton, Esq.
Romanucci & Blandin, LLC
321 N. Clark St., Suite 900
Chicago, IL 60654
nward@smbtrials.com
braveendran@rblaw.net
jrodriguez@rblaw.net
sharton@rblaw.net
**Attorneys for Plaintiff**

Jeffrey S. Bruni, Esq.
P.O. Box 1780
Gulfport, MS 39502
jbruni@gulfport-ms.gov
**Attorney for Defendant,**
**City of Gulfport**

*/S/ WILLIAM E. WHITFIELD, III*
*/S/ KAARA L. LIND*

William E. Whitfield, III
Kaara L. Lind
COPELAND, COOK, TAYLOR & BUSH, P.A.
Centennial Plaza
200 East Beach Boulevard, Building #5
Gulfport, Mississippi 39507
P.O. Box 10
Gulfport, Mississippi  39502-0010
telephone (228) 863-6101
telecopier (228) 863-9526