**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF MISSISSIPPI**

CATINA PARKER, as Personal Representative )
of the Estate of Leonard Parker, Jr., deceased, )
                                                               )
              Plaintiff, )
                                                                   )
      v.                                          )      No.  1:21-cv-217-HSO-BWR
                                                                 )
The CITY OF GULFPORT et al,            )
                                                                   )
              Defendants.         )

**<u>PLAINTIFF'S MEMORANDUM IN OPPOSITION TO DEFENDANT'S MOTION FOR
SUMMARY JUDGMENT</u>**

i

# Table of Contents

I.   Introduction ........................................................................................... 1

II.   Statement of Facts in the Light Most Favorable to the Plaintiff............................. 1

III.   Legal Standard .................................................................................... 11

IV.   Argument ............................................................................................ 13

    A.   The evidence establishes a material question of fact as to whether Defendant Cuevas was objectively unreasonable and violated a federal right in using deadly force against Parker....................................................................... 13

       1.  Whether the suspect poses an immediate threat to safety ............................... 14

       2.  Severity of the crime at issue......................................................... 30

       3.  Attempts at resistance or evasion. ................................................... 31

    B.   Defendant Cuevas violated clearly established law. ............................................ 31

       1.  Cases in this jurisdiction put Defendant Cuevas on notice that he could not use deadly force against a fleeing felon without sufficient justification, much less a non-resisting individual in a stationary vehicle suspected of a misdemeanor. ....................................................................................... 33

    2.   There are too many questions of fact in this matter to support qualified immunity. ........................................................................................ 37

       3.  It would have been obvious to any reasonable officer that he cannot kill someone sitting idly in the driver seat of a stationary vehicle........................ 39

V.   Conclusion ........................................................................................ 40

NOW COMES Plaintiff, Catina Parker, by and through her attorneys, Romanucci & Blandin, LLC, and Coxwell & Associates, PLLC, hereby responding to Defendant's Motion for Summary Judgment, respectfully requests this Court deny the same, and states as follows:

## I.    <u>Introduction</u>

On February 2, 2020, at approximately 2:55 a.m., Leonard Parker was sitting in the driver's seat of his stationary, motionless GMC Sierra truck when Defendant Officer Jason Cuevas shot and killed him without warning or justification. Plaintiff brought this action claiming Defendant Cuevas violated Leonard Parker Jr.'s constitutional rights by using excessive and deadly force against him without justification. Now moving for summary judgment, Defendant Cuevas improperly construes disputed, material issues of fact in his favor to support his contention that Parker posed a threat of serious bodily harm that justified his use of deadly force. Viewing the facts in the light most favorable to the Plaintiff, as the Court must at this stage, Defendant Cuevas shot into a stationary vehicle that posed no threat to anyone without issuing any warning. Accordingly, a reasonable jury could find that Defendant Cuevas, who has contradicted himself and the physical evidence throughout discovery, acted objectively unreasonably and in violation of clearly established law when he shot and killed Parker.

## II.    <u>Statement of Facts in the Light Most Favorable to the Plaintiff</u>

### A.  Undisputed Facts

On February 1, 2020, Parker was attending a social gathering at a private residence in the 200 block of 25th Street in Gulfport, Mississippi ("the residence") for Stephanie Baldwin's birthday. Ex. 1, Baldwin Dep., 84:3-20, 105:6-24.[1] There were several other people at the

---

[1] Defendant takes issue with Plaintiff asserting facts not identified in the Second Amended Complaint. Facts and arguments in this memorandum are derived from discovery taken in this case. Plaintiff amended her complaint to conform with that discovery, and this Court granted her leave to file the Third Amended Complaint. Doc. 140-141.

1

residence: Stephanie Baldwin, Kimberly Bonds, Angela Jackson, Derrian Tremain Markray, Geraldine McNair, and Maxine Owens. Mr. Markray got into a verbal altercation with his girlfriend, Ms. Bonds, and became increasingly disruptive throughout the night. Ex. 1, Baldwin Dep.,110:18-112:2; Ex. 2, Markray Dep., 74:25-75:1. Parker made efforts to get Markray under control. Ex. 1, Baldwin Dep., 70:5-9, 110:18-112:2, 113:19-115:22. Due to Markray's behavior, Ms. Owens called the police. Ex. 1, Baldwin Dep., 117:17-118:14.[2]

Dispatch informed Defendant Cuevas that there was a disorderly male who appeared to be intoxicated at 25th Street, and that there were no weapons. Ex. 3, Cuevas Dep., 33:2-12. Cuevas dispatched to the scene at approximately 2:51:37 a.m. Doc. 32-1 at 34. Cuevas did not activate his sirens or blue lights during his dispatch or upon arrival to the scene because it was a Code 1 call, which encompassed "property crimes where there's no suspect on the scene, non-violent crimes where like emergency assistance wasn't necessary at a quick pace," as opposed to a Code 2 call, which applied to "like an accident involving injuries, a person with a firearm, a person with a knife, a shooting, ag assault, murder, those kind of calls." Ex. 3, Cuevas Dep.,35:23-36:23. Cuevas is not sure if he had his headlights on as he arrived. Id.,40:20-23.

Parker offered to drive Mr. Markray to a hotel, and Ms. Baldwin offered to pay for the hotel room, to get Mr. Markray away from the house. Ex. 1, Baldwin Dep.,117:22-118:14; Ex. 4, Jackson Dep. 156:5-22; Ex. 2, Markray Dep.,77:10-15. Markray agreed to go with Parker to the hotel in Parker's GMC Sierra ("the truck"). Ex. 1, Baldwin Dep.,119:18-120:5. Parker entered the driver's side of the truck, and Markray entered the front passenger side. Id. at 70:2-4, 117:17-118:14; Ex. 2, Markray Dep., 78:10-23. With Markray in the passenger seat of the truck, Parker began to slowly

---

[2] Defendant stated that Maxine Owens "asked for police assistance with the escalating situation." Doc. 133 at 2. It is worth noting Ms. Owens did not describe the situation as "escalating" herself. Doc. 132-2, 911 call.

reverse out of Baldwin's front yard. Ex. 5, Owens Dep., 53:13-17; Ex. 3, Cuevas Dep., 49:22-50:3. To get out of the yard, Parker had to maneuver in reverse around other parked cars. Ex. 1, Baldwin Dep., 121:1-4; Ex. 3, Cuevas Dep., 70:1-6 ("When it was backing out of the driveway, it was going fairly slow because it looked like it was having to maneuver around maybe other vehicles or something. So it was going relatively slow …."). As Parker backed out in the truck, Baldwin, McNair, Bonds, Jackson, and Owens stood in front of the house and observed. Ex. 1, Baldwin Dep., 64:18-24. Meanwhile, Cuevas arrived at the scene at approximately 2:55 a.m. Doc. 32-1 at 34.

### B. Disputed Material Facts

When Cuevas first arrived at the scene, he parked around the corner from Baldwin's home, east of Baldwin's home, so it was not visible to the party's attendees. Ex. 1, Baldwin Dep., 153:25-155:3, 183:1-4, 200:1-2 ("This cop car was not here. It was not there."); Ex. 2, Markray Dep.183:22-184:3. Cuevas exited his vehicle and walked down the road, on the *north* side. Ex. 3, Cuevas Dep., 55:9-17 ("I walked west from my parked vehicle and went to the north side of the road towards that mailbox."). Cuevas was wearing a dark blue uniform. Id., 24:10-15. The only part of Cuevas's uniform identifying him as a police officer were patches secured onto the uniform. Id., 24:10-25:5. Cuevas was wearing a vest and duty belt equipped with his Glock 17 Generation 5 firearm. Id., 27:2-28:24. He was also carrying a flashlight with strobe-mode that he typically used "to gain attention from people to show that something was changing in their sight to gather attention." Id., 30:22-31:10. Cuevas was equipped with a body-worn camera mounted in the middle of his chest that was activated by pressing a button on his wristwatch or pulling the camera out and turning it on. Id., 25:12-26:10. If Cuevas had turned on his blue lights and sirens, the body-worn camera would have immediately and automatically activated once he opened his vehicle's driver door. Id., 25:12-26:10. If Cuevas had turned on his lights and sirens, his police vehicle

dashboard camera would have automatically activated, and otherwise could have been manually activated. Id., 26:11-18. Cuevas testified that he would activate his body-worn camera anytime he made "citizen contact" or was interacting with individuals. Id., 26:19-27:1. No dashboard camera footage or body worn camera footage has been produced that captured the shooting.

As Cuevas walked from his vehicle towards Ms. Baldwin's home, he witnessed Parker driving "fairly slowly" in reverse. Id., 70:1-6 ("When it was backing out of the driveway, it was going fairly slow…"). Cuevas testified that he witnessed the truck "strike" a mailbox as he reversed, pushing it back but not causing it to fall over. Id., 67:16-68:10.

Once Parker finished backing out, he began to drive forward slowly at three to five miles per hour, straightening the truck's wheels on 25th Street, heading east. Ex. 5, Owens Dep., 53:19-22; Ex. 1, Baldwin Dep., 121:4-8 (describing Parker's driving as "real slow"), 135:15-17 ("he was just going really slowly, then he just stopped right here. And my aunt said, why did he stop?"), 195:19-25 ("He was going like three to five miles an hour. He was going really slow. To the point where he stopped, it was a really slow roll. It was not [] he wasn't doing the speed limit, not nearly."); Ex. 4, Jackson Dep., 79:10-16, 125:2-7 ("Q. Okay. About how fast was [the truck] moving? A. Seriously? I could beat that walking. It was not -- he backed out and tried to go forward. He tapped the gas and stopped. He didn't go nowhere. And they didn't have to tell him to stop. He seen lights, he stopped."), 150:13-15 ("You could say he tapped on it. He didn't really even hit the gas."); Ex. 2, Markray Dep., 93:8-13 (testifying the truck was going approximately two to three miles per hour and "just barely moving"), 137:6-7 ("I knew he wasn't going to run over him. He wasn't even moving fast enough to run over him."), 176:23-24 ("He wasn't moving fast."). Once Parker finished backing out, Cuevas "went to make contact with the [truck]." Ex. 3, Cuevas Dep., 71:10-72:5, 78:8-11 ("I saw the vehicle leaving, I assumed that the vehicle was just

4

going to slow roll up to me so I could make contact with the driver"), 73:11-18 ("When it made contact with it, I started—once it made contact with the mailbox is when I veered my path towards the vehicle to make contact with it."), 79:2-6 ("So as I went to make contact with the vehicle, as it kept slow rolling, I activated it--activated the strobe function to illuminate and show that there was a visible change in the drivers's vision."). The truck's headlights were on. Id. at 72:22-24.

