1           IN THE UNITED STATES DISTRICT COURT
        FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
2                    SOUTHERN DIVISION

3


4   CATINA PARKER, as Personal
    Representative of the Estate
5   of Leonard Parker, Jr.,
    Deceased,
6        Plaintiff,

7

    VERSUS        CIVIL ACTION NO: 1:21-cv-00217-HSO-BWR
8

9   THE CITY OF GULFPORT, a
    municipal corporation; JASON
10  CUEVAS in his individual and
    official capacity; and JOHN
11  DOE OFFICERS #1 - 5 in their
    official and individual
12  capacities,
         Defendants.

13

14

15

16       VIDEOTAPED DEPOSITION OF JASON CUEVAS

17

18       Taken at the offices of Copeland, Cook,
         Taylor & Bush, P.A., 200 East Beach
19       Boulevard, Building 5, Gulfport,
         Mississippi, on Wednesday, June 14,
20       2023, beginning at 9:16 a.m.

21

22

23

24

25  REPORTED BY:  F. DUSTY BURDINE, CSR #1171
    McCORKLE LITIGATION SERVICES, INC.          Exhibit 3



McCorkle Litigation Services, Inc.          1
Chicago, Illinois  (312) 263-0052

```
 1    APPEARANCES:

 2    REPRESENTING THE  PLAINTIFF:

 3         BHAVANI K. RAVEENDRAN, ESQUIRE (VIA ZOOM)
           SAMANTHA A. HARTON, ESQUIRE (VIA ZOOM)
 4         Romanucci & Blandin, LLC
           321 N. Clark Street, Suite 900
 5         Chicago, Illinois  60654

 6         CHARLES R. MULLINS, ESQUIRE (VIA ZOOM)
           COURTNEY SANDERS, ESQUIRE (VIA ZOOM)
 7         Coxwell & Associates, PLLC
           P.O. Box 1337
 8         Jackson, Mississippi  39215

 9
      REPRESENTING THE CITY OF GULFPORT:
10
           JEFFREY S. BRUNI, ESQUIRE
11         Gulfport City Attorney
           2309 15th Street
12         Gulfport, Mississippi  39501

13
      REPRESENTING JASON CUEVAS:
14
           WILLIAM E. WHITFIELD, III, ESQUIRE
15         KAARA LIND, ESQUIRE
           Copeland, Cook, Taylor & Bush, P.A.
16         Centennial Plaza
           200 East Beach Boulevard, Building 5
17         Gulfport, Mississippi  39507

18
      VIDEO TECHNICIAN:
19
           KELLY WOODS, McCORKLE LITIGATION SERVICES
20

21

22

23

24

25
```



1              T-A-B-L-E O-F C-O-N-T-E-N-T-S

2

   Examination by:                        Page

3

         Ms. Raveendran --------------------- 12

4

         Mr. Whitfield ---------------------- 159

5

   Exhibits:

6

         Exhibit 50, Photograph, Bates

7           MBI Scene Photos 091 ------------- 119

8        Exhibit 51, Use of Force Policy,
           Bates MBI Complete Case File

9           Report 063 - 076 ---------------- 152

10                        - - -

11

12   Stipulation ---------------------------   4

13   Certificate of Reporter ---------------- 163

14   Errata Sheet --------------------------- 164

15

16

17

18

19

20

21

22

23

24

25



1                    STIPULATION

2        It is hereby stipulated and agreed by and

3   between the parties hereto, through their

4   respective attorneys of record, that this

5   deposition may be taken at the time and place

6   hereinbefore set forth, by F. Dusty Burdine, Court

7   Reporter and Notary Public, pursuant to the

8   Federal Rules of Civil Procedure, as amended;

9        That the formality of READING AND SIGNING is

10  specifically NOT WAIVED.

11                       - - -

12

13

14

15

16

17

18

19

20

21

22

23

24

25



Jason Cuevas  06/14/2023

 1        A.    I don't recall ever responding to that

 2    address, no, ma'am.

 3        Q.    And any of the witnesses on scene, did

 4    you recognize anyone that you believe you had met

 5    before or seen before?

 6        A.    No, ma'am.

 7        Q.    And you were in uniform that night; is

 8    that correct?

 9        A.    Yes, ma'am.

10        Q.    Can you describe your uniform?

11        A.    It's dark blue polyester pants with a

12    lighter blue stripe up the sides of the legs and

13    the outside of the legs and a short-sleeved

14    polyester top the same color as the pants with

15    patches and badge and name plate and all.