Parker was driving so slowly as he proceeded eastbound in the truck on 25th street that Owens and Markray described the truck as "barely moving." Ex. 5, Owens Deposition at 55:19-22; Ex. 2, Markray Deposition at 93:8-13. Baldwin, McNair, Bonds, Jackson, and Owens stood in front of the house and observed. Ex. 1, Baldwin Dep., 64:18-24; Ex. 5, Owens Deposition, 44:2-11. As Parker drove slowly eastbound on 25th Street, Owens saw the truck's brake lights go on. Ex. 5, Owens Dep., 58:1-11. The truck came to a full stop soon after the brake lights came on. Id., 69:6-12. At that time, Owens said, "why is he stopping?" and Baldwin also saw that the truck was stopped. Ex. 1, Baldwin Dep., 64:18-24, 135:15-17 ("he was just going really slowly, then he just stopped right here. And my aunt said, why did he stop?").

Upon seeing the truck stop, Baldwin walked off the porch to the end of the driveway and saw someone in the street, now known to be Cuevas. Ex. 1, Baldwin Dep. at 134:9-13 ("We didn't know there was an officer. My aunt said, why is he stopping? And we walked out to the end of the driveway. And that's when I saw this cop walking. And the truck was just sitting here."). After seeing the truck stop, Baldwin called out to Cuevas, to explain that they were the people who called. Id. Only after calling out to Cuevas, Baldwin heard something and stated, "is he shooting?" Id., 64:18-65:2. Baldwin called to Cuevas, telling him "they are not armed." Id., 145:10-15; Doc. 132-1 at 15, Summary of Baldwin Statement. Cuevas had fired three or four shots, one of which

5

struck Parker in his left cheek then traveled through his neck and into his vertebrae, killing him. Ex. 7, Postmortem Exam at 1; Doc. 132-10 at 16, 30; Ex. 3, Cuevas Dep. at 107:14-16.

> **<u>Cuevas fired his weapon at Parker *after* the truck had come to a full stop.</u>** See Ex. 5, Owens Dep., 61:12-23 (testifying that she heard multiple pops *after* the GMC Sierra's brake lights came on), 96:1-8 (Q: "Did you see the truck stop after he shot the weapon? A. No. Q. Okay. Remind me again when you saw the truck stop. A. When Leonard straightened up. His brake lights came on and the truck stayed right there. The truck never moved."), 96:12-15 ("Q. So if someone said that the truck stopped after the pop, pop, pop, would that be true? A. No. It's a lie."); Ex. 1, Baldwin Dep., 68:8-17 ("He didn't tell him to stop first. He was already stopped. …When I walked off the porch, his truck was still standing in the same spot by the time I made it to the end of the driveway. He wasn't driving it."), 68:20-24 ("Q: She said that Leonard stopped his truck when the police told him to stop. Is that true or not true? A. That's not true. The truck was already stopped."), 134:9-13, 135:15-17, 136:10-15 ("It was stopped. Like from when I walked off this porch to the time I made it out here, the truck was still in the same place."), 144:5-12 ("Q […] So you're standing here and all of a sudden you see a silhouette, and at that point you're saying that Leonard's truck is stopped? A. Yes."), 147:10-14 ("Q. So did you hear these shots, as you say after the truck had stopped? A. Yes. The truck was stopped. I was already at the driveway. So, yes, the truck never the truck never moved, ever. It didn't move."), 184:16-25 ("Q. So did you see the car move at all or the truck after you heard what you thought were fireworks or the shooting? Did you see the car move at all or the truck? [Objection omitted] A. I did not see it move. And once the truck stopped and once I walked out to it, it never moved. I never saw it move. I never saw it move anymore."), 195:3-10 ("Q. So when you saw the police officer in the road, did you think that the GMC truck that Leonard was driving was going to hit him?" A. No. It wasn't moving."), 196:4-9 ("He was rolling in that

6

direction, and then he stopped. Then that was it. It never moved again. I never heard the engine. I never heard anything else. He was just sitting there. And when I made it to the edge of the road, it was still just sitting there."); Ex. 4, Jackson Dep., 48:12-24 ("We didn't know if he seen it, but when he backed out and got ready to proceed forward, he stopped 'cause he seen the police car."); 124:20-22 ("Q. Was the car stopped at the time of the gunshot or was it moving? A. It was stopped before the man said stop."); 141:6-18 ("That truck stopped when he seen the police coming. Whoever was driving that car, pulled over. That truck stopped when he seen them lights. That truck did not move, period, point blank."), 146:25-147:2 ("Ma'am, the truck was stopped. The lights was just on. The truck had stopped [...]"), 79:10-16 ("He stopped right -- when he backed up out of Stephanie's yard, he tapped the gas and just stopped. A tap, and he stopped. … The lights was on, but that was it. He didn't move."); Ex. 2, Markray Dep., 119:15-19 ("Everybody out there knew because he wasn't moving to hit him. You have to be moving to hit someone."), 131:22-23 ("I know he wasn't going to get hit because we wasn't even moving.), 170:17-171:9; Ex. 6, McNair Dep. at 31:22-24 ("I wondered why he stopped. And I looked down the street and I saw the policeman on this side."), 50:23-51:5 (Q. Leonard's truck is stopped? A. Yes. Q. You look up the street and see the officer. You heard the shot, but didn't see the flash, right? A. Yes.); Doc. 132-1 at 13, Summary of Bonds' statement to police ("She noticed him slow down and stated that Leonard's vehicle was kind of at a stop at this point"); Doc. 132-1 at 13, Summary of Owens' statement to police ("She said that he pulled off and then stopped. Then Maxine heard pop pop pop!! She thought that they were warning shots.").

**The truck did not drive, move, or "track" towards Cuevas at any time.** See Ex. 5, Owens Dep. at 104:6-15 ("So if Cuevas said that the truck tracked towards him before he shot his weapon, that's not true? A. And he lied."); Ex. 4, Jackson Dep. at 147:9-14 (Okay. As far as what

7

you saw, you never saw the tires turn towards the officer; you only saw them going straight forward? [Form objection omitted] A. Yes, ma'am."); Ex. 2, Markray Dep. at 120:21-121:5 (A. So, how is he going to hit him if you out of the way anyway. There's no way he can hit you if you're out of the way. […] He wasn't -- the cop wasn't even in the middle of the road. Q. Well, that's different than what you just told these investigators? A. No, I told him he was on the driver's side on the side of the road."). **Cuevas was standing to the north side of the truck and not immediately in front of the truck when he opened fire on Parker.** Ex. 1, Baldwin Dep. at 189:4-8 ("I was speaking specifically about when you heard those firework/gunshot noises. A. I didn't feel like he was close to the truck when I heard that."); Ex. 2, Markray Deposition at 190:8-17 (testifying that the officer was standing north of the vehicle, to the side rather than directly in front of it); Id. at 207:21-208:10 (testifying that the officer was not in the middle of the road, but to the side of the truck, and was standing at "a pretty good distance"); Id. at 184:23-185:3 (testifying that the police officer never got closer to the truck than the mailbox in front of the truck, as identified in Ex. 11); See Ex. 11 (depicting the mailbox which Mr. Markray testified the police officer never passed prior to shooting); Ex. 8, Teates Dep. 59:3-62:23; Ex. 9, Teates Report 6-7. **The truck's engine never picked up, made a "vroom" sound, or made any other sound that would indicate it was accelerating.** Ex. 5, Owens Dep. at 94:16-95:14; Ex. 1, Baldwin Dep. at 195:12-14 ("And did Leonard ever rev his engine? A. No."); Id. at 196:4-9 ("He was rolling in that direction, and then he stopped. Then that was it. It never moved again. I never heard the engine. I never heard anything else. He was just sitting there. And when I made it to the edge of the road, it was still just sitting there."); Ex. 4, Jackson Dep. at 124:10-16 ("Is there anything you saw the truck that he was driving do that you believe would indicate to the police officer that the police officer's life was in danger? [Form objection omitted]. A. Nothing."); Id. at 137:13-15 ("Did you ever hear the truck

accelerate before the shooting? A. No, ma'am.); Ex. 2, Markray Deposition at 209:5 ("There was

no way he was in danger.").

**Cuevas did not speak, give commands, or give Parker warning prior to shooting.** Ex.

5, Owens Dep. at 62:5-22, 93:14-2 (testifying she heard someone say, "stop the truck" after she

heard the "pops"); Ex. 1, Baldwin Dep. at 65:2-6 ("This cop was not saying a word."); Id. at 66:17-

22 ("This cop was not screaming anything. I was not -- I was already standing there when I saw

the cop"); Id at 68:8-17 ("He didn't tell him to stop first. He was already stopped"); Id. at 70:20-

71:1 (20 Q. Okay. Well, so the sequence of events -- what about this statement reflects an

inaccuracy as it relates to the sequence of events? A. That he was speaking and giving commands,

because he was not. He was not giving commands at all before he shot."); Id. at 144:13-15 ("Do

you hear anything said prior to seeing the truck stopped and seeing the officer? A. No."); 144:25-

145:6 ("Q. So you're saying before you saw the police officer, before you saw the truck stop, you

didn't hear anything resembling stop, stop the car right now, right? A. I heard no commands. I was

the only one talking. I was talking. I was standing there talking. He wasn't saying nothing."); Id.

at 145:24-146:8 ("A. The policeman said nothing. Q. Okay. A. He said nothing, okay? I don't know

how many more times I need to say that. He said nothing. Q. Before you said he's not armed, you

didn't hear a thing? A. He didn't say a thing to hear."); Id. at 158:4-13 ("I didn't hear any speaking,

any – no commands. He wasn't speaking. He was not speaking. Q. At all?  A. At all. Q. So the

officer that was walking toward you or at least down the street toward you, he didn't speak at all?