16        Q.    Okay.  Can you describe where the

17    patches are located?

18        A.    On the outsides of the shirts.

19        Q.    Do they identify you as a police

20    officer?

21        A.    Yes, ma'am.

22        Q.    What do they say?

23        A.    Gulfport Police Department.

24        Q.    And what color are the patches?

25        A.    Trimmed in yellow and they have like

1    multicolors.  They have blue.  They've got a

2    little bit of green in there.  All kinds of color.

3         Q.   Is there anywhere on your uniform where

4    it says Police in letters right on the fabric?

5         A.   Other than the patches, no, ma'am.

6         Q.   And did you have a name tag or anything

7    like that on your uniform?

8         A.   Yes, ma'am.

9         Q.   Where was that located?

10        A.   It's on the breast pocket, above the

11   breast pocket.

12        Q.   Did you have -- on February 1st, 2020,

13   were you equipped with a body-worn camera?

14        A.   Yes, ma'am.

15        Q.   And where was that located?

16        A.   It's mounted to the front of the shirt.

17        Q.   Okay.  Right in the middle of the chest?

18        A.   Yes, ma'am.

19        Q.   And how do you turn it -- well, strike

20   that.

21             Do you still have the same kind of

22   body-worn camera today?

23        A.   No, ma'am.

24        Q.   Okay.  So back in February of 2020, how

25   did you turn on your body-worn camera if you

1    needed to use it?

2        A.   There was multiple ways.  The first of

3    which there was a wristwatch kind of deal that had

4    a button to activate the camera.  You could also

5    pull the camera out of the shirt to then turn it

6    on from there to put back into the unit so it

7    would record, as well as there was an automated

8    system within the car that when blue lights and

9    sirens were activated once you opened the driver

10   door it would turn the body-worn camera on.

11       Q.   Okay.  And then did you also have a dash

12   camera?

13       A.   Yes, ma'am.

14       Q.   And how was that activated?

15       A.   Either by the same method of the

16   body-worn camera or when you immediately turn the

17   blue lights on for the patrol vehicle, the cameras

18   would turn on.

19       Q.   Okay.  And generally speaking, when

20   would you activate your body-worn camera when

21   responding to a call?

22       A.   Anytime you make citizen contact.

23       Q.   Okay.  So would it be fair to say that

24   you would turn it on if you were going to be

25   interacting with individuals?



Jason Cuevas 06/14/2023

1        A.    Yes, ma'am.

2        Q.    Did you have a duty belt or a vest on on

3   the date of the incident?

4        A.    Yes, ma'am.

5        Q.    And what was -- well, strike that.

6   Sorry.

7             Which one, a vest or a belt?

8        A.    Both.

9        Q.    Both, okay.  And was there any -- strike

10  that.

11            So where did you keep your firearm, on

12  your vest or your belt?

13       A.    On my duty belt.

14       Q.    On your duty belt?

15       A.    Yes, ma'am.

16       Q.    And what else was on your duty belt?

17       A.    Two spare magazines, a can of Oleoresin

18  Capsicum spray, a Taser Model X2, a radio, a

19  flashlight, two sets of handcuffs, tourniquet and

20  an ASP baton as well as a firearm.

21       Q.    Do you recall what firearm you were

22  carrying on the day of the incident?

23       A.    Yes, ma'am.

24       Q.    What was that?

25       A.    A Glock 17 Generation 5.



1      Q.   When you carry your Glock 17 in your

2   duty belt, was the safety on?

3      A.   Glocks don't have a manual safety.

4      Q.   Okay.  They have an automatic safety; is

5   that right?

6      A.   It's a -- I don't know how they define

7   it, actually.  It's basically built into the

8   trigger.

9      Q.   Do you recall if your magazine was full

10   on February 1st, 2020 before you discharged the

11   weapon on scene?

12      A.   I'd be assuming.  I didn't check it

13   before I went on shift that day.

14      Q.   What kind of flashlight did you have?

15      A.   It's a Streamlight.  I don't remember

16   the model.

17      Q.   Do you recall how big it was?

18      A.   I guess just an average size flashlight.

19      Q.   Okay.  So I've seen a lot of police

20   officers carry a flashlight that's about the

21   length of the average person's forearm.

22      A.   Oh, no, no, no.

23      Q.   No, okay.  So just a normal flashlight?

24      A.   Yes, ma'am.

25      Q.   Okay.  You have a water bottle next to



1    you on the desk.  Do you recall if the flashlight

2    was bigger or smaller than the water bottle?