A. He wasn't talking."); Ex. 4, Jackson Dep. at 140:10-15 ("Q. It says, Cuevas had his flashlight

in his hand shinning at truck commanding to stop the vehicle, stop the vehicle, police, stop the

vehicle. A. No, ma'am. None of that was said. Sorry."); Id. at 142:11-14 ("Before the shooting, did

you ever hear an officer yell, let me see your hands, let me see your hands? A. No, ma'am."); Ex.

2, Markray Dep. at 88:4-15 ("Q. Okay. Tell me -- tell me if you heard the police officer say anything to your -- to the vehicle that you're now occupying? A. No. […] Q. You didn't hear any commands like stop? Stop? A. No. Q. Stop the vehicle? A. No. Q. You heard none of those before the shooting? A. No."); Ex. 5, Owens Dep. at 93:14-20 ("then did you hear him say, stop the vehicle, stop the vehicle, police, stop the vehicle? A. All I heard was, stop the truck, Gulfport Police after pop, pop, pop, pop. Q. After the pop, pop, pop? A. After the pop, pop, pop."). At the time of the shooting, the truck was stopped in front of 208 25th Street, which was just one house over from Baldwin's home at 210 25th Street where Parker had just backed out of and Owens, McNair, Baldwin, and Jackson stood. Doc. 132-6 at 8:38; Doc. 132-3 at 19, Map of Scene; Ex. 5, Owens Dep. at 93:14-20 (indicating she was close enough to hear Cuevas speak, but did not hear him do so until after the "pop pop pop.").

The truck did not roll forward or move immediately after the shooting. Ex. 3, Cuevas Dep. at 143:18-144:5; Doc. 132-1 at 13, Summary of Kimberly Bonds' statement to police ("Bonds believed that the truck was in park because when Leonard's body fell, the truck did not roll."). The truck did not roll forward or otherwise move immediately before, during, or after the shooting. Ex. 5, Owens Dep. at 69:6-12 (testifying that the truck never moved again after it initially stopped); Ex. 1, Baldwin Dep. at 147:5-9 ("Did you see anything about the truck that indicated to you that any of the gunshots hit the truck? A. No. It never moved no more. It just stayed there. It never moved."); Id. at 196:11-16 ("Q. And when they opened the door and he fell out, did the truck move at all? A. It did not. Q. It didn't roll? A. It didn't move."); Ex. 4, Jackson Dep. at 127:18-19 ("[The truck] didn't move after they shot him, so it had to been in park.").

When the door of the truck opened, Parker fell out onto his stomach. Ex. 5, Owens Dep. at 98:17-25; Ex. 1, Baldwin Dep. at 152:18-25. Cuevas did not make any effort to help Parker exit

10

the vehicle. Ex. 5, Owens Dep. at 98:17-25; Id. at 100:12-17 ("If Cuevas said that he tried to help the driver out of the truck when his legs gave way, is that a true statement? [objection omitted] 17 A. No."); Ex. 4, Jackson Deposition at 143:15-20 ("Ma'am, after he shot this man, he sat there and waited, looked us all in our face, walked to that driver's side, opened up that driver's door. That man hit that floor. He hit the ground. That man sat there and watched him on that ground."). After Parker fell out of the truck, Cuevas pointed his gun at Baldwin. Ex. 1, Baldwin Dep. at 152:18-25. After Parker fell out of the truck, Cuevas walked to the back of the vehicle to check the tags. Doc. 132-6, MBI Interview with Cuevas at 7:43-8:07. After Cuevas checked the truck's tag, he walked back to Parker, who lay on the ground breathing, rolled him over, and handcuffed him. Id. at 8:07-8:16. The State Medical Examiner ruled that the cause of Parker's death was a "Gunshot wound of the face and neck," and the manner of death was a homicide. Ex. 7, Postmortem Exam at 1. Two of Cuevas's gunshots struck Parker, one in his left cheek and the other in his left index finger. Id. at 1. The wound causing Parker's death entered through his left cheek and traveled through the left side of the mandible, the neck soft issue, penetrated into the fourth cervical vertebral body, and caused abundant hemorrhage in the neck soft tissue. Id. at 3. The trajectory of the bullet that caused Parker's death was left to right, downward, slightly front to back. Id. at 3. When the Medical Examiner received Parker's body, he was still handcuffed. Id. at 2. The flight path of the only bullet leaving a defect capable of demonstrating trajectory had a driver to passenger angle. Ex. 8, Teates Dep. at 59:3-62:23; Ex. 9, Teates Report at 6-7.

## III.    <u>Legal Standard</u>

Summary judgment is appropriate only if "the movant shows that there is no genuine issue as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "In making that determination, a court must view the evidence in the light most favorable to the opposing party." *Tolan v. Cotton*, 572 U.S. 650, 657 (2014) (internal qutations omitted). It

11

is reversible error and "a clear misapprehension of summary judgment standards" to "credit[ ] the evidence of the party seeking summary judgment and fail[ ] properly to acknowledge key evidence offered by the party opposing that motion." *Id.* at 659.

"[U]nder either prong [of qualified immunity], courts may not resolve genuine disputes of fact in favor of the party seeking summary judgment." *Id.* at 656 (citing *Brosseau v. Haugen,* 543 U.S. 194, 195, n. 2 (2004)). "In resolving questions of qualified immunity at summary judgment, courts engage in a two-pronged inquiry. The first asks whether the facts, "taken in the light most favorable to the party asserting the injury, ... show the officer's conduct violated a federal right." *Id.* (cleaned up) (quoting *Saucier v. Katz,* 533 U.S. 194, 201 (2001)). "When a plaintiff alleges excessive force during an investigation or arrest, the federal right at issue is the Fourth Amendment right against unreasonable seizures." *Id.* (citing *Graham v. Connor*, 490 U.S. 386, 394 (1989)). There is no dispute that Defendant Cuevas's use of deadly force constituted a seizure, so, to prove the Fourth Amendment violation, Plaintiff need only show that the use of deadly force was excessive, and that the excessiveness of the force was unreasonable. *Thompson v. Mercer*, 762 F.3d 433, 437 (5th Cir. 2014) (internal quotations omitted). "The second prong of the qualified-immunity analysis asks whether the right in question was 'clearly established' at the time of the violation." *Tolan,* 572 U.S. at 656 (citing *Hope v. Pelzer,* 536 U.S. 730, 739 (2002)). In determining whether a right was clearly established for purposes of qualified immunity, the court "the salient question ... is whether the state of the law at the time of an incident provided fair warning to the defendants that their alleged conduct was unconstitutional." *Id*. (citing at *Hope*, 526 U.S. at 741).

12

IV.  <u>**Argument**</u>

A. **The evidence establishes a material question of fact as to whether Cuevas was objectively unreasonable and violated a federal right in using deadly force against Parker.**

"The intrusiveness of a seizure by means of deadly force is unmatched. The suspect's fundamental interest in his own life need not be elaborated upon. The use of deadly force also frustrates the interest of the individual, and of society, in judicial determination of guilt and punishment." *Tennessee v. Garner*, 471 U.S. 1, 9 (1985). Determining whether an officer's use of force is reasonable under the Fourth Amendment "requires careful attention to the facts and circumstances of each particular case, including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." *Graham v. Connor*, 490 U.S. 386, 396 (1989) (internal quotations omitted). "The threat-of-harm factor typically predominates the analysis when deadly force has been deployed." *Harmon v. City of Arlington,* 16 F.4th 1159, 1163 (5th Cir. 2021).

Had a reasonable officer been dispatched to 25th Street on February 1, 2020, Leonard Parker would still be alive. Five eyewitnesses testified under oath that the truck had come to a stop and was not moving at the time that Cuevas fired his weapon. See *supra* at 9-12. Witnesses also stated that he did not say a word before shooting, and that the vehicle was not making any noise to indicate it was accelerating or about to accelerate. See *supra* at 12-13. There are only two pieces of physical evidence that show the trajectory of the bullets—the bullet that entered Parker's face and the bullet that left a defect on the hood of the truck—both of which has a north to south/driver to passenger trajectory that would allow a jury to conclude Cuevas was not directly in front of the truck at the time of the shooting, but rather stood outside of the path of the vehicle, to the right/north. Ex. 9, Teates Report at 6-7; Ex. 8, Teates Dep. at 59:3-62:23; Ex. 7, Postmortem report.

Thus, there are genuinely disputed questions of fact in this matter which are directly material to whether Cuevas's use of force was objectively reasonable, including the following: whether the truck was stationary, whether the truck was making a sound that indicated it was about to accelerate, whether Defendant Cuevas was in the path of the vehicle, and whether Cuevas issued commands or warnings to Parker. All facts and circumstances attendant to Cuevas's use of deadly force, construed in the light most favorable to the Plaintiff, indicate that at the time of the shooting the truck was not moving or revving to indicate it was about to accelerate, Cuevas was outside of the path of the vehicle, and Cuevas did not provide any warning that he was about to use deadly force. Thus, the facts weigh heavily in favor of an unreasonable use of force violating Parker's Fourth Amendment rights.

    1.   <u>Whether the suspect poses an immediate threat to safety</u>

     Plaintiff begins with the threat-of-harm factor due to the Fifth Circuit's emphasis in deadly force cases. *See Harmon,* 16 F.4th at 1163. **Cuevas's belief that the stationary truck posed a threat of serious bodily injury was unreasonable.** "[I]t is manifestly unreasonable for an officer to seize a suspect the officer knows is unarmed and not aggressive by shooting him dead." *Allen v. Hays*, 65 F.4th 736, 744 (5th Cir. 2023). "Although [Fifth Circuit] precedent gives an officer's decision to shoot an unarmed suspect in a speeding car considerable latitude, the officer must have cause to believe that the car poses an immediate threat." *Baker v. Coburn*, 68 F.4th 240, 249 (5th Cir. 2023), *as revised* (May 19, 2023). Parker gave Cuevas no reason to believe he posed a threat in the stationary truck.