3         A.   Sorry.

4    MR. WHITFIELD:

5              Turn that cap on.

6    MS. RAVEENDRAN:

7         Q.   I don't think that water bottle wants

8    you to turn it.

9         A.   So I'd say it's probably about maybe

10   that long (indicating).

11        Q.   So I'm going to say that you're holding

12   out what looks like about eight or nine inches

13   long?

14        A.   I have no idea.  It's a 16.9 ounce water

15   bottle.

16        Q.   Okay.  Just a little bigger than that

17   water bottle; is that fair?

18        A.   Yes, ma'am.

19   MR. WHITFIELD:

20             It looks, at least in the room, Bhavani,

21   like it's about 12 to 14 inches long.

22   MS. RAVEENDRAN:

23             Okay.

24   MR. WHITFIELD:

25             Okay.  The flashlight would be about 12



Jason Cuevas  06/14/2023

 1  to 14 inches long.

 2  MS. RAVEENDRAN:

 3      Q.   So is that correct, then, Officer

 4  Cuevas, about 12 to 14 inches long the flashlight

 5  is?

 6  MR. WHITFIELD:

 7          Let me do this for you.  Here's an

 8  eight-and-a-half-by-11 piece of paper.  And what

 9  he did is, he put his finger beyond the top of the

10  bottle about like that.  Does that make sense?

11  MS. RAVEENDRAN:

12          Yes.  Thank you.

13      Q.   Now, I'm going to say for the record

14  that looks about 10 inches or so; is that fair?

15      A.   Yes, ma'am.

16  MR. WHITFIELD:

17          Yeah.

18  MS. RAVEENDRAN:

19      Q.   Do you recall what settings the

20  flashlight had?

21      A.   I didn't hear you.  I'm sorry.

22      Q.   Sure.  Do you recall what settings the

23  flashlight had?

24      A.   It had an on and an off, a dim setting,

25  which when you turn the flash on, it's always on

1  the brightest setting.  You actually have to hold

2  the button down for it to reduce the power.  And

3  it also had a feature where if you double click

4  the activation button, it would go into a strobe

5  mode.

6      Q.   And what did you use the strobe mode

7  for?

8      A.   Typically to gain attention from people

9  to show that something was changing in their sight

10  to gather attention.

11      Q.   Do you recall what you were doing before

12  you were informed that your presence may be

13  required at the scene of the incident?

14      A.   I do not.

15      Q.   Do you recall any of the other dispatch

16  calls or activities you were involved in on shift

17  before you responded to the scene of the incident?

18      A.   No, ma'am.

19      Q.   Okay.  At some point do you recall

20  receiving a dispatch call that informed you there

21  was a potential disorderly to investigate?

22      A.   Yes, ma'am.

23      Q.   What do you recall -- strike that.

24          Do you recall if you received a dispatch

25  call, a call to your phone or information on the



1    computer or something like that?

2        A.   It was through dispatch, through the

3    police radio.

4        Q.   Okay.  Does your vehicle have a computer

5    system?

6        A.   Yes, ma'am, it did.

7        Q.   Okay.  And do you ever receive

8    information along with radio calls on that system?

9        A.   Yes, ma'am.

10       Q.   Do you ever recall viewing on the

11   computer system any information regarding this

12   call?

13       A.   No, ma'am.  I was so close to the call

14   that I didn't need to look at the MDT.  I was able

15   to listen to dispatch.

16       Q.   Do you remember where you were?

17       A.   Exactly when the call came out, no,

18   ma'am.

19       Q.   Do you remember the general area?

20       A.   It was on the east -- the -- it's called

21   the eastern side of A3.

22       Q.   What do you recall hearing when the

23   radio call came through?

24       A.   They said there was a disorderly male at

25   a residence that was trying to fight people at the

Jason Cuevas 06/14/2023

1    residence who appeared to be intoxicated.

2        Q.   And you were informed of one individual;

3    is that right?

4        A.   Yes, ma'am.

5        Q.   Were you given any description of what

6    the individual looked like?

7        A.   I don't recall that I was actually given

8    the description by dispatch.  I just remember they

9    said there was a -- they said 29 male -- a single

10   29 male, which means disorderly, and that -- I

11   think they even stated there were no weapons

12   involved from what dispatch received.

13       Q.   Do you recall hearing the race of the

14   individual that you'd be investigating?

15       A.   No, ma'am.

16       Q.   And were you specifically assigned to

17   this call or did you know you were assigned to it

18   because of your location in A3?