       ***i.   The GMC Sierra was stationary at the time of shooting.***

     Notably, Cuevas does not argue that his use of force would have been reasonable even in the scenario where the truck was stationary or slow-moving, see Doc. 133, as doing so would acknowledge the genuine issue of material fact established by the record. Generally, it is

14

objectively unreasonable for a police officer to believe that a vehicle is a deadly threat to him if it is stationary at the time of shooting. See e.g. *Crane v. City of Arlington*, 2022 WL 4592035, at *9 (5th Cir. Sept. 30, 2022); *Texas Jones v. City of Atlanta*, 192 F. App'x 894, 897 (11th Cir. 2006) ("Firing on a stationary vehicle containing an accident victim who was neither threatening the officers with harm nor a suspect in a crime (other than possible misdemeanor traffic violations) is an excessive use of force and a violation of a victim's right to be free from unreasonable seizure."); *Kirby v. Duva*, 530 F.3d 475, 482 (6th Cir. 2008) (where the plaintiff's version of events showed that the vehicle was "moving slowly and in a non-aggressive manner, could not have hit any of the officers, and was stationary at the time of the shooting," the Court found that no reasonable police officer could have believed the vehicle posed a threat of serious physical harm); *Knight v. Miami-Dade Cnty.*, No. 09-23462-CIV, 2012 WL 12844727, at *18 (S.D. Fla. Aug. 6, 2012) ("Defendant Officers' use of deadly force was unreasonable because an officer fired on the vehicle *before* it moved from its stationary position or *before* it (or any of the Plaintiffs) threatened these officers or placed the public in danger. This inference of the record is dispositive."); *Morton v. Kirkwood*, 707 F.3d 1276, 1282 (11th Cir. 2013) ("Kirkwood shot an unarmed man in a stationary vehicle while having no reason to believe that the man would place anyone's safety in danger. A reasonable officer would not have shot Morton under these circumstances, and therefore Kirkwood's use of deadly force violated Morton's Fourth Amendment right to be free from excessive force."). In *Crane*, the Fifth Circuit stated, "[w]hile the Fourth Amendment's reasonableness test is 'not capable of precise definition or mechanical application,' the test is clear enough that [the shooting officer] should have known he could not use deadly force on an unarmed man in a parked car." 2022 WL 4592035, at *9. Although the *Crane* facts differ in that the officer shot the plaintiff while holding him in a chokehold inside the car while claiming the car was a threat because he could

15

have fallen out and been injured, it demonstrate that a stationary vehicle showing no signs of accelerating does not present a threat that justifies deadly force. Pertinently, the Court stated "Whether [the shooting officer's] use of deadly force was reasonable may well turn on whether the car was in park or moving at the moment Roper shot Crane. But that is a question for the jury." *Crane*, 2022 WL 4592035, at *6.

Using deadly force against a stationary vehicle has been found to be generally unreasonable, though the Fifth Circuit has described one situation in which the use of deadly force against a stationary vehicle may not be unreasonable: where, in a rapidly evolving situation, the driver and his vehicle are showing signs that they are *immediately about to become a threat* through undisputed facts. *Baker,* 68 F.4th 245-46. In *Baker*, officers identified a stolen car parked at a Texas gas station and learned that the involved individuals had asked around about how to evade police checkpoints. *Id*. at 242-243. Officers drove behind the vehicle, activated their police lights, exited, and approached with their guns drawn. *Id*. One of the individuals was in the driver's seat; the individual pumping gas got in the front passenger seat. *Id.* The officers continued approaching the vehicle shouting commands like "let me see your hands" and "roll the window down!" *Id*. One officer stepped in front of the sedan, heard the engine rev, and saw the driver dip down below the dashboard. *Id*. The officer claimed that he believed the driver was dipping down to reach for a weapon and fired immediately after that, but plaintiffs claimed that the driver dipped down because the officer had already begun shooting. *Id*. Importantly, though, the plaintiffs did not dispute that the driver revved the engine immediately before the officer fired his weapon, the sedan did actually strike the officer, and there was body-camera footage capturing the incident, placing most material events beyond factual dispute. *Id*.

16

The Fifth Circuit held the officer could have reasonably believed that the sedan was *about* to be used as a deadly weapon. The Court linked its reasoning to the dash camera footage,[3] which shows that it was precisely the type of "tense, uncertain, and rapidly evolving" situation that forced the officers to make "split-second judgments about the amount of force needed." See *Malbrough v. Stelly*, 814 Fed. Appx. 798, 806 (5th Cir. 2020). Even the version of facts most favorable to the *Baker* plaintiff indicated that the sedan revved its engine while the officer was directly in front of the vehicle and so close that he could touch the hood. *Baker*, 68 F.4[th] 242-243. Further, the vehicle struck the officer immediately after he fired his first shot, providing evidence that this vehicle was actually a threat. Further, the individuals in *Baker* were suspected of a felony and had been evading police and shown their intention to continue to do so. *Id.*  Further, the *Baker* plaintiff had no reasonable doubt that police were approaching and attempted to flee, even in the midst of receiving repeated warnings that were caught on body-camera footage. *Id*. *Baker* is a fleeing felon case demonstrating that where a stationary vehicle is showing obvious signs of making a deadly move towards the officer, the officer does not have to wait for the vehicle to actually make that deadly move before the officer can defend himself. The *Baker* case clearly illustrates the facts Cuevas would need to demonstrate his use of force was reasonable – but they do not exist here. The truck was stationary and not doing anything to indicate it was about to accelerate and any facts that suggest it was are disputed.

Parker was sitting idly in a stationary vehicle, so Cuevas was not faced with a "rapidly evolving situation." But even if he was, courts do not afford officers carte blanche to use deadly force in tense scenarios if there is a question of whether there is a threat. In *Kelly v. Stassi*, deputies

---

[3] The *Baker v. Coborn* dash cam footage can be found at https://www.ca5.uscourts.gov/opinions/pub/21/21-10303_Dash-Video.mp4. The body camera footage can be found https://www.ca5.uscourts.gov/opinions/pub/21/21-10303_BodyCam.mp4.

17

received information that Gregory Hardin, who they knew due to previous attempts to flee the police, was coming into their jurisdiction with "a large quantity of different narcotics." 587 F. Supp. 3d 409, 412 (M.D. La. 2022), *appeal dismissed,* No. 22-30101, 2022 WL 18923152 (5th Cir. Apr. 14, 2022). Three deputies drove their vehicles along the highway until they spotted Hardin's car. *Id.* One of the officers pulled in front of Hardin's car, while the other stayed behind, and the three vehicles slowed down. *Id* at 413. The plaintiff disputed that Hardin's car ever came to a full stop. *Id.* Two of the officers got out of their vehicles and walked towards Hardin's car, at which point it was uncontroverted that Hardin drove his car to the right, off the road into a wet grassy area, prompting one officer to shoot into the vehicle, striking the passenger. *Id*. The *Kelly* court noted that "the undisputed fact that Hardin drove his vehicle off the road after officers pulled him over is not an unqualified license to use deadly force," and the central question was whether the shooting officer "could reasonably have believed that Hardin, the driver, posed a serious threat of harm." *Id*. at 416. Like here, the *Kelly* court did not have video evidence, requiring it to rely on "depositions, police reports, drawings of the scene, and statements given by officers." *Id*. In denying qualified immunity, the court found disputed facts, including conflicting testimony on whether Hardin was driving towards the shooting officer or turning to go around him. *Id*. at 419-420. Notably, the court recognized that the events "unfolded very quickly, and the events were a 'blur,'" but found that the very fact that the situation was a rapidly evolving—as Cuevas tries to characterize Parker's killing—did not necessitate a finding of reasonableness where "the underlying facts that contribute to the excessive force analysis are disputed based on the competent summary judgment evidence. *Id*. at 424.

Cuevas urges this Court to accept that Parker was accelerating towards Cuevas at the time of the shooting, but that is contrary to the five witnesses who testified that he was stationary. In

18

their motion, Defendants appear to argue that the Court should resolve these factual disputes in their favor, despite the very clear summary judgment standard, because "the objective physical evidence conclusively shows that Officer Cuevas was in front of Parker's moving truck at the time the shots were fired." Doc. 133 at 23-24. Despite this claim, Defendant does not identify objective physical evidence that nullify the facts supporting that the vehicle was stationary. Defendant points to the fact that the vehicle was still in "Drive" when investigators arrived. Doc. 133 at 7. How this fact unequivocally supports their position is unclear. It is undisputed that when investigators arrived, the truck was in Drive. Doc. 133 at 7. It is also undisputed that the truck did not roll forward after the shooting. Doc. 133 at 7; Ex. 3, Cuevas Dep. at 143:18-144:8.

Even with the truck in Drive, the evidence supports a genuine issue of material fact that the truck was stationary at the time of the shooting. Plaintiff's accident reconstruction expert, John Stamm, explains how a vehicle can come to a complete stop while in Drive, and tested it using an exemplar truck that was the same make and model as the truck in which Parker was killed. Ex. 12, Stamm Report at 29. With every driving vehicle, there is a "relatively small force that is retarding its motion that is called rolling resistance," which is "typically assigned as a dimensionless rolling resistance coefficient (RRC) that is defined as the value of the rolling resistance force divided by the wheel load." Id. In simpler terms, a truck can come to a stop while in Drive even if the driver never applies the brake or puts it in Park, but the time it takes the vehicle to come to a stop is correlated with the speed it was going as it began to idle. Stamm made the following calculations based on a conservative estimate of the GMC Sierra's RRC:

> If the vehicle's average RRC was 0.035 (approximate lower bound for the subject vehicle and location) and it was traveling at 5 mph, it would continue to roll for approximately 6.5 seconds and 24 feet before stopping if the service brake was not applied. If the vehicle was traveling at 10 mph with an RRC of 0.035 it would continue to roll for approximately 13.0 seconds and 95.5 feet before stopping if the service brake is not applied. If the vehicle's combined RRC was 0.06 (approximate

19

> upper bound for the subject vehicle and location) and was traveling at 5 mph, it would continue to roll for approximately 3.8 seconds and 14 feet before stopping if the service brake is not applied. If the vehicle was traveling at 10 mph with an RRC of 0.06 it would continue to roll for approximately 7.6 seconds and 56 feet before stopping if the service brake is not applied.