19       A.   I remember being assigned to the call

20   and -- because the officer that worked the

21   neighboring area, his area partner who rides in a

22   separate vehicle was at the station, so he would

23   have had to have responded by himself without

24   another officer.

25       Q.   And did you have an area partner that



1    night?

2        A.   Yes, ma'am.  I had another officer that

3    worked in A3 with me.

4        Q.   Okay.

5        A.   Not in my vehicle.

6        Q.   Oh, sorry.  Who was that?

7        A.   Officer Eddie Flores.

8        Q.   Do you recall who the first officer who

9    responded to the scene was after the shooting

10   occurred?

11       A.   Officer William Brewer.

12       Q.   Do you know where Officer Brewer was

13   assigned that night?

14       A.   I don't remember if he was assigned to

15   A5 or A6, but he was assigned to one of those two

16   areas.

17       Q.   Do you ever recall seeing Officer Flores

18   on scene?

19       A.   He was not there.  I don't recall seeing

20   him.

21       Q.   When you heard the dispatch call, do you

22   recall hearing whether or not Officer Flores was

23   assigned to the call as well?

24       A.   I believe he was at the station at that

25   point, but I don't recall him being actually

1    dispatched to that call.

2         Q.   Did you ask any follow-up questions or

3    get any additional information?

4         A.   I did not ask any follow-up questions

5    and I don't recall getting any more information.

6         Q.   Did you then travel to the scene?

7         A.   Yes, ma'am.

8         Q.   How long did that take you?

9         A.   Not very long, like -- I couldn't give

10   you an exact number, like a time frame.

11        Q.   Do you believe it was less than 10

12   minutes?

13        A.   Yes, ma'am.

14        Q.   Do you recall approximately how much

15   distance you traveled to get there?

16        A.   I'd be guessing if I gave you a distance

17   on that one.

18        Q.   Were you in the same neighborhood, if

19   you can recall?

20        A.   Was I in the same neighborhood as what?

21        Q.   As the scene.

22        A.   No, ma'am.

23        Q.   As you headed to the scene, do you

24   recall if you turned on your lights and sirens?

25        A.   I did not turn on my lights or sirens.



Jason Cuevas 06/14/2023

1        Q.    Do you remember why?

2        A.    Because it didn't warrant a -- what we

3    would say a Code 2 response, which is activating

4    lights and sirens.

5        Q.    And based on your experience, what is a

6    Code 2 response?

7        A.    Typically like an accident involving

8    injuries, a person with a firearm, a person with a

9    knife, a shooting, ag assault, murder, those kind

10   of calls.

11       Q.    Okay.  And then is there a code number

12   that would have applied to your response to the

13   scene?

14       A.    Yes, ma'am.  It would be Code 1.

15       Q.    And can you describe what Code 1 is?

16       A.    Driving the speed limit with no lights

17   or sirens activated.

18       Q.    And what kind of calls warrant a Code 1

19   response?

20       A.    It could be property crimes where

21   there's no suspect on the scene, non-violent

22   crimes where like emergency assistance wasn't

23   necessary at a quick pace.

24       Q.    Okay.  And would it be fair to say that

25   a drunken disorderly would be within the bounds of

Jason Cuevas 06/14/2023

1    Code 1?

2        A.   Yes, ma'am.

3        Q.   At any point before you got to the

4    scene, were you aware of any other units

5    responding as well?

6        A.   The only other officer I knew that was

7    dispatched was Officer Brewer.

8        Q.   And do you recall knowing whether or not

9    Officer Brewer was assigned as the primary officer

10   on the scene or if he was a backup for you?

11       A.   Typically they just assign multiple

12   officers to a call.  They don't say which ones are

13   primary or backup.

14       Q.   So what was your understanding of your

15   role when you arrived on scene?

16       A.   To make initial contact with the

17   complainant.

18       Q.   And where -- strike that.

19            Is it your understanding that you parked

20   east of the residence that you were sent to?

21       A.   Yes, ma'am.

22       Q.   Do you recall if you arrived from east

23   of the residence or west of the residence?

24       A.   Like which direction I came in from?

25       Q.   Yes.



1  left down 25th Street.

2      Q.   Did you hear -- were the voices --

3  strike that.

4          Could you tell if the voices were

5  excited or if there was some conflict occurring?

6      A.   It sounded like so because it was so

7  many people it sounded like were talking.  It was

8  like multiple voices very loud.

9      Q.   Could you make out any of the words that

10 were being said?