Id. at 30. Stamm further explained his opinions: "Under the scenario where the truck was already stopped prior to the shooting and the service brake was not applied, Parker must have been traveling at a slow rate of speed and coasted to a stop solely due to the rolling resistance force of the vehicle. Alternatively, Parker could have utilized the service brake to stop his vehicle prior to the shooting, consistent with the several witnesses that testified that they saw his brake lights." Id. at 30-31. Importantly, a vehicle can move forward after the driver has stopped the vehicle using the brake if, upon releasing the brake, if "the force generated by the vehicle is greater than the rolling resistance which is trying to stop the vehicle." Ex. 13, Stamm Dep. at 179:1-180:10.

The evidence demonstrates that the truck was stopped, or at most, moving very slowly prior to the shooting. If, as Cuevas argues, the truck was accelerating towards him immediately before the shooting, Parker would have had to apply the brake during the shooting in order to cause the vehicle to come to an abrupt stop, which is unlikely considering that a bullet struck Parker in the face then traveled through his neck into his vertebrae. Id. at 30 ("Under the scenario where the vehicle was brought to an immediate stop after the shooting, Parker must have applied his service brake. Officer Cuevas testified that he discharged his firearm in rapid succession. Officer Cuevas also testified that it appeared that Parker had no control over his body when he later opened the driver's door."). What further supports the question of fact, even under Cuevas's version of events, is that the truck *never rolled forward after the shooting* even after Parker lifted his foot from the brake. Id. at 30-31; Ex. 13, Stamm Dep. at 179:23-180:10. When Parker fell out of the vehicle and his foot was no longer on the brake, the truck stayed put despite the undisputed fact that the vehicle remained in Drive. See, *supra*, 14-15. Investigators attributed this to the fact that the doors had

opened, but there is no evidence that the GMC Sierra had a feature that would prevent it from rolling upon the doors opening. Indeed, Mr. Stamm "inspected a 2014 GMC Sierra 1500 SLE Crew Cab 2WD" with the same specs as Parker's truck. Ex. 12, Stamm Report at 26. During this inspection Stamm confirmed that the truck did not have a feature that would prevent it from rolling forward when the driver's door was open. Id.

The evidence will demonstrate that if a car idles in Drive on a flat road, it will likely eventually idle to a stop on its own and require pressing the gas pedal to move forward again.  Ex. 12, Stamm Report at 30-31; Ex. 13, Stamm Dep. at 179:1-180:10. Since it is undisputed that the truck did not roll forward after the shooting despite remaining in Drive, a reasonable jury could infer that Parker could not have accelerated towards Cuevas and hit the brakes after Cuevas started shooting, not only because Parker had been shot, but also because that would cause the truck to move forward once Parker no longer had his foot on the brake. Under those facts, a reasonable jury could conclude that Parker idled forward without his foot on the accelerator, exhausting the momentum and coming to a slow stop before the shooting, as opposed to accelerating then quickly braking to a full stop. Even if he *was* moving during the shooting, it would have been so slow that the truck was able to come to a full stop and never roll again, despite remaining in Drive. This is consistent with eyewitness testimony that the vehicle was stopped during the shooting and is not contradicted by the truck remaining in Drive. Far from conclusive evidence requiring the Court to discard the summary judgment standard and accept Cuevas's version of events, the physical evidence supports the contention that he shot into a vehicle that had come to a complete stop.

Cuevas cites the report of his own expert as "physical evidence," merely restating the Experts' opinions. Doc. 133 at 9-10. Setting aside the fact Plaintiff has moved to strike many of these opinions from consideration based on methodological concerns, Doc. 138-139, such opinions

21

from hired experts do not constitute "objective physical evidence." The Fifth Circuit's Model Jury Charge regarding "Expert Witnesses" states the following: "When knowledge of technical subject matter may be helpful to the jury, a person who has special training or experience in that technical field is permitted to state his or her opinion on those technical matters. However, you are not required to accept that opinion. As with any other witness, it is up to you to decide whether to rely on it." Fifth Circuit District Judges Association Pattern Jury Instructions Committee, Pattern Jury Instructions, Civil Cases (June 2020); See also *Brown v. United States*, 351 F.2d 473, 474–75 (5th Cir. 1965) ("The jury is not required to accept the opinions of the experts nor to reject those of lay witnesses."). Defendant has hired experts, as he is entitled, to provide a report that supports his version of events, but their opinions are not "physical evidence" in and of themselves that allow the Court to discard other evidence—including eyewitness testimony—which directly contradicts his version of events.

Finally, Defendants provide a "simulation" of what Cuevas would have seen at the time of the shooting, but it does not support a finding of the objective reasonableness of his actions and is inconsistent with his testimony. Doc. 132-5, Ex. A-B. As the simulated 'truck' approaches 'Cuevas' in the simulation, the truck actually appears to slow down in the final seconds before stopping, and there is no perceptible acceleration that would support the suggestion that the vehicle made a "VROOM!" sound, as Cuevas contends it did. The simulation actually supports the inference that when Parker straightened out to move forward down the road (0:05), he saw Defendant in the middle of the street and drove slowly towards the south side of the road (0:06-0:09), then, upon reaching the south side of the road, turned again straightened out the truck so that it was parallel to the road as he slowed to a complete stop (0:09-0:13). To be clear, this is not Plaintiff's version of events—which is that the truck had been completely stopped at the time of the shooting as is

supported by eyewitness testimony—but Plaintiff notes the ways in which even the evidence created by Defendant adds to the clear question of fact as to whether the truck was moving quickly, moving slowly, or stationary during the shooting.

### ii.  *Cuevas was not in the path of the GMC Sierra*

There is also evidence establishing a question of fact that, regardless of the stationary condition of the truck, Cuevas was never in its path, which weighs against a finding of reasonableness. In *Edwards v. Oliver*, the defendant officers were inside a home after a party  responding to underage drinking, when gunfire erupted nearby. 31 F.4th 925, 928 (5th Cir. 2022). After leaving the house, an officer traveled on foot whilst a vehicle began to travel southbound on the same road. As the vehicle accelerated past the officer, another officer fired five shots into the vehicle, killing a fifteen-year-old passenger. *Id*. The parties disputed one material fact: whether the vehicle accelerated towards the officer or as plaintiffs "claim[ed][,] that the vehicle was not close to Officer Gross when it proceeded forward, and that Officer Gross was never in the path of the vehicle." *Id*.  Like in *Edwards*, here, "the extent of the car's threat to [the] Officer [] is the factual question at the heart of this case" and is a genuinely disputed question. 31 F.4th at 930. In *Edwards*, the shooting officer described the car accelerating "towards/near/by" his fellow officer, but the plaintiff asserted that the officer was never in the path of the vehicle. *Id*. "Importantly, the resolution of this factual dispute is material because it affects both whether [the shooting officer's] use of force was reasonable and whether the force he used violated clearly established law." *Id*. This fact question is directly analogous to the present case. Cuevas emphasizes his claim that the vehicle was accelerating and "tracking" towards him, but that is genuinely disputed by Plaintiff. Owens, Baldwin, McNair, Jackson, and Markray testified that the truck was not moving at the time of the shooting; certainly, the vehicle could not have been tracking towards him as it stayed in place. Indeed, Markray testified that Cuevas was not standing within the path of the vehicle when he

23

shot. Ex. 2, Markray Deposition at 190:8-17 (testifying that the officer was standing north of the vehicle, to the side rather than directly in front of it); Id. at 207:21-208:10 (testifying that the officer was not in the middle of the road, but to the side of the truck, and was standing at "a pretty good distance"); *see also supra* at 10-11.

The question of whether Cuevas was even in front of the vehicle remains in dispute. Every single bullet that entered the truck entered so far to the driver's side that they were north of the steering wheel. See Ex. 14, CSU Garage Photo 77. There are two "defects" which provide context for where Cuevas could have been standing at the time of the shooting. First, the bullet that entered Parker's left cheek had a slight driver-to-passenger/north-to-south trajectory. Ex. 7, Postmortem Examination. Second the defect caused by a bullet hitting the hood of the truck had a driver-to-passenger/north-to-south trajectory of approximately five degrees. Ex. 8, Teates Report at 6-7. This indicates that, if the truck was stationary as the Plaintiff's version of facts indicates, the shooter was standing at least slightly to the north of the hood defect when he created that defect. Ex. 8, Teates Dep. at 59:3-62:23. The fact that the wound in Parker's face was also driver-to-passenger/north-to-south further emphasizes that Cuevas was shooting at an angle, not straight on, facing down the truck at an exact perpendicular. was either outside the path of the vehicle or only slightly within it. Yet, Cuevas testified that he was standing directly in front of the truck, "like where basically the logo is on the front of the truck," when he first took his firearm out, and "moved southward, like directly – not towards the passenger of the vehicle," Ex. 2, Cuevas Dep. at 105:23-107:10. To reconcile the north-to-south angle of the defect on the driver's side of the hood with Cuevas's testimony that he started at the center of the truck and moved southward, that the truck had actually turned so far south away from Cuevas to place him at the north edge of the truck, moving *out* of his path, rather than towards him. Moreover, a reasonable jury could conclude that

24

his testimony about his placement immediately before and during the shooting simply does not align with the physical evidence, especially in light of the ample testimony about the truck being stationary. Either way, a jury could reasonably conclude it is unlikely that Cuevas was standing directly in front of the truck at the time of shooting.

Defendant attempts to distinguish *Edwards* on the basis that "the objective physical evidence conclusively shows that Officer Cuevas was in front of Parker's moving truck at the time the shots were fired." Doc. 133 at 23-24. Again, he does not explain what he means by "objective physical evidence." In *Edwards*, the Court discussed body-camera footage, and the extent to which it raised a factual question as to whether the vehicle was moving towards the officer or away from him. *Edwards*, 31 F.4th at 930. In this matter, no such "objective physical evidence" exists because Cuevas failed to properly activate his body-worn or dashboard camera, so there is no video footage that could provide an 'objective' version of events. Assuming that by "physical evidence" Defendant means evidence collected by crime scene investigators after the shooting, such evidence can be reasonably interpreted in several ways, and certainly does not eliminate any potential question of fact in this case. As discussed, *supra*, Cuevas pointed to the truck remaining stopped while in Drive after the shooting to support his version of events, but the fact that the GMC remained stationary while in Drive could reasonably be construed to show that Parker slowly idled to a stop without accelerating and thus did not pose a threat to Cuevas.