11     A.   No, ma'am.

12     Q.   And you said your driver's side window

13 was open?

14     A.   Yes, ma'am.

15     Q.   Do you recall if your passenger side

16 window was open?

17     A.   I don't recall.  I just know I rolled

18 down my driver's side window so I could hear

19 better.

20     Q.   And as you turned onto 25th Street, do

21 you recall if your headlights were on?

22     A.   I really don't know if they were on or

23 off.

24     Q.   When you -- strike that.

25          Do you recall if your vehicle on



1        A.   You said from my perspective, I could

2  see what?

3  MS. RAVEENDRAN:

4        Q.   If you were able to see people, could

5  you tell if they were in a yard?

6        A.   In a yard?

7        Q.   Yes.

8        A.   I knew they were in front of the house.

9        Q.   Okay.

10       A.   What I -- at that point I believe it was

11  210.

12       Q.   Okay.  So at that point did you head

13  straight to the house or did you do something else

14  first?

15       A.   I was kind of watching to see what was

16  going on because of the commotion in case there

17  was, you know, someone fighting or anything to try

18  and gather information about the whole incident

19  and how to approach it.

20       Q.   And while you were observing -- strike

21  that.

22            Did you make any observations of what

23  the individuals were doing and -- well, that's my

24  whole question.

25       A.   I was able to observe a vehicle that was



1  slowly trying to back out of the driveway and

2  there were other people there that were watching

3  the vehicle as it was backing out.

4      Q.   And was anyone outside of the vehicle

5  fighting as far as you could tell?

6      A.   No, ma'am.  I did not observe anyone

7  fighting outside the vehicle.

8      Q.   Okay.  Did you observe any of the

9  individuals outside of the vehicle helping to

10  direct the vehicle?

11      A.   I don't recall seeing anyone direct the

12  vehicle.

13      Q.   Is there anything specific you recall

14  about who was -- well, strike that.

15           Can you describe any of the people that

16  were outside of the vehicle?

17      A.   I just -- I could see figures because of

18  how far away it was.  I could just see individual

19  figures in the yard.  I couldn't actually tell

20  what they truly looked like.

21      Q.   Okay.  Could you tell what they were

22  wearing?

23      A.   No, ma'am.

24      Q.   Okay.  Was there light shinning on the

25  individuals outside of the vehicle from the house

1  driveway; is that what you're asking me?

2  MS. RAVEENDRAN:

3       Q.   It would have been north.  All right.

4  Let me start over.

5       A.   I'm sorry.

6       Q.   So once you had parked, you got out of

7  the vehicle, right?

8       A.   Uh-huh.  Yes, ma'am.  Sorry.

9       Q.   Okay.  And would it be fair to say that

10 you had to walk west on 25th to get around your

11 vehicle and then you went towards the driveway to

12 the right?

13 MR. WHITFIELD:

14         Object to the form.

15      A.   I walked west from my parked vehicle and

16 went to the north side of the road towards that

17 mailbox.

18 MS. RAVEENDRAN:

19      Q.   Okay.  And when you were looking at the

20 mailbox, you were on the driveway already?

21 MR. WHITFIELD:

22         Object to the form.

23      A.   I couldn't recall if I was actually on

24 the driveway when I was looking at the mailbox

25 because I don't know how wide it was.  I know that



1    standing on the driveway of the house with the

2    white mailbox in the grass or on 25th Street?

3        A.   I don't know if I was on the asphalt or

4    the grass.  I know I was between the distance from

5    my car actually to the mailbox because I was

6    walking pretty much aligned to that mailbox when I

7    first saw it backing out.

8        Q.   Okay.  Can you describe the GMC, what

9    you remember seeing of that vehicle?

10       A.   I saw a dark colored truck, like a

11   full-size truck.

12       Q.   Did you notice how big the cab was?

13       A.   I couldn't tell you if it was like a

14   four door or if it was an extended cab at the time

15   when I first saw it.

16       Q.   You said that you observed the GMC

17   backing out of the driveway and strike a mailbox;

18   is that right?

19       A.   Yes, ma'am.

20       Q.   Can you describe the mailbox, color,

21   size, anything like that?

22       A.   I couldn't tell you the color.  I just

23   know -- because it was so dark.  I just -- I could

24   audibly hear the sound of the impact and visually

25   see it hitting the mailbox.  I could just see the



Jason Cuevas 06/14/2023

1    shape of it, like a silhouette.

2        Q.    And did you observe whether the mailbox

3    moved?