Cuevas suggests that the testimony and investigatory findings of Investigator Brandon Teates eliminates the question of fact regarding the path of the vehicle, though it is not clear how. Teates' testimony emphasizes that the physical evidence is up for interpretation by a jury, particularly the location of the bullet casings. Although "Teates explained that typically, the casings will eject to the right of the weapon," Doc. 133 at 9, Teates explains the difficulty of trying to

25

"determine the location of the weapon based on shell casings because a casing, once it hits an object, it could bounce in any direction. [He] can't give the location of that." Dkt. 132-9, Teates Dep. at 94:2-5. While Defendant makes much of the fact that the bullet casings were marked in locations in front of the hood of the vehicle, the final resting place of those casings say nothing about the location of the weapon at the time of the shooting.

The final resting place of the bullet casings does not provide a reliable measure of where Cuevas was at the time of shooting. In addition, the final resting location of the casings presents more questions than answers. It is expected that Cuevas's firearm would have ejected its casings to the right of its weapon. Ex. 8, Teates Dep. at 93:17-94:5. By his own testimony, Cuevas was directly in front of the truck when he fired his weapon. Ex. 3, Cuevas Dep. at 106:2-20. Yet, one bullet casing was located near the front tire of the *passenger* side of the vehicle, in the grass on the *south* side of the road, to the *left* of the GMC logo. Ex. 10, Scene Photos; See also Ex. 8, Teates Dep. at 92:23-25 ("The casings were located on the front right or passenger side of the vehicle in the front right corner."). If the casings' final resting places *did* indicate where Cuevas was standing as his firearm ejected casings to the right, they would place him to left/south of the truck, which is contrary to his own account. The casings do not provide a reliable inference as to where Cuevas was standing, but even if they did, they do not match up with Defendant's version of events. In summary, when looking at the physical evidence and witness testimony there is question of fact remaining as to where Cuevas was located at the time of the shooting.

### iii. Cuevas failed to warn Parker that he was about to use deadly force.

The Court should also consider Cuevas's failure to warn Parker prior to using deadly force. "Even when a suspect is armed, a warning must be given, when feasible, before the use of deadly force." *Poole v. City of Shreveport*, 13 F.4th 420, 425 (5th Cir. 2021). "A rational jury may find [ ] that if the car was moving at an average speed of 3 to 7 miles per hour, a warning was practicable

and the failure to give one might weigh against reasonableness." *Gonzalez v. City of Anaheim*, 747 F.3d 789, 797 (9th Cir. 2014). Here, despite Cuevas standing about one house away from them, Owens, Jackson, and McNair testified that Cuevas did not say anything prior to shooting. See *supra* at 13-14. A jury could reasonably infer that the very fact he did not provide such a warning to stop is consistent with the fact that the vehicle was *already* stopped.

In slowly driving down a residential road, performing a maneuver akin to that of pulling over to the side of the road, and stopping before Cuevas was ever in the path of the vehicle, Parker showed absolutely no signs of preparing to flee or use the vehicle as a deadly weapon. He stopped in the road, did not accelerate, and did not rev his engine. At most, Cuevas suspected him of a traffic misdemeanor, and did not know if the driver was the "disorderly male" necessitating his dispatch. Despite that, the evidence supports that Cuevas did not say a word before opening fire on the truck; that considered with the fact that Cuevas was wearing a dark blue uniform on a dark night while shining a flashlight at the driver suggests that Parker had no idea that he was a police officer and it was unreasonable not to warn him.

### iv. Cuevas improperly asks this court to make credibility determinations to resolve the question of whether the GMC Sierra posed a threat.

Defendant construes facts in the light most favorable to him and asks this Court to resolve factual disputes in his favor, despite both eyewitness testimony and the physical evidence that demonstrates material issues of fact. Defendant makes much of Markray's credibility and contradictory testimony, referring to him as a "confusing witness" and asking this Court to determine which of his contradictory statements are more credible. But at summary judgment, the trial court may not weigh the evidence or make credibility determinations. *Chacon v. York*, 434 F. App'x 330, 332 (5th Cir. 2011). Defense counsel is entitled to, and undoubtedly will, cross-examine Markray regarding his inconsistent statements in this matter. Even upon impeachment, though, the

jury is entitled to believe the witness's statements on either side of any contradiction. *See United States v. White*, 611 F.2d 531, 539 (5th Cir. 1980) (explaining that a jury is entitled to believe certain testimony or that which impeaches it); *Firemen's Mut. Ins. Co. v. Aponaug Mfg. Co.*, 149 F.2d 359, 363 (5th Cir.1945) (The success of an attempt to impeach a witness is always a jury question, as is the credibility of the witnesses where they contradict one another, or themselves). A reasonable jury could weigh Markray's sworn deposition testimony, made under oath, over the statements Markray made immediately after the shooting while in the presence of the police immediately after witnessing Parker's death. The law supports construing Markray's statements in the light most favorable to the Plaintiff—that the truck was stopped and did not pose any threat— at the summary judgment stage. Cuevas also relies on the affidavit of Michelle Desroche. Doc. 133, 10-12. Desroche states that she could hear various conversations and statements coming from 210 25th Street, but that she could not say one way or another whether she heard Cuevas yell commands prior to shooting.[4] Cuevas does not explain how her affidavit supports the reasonableness of Cuevas's use of force. In fact, Desroche's inability to recall whether she heard anyone give commands, when she was able to hear the exact words spoken by Markray, supports testimony from other eyewitnesses that Cuevas failed to give any warning prior to shooting. Regardless, to the extent Desroche's testimony supports Defendant's version of events, such would go to the weight of the evidence to be considered by the jury.

Defendant asks this Court to blindly accept Defendant Cuevas's version of events, however, that is not the approach taken by courts at the summary judgment stage. "Given the difficult problem posed by a suit for the use of deadly force, in which 'the witness most likely to

---

[4] Plaintiff issued a subpoena for Desroche and informed Defendant of the intent to depose her. Plaintiff never received a response to her subpoena and was not aware that Defendant had made contact with Desroche.

contradict the police officer's story—the person shot dead—is unable to testify,.... the court may not simply accept what may be a self-serving account by the police officer. Rather, the court must also consider 'circumstantial evidence that, if believed, would tend to discredit the police officer's story, and consider whether this evidence could convince a rational factfinder that the officer acted unreasonably." *Hatcher v. Bement*, No. 3:14-CV-432-M-BN, 2016 WL 11431547, at *10 (N.D. Tex. Feb. 2, 2016) (quoting *O'Bert ex rel. Estate of O'Bert v. Vargo*, 331 F.3d 29, 37 (2d Cir. 2003) (cleaned up), report and recommendation adopted as modified, No. 3:14-CV-432-M-BN, 2016 WL 1156469 (N.D. Tex. Mar. 24, 2016), aff'd, 676 F. App'x 238 (5th Cir. 2017).

Cuevas has credibility issues of his own. "[A] motion for summary judgment cannot be defeated solely by conclusional allegations that a witness lacks credibility. Nevertheless, when the circumstances are conducive to lying, well-supported suspicion of mendacity may serve as a legitimate basis for the factfinder's reasonable inferences concerning the ultimate facts at issue." *Thomas v. Great Atl. & Pac. Tea Co*., 233 F.3d 326, 331 (5th Cir.2000). Plaintiff does not rest her response on the basis that Cuevas lacks credibility; her version of facts is taken from eyewitness testimony and physical evidence without consideration of Cuevas's self-serving testimony. However, the implausibility of his version of events emphasizes the questions of fact which remain to be resolved by a jury. For example, the final resting place of the vehicle is inconsistent with Cuevas's version of events. Photos show that the truck came to rest facing straight ahead, the wheels flush with the vehicle as opposed to angled towards the south side of the road. Ex. 10, Scene Photos at 199-208. Cuevas, on the other hand, testified that in the seconds immediately preceding the shooting, the truck tracked towards him as he moved towards the *south* side of the road. Ex. 2, Cuevas Dep. at 105:23-107:10. He also testified that, as he was backpedaling towards the south side of the road, he noticed that the truck was turning towards the south side of the road

29

in such a way that would require the tires to be turned south towards him. Id. at 94:7-24 (When I started backpedaling, I noticed that the tires were -- like the vehicle was actually turning to its right toward the direction that I was actually backpedaling to"); Id. at 105:23-107:10; Doc. 132-4, Cuevas Supplemental Answers to Interrogatories ("And, as I back peddled, I saw the truck tires turn towards me."). The tires on the truck were not angled towards the south side, and the truck was parallel to the road. Ex. 10, Scene Photos. This is inconsistent with Defendant's "tracking" account and supporting witness testimony that Parker had pulled over. To be clear, Plaintiff does not ask the Court to make a credibility determination, and only notes issues regarding Cuevas's version of events to emphasize the factual disputes which remain to be decided by a jury.

    2.  <u>Severity of the crime at issue</u>

Cuevas stated that he suspected Parker of "the misdemeanor crime of leaving the scene of an accident causing property damage" after witnessing Parker bump the mailbox while driving in reverse. Ex. 3, Cuevas Dep. at 78:6-79:1. Minor, non-violent, misdemeanor traffic offenses do not sway the pendulum in favor of using deadly force. See *Deville v. Marcantel*, 567 F.3d 156, 167 (5th Cir. 2009) ("Deville was stopped for a minor traffic violation—exceeding the 40 mph speed limit by 10mph—making the need for force substantially lower than if she had been suspected of a serious crime."); *Drake v. City of Pearl*, 494 F.Supp.2d 437, 440 n. 4 (S.D.Miss.2007) ("the mere fact that a motorist has committed a traffic infraction ... does not authorize the officer to use excessive force to arrest that person."). Even if Cuevas believed that the driver of the vehicle was the subject of the dispatch call, he would have only suspected him of disorderly conduct. Indeed, when he arrived at the scene, he did not believe the disorderly conduct was severe enough to warrant a Code 2 response, which would require him to arrive with blue lights and sirens on. Ex. 2, Cuevas Dep. at 35:23-37:2.