4        A.    Yes, ma'am.

5        Q.    What did you observe the mailbox doing?

6        A.    When it was struck by the vehicle, it

7    appeared to have been pushed back, like leaning

8    back more than it was before it was hit.

9        Q.    Okay.  Did it fall over completely?

10       A.    No, ma'am.

11       Q.    Could you tell if the mailbox was pushed

12   into the ground -- well, strike that.  Before the

13   vehicle struck the mailbox, could you tell if the

14   mailbox -- strike that also.

15            At any point while you were on scene,

16   did you observe if the mailbox that the GMC struck

17   was pushed into the ground or on a cement block of

18   some kind?

19       A.    I was too far away to --

20   MR. WHITFIELD:

21            Object to the form.

22   COURT REPORTER:

23            You've got to repeat your answer,

24   please.

25   THE WITNESS:

1           I was too far away to be able to see how

2    it was mounted or how it was positioned in the

3    ground.  I just could see that it was there.

4    MS. RAVEENDRAN:

5        Q.   Okay.  At any point while you were on

6    scene, did you go look at the mailbox that the GMC

7    struck?

8        A.   No, ma'am.

9        Q.   Can you describe the sound you heard

10   when the GMC hit the mailbox?

11       A.   It was just like the sound of contact.

12   I don't know really -- other than to say like

13   something hitting something, like a vehicle

14   hitting something.

15       Q.   Did you hear the sound of any glass

16   breaking?

17       A.   I don't remember hearing glass breaking.

18       Q.   And do you recall hearing any sound of

19   something shattering on the vehicle?

20       A.   I don't really -- I don't remember

21   hearing anything shatter.

22       Q.   How -- strike that.

23           Could you tell how fast the GMC was

24   going when it backed out of the driveway and

25   struck the mailbox?

Jason Cuevas 06/14/2023

1        A.    When it was backing out of the driveway,

2    it was going fairly slow because it looked like it

3    was having to maneuver around maybe other vehicles

4    or something.  So it was going relatively slow to

5    be able to maneuver through all the -- whatever

6    was in the yard.

7        Q.    Were there cars in there?

8        A.    Of 210 25th Street, yes, ma'am.

9        Q.    Could you tell -- well, strike that.

10           Did the GMC start at the top of the

11    driveway for 210 25th Street or was it somewhere

12    down the driveway?

13    MR. WHITFIELD:

14           Object to the form.

15    MR. BRUNI:

16           Same objection.

17        A.    When I saw it, it was -- I don't know

18    where the top of the driveway started, but it was

19    like -- there was a couple of cars that were

20    parked east of it in the yard, and then the truck,

21    I could just see it slowly backing out.  It was

22    like past the chain-link fence, or whatever fence

23    they had there at the south part of the residence,

24    the yard.  And it was slowly backing out from

25    there until it got past the chain-link and



Jason Cuevas 06/14/2023

1  continued on until it hit the mailbox.

2  MS. RAVEENDRAN:

3      Q.   Have you ever received any information

4  that made you believe that the GMC was parked in

5  the grass?

6      A.   Of 210, like where it was parked there?

7      Q.   Yes.

8      A.   No, ma'am.  I didn't receive any

9  information.

10      Q.   When you first saw the GMC, it was

11  already moving; is that right?

12      A.   Yes, ma'am.

13      Q.   So you never saw where it was parked; is

14  that fair?

15      A.   Correct.

16      Q.   Once the GMC made contact with the

17  mailbox on the south side of the street, did you

18  see the GMC stop?

19      A.   Yes, ma'am, it stopped.  As soon as it

20  hit the mailbox, it came to a stop.

21      Q.   Okay.  And then did you at some point

22  see the reverse lights go off?

23      A.   Yes, ma'am.

24      Q.   Do you remember if that was before or

25  after it made contact with the mailbox?



1     A.   It was after because the vehicle had

2  stayed stationary.  For a second, I actually

3  believed that the driver was gonna get out to

4  check the damage.  That's why I went to make

5  contact with the vehicle.

6     Q.   Okay.  So you saw that the vehicle had

7  stopped at that point?

8     A.   Yes, ma'am.

9     Q.   Okay.  Did you see brake lights on the

10  GMC after the reverse lights went off?

11     A.   I could see the reflection like off of

12  the actual mailbox.  That's how I was able to see

13  the reverse lights as well.  Because it was so

14  close to the mailbox, I could see the white light.

15  And then when the white light turned off, that's

16  how I knew the reverse lights were off.