3. <u>Attempts at resistance or evasion.</u>

Defendant does not argue that Parker was trying to flee or resist arrest or that he informed Parker he was under arrest. Doc. 133. It is unclear whether Parker even knew Cuevas was a police officer, and eyewitnesses testified that he did not identify himself as such. See *supra* at 13-14. Cuevas's version of facts does not support that he believed Parker was attempting to resist, flee, or evade as a justification for the use of force. Rather, Cuevas has been resolute that the reason he killed Parker was because he posed a deadly threat though there is no evidence that Parker posed such a threat when viewing the facts in the light most favorable to the Plaintiff. Similarly, there is no evidence to support that Parker attempted to resist or evade an arrest.

**B. Defendant Cuevas violated clearly established law.**

On February 1, 2020, it was clearly established in the Fifth Circuit that an officer could not use deadly force against an individual whom he did not reasonably believe posed a threat of serious bodily harm. *Lytle*, 560 F.3d at 417–18; *See also Allen*, 65 F.4th at 745 (it was well-established on November 4, 2015 "that such use of deadly force against a person who the officer knows is not dangerous is a constitutional violation."); *Crane*, 2022 WL 4592035, at *9 ("[The officer] was on notice that the use of deadly force is objectively reasonable except in only one circumstance, where an officer has a reasonable belief that he or the public was in imminent danger."). Further, the weight of authority in other jurisdictions provides additional notice to Defendant Cuevas that he could not shoot into the stationary vehicle in which Parker, an individual who was not suspected of a felony, sat idly.[5] *Stewart v. City of Euclid, Ohio*, 970 F.3d 667, 682 (6th Cir. 2020) ("Stewart

---

[5] In addition to Supreme Court and Fifth Circuit precedent, courts in this Circuit look to other Circuit Courts of Appeals to determine whether a right was clearly established. *McClendon v. City of Columbia*, 305 F.3d 314, 329 (5th Cir. 2002) ("we must consider both this court's treatment of the state-created danger theory and status of this theory in our sister circuits in assessing whether a reasonable officer would have known at the time of Detective Carney's actions that his conduct was unlawful.").

31

was unarmed, was not suspected of committing a serious felony, and was operating a stationary vehicle. Therefore, he presented no imminent threat of death or serious physical injury to any individual, and "any reasonable official should have known" that lethal force was plainly inappropriate."); *Villanueva v. California*, 986 F.3d 1158, 1171 (9th Cir. 2021) (finding that in 1996, the Ninth Circuit "[c]learly established that an officer who shoots at a slow-moving car when he can easily step out of the way violates the Fourth Amendment); *Lane v. City of Mesa*, 2021 WL 11650853, at *12 (D.Ariz., 2021) ("the Court finds that, interpreting the evidence in the light most favorable to Plaintiff, it was clearly established before April 20, 2017 that shooting unarmed vehicle occupants in a stationary vehicle, who were complying with officer commands and posing no risk or harm to officers or others, violated the Fourth Amendment prohibition on unreasonable seizures and excessive force."); *Morton v. Kirkwood*, 707 F.3d 1276, 1283 (11th Cir. 2013) (finding a 2003 case "gave fair warning that the use of deadly force against a non-resisting suspect who posed no danger violates a suspect's Fourth Amendment right to be free from excessive force.").

Cuevas urges this Court to define the right at an impermissible level of specificity and to hold Plaintiff to an impossibly high burden of citing to a case that is exactly analogous to overcome qualified immunity. That is not what the Fifth Circuit requires. In determining whether a right was clearly established, "the salient question ... is whether the state of the law at the time of an incident provided fair warning to the defendants that their alleged conduct was unconstitutional." *Id*. (citing at *Hope*, 526 U.S. at 741, 122 S.Ct. 2508). "**While there need not be a case directly on point, the unlawfulness of the challenged conduct must be beyond debate**." *Joseph on behalf of Est. of Joseph v. Bartlett*, 981 F.3d 319, 330 (5th Cir. 2020) (internal quotations omitted) (emphasis added). "The law can be clearly established despite notable factual distinctions between the precedents relied on and the cases then before the Court, so long as the prior decisions gave

32

reasonable warning that the conduct then at issue violated constitutional rights." *Lytle.*, 560 F.3d at 417. It is beyond debate that Cuevas could not use deadly force against Parker as he sat idly in a stationary vehicle, posing no threat to anyone.

1. <u>Cases in this jurisdiction put Cuevas on notice that he could not use deadly force against a fleeing felon without sufficient justification, much less a non-resisting individual in a stationary vehicle suspected of a misdemeanor.</u>

The Fifth Circuit has long held that an officer cannot use deadly force against a "fleeing felon" that does not pose a sufficient threat inside of a vehicle. *Lytle,* F.3d at 417–18 ("It has long been clearly established that, absent any other justification for the use of force, it is unreasonable for a police officer to use deadly force against a fleeing felon who does not pose a sufficient threat of harm to the officer or others."). The *Graham* factors weighed more in favor of the use of deadly force in those cases because they involved 1) a civilian who was suspected of a felony as opposed to a misdemeanor and 2) there was no question that the civilian was evading the officer. Still, officers using deadly force against a fleeing felon have been *denied* qualified immunity where the "fleeing felon" did not pose a threat of serious bodily injury. Cuevas was on notice from clearly established Fifth Circuit precedent that he could not use deadly force to shoot a fleeing felon in a car that posed no threat, so he was certainly on notice that Parker, who was suspected of nothing more than a traffic misdemeanor and was not attempting to flee, was entitled to the same right to be free from excessive force while sitting in a stationary vehicle.

In *Lytle*, a defendant deputy responded to a domestic violence complaint involving an ex-boyfriend driving a stolen car. 560 F.3d at 407. After learning that the ex-boyfriend was a known car thief on bond for felony theft and unlawfully carrying a weapon, the deputy spotted a similar car and began to follow it. *Id*. After witnessing it change lanes without signaling, the deputy initiated a traffic stop but the car did not stop. *Id.* The deputy pursued until the car collided with another vehicle. *Id*. The car then backed up towards the deputy and continued to drive three or four

houses down the block, until the deputy fired twice at the vehicle, striking and killing the 15-year-old girl in the back seat. *Id.* 407-08. The deputy asserted "that his use of force was a reasonable response to the threat of harm that the [Ford] Taurus posed to himself and the public." *Id*. at 412. The Fifth Circuit rejected this argument, finding that the plaintiff's versions of fact allowed a jury to find the use of force was unreasonable, even though the vehicle had fled from the officer, caused a collision, and sped off in an unpredictable manner. *Id*. at 417. If it was clearly established in 2009 that an officer cannot used deadly force against an individual who had committed a felony and was evading the police unless they pose a threat, surely Cuevas was on notice that he could not use deadly force on someone who was not fleeing and was, at most, suspected of a misdemeanor. The Fifth Circuit has long put officers on notice that an officer may not use deadly force without sufficient justification, even against a felon who was attempting to escape law enforcement in a vehicle.

Cuevas relies on *Irwin v. Santiago*, an unpublished case decided well after the incident in question. 2021 WL 4932988 at *1 (5th Cir. Oct. 21, 2021). In *Irwin*, officers witnessed the decedent run off the road. *Id*. As he reversed, the officers got out of their vehicles with their weapons drawn and gave commands to stop the vehicle. *Id*. An officer approached the decedent's vehicle from the rear, while the other officer approached from the front. *Id*. By the plaintiff's account, the officers were close to the vehicle and they started shooting as he drove past the officer at the front of the car. *Id*. In granting qualified immunity, the court focused on particular material facts: the failure to heed officers' commands to stop, the officer in front's position, and the brief period of time available for officers to perceive and react to the vehicle's direction. *Id*.  None of these facts weighing in favor of qualified immunity exist in Parker's case. Cuevas never commanded Parker to stop the vehicle or identified himself as an officer. He arrived at the scene without his lights or

sirens on, so Parker may not have even known the police were there. Parker was barely moving and then came to a complete stop by the time Cuevas shot at him.

Plaintiff recognizes that vehicles can be and have been used as deadly weapons justifying the use of force, but it is clearly established that an officer cannot use deadly force just because a suspect is in a vehicle. The *Lytle* court also provided the following:

> "[O'Donnell] is mistaken to focus entirely on the threat of harm. Even were we to agree with O'Donnell as to the threat the Taurus posed, we would be remiss not to consider O'Donnell's conduct in response to that threat. **It is unclear how firing at the back of a fleeing vehicle some distance away was a reasonable method of addressing the threat.** Indeed, there is some evidence in the record that O'Donnell had been previously informed of the potential danger and futility of shooting at a vehicle. Were a jury to accept Lytle's version of the facts, it might very well be troubled by O'Donnell's act of firing his sidearm at the back of a vehicle three or four houses down the block of a residential area when he was unlikely to have a shot at—and apparently was not aiming for—the driver. A jury might also find that O'Donnell's act of firing at a vehicle driving away from him in a residential area posed a risk that the shots might strike an unintended target. Thus, even if we assumed that the Taurus posed a significant threat of harm, a jury could conclude that O'Donnell's conduct in response to that threat was unreasonable. In other words, under the plaintiff's version of the facts, O'Donnell's conduct itself weighs against a conclusion of reasonableness."

560 F.3d at 412-413 (emphasis added). As in *Lytle*, a jury may be troubled that Cuevas was so apt to fire his weapon three to four times at a vehicle with so many bystanders present, not even knowing if the occupants had been involved in any crime. The potential to strike bystander was evident, and indeed one bullet did ricochet off the truck. Ex. 8, Teates Report at 6. Thus, *Lytle* is sufficiently analogous to have put Cuevas on notice that he was violating Parker's rights, and the existence of the *Irwin* case cannot undermine what was already clearly established.

Other cases in the 5th Circuit have denied qualified immunity in similar circumstances, demonstrating the clearly established nature of Parker's rights. In *Dawes v. City of Dallas*, two officers received a call regarding a "suspicious person" related to a vehicle, approached the car, and shined flashlights inside revealing the sleeping plaintiffs. 2020 WL 5930624 at *1 (N.D. Tex.