17     Q.   Okay.  And then did you see any red

18  lights reflecting off the mailbox after the

19  reverse lights turned off?

20     A.   Yeah.  I couldn't tell if it was the

21  brake lights or if it was just the running lights.

22     Q.   Did you observe if the GMC had its

23  headlights on?

24     A.   Yes, ma'am, it did.

25     Q.   Okay.  And at the time the GMC made



1           Object to form.

2      A.   It was more or less trying to maneuver

3  its way down it looked like the middle of 25th

4  Street coming eastbound.

5  MS. RAVEENDRAN:

6      Q.   Did you continue walking when you saw

7  the vehicle turn eastbound?

8      A.   Yeah.  'Cause at the point that I saw

9  the vehicle leaving, I assumed that the vehicle

10  was just going to slow roll up to me so I could

11  make contact with the driver, since I was already

12  illuminating the truck to let them know that I was

13  there and to stop the vehicle.  So I was still

14  kind of coming up to where they would see me so I

15  could make contact with the driver.

16      Q.   Where were you when you started -- well,

17  strike that.

18           Can you describe what you were doing

19  with the flashlight again?

20      A.   Yes, ma'am.  So initially I had it in

21  the just on mode so it was at its highest power

22  and on shinning at the vehicle once I saw it

23  leaving from the mailbox.  Because I believed at

24  that point he committed the misdemeanor crime of

25  leaving the scene of an accident causing property



1  damage.

2          So as I went to make contact with the

3  vehicle, as it kept slow rolling, I activated it

4  -- activated the strobe function to illuminate and

5  show that there was a visible change in the

6  drivers's vision so that they would be alerted to,

7  oh, there's something in my path or to the left of

8  my path so that I could -- that they would see me.

9      Q.   When did you first raise your flashlight

10  up to point it at the GMC?

11      A.   As soon as it was leaving from the

12  mailbox.

13      Q.   And where were you located at the moment

14  that you pulled your flashlight up to illuminate

15  the GMC?

16      A.   I was toward the center of 25th Street.

17      Q.   And where was the GMC at that point?

18      A.   It was coming eastbound.  It had just

19  pulled out from the mailbox and gotten

20  straightened up on the road.

21      Q.   When did you turn on the strobe

22  function?

23      A.   Once it actually made it straight onto

24  25th Street and continued, that's when I started

25  the strobe function on the flashlight.



1    southbound, why didn't you change your direction

2    to move northbound?

3    MR. WHITFIELD:

4              Object to the form.  I objected to the

5    form.  That's all I did.

6    THE WITNESS:

7              Okay.

8    MR. WHITFIELD:

9              If you can answer the question, answer

10   the question.

11       A.   Because I had already tried to take the

12   path to get out of the vehicle's pathway, which I

13   figured seeding the road to the vehicle would be

14   the smartest option, so that I would get out of

15   the roadway so the vehicle could travel down the

16   roadway.  And if I would have went back north I

17   would have been more in the roadway than I was if

18   I would have just continued a little bit more

19   south to get out of the roadway.

20   MS. RAVEENDRAN:

21       Q.   And if we can go back to when you

22   removed -- strike that.

23              When you first took your firearm out, do

24   you recall if you were to one of the sides of the

25   vehicle or in front of the vehicle?



1          A.    No.  I was more in front of the vehicle.

2          Q.    Were you directly in front of the

3    vehicle, closer to the passenger side or the

4    driver's side, if you know?

5          A.    I was like directly in front of the

6    vehicle, like where basically the logo is on the

7    front of the truck.

8          Q.    At some point did you turn on your

9    weapon light?

10         A.    Yes, ma'am.  When I immediately pulled

11   it out, that's when I activated my weapon light.

12         Q.    After you backpedaled, what happened?

13         A.    I observed the vehicle continuing to

14   follow me towards the roadway, at which point I --

15   after I had given the verbal commands and the

16   vehicle continued to follow me, I discharged my

17   firearm three times.

18         Q.    Where were you standing when you

19   discharged your firearm?

20         A.    Directly in front of the truck.

21         Q.    Were you in the grass, were you on the

22   road, if you recall?

23         A.    Well, I discharged it three times as I

24   was moving, so I couldn't tell you exactly where I

25   was for each one of them.  I just remember I was



1  continuing to move as I was discharging my weapon.

2      Q.   Okay.  So you -- strike that.  When you

3  discharged your first -- strike that.

4          When you first fired your weapon, were

5  you directly in front of the GMC?