35

Jan. 27, 2020), *report and recommendation adopted in part, rejected in part*, 2020 WL 3603090 (N.D. Tex. July 2, 2020).[6] The car had been reported stolen, but the plaintiff who purchased it did not know, as it was purchased legitimately. *Id*. Surprised by the lights and voices, which she did not know belonged to police, the plaintiff started the car and began to back out until a police car drove into her path, after which she stopped, moved slightly forward, shifted into reverse, and slowly began to back up again. *Id*. During this second reverse maneuver, the officers fired through the passenger side window, striking both plaintiffs. *Id*. One of the officers argued that he was entitled to qualified immunity because "he used deadly force in response to the imminent danger to him and other [police] officers presented by [plaintiff] as she 'recklessly attempted' to flee the scene in a stolen vehicle, 'intentionally rammed' a police car, and tried to 'drive through a fence.'" *Id*. at 3. The court denied qualified immunity though, holding that an officer could not find it objectively reasonable to shoot "into a slowly moving vehicle, whose occupants had just been awakened, and the only suspected crime was that the vehicle had been stolen." *Id*.

In *Cole v. Carson*, officers searched for a suicidal teenager who they knew had placed a gun to his head but had not taken "aggressive action." 935 F.3d 444, 455 (5th Cir. 2019), *as revised* (Aug. 21, 2019). According to plaintiff, the teenager never pointed the gun at the officers, and the officers never provided warning before shooting him. *Id*. at 449. The officers, by contrast, claimed that the teenager pointed the gun at them and did not give them time for a warning. *Id*. Accepting plaintiff's facts, the Fifth Circuit affirmed that a "reasonable jury could find that [plaintiff] made no threatening or provocative gesture to the officers and posed no immediate threat to them" and that the officer had accordingly violated clearly established law. *Id*. at 455. Similarly, Cuevas was on notice that he would be violating clearly established law by shooting at an individual that was

---

[6] The court adopted the portion of the magistrate's opinion considering qualified immunity.

not a threat to him, despite having access to something that could hurt him, i.e. Parker's car. The *Cole* facts are sufficiently analogous because Parker, like the teenager in *Cole*, could *eventually* rise to a threat, albeit with a car instead of a gun. Yet, even with a gun present, the *Cole* Court found that the possession of a "deadly weapon" was not enough to warrant deadly force. *Id.* One of the officers "conceded that he would have had no basis to fire upon [plaintiff] unless [plaintiff] had been facing him and pointing a gun at him," and the Court deemed it an "obvious case." *Id*. at 453. Similarly, Cuevas would have understood, and it was obvious, that shooting at Parker merely because he was in possession of an item that *could* be used to harm Cuevas, when Parker provided no indication that he was *going to* use it to create a deadly threat, was unreasonable. Officer Cuevas was on notice of clearly established law such that qualified immunity should not apply here.

    2.  <u>There are too many questions of fact in this matter to support qualified immunity.</u>

The ample fact disputes in this matter preclude qualified immunity. *Cole v. Carson*, 935 F.3d 444 (5th Cir. 2019), *as revised* (Aug. 21, 2019). "Of course, if an excessive force claim turns on which of two conflicting stories best captures what happened on the street, *Graham* will not permit summary judgment in favor of the defendant official. And that is as it should be." *Saucier v. Katz*, 533 U.S. 194, 216 (2001) (J. Ginsburg, concurring). Cuevas relies on cases in which it was undisputed that the officer reasonably feared for his life, but those cases are inapplicable here, where many questions remain to be resolved by the jury regarding the speed and path of the vehicle, as well as whether Cuevas gave a warning before firing. In *Hathaway v. Bazany,* like here, the shooting officer claimed that he was in close proximity to a car that he had asked to pull over when it accelerated towards him, rendering reasonable any perception of a serious threat. 507 F.3d 312, 322 (5th Cir. 2007). Unlike in Parker's case, the *Hathaway* officer's deposition was "the primary source for direct evidence of how the shooting transpired." *Id*. at 318. Similarly, in *Herman*, the shooting officer claimed that a driver accelerated towards him at such a close

37

proximity that he was, in fact, struck by the vehicle. *Herman v. City of Shannon, MS.*, 296 F. Supp. 2d 709, 714 (N.D. Miss. 2003), *aff'd sub nom. Herman v. City of Shannon, Mississippi*, 104 F. App'x 398 (5th Cir. 2004). The *Herman* plaintiff conceded that she "did not have a clear recollection of these events and that Officer Edwards' recollection may well have been correct," instead arguing the officer was not justified in using deadly force because "he was not even struck hard enough to knock him to the ground and that he was not hurt." *Id.* at 713.

In *Hathaway* and *Herman*, it was undisputed that the officer's life was endangered by the suspect during the interaction. Without contradictory evidence, the Court in *Hathway* and *Herman* had to accept the officer's statements about the threat posed by the vehicles they fired at. That is not true regarding Mr. Parker. If Cuevas's version of events was to be taken at face value, he may indeed be entitled to qualified immunity. But where there are *five eyewitnesses* providing contradictory testimony and physical evidence undermining his account, both of which undermine the reasonability of his "belief" that the truck was accelerating towards him, accepting Cuevas's version of events would be antithetical to the summary judgment standard.

Of course, Cuevas's argument is that he *did* believe the truck posed a threat of serious bodily injury, but his subjective belief of such a threat does not justify his use of force when the belief is objectively unreasonable. The question is one of "objective reasonableness," not subjective intent, and his must be judged in light of the circumstances confronting him, without the benefit of hindsight. *Manis v. Lawson*, 585 F.3d 839, 843 (5th Cir. 2009); *see also Allen*, 65 F.4th at 744 ("[…] an officer cannot escape liability any time he claims he saw a gun. The question is whether the officer's belief that he saw a gun was sufficiently reasonable to justify the use of deadly force in light of all the surrounding circumstances."). Courts "do not look at the officer's subjective intent." *Giardina v. Lawrence*, 354 F. App'x 914, 915 (5th Cir. 2009). As discussed

*supra*, the facts construed in the light most favorable to the Plaintiff allow a jury to find that Cuevas was objectively unreasonable when he shot and killed Parker inside of a stationary vehicle that was not revving its engine or showing any sign of accelerating towards him. It was clearly established that such use of force would be excessive. Cuevas does not argue that his use of force would have been reasonable even in the scenario where the truck was stationary or slow-moving. Rather, he argues his position by resolving each factual inference in his favor and crafting a story that would have justified his use of force. Using his version of events to grant qualified immunity would be reversible error. *Cole*, 935 F.3d at 452 ("The Supreme Court has summarily reversed this court for failing to take the evidence and draw factual inferences in the non-movants' favor at the summary judgment stage.").

3.  <u>It would have been obvious to any reasonable officer that he cannot kill someone sitting idly in the driver seat of a stationary vehicle.</u>

Finally, it is obvious to any reasonable officer that he cannot use deadly force against a driver sitting in a stationary vehicle who is not showing any signs of aggressive behavior or flight. "[I]n an obvious case, analogous case law is not needed because the unlawfulness of the [challenged] conduct is sufficiently clear even though existing precedent does not address similar circumstances." *Joseph*, 981 F.3d at 330 (internal quotations omitted). Even if this Court determines that there is no case in the Fifth Circuit that is analogous enough, due to the distinction that the leading case involved an officer using deadly force against a driver in a stopped vehicle that was suspected of a felony, it was sufficiently obvious to Officer Cuevas that an individual suspected of a misdemeanor would have the same rights. To suggest that any reasonable officer would not understand that deadly force in a situation where an individual was idly sitting in the driver's seat of a stationary vehicle is tantamount to giving officers carte blanche to use deadly

force at every traffic stop, regardless of the circumstances, something a reasonable officer would know without doubt violates the rights of the individuals involved.

## V.    <u>Conclusion</u>

The eyewitnesses in this matter establish a question of fact. A  jury *could* reasonably find for the Plaintiffs' version of the facts, believing the testimony of witnesses along with the supporting physical evidence, and find that Cuevas killed Parker in violation of his Fourth Amendment rights. Defendant's motion for summary judgment does not negate the evidence contrary to Cuevas's version of the incident, which the jury will certainly hear it at trial. Further, this Court must accept the Plaintiff's version as true at summary judgment. These differing narratives provide the genuine issues of material fact that go to the heart of the rights protected by the Fourth Amendment. Defendant's motion should be denied.

Respectfully submitted this 29th day of November 2023,

CATINA PARKER, PLAINTIFF

<u>/s/ Sam Harton</u>, *pro hac vice*
**ROMANUCCI & BLANDIN, LLC**
Sam Harton (Il. No. 6342112), *pro hac vice*
Bhavani Raveendran, *pro hac vice*
Attorneys for the Plaintiff
321 N. Clark St., Ste. 900
Chicago, IL 60654
Telephone: (312) 458-1000
Facsimile: (312) 458-1004
sharton@rblaw.net
b.raveendran@rblaw.net

**COXWELL & ASSOCIATES, PLLC**
Charles R. Mullins (MB #9821)
Attorney for the Plaintiff
Post Office box 1337
Jackson, Mississippi 39215
Telephone: (601) 948-1600

Facsimile: (601) 948-7097
chuckm@coxwelllaw.com

41

## CERTIFICATE OF SERVICE

I hereby certify that on November 29, 2023, I electronically filed the foregoing with the Clerk of the Court using the ECF system which sent notification of such filing to the following:

William E. Whitfield, III
Kaara L. Lind
Attorneys for Defendant Cuevas
COPELAND, COOK, TAYLOR & BUSH, P.A.
Centennial Plaza
200 East Beach Boulevard, Building #5
Gulfport, Mississippi 39507
P.O. Box 10
Gulfport, Mississippi 39502-0010
telephone (228) 863-6101
telecopier (228) 863-9526

Jeffrey S. Bruni, Esq.
Attorney for Defendant City of Gulfport
P.O. Box 1780
Gulfport, MS 39502
jbruni@gulfport-ms.gov
Attorney for Defendant,
City of Gulfport

/s/ Sam Harton, *pro hac vice*
**ROMANUCCI & BLANDIN, LLC**
Sam Harton (Il. No. 6342112), *pro hac vice*
Bhavani Raveendran, *pro hac vice*
Attorneys for the Plaintiff
321 N. Clark St., Ste. 900
Chicago, IL 60654
Telephone: (312) 458-1000
Facsimile: (312) 458-1004
sharton@rblaw.net
b.raveendran@rblaw.net

42