6      A.   Yes, ma'am.

7      Q.   And then you moved towards the passenger

8  side of the GMC; is that right?

9      A.   I moved southward, like directly -- not

10  towards the passenger of the vehicle.  I wasn't

11  going towards the vehicle.  I was going directly

12  south of where I was, basically backpedaling to

13  the south of the road.

14     Q.   Okay.  And you discharged three times;

15  is that right?

16     A.   Yes, ma'am.

17     Q.   Could you mark with a number "4" where

18  you discharged for the third time?

19     A.   I don't know if it's going to fit on

20  there.

21  MR. WHITFIELD:

22          Yeah.  The -- I guess he could put it

23  down there, but, Bhavani, look at the dilemma that

24  he's in because there's just really no space to

25  really put it in there.  I guess you could make an



Jason Cuevas 06/14/2023

1            I don't believe I'm going to show

2    anything else that needs to be marked.

3    MR. WHITFIELD:

4            Okay.  Great.  Thank you.  So we'll go

5    off com.

6    VIDEO TECHNICIAN:

7            This is the videographer.  We are going

8    off the record at 11:57.

9                    (Off the record.)

10   VIDEO TECHNICIAN:

11           We are going back on the record at

12   12:08.

13   MS. RAVEENDRAN:

14       Q.   Officer Cuevas, I don't have that much

15   more for you.  I'll probably get us out of here by

16   12:30 unless the other lawyers have questions.

17   Once the GMC -- strike that.

18           Going back to right after you discharged

19   your third shot, once the GMC stopped, did it roll

20   forward or move at all?

21       A.   It was kind of like -- I don't know if

22   you've ever seen what a vehicle looks like you

23   when you throw it in park while you're driving and

24   it kind of does this number.  Like it stays in

25   position, but you can see the body like rock

1    forward because it's in a sudden abrupt stop.

2        Q.   Did you observe whether the car was in

3    park?

4        A.   I have no idea if it was in park or not.

5    I just knew it was stationary.

6        Q.   Okay.  So you were just saying that it

7    looked like when you throw a car in park --

8        A.   Yeah.  Like it was -- it just stopped.

9        Q.   Okay.  Would it be fair to say that when

10   you arrived on scene you felt as though you were

11   safe to get out of your vehicle and approach 210?

12       A.   Yes, ma'am.  At the time I didn't

13   perceive any threat when I exited my vehicle.

14       Q.   Okay.  And at the time that you saw the

15   GMC make contact with the mailbox on the south

16   side of the street, you had assessed that it was

17   safe to approach the GMC?

18       A.   Yes.  Because it come to a stop after it

19   hit the mailbox, so I deemed it was safe to

20   approach the vehicle.

21       Q.   Okay.  And then when you first walked

22   into the street towards the GMC, had you assessed

23   that it was safe to walk into the street at that

24   time?

25       A.   Yes, ma'am.



1              CERTIFICATE OF COURT REPORTER

2        I, F. DUSTY BURDINE, Court Reporter and Notary

3    Public, in and for the County of Harrison, State of

4    Mississippi, hereby certify that the foregoing

5    pages, and including this page, contain a true and

6    correct transcript of the testimony of the witness,

7    as taken by me at the time and place heretofore

8    stated, and later reduced to typewritten form by

9    computer-aided transcription under my supervision,

10   to the best of my skill and ability.

11       I further certify that I placed the witness

12   under oath to truthfully answer all questions in

13   this matter under the authority vested in me by the

14   State of Mississippi.

15       I further certify that I am not in the employ

16   of, or related to, any counsel or party in this

17   matter, and have no interest, monetary or

18   otherwise, in the final outcome of the proceedings.

19       Witness my signature and seal, this the

20   _____ day of _____, 2023.

21

22

23            _____
              F. Dusty Burdine, CSR #1171
24            My Commission Expires 4/22/25

25



1                    ERRATA SHEET

2       I, _____, do solemnly
   swear that I have read the foregoing _____ pages
3  of the testimony given by me at the time and place
   hereinbefore set forth, with the following
4  corrections:

5  Page:  Line:  Correction:    Reason for Change:

6  _____

7  _____

8  _____

9  _____

10 _____

11 _____

12 _____

13 _____

14 _____

15                           _____

16                           Witness Signature

17

18 Sworn to and subscribed
   by me, this _____ day of
19 _____, A.D., 2023.

20 _____
   Notary Public, State of Mississippi,
21 County of _____.

22

23 My Commission Expires:

24 _____

25

