1          IN THE UNITED STATES DISTRICT COURT

2      FOR THE SOUTHERN DISTRICT OF MISSISSIPPI

3              SOUTHERN DIVISION

4    CATINA PARKER, as          )
     Personal Representative    )
5    of the Estate of Leonard   )
     Parker, Jr., Deceased,     )
6                               )
                     Plaintiff, )
7                               )
         vs.                    ) No. 1:21-cv-00217
8                               )
     CITY OF GULFPORT, a        )
9    municipal corporation;     )
     JASON CUEVAS, in his       )
10   individual and official    )
     capacity; and JOHN DOE     )
11   OFFICERS #1-5 in their     )
     official and individual    )
12   capacities,                )
                     Defendants. )

13

14        The video-recorded deposition of

15   JOHN STAMM, P.E., called by the Defendant for

16   examination, taken pursuant to notice and

17   pursuant to the Federal Rules of Civil Procedure

18   for the United States District Courts pertaining

19   to the taking of depositions, before Gina M.

20   Sylvester, Registered Professional Reporter, at

21   321 North Clark Street, Chicago, Illinois, on

22   September 28, 2023, commencing at 11:09 a.m.

23   Reported By:  Gina M. Sylvester, CSR, RPR

24   License No:  084-004856



1    APPEARANCES:

2

3         ROMANUCCI & BLANDIN, LLC

4         BY:  MS. BHAVANI K. RAVEENDRAN

5         321 North Clark Street, Suite 900

6         Chicago, Illinois  60654

7         Phone:  (312) 471-0303

8         E-Mail:  B.raveendran@rblaw.net

9         -AND-

10        COXWELL & ASSOCIATES, PLLC

11        BY:  MS. COURTNEY SANDERS (Via telephone)

12             MR. CHARLES MULLINS (Via telephone)

13        P.O. Box 1337

14        Jackson, Mississippi  39215

15        Phone:  (601) 948-1600

16        E-Mail:  Chuckm@coxwelllaw.com

17                 Courtneys@coxwelllaw.com

18             Representing the Plaintiff;

19

20

21

22

23

24

Exhibit "B"

1    APPEARANCES:  (Cont.)

2

3         GULFPORT CITY ATTORNEY

4         BY:  MR. JEFFREY S. BRUNI (Via Zoom)

5         2309 15th Street

6         Gulfport, Mississippi  39501

7         Phone:  (228) 868-5906

8         E-Mail:  Jbruni@gulfport-ms.gov

9              Representing the City of Gulfport;

10

11        COPELAND, COOK, TAYLOR & BUSH, P.A.

12        BY:  MR. WILLIAM WHITFIELD (Via Zoom)

13             MS. KAARA LIND  (Via Zoom)

14        Centennial Plaza

15        200 East Beach Boulevard, Building 5

16        Gulfport, Mississippi  39507

17        Phone:  (601) 856-7200

18        E-Mail:  Bwhitfield@wewiii.net

19                Klind@cctb.com

20             Representing Jason Cuevas.

21

22

23

24



1          I N D E X

2 EXAMINATION BY                      PAGE

3   BY MR. WHITFIELD .......................06

4   BY MS. RAVEENDRAN  ....................185

5   BY MR. WHITFIELD ......................194

6

7          E X H I B I T S

8 NUMBER                            MARKED

9   Exhibit No. 52 ........................09

10   Exhibit No. 53 ........................65

11   Exhibit No. 54 ........................65

12   Exhibit No. 55 ........................65

13   Exhibit No. 56 ........................65

14   Exhibit No. 57 ........................65

15   Exhibit No. 58 .......................145

16

17

18

19

20

21

22

23

24


Exhibit "B"

1    MR. WHITFIELD:  So this is the deposition of

2  John Stamm.  And we are here together in the --

3  the case of Parker versus the City of Gulfport

4  and Jason Cuevas.  And pursuant to the rules,

5  what we did is, we sent a deposition notice to

6  the plaintiff's counsel in this particular case,

7  and hopefully that was forwarded on to you,

8  Mr. Stamm.

9          Before we get started in talking about

10  all of that stuff, pursuant to the rules, the

11  local rules require at least that there be a --

12  kind of a panoramic view of the room before we

13  get started.  So we have it, y'all have it.

14  Everybody is seeing each other in a panoramic

15  view.

16          And then now, what we can do, Bhavani,

17  is we can focus in on the witness.  Okay?

18    MS. RAVEENDRAN:  Yep.  I'll do that right

19  now.

20    MR. WHITFIELD:  Good deal.  I don't know that

21  I can do the same with me, nor would I want to

22  because the less you see of my face, the better

23  -- I've got face for radio.  Okay?

24          That's pretty cool right there, to zoom



John Stamm, P.E. 09/28/2023

1  in like that.  That's kind of neat.  I've got to

2  get that camera.  Is that something that I can

3  get at Best Buy?

4      MS. RAVEENDRAN:  Yes.

5      MR. WHITFIELD:  Okay.  I'm there today.

6          Okay.  So, Ms. Court Reporter, would

7  you please swear in our witness, please?

8                    JOHN STAMM,

9  having been first duly sworn, was examined and

10  testified as follows:

11                    EXAMINATION

12  BY MR. WHITFIELD:

13      Q.   Mr. Stamm, hey, my name is Bill

14  Whitfield.  I represent Jason Cuevas in a case

15  that's filed down here in the United States

16  District Court, Southern District of

17  Mississippi, Southern Division.  The title of

18  the case is Catina Parker, as Personal

19  Representative of the Estate of Leonard Parker

20  versus the City of Gulfport and Jason Cuevas, in

21  his individual and official capacity.  The cause

22  of action number of that case is

23  1:21-CV-00217-HSO-BWR.

24          We forwarded and filed, actually, a

John Stamm, P.E. 09/28/2023

1  copy of the notice of deposition in this case

2  for today for 10:30.  Unfortunately, we had some

3  technical difficulties which has delayed us, and

4  hopefully, that will not, in turn, delay you.

5        But as part of that notice of

6  deposition, Mr. Stamm, there were several things

7  that we had asked under Rule 30(b)(5), which may

8  not mean a whole lot to you, the rule number,

9  but there is an attachment that was attached to

10  your deposition notice.

11        Have you had a chance to look at the

12  deposition notice since we had filed it and sent

13  it to the lawyer that has hired you?

14     A.   I have.

15     Q.   Okay.  All right.  Did you happen to

16  see those items that were requested as part of

17  the deposition process?

18     A.   I did.

19     Q.   Okay.  So you have produced and we

20  received this morning -- and that may have been

21  another reason why we weren't able to get in

22  here, you know, earlier to kind of test out our

23  system, because we were looking at several

24  things that you had produced, and I'm going to



1    deal with some of them.

2         But as far as the items that were

3    produced, we have made a -- like, an index of

4    them.  I got my paralegal to make an index of

5    the things that were produced.  And what I'll do

6    is, I'll just kind of run down the index items.

7    It's kind of one page, and maybe it leaks over

8    to the next page, a couple of things.  I'll just

9    kind of go over them for the record.

10        MR. WHITFIELD:  And, then, Ms. Court

11   Reporter, what I may want to do is, I may want

12   to send you this kind of index of the items that

13   were produced that we're going to go over, and

14   attach that as the next exhibit.

15        And, Bhavani, what I'm going to do is,

16   I'm going to start with Exhibit No. -- I think

17   it's 52.

18        THE COURT REPORTER:  Yes.

19        MR. WHITFIELD:  I think it's Exhibit 52.

20        Do you have 51, and then we're going to

21   start at 52?  Is that how you're doing it?

22             (Brief discussion off the

23              record.)

24        MS. RAVEENDRAN:  So, Bill, do you mind

John Stamm, P.E. 09/28/2023

1  telling us which one you want as 52?  I printed

2  them.

3      MR. WHITFIELD:  Here's what we'll do:  Let's

4  make the deposition notice, Gina and Bhavani,

5  the deposition notice itself, the next exhibit,

6  which would be 52.

7              (Brief discussion off the

8               record.)

9      MR. WHITFIELD:  We can pull up the items that

10  we had requested be brought, we can pull that

11  up, or you can go ahead and get your copy off

12  your desk and then you can show it to Mr. Stamm.

13      MS. RAVEENDRAN:  You can pull it up.  That's

14  fine.

15      MR. WHITFIELD:  All right.  Let's pull it up.

16          So what I'll do is, I'll call the

17  deposition notice itself Exhibit No. 52.  Okay?

18              (Stamm Exhibit No. 52 marked.)

19      MR. WHITFIELD:  And if you would, pull up the

20  list.

21  BY MR. WHITFIELD:

22      Q.  Can you see that list, John?

23      A.  I can.

24      Q.  Okay.  It may not -- can you read it or

1   can you see it?

2       A.   I can read it -- yeah, that's better.

3       Q.   Okay.  All right.  Yeah, it was a

4   little small from our end as well.

5            So what we did is, we kind of put

6   together a list of things that we got this

7   morning.  And I'm, you know, going to go over

8   this list with you that we asked you to bring,

9   and let's maybe just see if we can't kind of do

10  a little timeline between items that were

11  requested versus those items that were produced.

12  Okay?

13           So the first item that we asked you to

14  produce was -- it says, Produce, in separately

15  segregated fashion, the document production,

16  discovery and depositions which the plaintiff's

17  designation represents were reviewed by John

18  Stamm prior to formulating his opinions and as

19  the basis of his opinions.

20           Now, what we got this morning was a

21  list of things in the sub- -- well, we didn't

22  get a list of things, we got items, and we

23  listed them.  And probably, they would all fit

24  under relatively small categories.



1          One of them was identified as 6.15.23

2    Site Inspection.  I don't know that there was

3    anything that was particularly intended by the

4    monicker of 6.15.23 Site Inspection, but it's

5    got under that subcategory drone photos and icon

6    photos, Runs 1 through 7 videos, Stamm at scene,

7    and then scanned data, night panoramic pictures.

8    And then the last under site inspection would be

9    VBOX data of runs.  So those five things were

10   under site inspection identified as 6.15.23.

11          Is that -- did you put together that

12   information or that data on 6/15/23; in other

13   words, June 15, '23?

14      A.   So I went to the site on June 15th,

15   2023, and that folder had the documentation and

16   data that I collected during that site

17   inspection.

18      Q.   Okay.  That's fair enough.  That's what

19   I -- that's what I had expected, but I wanted to

20   make sure that my assumption was correct.

21          The drone photos that we have gotten --

22   by the way, are you familiar with the federal

23   licensing requirements for operating a drone?

24      A.   Yes.



John Stamm, P.E. 09/28/2023

1      Q.   Are you a licensed person to actually

2    operate a drone?

3      A.   I am.

4      Q.   Okay.  I don't know what the

5    certification process is, but do you have to be,

6    like, certified by the FAA to operate a drone?

7      A.   Yeah, there's an exam that you have to

8    pass.

9      Q.   Okay.  So when you passed it, I mean,

10   do you get, like, a license or do you get a

11   certification?

12     A.   I mean, I have, like, a number that I'm

13   certified.

14     Q.   Okay.

15     A.   And I guess it's a pilot's license.

16   It's called an unmanned aerial device, I think.

17   UA -- oh, unmanned aerial vehicle.

18     Q.   UAE?  UAE?

19     A.   I think V, as in Victor.

20     Q.   V?  Okay.

21     A.   But, yeah, there is a license.  So my

22   pilot's -- like, a, quote, pilot's license is

23   tied to the -- we'll call it a drone, to keep it

24   simple, that I fly.

1      Q.   Okay.  So the drone photos, though,

2   that were done -- that just popped in my head.

3   I'm sorry for digressing -- that was done on

4   6/15/23, June 15, '23?

5      A.   Correct.

6      Q.   Okay.  And then the Nikon photos, that

7   would have been done by you on June 15 of '23?

8      A.   Yes.

9      Q.   Okay.  And then it's identified, at

10  least on the files that we got, Runs 1 through 7

11  videos.

12          Those were done also on June 15, 2023?

13     A.   Correct.

14     Q.   Did you answer?

15     A.   Yes, correct.

16     Q.   Okay.  Yeah, there is a little bit of a

17  delay.

18          Scanned data, night panoramic pictures

19  of scene area, that would have been done on June

20  15, '23?

21     A.   So the scanned data, yeah.  The night

22  panoramic photos, I'm not sure what that is.  I

23  didn't take any nighttime photos.  I wasn't

24  there during the night.

1    Q.   Okay.  Okay.  Okay.  So these

2  particular subcategories, that's how they were

3  given to us, so I don't think that we actually

4  renamed any of these titles.  So I don't know

5  where they came from, but I know they didn't

6  come from us.

7         So you're saying that the scanned data,

8  the night panoramic pictures of scene area, you

9  wouldn't have any night pictures of scene area?

10  Is that what you're saying?

11    A.   Yeah, it doesn't sound familiar.  I was

12  there during the day.  I'm not sure what -- I'd

13  have to look -- you'd have to put it on the

14  screen.  I'm not sure what the night panoramic

15  photo is.

16    Q.   Okay.  The last thing under site

17  inspection is VBOX data of runs -- it says

18  "rums," but I think is means Runs 4 through 6.

19         Does that mean anything to you?

20    A.   Yes, that's --

21    Q.   Okay.

22    A.   Do you want me to explain what a VBOX

23  is?

24    Q.   Briefly, briefly.



John Stamm, P.E. 09/28/2023

 1        A.   It's a GPS data logger, so it tracks

 2   the location and you can -- it also monitors

 3   speed and distance traveled.

 4        Q.   Okay.  Is this the first time, on June

 5   15 of 2023, that you came down to actually look

 6   at the site?  Is that the first and only time

 7   that you -- that you saw it?

 8        A.   Yes.

 9        Q.   Okay.  All right.  When were you

10   retained in this case?

11        A.   I would have to check the invoice.  But

12   I know --

13        Q.   Approximately, approximately.

14        A.   Let's see, my report's June 30th.  So

15   early June, late May, something like that.

16        Q.   Okay.  Of 2023?

17        A.   Yes.

18        Q.   Okay.  The next subcategory appears to

19   be a compilation of open source data on the

20   truck, 2014 GMC Sierra 1500.  And I'll just go

21   down then, because I've got some questions that

22   I want to ask you about.

23            And, by the way, under that

24   subcategory, would that have been data and items

1  that you would have pulled after being retained

2  in May or June of this year?

3      A.   Yes.

4      Q.   Okay.  Have you ever worked for

5  Ms. Bhavani before?

6      A.   No, I have not.

7      Q.   Have you ever worked for anybody in

8  the -- I think it's the Romanucci firm?

9      A.   Oh, well, I guess -- yeah, I was

10  thinking of -- I guess in the other -- the other

11  matter you were involved.

12         So, yeah, I have worked with them on

13  two other matters.

14     Q.   Okay.  The firm or with Bhavani?

15     A.   One other matter with Bhavani; the

16  firm, two other matters.  So three total

17  including this one.

18     Q.   Okay.  So one other matter with

19  Ms. Raveendran, and then you've got two others

20  going on with other members of the firm, right?

21     A.   You said Mr. Ingram?

22     MS. RAVEENDRAN:  No, my last name.

23     THE WITNESS:  Oh, sorry.

24

Exhibit "B"

1    BY MR. WHITFIELD:

2        Q.    Raveendran would be Bhavani.

3        A.    Yeah, sorry, I didn't -- actually, I

4    don't know her last name.

5            So I had three total with the firm, two

6    of them with Bhavani, one with someone else at

7    the firm.

8        Q.    Oh, okay.  So two with Bhavani, and

9    then one with somebody else from the firm for a

10    total of three for the firm?

11        A.    Correct.

12        Q.    Okay.  The other matter that you are

13    working on with Bhavani, would that have

14    predated May or June of 2023?

15        A.    Yes.

16        Q.    Okay.  Can you give me just a rough

17    estimate about what year and what month you

18    would have been retained on in the other matter?

19        A.    It's within the last couple of years.

20    I really don't have a number.

21        Q.    Okay.  That narrows it down.

22            So since COVID began?

23        A.    I think so.

24        Q.    Okay.  So since COVID?

1        A.    Sounds reasonable, right?

2        Q.    Was the other matter an auto accident?

3        A.    It involved an auto accident.

4        Q.    Okay.  Did it involve you giving

5   opinions as a motor vehicle accident

6   reconstructionist?

7        A.    I haven't given opinions in that case.

8        Q.    Oh, okay.  All right.  So you haven't

9   been deposed then, I take it, right?

10        A.    Correct.

11        Q.    Okay.  So it involves another accident,

12   auto accident, right?  Was it an auto accident?

13        A.    Yes.

14        Q.    Okay.  When you say "auto accident," I

15   guess that's kind of like beauty being in the

16   eyes of the beholder.  Auto accidents can happen

17   between two vehicles.

18            Was it basically a multi-vehicle auto

19   accident or maybe a single-car auto accident?

20        A.    There was two vehicles in the

21   collision.

22        Q.    Okay.  Okay.  The other matter that

23   you're working on with someone else in her firm,

24   was that -- is that also an auto accident-type

John Stamm, P.E. 09/28/2023

1  case?

2      A.   It is.  But there's only -- I guess it

3  was a vehicle/multi-pedestrian accident.

4      Q.   Okay.  So one vehicle, one pedestrian?

5      A.   There were several pedestrians.

6      Q.   I'm sorry?

7      A.   There were several pedestrians.

8      Q.   Oh, several pedestrians.  Okay.  I

9  missed the "several" part.

10          Were you deposed in that case or have

11  you been deposed in that case?

12     A.   No.

13     Q.   Did you offer any opinions in that

14  case?

15     A.   I have not.

16     Q.   Okay.  So no opinions of record and no

17  depositions in the other matter for someone else

18  in her firm.

19          And then the other matter that you're

20  helping -- or at least serving as an expert for

21  Bhavani is a two-vehicle auto accident where

22  there's been no opinions offered and no

23  deposition given.

24          Have I summarized that okay?

Exhibit "B"

1        A.   That sounds correct.

2        Q.   Okay.  All right.  Now, back on the --

3    kind of the subcategories of the material that

4    we received this morning, there's approximately

5    ten items all pertaining to the vehicle, a 2014

6    GMC Sierra 1500.  And let me just kind of run

7    down that list real quick and then maybe you can

8    -- I've got a couple of questions, I guess,

9    about some of this stuff.

10             There's the EpicVIN for the vehicle,

11   which we're going to -- we're going to mark and

12   use that for examination.  And I've got that

13   here, photos of the Parker truck.

14             Where did you obtain photos of Parker's

15   truck?

16       A.   So are you talking about within the

17   EpicVIN folder?

18       Q.   What I've got -- what I've got are

19   separate pictures -- well, they would have been

20   in the 2014 GMC Sierra 1500 subtitle on the --

21   on the items that we got.  And I do have a

22   separate folder that simply has photographs in

23   it of the -- I take it, it's of the GMC Sierra

24   pickup.  There's about ten of them, maybe eight



John Stamm, P.E. 09/28/2023

1    of them.

2            Do you remember?

3        A.   Yeah, so I think I know what you're

4    talking about.  So EpicVIN is a website.  It's

5    kind of like CARFAX, if you're familiar with

6    CARFAX.  You put in the VIN and it autogenerates

7    a report.  And towards the bottom of the report,

8    it includes photos of the vehicle potentially if

9    it -- it doesn't always, but sometimes if the

10   vehicle went out for, like, a salvage auction,

11   or sometimes even if, you know, the dealer --

12   you know, there's no accident, the dealer just

13   puts it for sale and they have photos on the

14   internet.

15           So EpicVIN is like an aggregator, and

16   it -- they found those photos, and so I just

17   included them in the folder, the EpicVIN folder.

18       Q.   You know, I don't know enough about

19   reading the kind of collateral data to get some

20   idea about the date of these vehicles.

21           Do you know when these pictures were

22   taken?

23       A.   In the EpicVIN report, there should be

24   a date associated with those photos.



John Stamm, P.E. 09/28/2023

1      Q.   Okay.

2      MS. RAVEENDRAN:  Bill, Kaara, is there any

3  way you could share, you know, the file on the

4  screen?

5      MR. WHITFIELD:  Sure, yeah.

6      MS. RAVEENDRAN:  Because then he can walk you

7  through it, I think, a little easier.  He's

8  trying to, like, guess from memory what the name

9  of those files were.

10      THE WITNESS:  Yeah, I'm thinking of the file

11  structure in my brain.

12      MR. WHITFIELD:  Yeah, we can do that.  We can

13  do that.

14      MS. RAVEENDRAN:  Thank you.

15  BY MR. WHITFIELD:

16      Q.   There were several documents that were

17  identified very specifically about the truck.

18  You know, one of them was CARFAX and the other

19  one was FAXVIN.

20          Does FAXVIN sound familiar to you,

21  John, that would have been associated with those

22  pictures?

23      A.   So if you go into the 2014 -- yep,

24  click on that folder right there.  Under



John Stamm, P.E. 09/28/2023

1    EpicVIN --

2        Q.   Okay.

3        A.   -- open that folder.

4            So, yeah, see the date, 8/31/20?  So

5    that's August 31st, 2020.  And I got that date

6    from the EpicVIN report.  So I can't, you

7    know --

8        Q.   Okay.

9        A.   -- verify that that's the date of these

10   photos.  But if you go back one folder and click

11   on the EpicVIN PDF.

12       Q.   Okay.

13       A.   So start scrolling down.

14       Q.   Yeah, I do have that one printed.  I do

15   have that one printed out.  Let me pull it real

16   quick.

17           So when you say "EpicVIN," that picture

18   -- that document that we've got pulled up there,

19   that would have been associated with these

20   pictures?

21       A.   Yes, this document.  So if you scroll

22   down on the PDF towards the bottom --

23       Q.   Okay.

24       A.   -- you will -- at least you should

1    see --

2        Q.   How far do we scroll down?

3        A.   Probably most of the way.  You'll see,

4    like, thumbnails of those photos.

5        Q.   Oh, I see them.  I see them.

6        MR. WHITFIELD:  It's about Page 5 or 6, sales

7    history.  Bottom of -- yeah, just keep on going

8    till you see -- it's going to have sales --

9    there you go, right there.

10       THE WITNESS:  Right there.

11           So do you see --

12       MR. WHITFIELD:  Pull it up so sales history

13   is on the top.

14       THE WITNESS:  See where it says, Was put on

15   sale August 31st, 2020?

16       MR. WHITFIELD:  Oh, okay.  Okay.

17       THE WITNESS:  So what I did is, I made a

18   subfolder, and then I just right-clicked on

19   these photos just to save them within -- just a

20   little bit larger.

21   BY MR. WHITFIELD:

22       Q.   Sure.  Got them -- we got them.  I see

23   what you're talking about.

24           So those photographs would have been

John Stamm, P.E. 09/28/2023

1   essentially open-source photographs that

2   somebody associated with the EpicVIN, they would

3   have taken that picture, right -- those

4   pictures?

5       A.   So they would have obtained them.  I

6   think they're like an aggregator.  I think they

7   somehow work with salvage auctions.  I'm not

8   sure how they find their information, but they

9   obtained it.

10      Q.   Do we have any way of knowing, John,

11  when the picture was specifically taken as

12  opposed to them being associated with the title

13  of "Was put on sale August the 31st, 2020"?

14      A.   Not that I know of.  When you click on

15  the individual photos, there's no metadata to

16  tell you when the photo was taken.

17      Q.   Right.  Okay.

18           I take it, then, that since we are kind

19  of adopting the notion that the vehicle was sold

20  -- or put on sale August the 31st, 2020, and

21  maybe sold shortly after that, that you've not

22  had a chance to actually inspect the vehicle?

23      A.   I have not.

24      Q.   Okay.  Have you made an effort to reach



1   out to somebody to try to get some availability

2   of this vehicle to inspect or to look at?

3        A.   I have not.

4        Q.   Okay.  We're going to -- we're going to

5   come back to that because there is some things

6   on that one that I do want to ask you about.

7   Thank you for that explanation about the

8   pictures.

9            Okay.  So we're still on the

10  subcategories.  And we've got photos of Parker's

11  truck that we're going to talk about.  The 2-9

12  GMC manual, the auto unlock, I'm not real sure

13  that I need to deal with that.

14           The next that you produced was GMC

15  product information, 2014 GMC Sierra 1500.  I

16  looked at that, and I didn't really see anything

17  in there that I needed to ask you specifically

18  about.

19           The next item was FAXVIN for a 2014 GMC

20  Sierra.  And I do have that, and that's another

21  document that I will want to talk to you about.

22  I have that here.

23           CARFAX report, I've got that as well.

24  I do want to talk to you about that one.

John Stamm, P.E. 09/28/2023

 1        MS. LIND:  (Indiscernible.)

 2        MR. WHITFIELD:  Sure, okay.  Yeah.  Do you

 3  want to just click open that document right

 4  there, the 2014?  Right there.

 5  BY MR. WHITFIELD:

 6        Q.   Yeah, see all the things that I'm going

 7  over with you, John, they're listed here, but

 8  they're as produced.  Okay?  They were produced

 9  to us like this with this listing.

10            Make sense?

11        A.   Yep.

12        Q.   Okay.  All right.  So I'm kind of going

13  down the list.

14            Universal VIN decoding and vehicle info

15  on 2014, I looked at that.  You know, it didn't

16  really seem impressive to me enough to talk to

17  you about.

18            Then the owner's manual, a 2014.

19            Then the VIN decoder for equipment

20  summary and tech specs.  Do you see that?

21        A.   Yes.

22        Q.   Okay.  That kind of closes out on the

23  2014 GMC Sierra 1500.

24            All of these things would have been

Exhibit "B"

John Stamm, P.E. 09/28/2023

1   obtained or, you know, in some instances, maybe

2   even generated by you since May or June of this

3   year, correct?

4       A.   Correct.

5       MR. WHITFIELD:  All right.  Let's go to the

6   calculations.

7   BY MR. WHITFIELD:

8       Q.   That would have been another

9   subcategory of things that were produced to us.

10  I see that there are about three pages there.

11  One of them is kinematics, one of them is

12  tractive force, and the other one is work

13  energy.  Okay?  And that would have been

14  produced by you in connection with our 30(b)(5)

15  request.

16          And, again, that material was pulled by

17  you since you were retained, correct?

18      A.   Correct.

19      Q.   The next subcategory is of deposition

20  summaries.  So what I'm showing you here is the

21  identity of those summaries as produced.  Our

22  deposition summary just simply has the name.

23          The first one is Stephanie Baldwin,

24  next is Jason Cuevas, then Angela Jackson



1   followed by Geraldine McNair, then Maxine Owens,

2   and then the final two are Brandon Teates and

3   Derrian Tremaine.  I think he's Markray.  I

4   think that's his last name.

5          So did you -- did you read all these

6   depositions, or did somebody summarize those

7   depositions for you in-house?

8      A.   So some of them, I read and summarized

9   myself.  Some of them were initially summarized

10  by a colleague, a couple colleagues, but then I

11  went back and checked the relevant portions of

12  the depositions.

13     Q.   Okay.  When you say "a colleague,"

14  would that have been an engineer colleague,

15  somebody that's a P.E. colleague?

16     A.   You know, I'd have to check the invoice

17  to say that.  We had an intern, I think, this

18  summer.  He's studying mechanical engineering at

19  University of Purdue.  I think he read a couple

20  of them.  We have another colleague named J.P.

21  who's not an engineer, but he does a lot of

22  deposition summaries on fact witnesses.  I think

23  both of them summarized one or two.

24     Q.   Is J.P. an employee of yours?



John Stamm, P.E. 09/28/2023

1        A.   Not of me, but he works at Fusion

2   Engineering.

3        Q.   Okay.  So he's an employee of Fusion

4   Engineering?

5        A.   Correct.

6        Q.   Okay.  All right.  You're an employee

7   of Fusion Engineering?

8        A.   I am.

9        Q.   Okay.  Do you own any particular

10  interest in that entity?

11       A.   I do not.

12       Q.   Okay.  So both you and J.P. are

13  employees, and then you had a summer intern or a

14  clerk or something like that that did some of

15  them?

16       A.   Yeah, engineering student.

17       Q.   At Purdue?

18       A.   Yep.

19       Q.   Okay.  Which ones do you remember

20  actually reading and summarizing yourself?

21       A.   Brandon Teates, Derrian Tremaine, Jason

22  Cuevas, I'm trying to think, probably Angela

23  Jackson.  You can -- you can tell how I -- my

24  file structure is.  I put the little underscore.

 1          And also, if you open up, for example,

 2   the Jason Cuevas deposition summary.

 3      Q.   Okay.

 4      A.   It's not showing on our screen.

 5      MR. WHITFIELD:  You may have to double-click

 6   it again.  You have to do it twice.

 7      MS. LIND:  (Indiscernible.)

 8      MR. WHITFIELD:  Huh?  Yeah, that's the

 9   summary, right there, of Jason.

10   BY MR. WHITFIELD:

11      Q.   So you were about to say whatever it

12   was that you did -- you knew you did this?

13      A.   Yeah, it's just another way -- well,

14   one, I remember reading his dep.  But, two, if

15   you look in the upper left-hand corner, you see

16   created by J.J.S., those are my initials.

17      Q.   Okay.  Fair enough.  Okay.

18      MR. WHITFIELD:  Okay.  So let's go out of

19   that and go back to the index, the file index.

20   BY MR. WHITFIELD:

21      Q.   Okay.  So the file index has got those

22   deponents down there.  And the earliest one

23   seems to be May 24 and then May 25, and then --

24   actually, May 22nd.  May 22nd is the earliest.



1            Would that give you any idea by having

2    a date down there of Tremaine, Derrian -- and

3    I'm using your name, or at least the name you've

4    given that folder.  Would you -- in seeing that,

5    do you have any better idea about when you were

6    retained?

7        A.   So those dates are the dates the

8    depositions were taken.

9        Q.   Okay.  All right.  Not the date that

10   you actually looked at them and summarized them?

11       A.   Correct.

12       Q.   Okay.  Fair enough.  That does sound

13   right.

14            So let's -- by the way, let me ask you

15   whether you had a chance to actually look at the

16   video deposition of Mr. Markray?

17       A.   I did not look at the video.  I don't

18   remember if it was sent to me or not.  I don't

19   -- but I did not look at the video.

20       Q.   Okay.  Did you have a chance to look at

21   the actual video interview that was -- that took

22   place at the Gulfport police station on the next

23   morning after this incident occurred?

24       A.   With whom?



1    Q.   Of Markray, Mr. Markray.

2    A.   Yes, I did.

3    Q.   Okay.  So you did watch that interview

4  by the officers that were in the room with him?

5    A.   Yes.

6    Q.   Okay.  And I'm going to ask you about

7  that a little bit more when we get farther into

8  your deposition.

9        Did you watch the whole thing, even --

10  because there was a -- kind of a space between

11  the end of the interview, then the camera ran a

12  couple of minutes while he's in the room alone,

13  and then all of a sudden he started talking to

14  himself.

15        Do you remember seeing that?

16    A.   I think I did because I think it was

17  brought up in his deposition, so I went back and

18  looked at it.

19    Q.   Okay.  So when you read his deposition,

20  it kind of was a prompt to you to go back and

21  look at that video summary -- or that video

22  depiction?

23    A.   Yeah, I'm not sure if I saw it when I

24  initially looked at the file or only after it



1  was talked about in his deposition.

2       Q.   But you saw it nonetheless, right?

3       A.   Yes.

4       Q.   Okay.  We -- and Bhavani will probably

5  simply have to confirm this.  We had a very,

6  very difficult time getting all of the MBI file,

7  and we finally got our hands on it last week and

8  I think we produced it earlier this week, the

9  rest of the MBI file, the Mississippi Bureau of

10 Investigation file.

11            Within that file was a -- I think it

12 was a car camera in one of the officers' -- I

13 can't remember who it was, I think it was Cook,

14 where Mr. Markray is sitting in the backseat of

15 a patrol car, and as with the later interview,

16 he was talking to himself.

17            Have you had a chance to look at that?

18      A.   That does not sound familiar.

19      Q.   Okay.  All right.  Fair enough.

20            Did you have a chance to actually watch

21 or look at the video deposition -- the video of

22 Jason Cuevas's deposition?

23      A.   I did not.

24      Q.   Okay.  Okay.  All right.  The next



1    subcategory of the things that we were provided

2    was literature.  You know, all well and good.

3    There's two articles under there.  And we can

4    talk about that.  I want to -- I want to

5    probably talk to you about that when you get

6    into the CCR in your report.  That's probably

7    going to be relevant to that discussion there.

8            But we did, nonetheless, get two

9    articles from you.  You can confirm that by

10   seeing that on the screen?

11      A.   I see it.

12      Q.   Okay.  Again, I can't take any type of,

13   you know, privilege of authorship of how these

14   documents are called.

15           I take it that that's the name you gave

16   them to produce them?

17      A.   So those articles -- that's just what

18   they're downloaded as far as --

19      Q.   Okay.

20      A.   -- their names.  Both of those articles

21   are cited as footnotes in the report.

22      Q.   Okay.  That's fine.

23           Well, the names are different than what

24   the title is on the computer.  And we can get



John Stamm, P.E. 09/28/2023

1    into that, if necessary.

2           But what you're saying is, is that when

3    you downloaded those articles, that was the name

4    that they were downloaded as?

5        A.   Correct.

6        Q.   Okay.  Then there is another subtopic

7    called "vehicle inspections."

8           Do you see that?

9        A.   I do.

10       Q.   And then under "vehicle inspections,"

11   there appears to be the -- two different

12   folders.

13          I take it you created those folders,

14   right?

15       A.   I did.

16       MR. WHITFIELD:  Why don't you open up the

17   first one, the top one, so we can just kind of

18   get an idea about what that is on the video, the

19   Zoom video recording.  Open it up.

20          Can we go back?

21       MS. LIND:  Go back, it...

22       MR. WHITFIELD:  Bear with us.  Technology is

23   wonderful until it's not.

24       THE WITNESS:  I agree.



John Stamm, P.E. 09/28/2023

 1  BY MR. WHITFIELD:

 2      Q.   Yeah, so you can see at the bottom,

 3  there's a lot of thumbnails.

 4      MR. WHITFIELD:  Any way you can kind of move

 5  through that small bar at the bottom with your

 6  computer?  Double-click.  There you go.

 7  BY MR. WHITFIELD:

 8      Q.   So, yeah, so I guess these would have

 9  been photographs, if I remember, that were taken

10  from the MBI, a Brandon Teates?

11      A.   No, these were photographs --

12      Q.   No?  Okay.

13      A.   These are photographs that I took of an

14  exemplar truck down in Louisiana.

15      Q.   Got it.  Okay.

16          So you found this particular truck

17  bearing -- in the upper left-hand corner, there

18  is a -- I guess that's the thing that's on the

19  inside of the door.  It's got the VIN number and

20  the model and all that stuff.

21          You found that truck in Louisiana, and

22  you took all these pictures?

23      A.   I did.

24      Q.   Okay.  Did you go look at that truck in

Exhibit "B"

1    Louisiana whenever you were here back in June?

2        A.    Yeah, the day before.

3        Q.    Okay.  You looked at this truck the day

4    before, before you came here?

5        A.    No, so I think I looked at the site

6    inspection, if I remember, on June 15th.  I flew

7    into Louisiana on June 14th, and I looked at

8    this exemplar truck on the 14th.  I think the

9    folder said 6/14/23.

10       Q.    Okay.  And then you came and looked at

11   the site on June the 15th?

12       A.    I think so.  Let me...

13       MS. RAVEENDRAN:  And for the record, Bill,

14   he's got a copy of his report in front of him.

15   He's looking at it, if that's okay with you.

16       MR. WHITFIELD:  That's fine, that's fine.  If

17   he's got a way to make that date a little bit

18   more accurate, that's fine.

19       THE WITNESS:  Yeah, June 15th, I looked at

20   the site and then --

21   BY MR. WHITFIELD:

22       Q.    What page are you on, John?

23       A.    So on Page --

24       Q.    8?



1        A.    Page 20 of my report.

2        Q.    Page 20.  Okay.

3        A.    See Section 7.0?

4        Q.    Okay.  I see that.

5        A.    Yeah, so June 15.

6        Q.    I see that.

7        A.    And then if you go to Page 26, the top

8    paragraph says, "On June 14th, I inspected."

9    That's the truck you're looking at in these

10   photos.

11       Q.    Okay.  Now I get it.  I think that

12   connected some dots for me.

13             So on Page 26 of your report, the two

14   thousand and -- well, there's two down here.

15             Are you looking at your report?

16       A.    I am.

17       Q.    All right.  So under "8.0 Fusion

18   Engineering Inspection of Exemplar Trucks,"

19   there two of them under here.  One of them is a

20   2014 and one of them is a 2015.

21             Do you see that?

22       A.    Yes.  So the photos on the screen right

23   now are the June 14th, 2023, down in Louisiana.

24   On June 22nd, I looked at a different exemplar

1    truck up in the Chicagoland area.

2        Q.   Okay.  Okay.  So the one that you

3    looked at on the 14th would have been the

4    vehicle in Louisiana?

5        A.   Correct.

6        Q.   Did -- how did you locate a vehicle --

7    this particular exemplar, 2015, to even reach

8    out to somebody to come look at it?  Tell me how

9    you did that.

10       A.   Sure.  I believe I used a website

11   called Autotrader.  There's a number --

12       Q.   Okay.

13       A.   There's a number of them.  I think I

14   used Autotrader.  And you can filter by

15   manufacturer, make, year range, trim line, and

16   so that's what I did.

17       Q.   Okay.  And then you determined, based

18   upon using Autotrader, that there was a -- this

19   2015 was in Louisiana.

20            I guess you would have flown into New

21   Orleans, right?

22       A.   Correct.  Yeah, you can also filter by

23   location, so I put in New Orleans, and then you

24   can say, you know, within 50 miles, 100 miles.



John Stamm, P.E. 09/28/2023

1    And this one was, you know, somewhere -- a

2    reasonable driving distance in New Orleans or

3    just outside.

4        Q.   Did you go to, like -- did you go to,

5    like, a dealer, or did you go to somebody's

6    house?

7        A.   A dealer.  Autotrader only has vehicles

8    for sale.  I don't --

9        Q.   Okay.

10       A.   Yeah, and they're all dealerships.  At

11   least I don't --

12       Q.   Okay.  So you went to a dealer to go

13   look at this truck?

14       A.   Yeah, I just asked if I could take some

15   photos, and they said okay.

16       Q.   Sure.  Okay.

17           Do you remember specifically the name

18   of the dealer?

19       A.   I don't.  There might have been a photo

20   -- if you scroll all the way to the right, I

21   think I took a photo of the sticker, the for

22   sale sticker.

23       MR. WHITFIELD:  You may have to unclick the

24   one's you've got.

John Stamm, P.E. 09/28/2023

 1            She's going to unclick these.

 2            Go all the way to the right.  It looks

 3  like there's a, like, a --

 4      THE WITNESS:  You had it up.

 5      MR. WHITFIELD:  There you go, right there.

 6  Click that one.  There you go.

 7  BY MR. WHITFIELD:

 8      Q.   Nicholson's College Cars.  Okay.  I

 9  know -- all right.  So Marrero, you had to go

10  across the river to get to this car.

11            Did you go to Nicholson's College Cars?

12      A.   I think so, yeah.

13      Q.   Okay.  All right.  Good to know.  Okay.

14            The vehicle that you went and looked at

15  in this particular instance was a 2015.  Right?

16  You know that the vehicle that Mr. Parker was

17  driving was a 2014 Sierra, right?

18      A.   Yes.

19      Q.   Okay.  So, I guess, did you use

20  Autotrader to locate a 2014 GMC Sierra 1500?

21      A.   So I did look at a 2014 back in

22  Chicago, but this particular -- you know, the

23  GMC SLE trim line for the Sierra 1500, the '14

24  and '15 model years were the same.  They didn't

1    make any changes that I could find with my

2    research online.  So it's basically the same

3    truck.

4        Q.   Sure.  So -- but the 2014 GMC Sierra

5    that you looked at, that would have been in the

6    Chicago area?

7        A.   Correct.

8        Q.   Did you find this vehicle pretty much

9    the same way that you found the 2015 down in New

10   Orleans?

11       A.   Yes.

12       Q.   Autotrader?

13       A.   Yes.

14       Q.   Okay.

15       MR. WHITFIELD:  Let me see.  Would you go

16   back to the -- go back to the index real quick.

17   BY MR. WHITFIELD:

18       Q.   All right.  Those -- those all are

19   pictures of the 2015 that are under the exemplar

20   inspection, all those right there.

21            Did you take any pictures of the 2014

22   vehicle?

23       A.   Yes.  If you go back to "vehicle

24   inspections," and then the rolling --

1      Q.   Okay.

2      A.   -- the rolling resistance test.

3      Q.   Right there?

4      A.   The exemplar truck folder at the top.

5      Q.   Okay.

6      A.   That is the 2014.

7      Q.   Okay.  Understood.

8           So those were all -- those are where

9    the pictures of the 2014 GMC Sierra is that you

10   inspected up in Chicago --

11     A.   Correct.

12     Q.   -- correct?

13     A.   Yes.

14     MR. WHITFIELD:  That one is being pulled up.

15     MS. LIND:  I don't know why --

16   (indiscernible).

17     MR. WHITFIELD:  Our programs are not liking

18   each other, John.

19     MS. LIND:  No, I got it.  It's just the way

20   it is.

21     THE WITNESS:  It's okay.

22   BY MR. WHITFIELD:

23     Q.   Okay.  So there's the photograph of the

24   2014 that you took -- that you inspected?

1    A.   Yes.

2    Q.   Okay.  Did you take these pictures?

3    A.   I did.

4    Q.   Okay.  I have a 2014 Chevrolet that

5  looks just -- Chevrolet truck that looks just

6  like that.  It's not a GMC Sierra.  That

7  particular vehicle looks pretty good at least by

8  the pictures.

9         Did it look pretty good to you whenever

10  you came to see it -- whenever you went to see

11  it?

12    A.   Yeah, they had it all detailed and

13  ready for sale.

14    Q.   I got it.

15         Did you happen to -- did you drive that

16  vehicle?  Did you drive it?

17    A.   I think in the parking lot a little

18  bit.

19    Q.   Okay.

20    A.   We did go up and down --

21    Q.   Did you, like --

22    A.   We did go up and down the road for a

23  short test drive.

24    Q.   Okay.  All right.  Did you happen to


Exhibit "B"

John Stamm, P.E. 09/28/2023

1   notice the number that was on the odometer on

2   this particular vehicle, 2014?

3        A.   I probably took a photo of that.  If

4   not, it should be on the sticker, the for sale

5   sticker.

6        Q.   Okay.  Okay.  So we're going to try to

7   open that up here in just a --

8        MR. WHITFIELD:  Well, the for sale -- the

9   sale sticker.  It looks like it's that one, the

10  next one, Kaara, right there.  Maybe one over.

11           Is that the one?

12       MS. LIND:  No, that's, like, the VIN sticker.

13       THE WITNESS:  Yeah, I mean, that's a

14  description of the features.  I'm seeing if

15  there's a mileage.

16           Yeah, right there.  Upper left.  It's

17  kind of hard to read.  Just -- you can zoom in

18  just to the right of "city."  I believe

19  that's --

20  BY MR. WHITFIELD:

21       Q.   Oh, I see.  Yeah, okay.  116?

22       A.   That's what it looks like.

23       Q.   Okay.  116,794 miles.

24       MR. WHITFIELD:  Get me the -- yeah, the upper

John Stamm, P.E. 09/28/2023

1  left, right there.

2  BY MR. WHITFIELD:

3      Q.   Okay.  Just out of curiosity, on this

4  particular vehicle, you did produce one of your

5  reports that seem to -- let me see if I can find

6  it.  It's the one that we looked at earlier that

7  had the thumbnails of this particular vehicle at

8  the bottom of Page 6.

9          And we're going to get to this in just

10  a minute, and I don't want to have to go through

11  all the gymnastics of going back and forth and

12  back and forth.

13      MR. WHITFIELD:  Bring us back to the index

14  there, Kaara.

15  BY MR. WHITFIELD:

16      Q.   On one of the documents that you

17  produced which -- it doesn't have a title.  It

18  just says at the top, "2014 GMC."  I think it's

19  that box something.  It looks to me like the

20  period of time that Mr. Parker owned this car

21  would have been in 2020.  And I can't really

22  tell whether he would have been the third or the

23  fourth owner because there's a third owner

24  that's got an odometer reading of 157,000 miles,



1    and then there's another fourth owner that shows

2    140,000, and it's the same purchase date in

3    2020.  I don't know how long Mr. Parker would

4    have owned this truck.

5              Do you know anything about that?

6        MR. WHITFIELD:  Can you find that one right

7    there?  It's not CARFAX.  It's that 14 MPG up

8    there at the top.

9              Go up, right there.

10       MS. LIND:  This one?

11       MR. WHITFIELD:  It's the one right there

12   that's got the pictures at the bottom.

13             It's getting pulled up, John.

14       THE WITNESS:  Sure.

15       MR. WHITFIELD:  I think that's the document

16   -- isn't that the document that you said had the

17   thumbnails at the bottom of the pages?

18       THE WITNESS:  No.

19       MR. WHITFIELD:  I'm pretty sure --

20       THE WITNESS:  No.

21       MR. WHITFIELD:  Huh?

22       THE WITNESS:  No, the thumbnails were within

23   the EpicVIN document, but --

24       MR. WHITFIELD:  Yes, that's correct.

1          Go to the EpicVIN, right there.  Yeah,

2   the EpicVIN -- go to that document right there.

3          Click that one up.

4          It's coming.

5          Yeah, that's -- go to the top of it.

6   Go to the top of that document.

7          There you go.

8   BY MR. WHITFIELD:

9      Q.   Can you see that document that is up

10  there on your screen?  At the top, it's got 2014

11  GMC Sierra.

12     A.   I can.

13     Q.   Now, I guess I'm assuming -- and maybe

14  you can confirm this -- that that's VIN number

15  -- that's the VIN number of the vehicle that was

16  involved in this particular event?

17     A.   It should be.  I can confirm it right

18  now.

19     Q.   Right.  I'm assuming that --

20     A.   Yeah.

21     Q.   -- for the reason -- yeah.

22     A.   The reason we put it in there.

23     Q.   Right, right.  I haven't compared it,

24  but I assume that that would have been your

Exhibit "B"

1    intention at least --

2        A.    Yeah.

3        Q.    -- in producing this document.

4              So you can see here "Ownership History"

5    that's roughly toward the bottom of the page.

6        MR. WHITFIELD:  Maybe we can pull that up a

7    little bit higher so we can see the fifth owner

8    down there.  Can you pull that up?

9    BY MR. WHITFIELD:

10       Q.    Well, okay.  So here's what we're

11   looking at, ownership history.  The first owner

12   apparently bought it in '14.  I guess the reason

13   that the box itself is communicating four years,

14   five months, that must have been the first

15   owner.

16             And then the second owner, in 2018 -- I

17   don't know when Mr. Parker purchased this

18   vehicle.  I guess it's possible that he could

19   have purchased it in 2018 with 84,000 miles on

20   it.

21             Do you know -- do you know when he

22   would have purchased this vehicle?

23       A.    No.

24       Q.    Well, in 2020 --

1        A.   I --

2        Q.   -- there are two boxes.

3        A.   But I don't even know if it's been

4   established that he is the owner of the vehicle.

5   I think it was implied.  But I haven't seen any,

6   like, sales records or documents stating that he

7   was the owner.  I think it was implied, though.

8        Q.   Right.  Well, I'm making the same

9   assumption.  Okay?

10            Now, this event happened in 2020.  And

11   there are two boxes down there, a third and a

12   fourth owner.  It may very well be that these

13   are exchanges made after the event in 2020.

14   That would stand to reason.

15            However, I wouldn't think that the

16   mileage would be, you know -- there would be

17   that big of a difference in the mileage if

18   you're talking about this vehicle being

19   purchased from salvor to salvor.  So maybe you

20   can help me out understanding why this document

21   has got such a disparity between the number of

22   the miles on the vehicle -- on the same vehicle

23   in 2020 between the third and the fourth owner.

24        A.   So I don't know how they pull those



1    numbers.  I think that CARFAX does a better job

2    outlining the history of who owned the vehicle.

3        Q.   Right.  We'll get -- we've got that and

4    we can pull that up.  You know, we'll pull that

5    up in just a minute.

6            But if you look down there, there's the

7    fifth owner.  And the fifth owner is purchasing

8    the vehicle in 2021, which we know is the next

9    year after this event.  And it's got 140,000

10   miles on it, which makes me think that maybe

11   140,000 is more truer than 157.

12           Would that -- actually, the second and

13   the third owner, 156 to 157.  So I'm thinking --

14   do you know whether that period of time between

15   2018 to 2020, the second to the third owner,

16   reflects the years of ownership of Mr. Parker?

17   Do you know that or not know that or...

18       A.   I don't know --

19       Q.   No?

20       A.   I don't know when he purchased it and

21   what owner he was, assuming he did purchase it.

22       MR. WHITFIELD:  Okay.  Let's pull up the

23   CARFAX.  The CARFAX is on that subline.

24       MS. LIND:  (Indiscernible.)

John Stamm, P.E. 09/28/2023

1        MR. WHITFIELD:  No, no, we haven't pulled

2    that up yet.  So just go out of all of -- in

3    fact, why don't you shut all those down.  That

4    might be what's dragging us down.

5        MS. LIND:  Yeah.  So do I go --

6        MR. WHITFIELD:  Go back to the index of this

7    vehicle.

8             There you go, right there.

9    BY MR. WHITFIELD:

10       Q.   Did you happen to -- when you reviewed

11   this document, I guess when you pulled it down,

12   did you review it to determine when Mr. Parker

13   would have bought this vehicle, CARFAX?

14       A.    No, that wasn't really my reason.

15   Basically, whenever I have a case that has a

16   vehicle involved, the first thing I do is

17   download the CARFAX and the EpicVIN report.  I

18   think at the time I was retained, it was still

19   unclear where this truck was, and so I just --

20   it's just like an initial -- let's just find out

21   everything I can about the vehicle right away.

22       Q.   Do you know why the truck was

23   unavailable to you?  Were you given any kind of

24   an explanation as to why this truck is not



1    available to you to inspect?

2        A.    No.

3        Q.    Now, there is, on Page 8 of 12 --

4        MR. WHITFIELD:  Can you pull over to Page 8

5    of 12?  Are you on 8 of 12?

6        MS. LIND:  Yes.

7        MR. WHITFIELD:  Okay.  Tell you what, back up

8    one page, 7 of 12.

9    BY MR. WHITFIELD:

10        Q.    So 7 of 12 gets us to 2018, which would

11    correspond to the other document that we've got

12    which indicated a sale.  And all of the dates on

13    this particular page, Page 7 of 12 of CARFAX,

14    are 2018.

15            And then on Page 8 of 12, the top

16    number shows that the vehicle is serviced in

17    2019 at apparently a dealer -- or the dealer in

18    Conyers, Georgia, and then serviced again in May

19    and June and October and November of 2019 at the

20    -- well, actually, October the 3rd, 2019, the

21    registration was renewed for the vehicle.

22    November of 2019 is when the vehicle was

23    serviced again in Conyers at the dealer.

24            Then we move into '20.  And this

1  particular event happened in February of 2020.

2  So we see that the first date that is on your

3  CARFAX on Page 8 after 11/6 of 2019 is 6/30/2020

4  where the motor vehicle was purchased and it was

5  reported to the Georgia authorities.

6          Do you see that at the bottom of that

7  page?

8      A.   I do.

9      Q.   And then in July, there's a title that

10  is issued or updated, I guess.

11          Would that imply to you that the

12  vehicle --

13      MR. WHITFIELD:  Are you on Page 8 of 12?

14      MS. LIND:  Yes.

15      MR. WHITFIELD:  Okay.  So we've got 8 of 12

16  at the top.

17  BY MR. WHITFIELD:

18      Q.   Do you see where it says, "Title issued

19  or updated"?  Would that suggest to you that the

20  vehicle is now being retitled in July of 2020?

21      A.   That seems to imply that.

22      Q.   Okay.  Well, I mean, when you look at

23  that, is that what you think as an expert?

24      A.   That's how I interpret the CARFAX



1    report.

2         Q.   Okay.  So that vehicle is being

3    transferred to someone else other than the owner

4    that had it previously.

5              Would that be a fair assumption by this

6    CARFAX report?

7         A.   Yes.

8         Q.   And then below that, July the 30th of

9    2020, the document is showing that the vehicle

10   was purchased in this report of CARFAX in July

11   of 2020.

12             Do you see that?

13        A.   I do.

14        Q.   All right.  Now, the next item on this

15   CARFAX report is August the 3rd of 2020, and

16   it's reporting a total loss of the vehicle.

17             Do you know of any reason why this

18   vehicle would have been identified as a total

19   loss in August of 2020?

20        A.   I don't know anything about the history

21   of the truck after the accident besides trying

22   to interpret this report.

23        Q.   Okay.  So you read -- you read some

24   depositions, and you, I'm assuming, looked at



John Stamm, P.E. 09/28/2023

1    some of the pictures that were done by Brandon

2    Teates at the scene and back at the MBI or the

3    Biloxi facility that they took pictures of the

4    vehicle off-site.

5            Are you aware of there being any other

6    damage other than a defect -- it's called a

7    defect.  It's more a bullet hole in the hood and

8    then three in the windshield.  Are you aware of

9    any other damage to the vehicle other than that?

10       A.   There's some minor damage to the back

11   right corner when it contacted the mailbox.

12       Q.   Sure.  Okay.

13            In your experience, would you expect

14   that to result in a total loss of the vehicle?

15       A.   I wouldn't think so.  You know, it's

16   possible that the bullet that went into the hood

17   caused some engine issues, but I would be

18   surprised if it was totaled.  But it is an older

19   vehicle.  I'm not sure how much it would cost to

20   repair everything.

21       Q.   Sure.  Okay.

22            I'm looking for some kind of an

23   odometer reading on the vehicle at various time

24   increments, you know, moving from wherever we



1  were.  And I see in July -- at the very top

2  right there, in July of 2019 that the vehicle

3  had 135,000 miles on it.

4          Now, if we move to the next page where

5  we can pick up the next mileage, that would be

6  140, which corresponds to two of the other -- I

7  guess the thumbnail sketches on the other

8  document that we -- that we looked at where

9  there was 140 and then another 140.

10          Does that -- does that compare up

11  fairly well with the CARFAX, those -- that data?

12      A.    So the EpicVIN referenced 140,000.  I'm

13  not sure how EpicVIN or CARFAX gets the numbers,

14  but they both say 140.  If we're trying to

15  figure out --

16      Q.    Sure.

17      A.    -- how many miles there were at the

18  time of the accident --

19      Q.    Yes.

20      A.    -- if you scroll back to November of

21  2019, there's a few -- a few months before the

22  accident.

23          And you see where it says 135,292?

24      Q.    Right.

John Stamm, P.E. 09/28/2023

1    A.    In my experience, that would be put in

2  by that dealership.  And the fact that there's

3  not, you know, 140,000, you know, there's an

4  actual 292 at the end implies that that's going

5  to be the correct mileage.

6         So I would suspect at the time of the

7  accident the truck's mileage to be a little bit

8  more than 135,292.

9    Q.    Okay.  Fair enough.  That sounds

10  reasonable.

11         So I guess the working assumption would

12  mean -- or would be that the last time that we

13  actually had an odometer reading was about three

14  months before this event.

15         So if we added, you know, 2,000 miles

16  onto the vehicle in that three-month period,

17  we'd be close, right?

18    A.    Yeah.  I don't know his typical driving

19  habits, but that sounds reasonable.

20    Q.    Well, you know, if you go from June to

21  November on the CARFAX report, in June, he's

22  identified -- it's identified that he drove 121,

23  and then you go five months and he's at 135.  So

24  that's 14,000 in five months.


Exhibit "B"

1      A.   Yeah, he's driving a lot.

2      Q.   So I'm just kind of estimating, based

3  on driving habits, a couple of thousands more on

4  top of 135.

5           Would that be a reasonable assumption?

6      A.   Yeah, I mean, that seems reasonable.

7  If you go back to January, so you've got four

8  months --

9      Q.   1/11?

10     A.   Yeah, between the two, a little less.

11  You know, it's only 8,000 difference.  So --

12     Q.   Correct.

13     A.   -- I don't know what his typical

14  driving would be, but it likely is going to be,

15  you know, at least a few thousand more than that

16  135,000 number.

17     Q.   Okay.  Fair enough.  Fair enough.

18          Let's just -- I guess for purposes of

19  the deposition, let's just kind of, you and I,

20  have an informal assumption that around the time

21  of this incident, he had about 137,000 miles on

22  the car -- or on the truck.

23     A.   Sure, sounds fine.

24     Q.   Would that be fair?


Exhibit "B"

John Stamm, P.E. 09/28/2023

 1      A.   Sure.

 2      Q.   Okay.  All right.  I don't think

 3  there's anything else on the -- well, actually

 4  there is.

 5      MR. WHITFIELD:  Go to Page 9 of 12, top part.

 6  BY MR. WHITFIELD:

 7      Q.   You see where it says, "Salvage

 8  Title/Certificate issued" at the top on August

 9  -- in August of 2020?

10      A.   Yes.

11      Q.   So would that -- would that be

12  something that you would expect when a vehicle

13  had previously been declared a total loss if

14  you're going to sell the salvage or sell the

15  vehicle?

16      A.   Yes.

17      Q.   Okay.  There's also a total loss

18  reported in December of 2020, and then below

19  that, same day, another salvage title, and then

20  below that, same day, a rebuilt title issued.

21           Do you know what a rebuilt title is?

22      A.   Generally, it's just a title to say

23  this vehicle has been rebuilt, it's not original

24  from the manufacturer.

Exhibit "B"

John Stamm, P.E. 09/28/2023

1      Q.   Would that be -- would that be the

2   title itself rebuilt or the vehicle rebuilt?

3      A.   The vehicle's rebuilt, but it's issued

4   as a rebuilt title just to let the purchaser

5   know this isn't a title from the original -- you

6   know, the vehicle's been worked on.

7      Q.   Would you expect, just given your

8   experience with looking at these things, that a

9   rebuilt title would mean that somebody bought

10   that vehicle, whoever, and repaired it; in other

11   words, replaced the hood, replaced the

12   windshield, fixed the back right quarter panel,

13   and then decided they were going to sell it with

14   137-, 140,000 miles on it?

15      MS. RAVEENDRAN:  Objection; calls for

16   speculation.

17   BY MR. WHITFIELD:

18      Q.   Would that be your expectation?

19      A.   Yeah, once again, I don't know the

20   history of the vehicle after the accident, so I

21   don't know if there was additional damage.  You

22   know, I just -- I don't know.

23      Q.   So I understand.

24          Here's my question, though:  You look



1    at these CARFAX reports a heck of a lot more

2    than I do, and would it be your expectation,

3    knowing the history of this vehicle that was

4    involved in an event that resulted in some -- a

5    bullet hole in the hood and a bullet -- some

6    bullet holes in the windshield, that if you see

7    a rebuilt title issued, would it suggest to

8    you -- having reviewed these particular kinds of

9    documents today and before, that that would mean

10   that the vehicle was repaired to the extent that

11   it needed to be repaired and then sold to

12   somebody with original -- with the miles of 140

13   and then with somebody apparently telling the

14   purchaser that you got a vehicle that's been

15   repaired?

16       MS. RAVEENDRAN:  Objection; calls for

17   speculation.

18           You can answer.

19       THE WITNESS:  So -- yeah, I'm just thinking

20   there.

21           So I'm not --

22   BY MR. WHITFIELD:

23       Q.   I'm not -- look, I'm not -- hey, John,

24   I'm not asking you to speculate, I'm asking you

John Stamm, P.E. 09/28/2023

1   **to --**

2       A.   No, I'm trying to clarify.  I'm not --

3   I don't know exactly what qualifies as a rebuilt

4   title.  If it's -- I know, you know, when

5   vehicles are involved in accidents or there's

6   damage, if it's declared a total loss, they'll

7   issue a salvage title, a rebuilt title.  They're

8   all kind of the same thing to me.

9           You know, I'm not sure what was

10  involved, why this -- what was involved in this

11  rebuilt title, all the work that needed to be

12  done to the vehicle.  I just don't know.

13      **Q.   Okay.  All right.  Fair enough.**

14      MR. WHITFIELD:  Let's do this real quick:

15  Why don't we -- I'm going to -- I need to

16  arrange these so I can mark them.

17          Bhavani, can we take about five minutes

18  to refresh coffee and then use the restroom?

19      MS. RAVEENDRAN:  Sure.  Sounds good.

20      MR. WHITFIELD:  Okay.  Let's just -- let's

21  see if we can't, like, maybe take about five,

22  six minutes to get it done so we can get on --

23  back on the record again.  Okay?

24      MS. RAVEENDRAN:  Yeah, no problem.


Exhibit "B"

1    MR. WHITFIELD:  Okay.  Good.  Thank you.

2    MS. RAVEENDRAN:  Thanks.

3            (Whereupon, a short break was

4            taken.)

5    MR. WHITFIELD:  So while we were off the

6    record, all counsel got together, and we decided

7    that we were going to identify certain

8    documents, Exhibit 53 all the way up to

9    Exhibit 57.  So they're now made a part of, I

10   guess, our deposition record.

11           (Stamm Exhibit Nos. 53 through

12           57 marked.)

13   BY MR. WHITFIELD:

14       Q.   One real quick thing while I'm thinking

15   about it.  The truck that you got those eight or

16   ten photographs that were part of the Epic, is

17   that -- are those the only pictures that you're

18   aware of of the truck that was not otherwise

19   involved in this particular event that happened

20   on -- February of 2020?

21       A.   Yes.

22       Q.   Okay.  So let me ask you this:  From a

23   standpoint of an expert, is it ever a suitable

24   alternative, at least from an expert standpoint,

1  engineering standpoint, to not have the vehicle

2  available for a personal inspection for you?  I

3  mean, would that be the -- kind of the highest

4  and best -- kind of the altruistic goal would be

5  to inspect the vehicle that was involved in an

6  event?

7       A.   I would say it depends on the case.

8  For this matter, it wasn't necessary.

9       Q.   Okay.  So in this particular matter,

10  you really didn't think that it -- that the

11  vehicle itself needed to be personally

12  physically inspected by you?

13       A.   For my purposes, no.

14       Q.   Okay.  By the way, you mentioned

15  something a little while ago about the pictures

16  that were taken.  I think we were talking about

17  the drone or something like that -- oh, that was

18  on the list of things, the drone photos we

19  talked about originally.

20            You mentioned that you had a pilot's

21  license, and, you know, I want to make sure I'm

22  not misunderstanding.

23            When you say "pilot's license," you're

24  talking about to pilot the drone?



1        A.    Correct.

2        Q.    You don't have, like, a separate

3   pilot's license where you can fly yourself all

4   over the country, right?

5        A.    No, I do not.  I wish.

6        Q.    Okay.  Yeah, me too.

7              So whenever you are actually operating

8   the drone, or the UAV, I think is what you

9   called it, when you do that, you're considered a

10  pilot?

11       A.    I think so, yeah.

12       Q.    Okay.  So whenever you use the drone,

13  do you have to secure clearance from the FAA --

14  whenever you're operating that drone no matter

15  where you are, do you have to secure clearance

16  to do that like a -- like a permit?

17       A.    So there's a GPS module on the drone.

18  So whenever you fly it, that GPS module is --

19  basically broadcasts where the drone is.

20             So if you're near an airport, for

21  example, it won't let you fly.  It also -- if

22  you're out in the middle of nowhere, you can

23  pretty much fly wherever you want, but there's

24  generally a height restriction of 400 feet.  So



1  there's a whole -- there's a number of different

2  classifications for airspace.

3      Q.   Okay.

4      A.   There -- just to further answer your

5  question, there is a regional or some sort of

6  airport near the accident site that prevented me

7  from flying all the way to -- what was the main

8  street?  Was that --

9      Q.   Railroad?  Pass Road?

10     A.   I think Oak.

11     Q.   Oak?  Right, okay.

12     A.   Yeah.

13     Q.   Oak.

14     A.   Yeah.  So I could fly pretty much to

15  208, 207, somewhere around there, and it just

16  won't let me fly any farther east because there

17  was basically, like, a runway.

18     Q.   Well, if you look -- look on Page 3 of

19  your -- is that where you are?

20     A.   I was on a different page, but I can go

21  to Page 3.  Yeah, that's fine.

22     Q.   Okay.  So Page 3, where did you get

23  this picture?

24     A.   See where it says "Google Maps" on the



John Stamm, P.E. 09/28/2023

1   bottom of the figure?

2        Q.   Okay.

3        A.   So this --

4        Q.   Oh, I see what you're -- I see what

5   you're talking -- okay.  Yeah, yeah, yeah, I got

6   that.

7             So this was a Google Maps photograph

8   that you pulled up --

9        A.   Yes.

10       Q.   -- right?

11            So did you -- maybe I'm missing another

12  imagine.

13            So did you use your aerial photography

14  as an inset in your report elsewhere?  That's

15  the one that I remember.

16       A.   Yes, so let me --

17       Q.   What page?

18       A.   I'm looking for it right now.

19            So on Page 23.

20       Q.   23?  Okay.

21       A.   Figure 15.

22       Q.   Okay.  That's your -- that's an aerial

23  view that you took?

24       A.   On the day of my inspection, yes.

Exhibit "B"

1           And then Figure 16 --

2      Q.   All right.

3      A.   -- is as well.  You can actually see me

4  standing on the road on the upper left of

5  Figure 16.

6      Q.   Oh, so that's you that's standing,

7  like, in the street?

8      A.   Yes.

9      Q.   Okay.  Okay.  I see what you're saying.

10          So 210 -- 210 is the address of

11  Stephanie.

12          So to your back is Oak Street, correct?

13     A.   Correct.

14     Q.   Okay.  You just couldn't go over Oak

15  Street with your drone?

16     A.   Yeah, it would not let me go any closer

17  to Oak Street than approximately where this

18  image was taken.  I could probably go another 50

19  or 100 feet.

20     Q.   So Page 24 has got some other aerial

21  photographs, and then 25 has got two more.

22          So tell me this.  Maybe I'm missing

23  something.  You're certified to operate the

24  drone, and you're saying that there is some kind

Exhibit "B"

John Stamm, P.E. 09/28/2023

1    of a GPS setting in your drone that won't let

2    your vehicle fly within a flight path of the

3    airport?  And, by the way, it's the

4    Gulfport-Biloxi International Airport.

5        A.    Okay.

6        Q.    It's not a regional airport.

7        A.    Well, that's --

8        Q.    And I know you didn't know that

9    specifically because, you know, you almost have

10   to live here to know that.  I mean, it's not

11   something, you know, you broadcast.  But it used

12   to be known as a regional airport.

13           Is there a different rule for regional

14   or local airports than there is for an

15   international?

16       A.    Not particularly.  So basically, I have

17   a license to fly it, but I can't fly it

18   anywhere.  Right?  I can't fly it onto the

19   runway.  You know, that would be dangerous.

20           So the license allows me to fly it for,

21   I guess, commercial purposes.  As a hobbyist,

22   you can have a drone and fly it not on the

23   airport, but in your backyard, as long as you're

24   not -- I guess it's not part of your work, it's



1  not part of your compensation.  So that's what

2  the license is for.

3         In addition, when I have the license, I

4  can fly -- I can apply for special permits for

5  certain airspaces that are only for licensed

6  unmanned aerial pilots.  But there's also areas

7  that are -- no matter what, you can't fly

8  anything in that area.

9    Q.   Sure.  Okay.  Okay.  All right.  I was

10  just curious about, you know, what kind of

11  license you had to get to actually run the thing

12  that close to an airport.

13         But what you're telling me is, is that

14  you don't have to get clearance from, like, the

15  FAA to operate the drone in the method that you

16  did, right?

17    A.   Yeah, I'm trying to remember.  I think

18  I had to apply for -- to even fly where I flown

19  -- where I flew, I had to apply for that, but I

20  couldn't get any closer to Oak Street.

21    Q.   Okay.  Okay.  All right.  Now, let me

22  bring some closure then -- we went over the

23  list, and we talked about your list of items to

24  bring to the deposition.  I'm not going to go



1  over all 20 of these things.  I think there's,

2  like, 20 of them.  Yeah, there's 20.

3         You've seen the list, and I'm assuming

4  that you accumulated whatever it was that you

5  had pertaining to this case and gave it to the

6  lawyer that hired you who, in turn, gave it --

7  gave the materials to us.  Okay?

8         Now, No. 1 simply asks in a very kind

9  of legal way for your file.  Now, we've talked

10  about all the different items that are in the

11  file that we got, and we made a list of them.

12         Is there anything that you did not

13  produce that you did in connection with your

14  task in this case?

15     A.   I produced all of my work product

16  related to my opinions, everything that I

17  generated.

18     Q.   Okay.  Is there anything that you

19  withheld at all --

20     A.   No.

21     Q.   -- and if so, what?

22     A.   I produced everything.

23     Q.   No?  Okay.

24         All right.  So normally, you know, when

John Stamm, P.E. 09/28/2023

1   I'm dealing with an expert, I typically have an

2   e-mail or two between me and them.

3          Do you have any e-mails between you and

4   Counsel?

5      A.   Yeah, we e-mailed, but I was, I guess,

6   advised by Counsel that --

7      MS. RAVEENDRAN:  So I'm going to advise you

8   not to repeat anything that you and I spoke

9   about.  That would be considered confidential.

10          And, Bill, our position under the

11  federal rules is that we don't have to turn over

12  e-mails unless they're about financial

13  conversations, and he didn't have any of those.

14     MR. WHITFIELD:  I'm sorry, what was that

15  again?

16     MS. RAVEENDRAN:  Based on Rule 26 and its

17  protection of certain communications between

18  counsel and experts --

19     MR. WHITFIELD:  Sure.

20     MS. RAVEENDRAN:  -- we didn't -- we advised

21  him to produce any communications that had to do

22  with the topics that are not considered

23  confidential.  And he didn't have any financial

24  e-mails, so he did not turn over any e-mails.



John Stamm, P.E. 09/28/2023

1        MR. WHITFIELD:  Okay.  So I didn't ask him,

2   you know, what was it.  I didn't ask him to

3   repeat to me anything that you said to him or he

4   said to you.  I just asked him did he have any

5   e-mails.

6        MS. RAVEENDRAN:  Oh, understood.

7        MR. WHITFIELD:  That was my question.

8   BY MR. WHITFIELD:

9        Q.   And, John, you know, don't tell me what

10   was in the e-mails.  Because Bhavani's right,

11   the substance of those kinds of things -- unless

12   they factor into your opinion, the substance of

13   those things would be protected and not

14   discoverable.

15             So all my question is, is that -- do

16   you have e-mails between you and Counsel about

17   this case?  That's it.

18        A.   There are e-mails related to this case,

19   links to download, materials, things of that

20   nature.

21        Q.   Okay.  All right.  That's fine.

22             Now, I think Bhavani said something

23   about financials.  I know that you produced a

24   document that reflected your fee schedule.  I'm

Exhibit "B"

 1    pretty sure I have that here somewhere.

 2              Do you remember sending a fee schedule

 3    to me?  Yeah, here it is.

 4         A.    I think it was attached to my report.

 5         Q.    It's -- yeah.  It's going to be in this

 6    -- right here, yeah.

 7              Do you see that fee schedule there?

 8         A.    Yes.

 9         Q.    Okay.  So all of these guys that are

10    listed below "Professional Services," would that

11    be the folks that are a member or an employee or

12    a partner in the group, Fusion Engineering?

13         A.    Yeah, they're all employees or

14    adjuncts.

15         Q.    Okay.  All right.  Well, in that list

16    of people is John Stamm, P.E.  You're one of a

17    few engineers -- well, not more than -- there's

18    more than a few of you.  But you're identified

19    as a P.E., and your fee is 275 per hour.

20              Do you see that?

21         A.    I do.

22         Q.    So one of the things that we had asked

23    you to produce that I don't remember us getting

24    was a copy of any fee bills that you generated

1    for your work in this case that may have been

2    submitted to Counsel.

3            Is there any particular reason that you

4    didn't print that out and produce that?

5        A.   I think the invoice was in there.

6        Q.   Was it in the material?  I don't

7    remember seeing that.  So if I missed it, I

8    apologize.  Let me look real quick to your

9    report.

10           All I remembered seeing, John, was just

11   a copy of your fee schedule.  I don't think I

12   got a copy of any fee invoice.

13           Did you --

14       MS. RAVEENDRAN:  Bill, it should --

15       MR. WHITFIELD:  Are you able to put your --

16       MS. RAVEENDRAN:  It should have been included

17   with the materials you got today.  There was an

18   invoice in there.

19       THE WITNESS:  Yeah, it's a PDF.

20       MR. WHITFIELD:  Oh, today.  Okay.  I was

21   thinking the things that we -- would have been

22   produced -- would have been attached to the

23   report.

24           So this was produced today?



1      MS. RAVEENDRAN:  Yes.

2      MR. WHITFIELD:  Okay.  All right.

3  BY MR. WHITFIELD:

4      Q.   So who is -- I see your name down

5  there.

6           Who is C. Fleming?

7      A.   Her name is Carmen Fleming.  She was an

8  intern --

9      Q.   Carmen Fleming?

10      A.   Yes.

11      Q.   So she's the intern that you were

12  talking about?

13      A.   So she is an intern.  She -- let's see.

14  She did not summarize any deps.  The intern I

15  was talking about is Kyle Spence.  You can see

16  his input on June 19th, and you can see that he

17  summarized McNair's and Ownes' depositions.

18      Q.   Okay.  Okay.  So Carmen Fleming, she's

19  an intern, and you billed her out for review of

20  file material, discussion with Stamm?  Do you

21  see that first entry up there, 8 -- 6/13 -- 6/2,

22  actually.  6/2 would have been June the 2nd.

23           Would that -- does that kind of jog

24  your memory in terms of when you were retained?

John Stamm, P.E. 09/28/2023

1    A.   Yeah, as I said, early June, late May

2  is when I first reviewed any documents for the

3  case.  So I'm not sure if I was retained a

4  little bit before then.  You know, I didn't

5  necessarily work on it the day I was retained.

6  I just don't remember.

7    Q.   Okay.  All right.  So Carmen Fleming is

8  showing up working on 6/13, so -- to review file

9  material and discuss the case with you.

10        And then you have file analysis on

11  6/13, 6/14, and then 6/15.  That's when you

12  actually -- well, 6/14 is when you came down

13  here from Chicago.  6/15, you came to the site.

14  And then Carmen Fleming is doing more work.

15        Who is J.P. Wolfe?

16    A.   He's an employee that helps with the

17  file assembly and also summarizes some

18  depositions.

19    Q.   Okay.  Fair enough.

20        All right.  Jean -- is it Jean-Pierre

21  or Jean-Pierre (pronunciation clarification)?

22  How do you say the name?

23    A.   Jean-Pierre.  But he goes by J.P.

24    Q.   J.P.?

1       A.   He's French Canadian.

2       Q.   Okay.  I understand.

3            And then who is T. Bundorf?  Thomas

4  Bundorf?

5       A.   Thomas Bundorf.  He goes by Tom.

6       Q.   Okay.  And he doesn't have any kind of

7  -- neither does J.P., they don't have any

8  destination behind their name, like P.E. or

9  C.P.E. or anything like that.

10           Are they -- what -- are they just,

11  like, staff?

12      A.   Yeah, I would say J.P. is staff.  Tom

13  Bundorf doesn't have a P.E., but he's part of

14  the technical team.  He's worked with us for a

15  long time, so...

16      Q.   Does he have an engineering degree?

17      A.   I don't know if he has a full

18  engineering degree.  I know he went to school

19  for a couple years.  He does a lot of our -- for

20  many, many years, he's worked on the data that

21  we collect during site inspections.  He's a

22  technologist, I guess would be the best way to

23  put him.

24      Q.   So he would be a tech?

John Stamm, P.E. 09/28/2023

1      A.   Sure, yes.

2      Q.   Then -- so --

3      MR. WHITFIELD:  Go to the next page.

4  BY MR. WHITFIELD:

5      Q.   And there's Tom Bundorf again, and then

6  I see you down there a bunch.  And then --

7      MR. WHITFIELD:  Go to the next page.

8  BY MR. WHITFIELD:

9      Q.   So to date, you have billed to the

10  plaintiff's group in this case $31,000?

11     A.   So I will just say that's what Fusion

12  Engineering has billed.

13     Q.   Okay.

14     MR. WHITFIELD:  All right.  Back on the

15  30(b)(5) -- 30(b)(5) stuff.

16  BY MR. WHITFIELD:

17     Q.   So we were talking about the 30(b)(5)

18  page on the deposition notice, which is Pages 2

19  and 3.  I kind of took a little bit of a

20  diversion with the e-mail and then the bill and

21  things like that.

22          No. 1 specifically talks about

23  basically your file.  You've indicated to me

24  that short of e-mails between you and Counsel,


Exhibit "B"

John Stamm, P.E. 09/28/2023

1  short of e-mails, that you have produced your

2  entire file.

3          Would that be fair?

4      A.   Yes.

5      Q.   Okay.  Is there anything other than

6  e-mails that you have not produced?

7      A.   Not that I can think of.

8      Q.   Okay.  Okay.  We did make the

9  deposition notice Exhibit 51 -- 52, so I can set

10 that aside.

11         Attached to your report, John, was your

12 CV.

13         Do you have that in front of you?

14     A.   Yes.

15     Q.   Okay.  I will say that as an engineer,

16 you have a -- an admirable career for such a

17 young man.

18     A.   Thank you.

19     Q.   So let's just pull the professional CV

20 or your resume kind of up.

21         Go down to "Examples of Areas of

22 Expertise."  Do you see that?

23     A.   Yes.

24     Q.   You have -- you have several things



John Stamm, P.E. 09/28/2023

1    listed down there, mobile elevating work

2    platforms and then so forth, all the way down to

3    mechanical testing.  A lot of those things

4    obviously would be very beneficial to an

5    engineer who is focussing on accident

6    reconstruction no matter what it is.

7            I do note, though -- and I wanted to

8    get you to comment upon this.  Are you a

9    ballistics expert?

10       A.   I am not.

11       Q.   Have you ever, ever -- in the context

12   of your work, ever had to examine an event that

13   involved ballistics?

14       A.   I mean, obviously this one involved

15   ballistics, but I can't think of ever analyzing

16   ballistics.

17       Q.   Well, you're not being called upon in

18   this particular case because of your expertise

19   in ballistics, are you?

20       A.   I do not have an expertise in

21   ballistics.

22       Q.   Okay.  Well, ballistics in this

23   particular case -- and I'm talking about

24   relative to your opinion.



John Stamm, P.E. 09/28/2023

 1            You weren't really hired in this case

 2    to consider the ballistics feature of this

 3    event, were you?

 4        A.    My understanding is, I was hired to

 5    analyze the vehicle and the vehicle movement.

 6        Q.    Okay.  Sure.

 7            So the vehicle movement is what you

 8    were hired to consider and give an opinion on in

 9    the context of this case and not the ballistics

10    realm -- or that strata that involves

11    ballistics?

12        A.    I think that's fair.

13        Q.    Okay.  Are you -- do you consider

14    yourself an expert in the field of law

15    enforcement or law enforcement practices?

16        A.    I do not.

17        Q.    You weren't hired in this particular

18    case, were you, to comment upon those things

19    that would be practices and procedures and what

20    is or what is not constitutional from a

21    use-of-force continuum?  You weren't hired to

22    comment upon those, were you?

23        A.    I was not.

24        Q.    Okay.  So as far as law enforcement is



John Stamm, P.E. 09/28/2023

1    concerned, that's not you?  That's not -- you're

2    not that expert, right?

3        A.   That's not me.

4        Q.   Okay.  You're -- I mentioned a minute

5    ago that you're a young man, and I don't know

6    how far back in time you go.

7             Do you remember a time when you could

8    actually work on your car without having to

9    navigate around electronic ignition?

10       A.   Without -- can you say that again?

11       Q.   All right.  So do you ever remember a

12   time that you, as a vehicle owner, could work on

13   your car without having to deal with the

14   frustration of electronic ignition and different

15   computer products under your hood?

16       A.   No.

17       Q.   Okay.  Here's the reason that I'm

18   asking.  Have you ever actually -- other than

19   changing -- have you ever changed your own oil?

20       A.   Yes.

21       Q.   How long has it been since you changed

22   your own oil?

23       A.   Couple years ago, my wife's Honda CR-V.

24       Q.   Okay.  Okay.  So you changed the oil in



 1    your wife's car.

 2           Before then, how long ago had it been

 3    that you changed oil in a car that you owned?

 4        A.   I think I did that a couple times in

 5    her vehicle.  Besides that, I think that's it.

 6        Q.   Okay.  All right.  Have you ever had to

 7    change out the transmission fluid in the

 8    transmission of any of your vehicles?  Have you

 9    ever done it before?

10        A.   No.

11        Q.   Have you ever had to bleed off a

12    vehicle's air lines and then, I guess,

13    reconstitute it -- fill it with brake fluid?

14    You ever had to do that?

15        A.   When you say "air lines," do you mean

16    brake lines?

17        Q.   Your brake lines.

18        A.   Yeah.

19        Q.   Your brake lines.

20        A.   Yeah, I've bled off brake lines.

21        Q.   Okay.  Well, how long has it been since

22    you did that?

23        A.   Probably within the last year.  I did a

24    brake job on the same vehicle.



John Stamm, P.E. 09/28/2023

1     Q.   The Honda?

2     A.   Yeah.

3     Q.   Your wife's Honda?  Okay.  All right.

4          How about when's the last time you

5   changed a tire?

6     A.   A couple months ago.

7     Q.   Your wife's car?

8     A.   So, I guess, I don't -- yeah, taken --

9   I don't remount and balance.  I'll do that at

10   the shop.  But I've rotated tires on my car and

11   my wife's car.

12     Q.   Do you have a shop that you can pull

13   your car into and lift it up and rotate tires?

14     A.   Yeah, we have a lift at our company.

15     Q.   Okay.  You have a lift, and you take

16   advantage of that lift on your personal

17   vehicles?

18     A.   Sometimes if it's --

19     Q.   Handy to have.

20     A.   If it's open.

21     Q.   How about any -- I'm sorry?

22     A.   I said if it's open, the lift.

23     Q.   It's what?

24     A.   A lot of times the lift -- there's a

John Stamm, P.E. 09/28/2023

1   vehicle for a project or someone else is using

2   it.  So it's not like it's always available, is

3   my point.

4        Q.   Understood.  I got it.

5             So you're only privileged to use it

6   personally when it's not being used

7   professionally?

8        A.   Correct.

9        Q.   Okay.  All right.  How about adding

10  coolant to the cooling system of your vehicle,

11  ever done that before?

12       A.   I don't think I've ever done that.

13       Q.   Okay.  All right.  Let me ask you maybe

14  even a more involved question.

15            Do you know what is involved in taking

16  off -- a carburetor off of an intake manifold?

17       A.   I mean, I can look it up and do it, but

18  it's nothing I've done before.

19       Q.   Okay.  Are you familiar with rebuilding

20  a carburetor?  Have you ever done that before,

21  rebuilt a carburetor?

22       A.   I have cleaned out the carburetor on a

23  little scooter I have, but not on a vehicle.

24       Q.   Yeah, let's talk about a vehicle, okay,



John Stamm, P.E. 09/28/2023

 1  as opposed to, you know, scooters, lawn mower,

 2  mini bike engines, things like that.

 3          Have you ever rebuilt a carburetor on a

 4  sure enough passenger vehicle?

 5      A.   I have not.

 6      Q.   Have you ever had to replace an intake

 7  manifold?

 8      A.   I have not.

 9      Q.   Have you ever had to do any work on the

10  heads of a vehicle?  In this particular case, it

11  would have been a V-8.

12          Have you ever had to work on the head

13  of a vehicle like in this particular car, a 2014

14  GMC Sierra?

15      A.   No.

16      Q.   Okay.  All right.  Have you ever

17  actually had to rebuild an engine?  No?

18      A.   No.

19      Q.   Okay.  Have you ever had to remove and

20  replace any of the drivetrain of a vehicle?

21      A.   I think maybe an output shaft going to

22  one of the wheels.

23      Q.   Output shaft on one of the wheels?

24      A.   Leading to one of the wheels.

John Stamm, P.E. 09/28/2023

1      Q.   Leading to one of the wheels?

2      A.   Yeah.

3      Q.   Okay.  Well -- so you have the

4   transmission and then you've got the apparatus

5   that connects the transmission up to the

6   differential and then out to the tires.

7      A.   Yeah.

8      Q.   That's normally the drivetrain.

9           Like, have you ever done any work on

10   that particular --

11      A.   Well, that's what I'm --

12      Q.   -- system, like the drivetrain system?

13      A.   That's what I'm saying.  Not my

14   vehicles, but projects we've worked on.  You

15   know, we've taken off wheels.  We've taken off

16   the steering knuckle, look at the linkages.  You

17   know, there's a shaft going into the wheel,

18   that's what I'm calling the output shaft.  That

19   actually turns and powers the wheel.  You know,

20   I've taken those off for sometimes demonstrative

21   purposes and just to explain how the systems

22   work.  But on my personal vehicles, I've never

23   had a need to.

24      Q.   Or something that would not have been



1  related to your professional involvement; is

2  that what you're telling me?

3      A.   Yeah, I've never worked on one of my

4  vehicles -- none of them have ever needed that.

5      Q.   Well -- so here's one of the things

6  that I'm trying to maybe understand.  You're

7  giving an opinion in this particular case, and

8  as I look and appreciate your opinion, at the

9  very, very end, your opinion section is about a

10  page long.  I mean, if you use the substance on

11  one page and put it over on the second page, the

12  opinion section is about a page.

13          One of the things that I noted in your

14  opinion was, you know, something to do with the

15  speed of the -- the movement of the vehicle

16  during an idle.

17          Would that -- do you remember dealing

18  with that in one form or fashion?

19      A.   So I measure the tractive force of the

20  truck with the engine idling.

21      Q.   Right.

22      A.   And I utilized that for some

23  calculations in the report, if that's what

24  you're referring to.



John Stamm, P.E. 09/28/2023

1      Q.   Sure, yeah.

2           Anyway, you mention something that I

3    think you produced a paper on.  It's called the

4    rolling resistance coefficient.

5           Remember that?

6      A.   Yes.

7      Q.   Have you ever had to use that

8    particular kind of formulaic algorithm before in

9    any of your cases as an expert?

10     A.   Yes, so rolling resistance coefficient

11   is a, you know, pretty well-known, you know,

12   resistive force.  But as far as the

13   calculations, they're kinematic calculations

14   that are utilized in pretty much every vehicle

15   reconstruction.

16     Q.   So rolling resistance coefficient; is

17   that what you're saying?

18     A.   That is -- yeah, that coefficient

19   correlates to a force that I utilize for the

20   kinematic equations.

21     Q.   Well, let me ask you this:  Just from

22   the standpoint of your opinion -- we do know

23   that the vehicle did come to a stop and the

24   engine was on, and there was no foot, at least



1    after the accident, on the brake.

2         We do know that it came to a stop and

3    it was idling, correct?

4        A.   I agree.

5        Q.   We do know that point when the vehicle

6    itself was put into drive, do we not, or at

7    least that distance?

8        A.   Can you repeat the question?

9        Q.   Sure.  Well, if you remember some of

10   the deposition testimony, even Officer Cuevas's

11   testimony, Mr. Parker was backing out of the

12   grass, I think, at Ms. Baldwin's house, and he

13   struck a mailbox at least on the right quarter

14   panel, the rear quarter panel of his vehicle,

15   right?

16       A.   Correct.

17       Q.   Right?

18       A.   Correct.

19       Q.   Yeah, you're skipping a little bit.  I

20   guess it's your voice.

21         So you agree, then, that when the

22   vehicle first was moving, it moved out of the

23   driveway in reverse until it struck the mailbox,

24   right?



John Stamm, P.E. 09/28/2023

1      A.   I agree.

2      Q.   Okay.  And then apparently, Mr. Parker

3  put the vehicle in drive to make it move

4  forward.

5      A.   Yes, I agree.

6      Q.   Correct?

7      A.   I agree.

8      Q.   Okay.  Now -- now, you went out there,

9  and as I remember, you tried to maybe reenact in

10  some form or fashion, the movement of the

11  vehicle, but you were operating a -- as I

12  remember, you were operating a Ford truck,

13  weren't you?

14      A.   Ford F-150.

15           So I wasn't trying to recreate the

16  accident.  I was just demonstrating the general

17  path taken and the steering wheel inputs

18  required.

19      Q.   Well, wouldn't the steering wheel and

20  the steering that would be required to at least

21  pull away from the mailbox and then ultimately

22  to end up where this vehicle ended up, wouldn't

23  that be determined by virtue of the wheelbase of

24  the vehicle, or no?



1      A.    That would affect it as well as, you

2  know, the turning radius.

3           But, once again, if you look at my

4  opinions, I'm not quantifying how much

5  right-hand turn or how much left-hand turn.  I'm

6  just stating that when you pull away from the

7  mailbox, you're going to have to put in a

8  right-hand turn, you're going to go up at an

9  angle, and if you keep holding that right-hand

10  turn, you're going to be no longer parallel

11  east, you're going to be going southeast at a

12  diagonal towards the grass.  And then to get

13  back parallel to the grass, you have to put it

14  in a left-hand turn.  And that was what I was

15  trying to demonstrate.

16      Q.    But you weren't suggesting, were you,

17  by doing that, that that was the path that

18  Mr. Parker took on the morning of February the

19  1st of 2020 with you in an F-150 and him in a

20  2014 GMC Sierra, were you?

21      A.    It's going to be the general path.  We

22  know where the truck was when the right rear

23  corner near the taillight impacted the mailbox,

24  and we know where the truck was -- where it



John Stamm, P.E. 09/28/2023

1    ended up.  To get to those two points, you have

2    to take that general path.

3            I'm not saying the path I took is

4    exactly the same, but that's the general path

5    that you have to take.

6        Q.   It's the general path that you would

7    have to take given the vehicle that you were

8    in --

9        A.   No, it doesn't matter --

10        Q.   -- to take that general path, right?

11        A.   It doesn't matter.  If you have a

12    couple of extra feet of wheelbase, you still

13    have to put in a right-hand turn and then a

14    left-hand turn to get parallel -- you know,

15    right wheels into the grass and parallel to the

16    road in any vehicle.

17        Q.   Understood.  Okay.  I understand what

18    you're saying.

19            Wouldn't the angle of your vehicle

20    coming out back into the -- to straighten up in

21    the street, wouldn't it matter as to what your

22    angle would be when you hit the mailbox?

23            Do you know what angle Mr. Parker was

24    in when he hit the mailbox?  Did he come



1  straight out of the yard, or did he come out of

2  the yard and attempt to angulate himself in the

3  street so that it would make him getting into

4  the street straightaway more easier?  Do you

5  know what angle he was when he hit the mailbox?

6      A.   To a certain extent.  So if you look at

7  -- let me see here.  Trying to find the best...

8          So we know where the damage is, you

9  know, above the taillight.

10     MS. RAVEENDRAN:  Can you tell him where

11 you're looking?

12     THE WITNESS:  Yeah, sorry.  On Page 10,

13 Figure 10.  This is my report.

14 BY MR. WHITFIELD:

15     Q.   I see the damage to the vehicle.  But

16 what I'm kind of curious about is, if you look

17 at Page 28 of your report --

18     A.   Yeah, so I'm trying to tie it together.

19 So that digital model of a truck is the GMC with

20 the same dimensions.  And it shows, on Page 28,

21 Figure 22, the mailbox contacting right above

22 the taillight.  And it's backed up straight from

23 Points 15, 16, which are tire marks documented

24 by the police.

1          So this is pretty close to the angle of

2     impact.  It might be slightly different if you

3     put any steering wheel input as he was backing

4     up from when he left the yard and when he

5     impacted the mailbox.  But it's going to be

6     pretty close to it.

7          Q.   Okay.  Pretty close.

8               But you're not suggesting that his

9     juxtaposition in the street is as you have

10    depicted it on Page 28?

11         A.   There's no way to determine if this is

12    exactly correct, if it's angled 5 degrees one

13    way or the other.  It's going to be close to

14    this, though.

15         Q.   Okay.  All right.  When you say there's

16    no way to determine it, it's because we don't

17    really have, like, a video of the event,

18    correct?

19         A.   We do not have a video.  I just have to

20    go off of the measurements made by the police

21    and my inspection measurements.

22         Q.   And the physical damage that's depicted

23    in the pictures?

24         A.   Correct, to the truck and the mailbox,



1    which indicate it was knocked backwards.

2        Q.    Right.  Right.

3            Well, the mailbox damaged the right

4    rear quarter panel of the truck, correct?

5        A.    So the mailbox contacted the -- you

6    know, back above the taillight, and then it

7    looked like there were some scrape marks likely

8    from this accident as well along the side.

9            So, you know, after -- it's a dynamic

10   event.  After it's being knocked backwards and

11   the truck's likely continuing to back up, that's

12   where you get the scraping on the side.

13       Q.    Right.  But there's nothing about the

14   scrape marks on the right rear quarter panel

15   indicated on Page 10 that would give you a

16   better idea about what angle Mr. Parker was when

17   he impacted it?

18       A.    Well, you've got to combine all the

19   evidence.  Right?  You have the mark above the

20   taillight.  You also have the scrape marks along

21   the side.  You have the disturbed ground -- I'm

22   trying to find where that is -- behind the

23   mailbox post that indicates it was knocked

24   backwards, so that would be the right side of



John Stamm, P.E. 09/28/2023

1    Figure 3 on Page 4.

2          And then you also have the tire marks

3    noted by the police, which I don't know if I

4    have an image in the report.  But on the page

5    that you pulled up, Page 28, that is marked 15

6    and 16, which was documented --

7        Q.    Sure.

8        A.    -- by the police with a total station

9    after the accident.

10       Q.    Right.  Well, here's my point -- and

11   I'm kind of -- wanting to kind of get on with --

12       A.    Sure.

13       Q.    -- with your testimony on that.

14          There really isn't any way that you can

15   specifically state at what angle Mr. Parker hit

16   that mailbox, but you've said that you're close?

17       A.    Correct.

18       Q.    Right?

19          Well, when you took the Ford out there,

20   did you back up to the mailbox in such a way

21   that you could recreate the angle that his truck

22   would have taken to get from the mailbox over to

23   the area where it stopped?

24       A.    Not the exact angle because I don't

 1  know.  But the general path, yes.

 2      Q.   Okay.  The general path.  Okay.

 3           Now, if I appreciate the conclusions of

 4  your report, John, you're -- look at Page 31,

 5  please.

 6      A.   I'm there.

 7      Q.   Okay.  So on Page 31, you give five

 8  opinions, and then two of them are on the second

 9  page.  So you give a total of seven opinions.

10           No. 1 is probably just a product of

11  your measurement from the mailbox to the place

12  where the vehicle came to rest, correct?

13      A.   That -- so that, you know, straight

14  line measurement.  And I also looked at the VBOX

15  data to see, you know, that arced path.  Because

16  obviously, the -- as you pull out and make your

17  right-hand turn and then pull over, that's not

18  straight lines.  That's going to add a couple

19  feet.

20      Q.   Do you know whether the Ford F-150 that

21  you were operating the day that you inspected

22  the scene, or the site, that its turning radius

23  was the same as the 2014 GMC that Parker was

24  driving?



John Stamm, P.E. 09/28/2023

1      A.    They're not exactly the same.  I think

2  I stated what they were in the report.  I can

3  pull those numbers if you want.

4      Q.    I think you did pull those numbers.

5  Because on one of the documents that you

6  produced, I think it did have a turning radius,

7  I thought.

8      A.    Yeah, so on Page 2 of my report, it

9  says the turning radius of the subject truck,

10  which based on the make and model, is 23.6 feet,

11  and then the turning radius of the F-150 is 20.4

12  feet.  So a couple feet less, which makes sense

13  because it's not a crew cab.

14      Q.    The Ford was not a crew cab?

15      A.    Correct.

16      Q.    But the GMC was a crew cab?

17      A.    Correct.

18      Q.    So the Ford had a tighter turning

19  radius than the GMC?

20      A.    Slightly.

21      Q.    Okay.  So 23.6 feet, you're attributing

22  that on Page 2 of your report to the GMC, 23.6

23  feet.

24           Is that the number of feet that it

John Stamm, P.E. 09/28/2023

1    would take to come out of a right angle and then

2    straighten up?  Tell me how you -- how that's

3    calculated.

4        A.   So that's not something I calculated.

5    That's a book value published likely from the

6    manufacturer.  But it's -- if you pulled in

7    full, you know, wheel lock turn, that's going to

8    be the radius of the turn without the wheel

9    slipping.

10       Q.   I mean, do you have to literally take

11   your vehicle in a 180?

12       A.   I'm sure -- I'm sure it's tested

13   physically.  I mean, they could also do it with,

14   you know, the models nowadays, but...

15       Q.   Yeah.  Well, I mean, I'm just trying to

16   learn from you.  I mean, when you put in your

17   report that a wheelbase of 143.5 inches, a

18   turning radius of 23.6 feet, I mean, I'm

19   assuming you understand what's represented by

20   that number, and I'm just asking you to teach me

21   what that means.

22            I mean, is that the number of feet that

23   it would take for the vehicle to do a 180 --

24       A.   No --

John Stamm, P.E. 09/28/2023

1        Q.    -- and a full turn?

2        A.    No, radius -- if you think of a circle,

3   from the center of the circle to the edge of the

4   circle is a radius.  Diameter is all the way

5   across the circle.

6        Q.    So if you -- if you put your vehicle in

7   a hard turn and did a circle with your

8   vehicle --

9        A.    Yes.

10       Q.    -- if you measured from one end of the

11  circle to the other side of the circle, I guess

12  that would be, what, circumference, I guess?  Is

13  that what it's called, circumference?  It's not

14  radius.

15       A.    The diameter is twice the radius.

16       Q.    Right, right.  So you would measure

17  from the most extreme edge of the circle to the

18  opposite circle.

19            In your report, you're intending to

20  represent that value is 23.6 inches?

21       A.    So when they define a turning radius,

22  I'm not sure if that's the actual radius or

23  they're referring, like we would, you know, in

24  engineering terms or if that's just a colloquial

John Stamm, P.E. 09/28/2023

1   term for the diameter.  But it's one or the

2   other.  It's not going to be the circumference.

3        Q.   Well -- well, I mean, if you were to --

4   if you were -- if I were to get in my truck and

5   drive my truck in a full circle so that I came

6   right back to the point of beginning, that

7   measurement across that circle, in this

8   particular instance, for a 2014 GMC Sierra,

9   would be 23.6, right, feet?

10       MS. RAVEENDRAN:  I'm --

11  BY MR. WHITFIELD:

12       Q.   -- across the circle?

13       MS. RAVEENDRAN:  I'm going to object to

14  misstating.  But I think we're just confusing

15  the words "circumference," "radius," and

16  "diameter."

17       MR. WHITFIELD:  Look, diameter -- I'll use

18  any word you want me to.  I'm just trying to

19  understand in laymen's terms what 23.6 turning

20  radius means.

21  BY MR. WHITFIELD:

22       Q.   If I were to put my vehicle in a

23  complete turn and come around to the point of

24  beginning, basically creating a circle on the

Exhibit "B"

1  planet, you know, in whatever parking lot I'm in

2  at Walmart, from one end -- one side of the

3  circle to the most extreme other side of the

4  circle would be 23.6 feet, right?

5      A.   I think that's what the turning radius

6  means.  It could be twice that.  I'm not sure if

7  turning radius is the way that engineers think

8  of radius, which is half the diameter, halfway

9  across, or all the way down.  I would need to

10  look it up.

11      Q.   Okay.  I was just curious, John, as to

12  what you intended to tell me when you said a

13  turning radius of 23.6 feet.

14      A.   I intended --

15      Q.   What are you intending to tell me by

16  that?

17      A.   These are vehicle specs.  I didn't do

18  any --

19      Q.   Okay.

20      A.   -- calculations based off of that

21  turning rate.  This is general vehicle specs,

22  similar to the wheelbase, which is going to be

23  the rear axle to the front axle.

24      Q.   And, look, I don't want to get into the



John Stamm, P.E. 09/28/2023

1    weeds with you, but when you tell me turning

2    radius of 23.6 -- that's your wording in your

3    report.

4              When you tell me a turning radius of

5    23.6 feet, is that the car in a full circle turn

6    and the width from one extreme end of the circle

7    to the other?  That's all I'm asking.

8        A.   And I'm telling you, that's either that

9    or it's going to be twice that.  I'd need to

10   look up how they report that.  It's nothing that

11   was reported -- or had no bearing on any of my

12   opinions in this case.

13       Q.   Well, okay.  So that's -- see, that's a

14   problem for me because the turning radius of his

15   vehicle, Mr. Parker's vehicle, is going to be

16   different than the turning radius of a Ford

17   F-150, and in order to come off of that mailbox,

18   you're going to implicate the turning radius of

19   those two vehicles, correct?

20       A.   The F-150 is a shorter wheelbase, a

21   shorter turning radius relatively, and so it's

22   going to be able to take a tighter turn, if

23   that's what you're trying to get to.

24       Q.   Right.  So when you took the F-150 out


Exhibit "B"

John Stamm, P.E. 09/28/2023

1    there and attempted to recreate to the extent

2    you that could, you really were using a more

3    efficient vehicle in a turn than Mr. Parker did

4    in his vehicle.  You could get a tighter turn

5    out of it, couldn't you?

6        A.    The vehicle can get a tighter turn.

7    Once again, I was not trying to replicate the

8    exact vehicle movements, just the general path

9    and the steering wheel inputs.

10       Q.    Okay.  All right.  All right.  Well,

11   look, so let's do this.  Your second opinion on

12   Page 31 of your report -- are you with me?  Do

13   you see it?

14       A.    I am there.

15       Q.    You there?

16       A.    Yes.

17       Q.    Okay.  "So while driving forward from

18   the stopped position near the 213 25th Street

19   mailbox, Mr. Parker must have turned the

20   steering wheel to the right and then to the left

21   for the vehicle to reach the point of rest . . .

22   while oriented approximately parallel with the

23   road."

24              The turning radius, even though it may


Exhibit "B"

John Stamm, P.E. 09/28/2023

 1    not be but just a few feet, there would be a

 2    difference in his ability to get the car back

 3    into the road again straight and then off road,

 4    I guess, parallel with where he ultimately ended

 5    up coming to rest, right?

 6        A.   So this opinion is true regardless of

 7    the turning radius.

 8        Q.   I understand.

 9             You're simply saying there that he

10    turned -- he hit the mailbox, he came off the

11    mailbox, took a right-hand turn, and then

12    ultimately ended up half off the roadway and

13    half on the roadway, right?

14        A.   That's his path, yes.

15        Q.   Okay.  So other than saying that,

16    that's really about the only -- that's the only

17    opinion that you're attempting to communicate to

18    me in Item 2, right?

19        A.   I'm stating how a vehicle can get

20    parallel to the road at the point of rest from

21    where it contacted the mailbox.  You can't just

22    put in a right-hand turn and get to that

23    post-accident location.  You're going to end up

24    at an angle diagonal to the road.

Exhibit "B"

1          Q.   I understand that.

2               He came off the mailbox, turned until

3   ultimately, he came up where the vehicle rested

4   half on and half off, right?

5          A.   And you need to put in a left-hand turn

6   towards the end to get parallel to the road with

7   the right-side wheels in the grass.

8          Q.   All right.  And I'm fine with that.

9               That's what you're attempting to

10  communicate to me at Item 2?

11         A.   Yes.

12         Q.   All right.  Good.

13              Item 3 -- by the way, do you know of

14  anybody that is disputing your observation at

15  Item 2?

16         A.   I guess I haven't seen anyone dispute

17  that, but I didn't see anyone point it out

18  either.

19         Q.   Okay.  So as far as the facts are

20  concerned, that's just a factual conclusion that

21  you're making, that the vehicle came off of --

22  Mr. Parker's vehicle came off of the mailbox,

23  took a right-hand turn, and then did a left-hand

24  turn or left-hand veer until he came to rest

1    half on and half off the roadway, right?

2         MS. RAVEENDRAN:  Objection to form.

3         THE WITNESS:  So that's --

4         MR. WHITFIELD:  Whoa, whoa.  What's the form

5    objection -- stop, stop, stop.

6              What's the form objection, Bhavani?

7    What am I saying wrong?  I'm just trying to get

8    it right.

9         MS. RAVEENDRAN:  You're mischaracterizing his

10   earlier testimony by saying this is a fact

11   conclusion when it's an expert opinion he's

12   giving in the case.  Also, it's vague because

13   you're referencing things, you know, just in

14   generalities on the question.

15             So, you know, if you want to ask him if

16   that's his opinion, I have no objection to that

17   whatsoever, but asking him if that is merely a

18   fact opinion, you know, I don't think that's a

19   fair question.

20        MR. WHITFIELD:  Okay.  Well, that's my

21   question.

22             Now I'd like for you to answer that

23   question, if you can.

24        MS. RAVEENDRAN:  You can answer.

1      THE WITNESS:  Sure.  To the best I can

2  remember the question, this is the path -- you

3  know, it's based on my -- me being down there,

4  surveying it, understanding the dimensions, the

5  geometry, and how the vehicles work.  That's my

6  opinion.

7  BY MR. WHITFIELD:

8      Q.   Okay.  Let's go to 3, your opinion at

9  3.  I'm going to ask you some questions about 2

10  and 3.

11          But 3, "The physical evidence is

12  consistent with Mr. Parker pulling over and

13  traveling straight and approximately parallel to

14  the road prior to coming to a stop and not

15  consistent with a vehicle that only had a right

16  steering wheel input after pulling forward from

17  the mailbox."

18          Do you know of anybody that has said

19  that Mr. Parker, once he pulled off the mailbox,

20  continued in a right-hand turn and not right and

21  then left, ultimately ending up half on and half

22  off the road?  Do you know of anybody that's

23  contending what you're saying is not consistent

24  in that opinion?

1    A.   It's my interpretation of

2  Officer Cuevas's version of the events, is that

3  the vehicle was veering towards the south side

4  of the road.  And so that would be an

5  inconsistency.

6    Q.   Not -- so you're saying it's not

7  consistent with a vehicle that only had a right

8  steering wheel input after pulling forward from

9  the mailbox; you're saying that if this vehicle

10  came off the mailbox and was traveling toward

11  him until he got off the road, there's something

12  inconsistent with Cuevas's rendition of that

13  fact?

14    A.    My understanding of Cuevas's testimony

15  is that the vehicle was not traveling east but

16  veering southeast towards the south side of the

17  road, and that's when he shot the vehicle and

18  the vehicle came to a stop.  So I think that is

19  inconsistent with the vehicle level -- you know,

20  turning a left-hand turn from the driver,

21  parallel to the road, and traveling forward for

22  some distance.

23    Q.   Okay.  All right.  So you believe -- so

24  what is the basis of that opinion?  What's --



John Stamm, P.E. 09/28/2023

1    are you saying that the basis of your opinion

2    is, is that you read Jason Cuevas's depo, and

3    because the vehicle is apparently straightaway

4    half on and half off, the vehicle when it came

5    to rest, that there was something wrong with

6    Officer Cuevas's rendition of the fact?  What

7    are you saying by that?  Why are you saying

8    that's even a thing?

9        A.   Well, I think I stated already what I

10   believe Officer Cuevas's testimony is.  But if

11   you look at, to point it out in the report,

12   Figure 7 where the red arrow is on Page --

13       Q.   Page what?

14       A.   Page 7, Figure 7.

15       Q.   Page 7, Figure 7?  Okay.

16       A.   Yeah, so that red arrow is pointing to

17   matted-down grass.

18       Q.   Okay.

19       A.   You can also kind of see it on the

20   bottom right corner, so it would be the right

21   rear wheel of Figure 8.

22       Q.   Okay.

23       A.   It's a little tougher to see the

24   matted-down grass there, but there as well.



John Stamm, P.E. 09/28/2023

1            So that's my evidence that the truck

2    was traveling forward for some period of time

3    and not at an angle directed towards the south

4    side of the road.  And that seemed to be

5    inconsistent with Officer Cuevas's testimony,

6    and so that's why I put that in the opinion.

7        Q.   Okay.  So we know where the vehicle

8    came to rest, right?  We know that.  We've got

9    plenty of pictures of that, don't we --

10       A.   We know.

11       Q.   -- right?

12            And we know that the vehicle came off

13   of the mailbox and had to at least straighten up

14   into the roadway?  We know that, don't we?

15       A.   We don't know how long it straightened

16   out in the roadway because it's -- at first,

17   it's going north, and then it's at an angle and

18   it's changing.  So it's possible that, you know,

19   it never straightened out, that it was -- just

20   started going back -- you know, kept the

21   right-hand turn.  So it went right past directly

22   east and it was facing southeast, and then

23   continued that path to get to the grass, and

24   then putting the left --

1      Q.   Okay.

2      A.   So just based on getting from the

3  mailbox to the point of rest, you know, I can't

4  say how long or if at all he was traveling

5  directly east.

6      Q.   Well, do you know at what angle the

7  truck entered the grass, even though its tires

8  seemed to be straight?  Do you know at what

9  angle Mr. Parker entered the grass in his

10 vehicle?

11     A.   I don't know the exact angle, no.

12     Q.   Okay.  Well -- so you don't have any

13 evidence to suggest that Mr. Parker's vehicle

14 came onto the grass at an angle and then

15 straightened up after it finally stopped?

16     A.   No, it had to come at an angle and then

17 straighten up based on where it was at the

18 mailbox and the short distance it traveled.

19     Q.   How is that inconsistent with the

20 testimony of Officer Cuevas?

21     A.   Because he said when he shot the truck,

22 the truck was at an angle coming towards him on

23 the south side of the road, and the truck

24 stopped.  He didn't say that the truck continued



John Stamm, P.E. 09/28/2023

1    and -- left steering wheel input and the truck

2    levelled out parallel to the road.

3         Q.   Oh, okay.  So your quibble, then, is

4    over your interpretation of what Officer Cuevas

5    said at the time that he shot and the vehicle

6    ultimately came to a rest?

7         A.   Basically.

8         Q.   Okay.  All right.  Well, you don't know

9    -- do you know where the vehicle was on the

10   roadway and what angle it was when the first

11   shot was made to the vehicle?

12        A.   I mean, I don't know if -- it's

13   possible that the first shot was made after the

14   truck was already stopped.

15        Q.   Well, it's possible, but it's possible

16   that it was not, correct?

17        A.   Yes.  I state those two possibilities

18   in my report.

19        Q.   Well -- so -- but what I'm asking you,

20   though -- we're not really allowed to do any

21   possibilities under Mississippi law.  We are

22   only allowed -- and certainly, probabilities

23   makes admissible evidence.

24             Is it probable or only possible that


Exhibit "B"

1  you don't know -- let me ask you this -- sorry,

2  bad question.

3        You don't know where the angle of the

4  vehicle was when the first shot was made, do

5  you, in the roadway?

6       A.   Based on all the evidence and

7  Officer Cuevas's testimony that he made -- I

8  think he used rapid or quick shots, the truck

9  was already pulled over when those shots were

10  taken.  I can't say if the truck was stopped or

11  not.

12       Q.   You can't say whether the truck was in

13  motion or not when the first shot, second shot,

14  third shot, or fourth shot, if that's what the

15  proof shows, was made in relationship to when

16  the vehicle was stopped?  You can't -- you don't

17  have any ability to tell me that, do you?

18       A.   I don't have any physical evidence to

19  tell you if the truck was still moving forward,

20  you know, parallel to the road, the right wheels

21  in the grass, left wheels on the roadway when

22  the four shots were made.

23       Q.   Okay.  And let me make sure I

24  understand what you just said.



John Stamm, P.E. 09/28/2023

1          Relative to the shooting itself, the

2    actual firing of the weapon, you don't know

3    whether the vehicle was in motion or not when

4    that happened, do you, by the physical evidence?

5        A.   By the physical evidence, I can't say

6    whether the vehicle was in motion or not.

7        Q.   Okay.  When the firing of the weapon

8    occurred?

9        A.   Correct.  I said there's two -- I know

10   you don't like the word "possibilities," but I

11   state the two possibilities in my report.

12       Q.   Well, we're not -- here's what we're

13   ultimately going to have to grapple with.  I

14   will object at trial to any testimony that you

15   give that is a possibility only.  I will

16   probably be overruled if the judge hears the

17   word "probability" come out of your mouth.

18          You're not able to say that it's

19   probable that the vehicle was or was not in

20   motion when the shots occurred, are you?

21       A.   So if we're just talking about the

22   physical evidence, I can't say one's more likely

23   than the other.

24          When you consider all the witness



John Stamm, P.E. 09/28/2023

1    testimony, you know, that might be a different

2    story.

3         Q.   Well, that's -- that's -- you're

4    listening to witnesses' testimony that certainly

5    most, if not all, of them had been drinking.

6              Did you know that?

7         A.   I'm aware.

8         Q.   Did you know what the toxicology was

9    for Mr. Parker?

10        A.   I do not recall that.

11        Q.   You haven't seen that, have you?

12        A.   I might have saw it, but it's not

13   really relevant to --

14        Q.   I understand.  Well, I mean, since

15   we're talking about things outside the physical

16   evidence, I'm just trying to maybe understand

17   what it is that you reviewed and what you didn't

18   review.  Okay?

19              The physical evidence doesn't suggest

20   that you can tell, as a professional engineer,

21   when the shots were fired relative to the

22   movement of the vehicle?  You can't say that,

23   can you?

24        A.   I can say that the vehicle was either

John Stamm, P.E. 09/28/2023

1  stopped or already pulled over and it pretty

2  much stopped immediately.  Everyone -- there's

3  no testimony that the vehicle traveled a great

4  distance after the shots were fired.

5          And I know the path taken -- general

6  path taken by the truck.  I've got my contact

7  with the mailbox, I've got my point of rest,

8  I've got my tire marks, matted-down grass.  It

9  says for at least some distance, the truck was

10  parallel to the road.  I know that to execute

11  that general maneuver, you need the right input;

12  once you get off the road, you've got to input

13  left to pull over.  I know all those things.

14          But I can't say one way or the other if

15  the truck was absolutely stopped, based on the

16  physical evidence, or not when the shots were

17  fired.  But in order for the vehicle to stop

18  there where it did stop, it either had to be

19  traveling at a very low rate of speed or the

20  brake had to be applied.

21      Q.   Okay.  And you don't know either way,

22  do you?

23      A.   Those are the two possibilities -- two

24  options.  How about that?


Exhibit "B"

John Stamm, P.E. 09/28/2023

1      Q.   Well -- sir?

2      A.   Yes.

3      Q.   Two what?

4      A.   Two options.

5      Q.   Two options.  Okay.

6           Okay.  So do you know what -- the

7   reaction, if any, that Mr. Parker had relative

8   to the brake when he was shot?

9      A.   I have no way of knowing that.

10     Q.   Correct.  Well, you mention in your

11  report that you don't -- you don't know whether

12  the service brake was applied.  In fact, on

13  Page 30 of your report, you gave different

14  scenarios about traveling and about, you know,

15  speed and things like that, but you qualified

16  every single sentence by saying that you didn't

17  know whether the service brake was applied or

18  not, right?

19          Look at Page 30 of your report.  Look

20  at Page 30 of your report, sir.

21     A.   I'm there.  Can you point to the

22  sentence you're referring to?

23     Q.   I'm trying to do that.  Look at Page 30

24  of your report.



1      A.    I am.

2      Q.    30.

3      A.    I'm on it.

4      Q.    Okay.  Page 30 of your report, if you

5  look down about midway, you'll see a sentence

6  that begins that, "If the vehicle's average RRC

7  was .035 . . . and it was traveling at 5 miles

8  per hour, it would continue to roll for

9  approximately 6.5 seconds and 24 feet before

10  stopping if the service brake was not applied."

11      A.    That's true.

12      Q.    So you're taking -- you're essentially

13  recognizing an unknown that you don't know

14  whether the service brake was applied or not,

15  correct?

16      A.    I think I'm very clear with that.  It's

17  -- there's two options.

18      Q.    And I don't have a -- I'm not quibbling

19  about that.  I'm just trying to get you to

20  recognize that at four different spots --

21  actually, five -- five different spots in that

22  paragraph, you acknowledge that you don't know

23  whether the service brake was applied.

24      A.    So this paragraph is just talking about



1    if you're going at 5 or 10 miles an hour, how

2    far you would expect the vehicle to continue to

3    roll before it came to a stop.  It's not going

4    to come to an immediate stop without the service

5    brake being applied.

6        Q.   And that's the point of my question.

7    You don't know that?

8        A.   I don't know if the service brake was

9    applied or not.  What I'm saying is, if he was

10    going 5 miles an hour or 10 miles an hour, he

11    would have kept going further, you know, right

12    before -- during the shooting, he would have

13    rolled well past where the vehicle was found

14    after the accident.

15        Q.   Well, wouldn't that tell you, then,

16    that the service brake had to have been applied?

17        A.   That or that he was traveling very

18    slow, a couple miles an hour.

19        Q.   Okay.  So it's one or the other?

20        A.   Yes.

21        Q.   Okay.  But I count at one, two, three,

22    four -- six, six spots in that paragraph where

23    you've acknowledged that you don't know whether

24    the service brake was applied depending upon the



1  speed of the vehicle and where the vehicle came

2  to rest.

3      A.   So each time that's mentioned in that

4  paragraph, that's just emphasizing how far the

5  vehicle will roll without the service brake

6  being applied.  These are true just due to that

7  environment.  It has nothing to do with him

8  applying the brake or not applying the brake.

9  These are calculations based on the rolling

10  resistance at the scene.

11      Q.   Yeah, but as it pertains, though, to

12  this accident, you really can't say how fast the

13  vehicle was -- how fast it was going before the

14  shooting or at the very end of the shooting

15  because you don't know whether the service brake

16  was applied or not by Mr. Parker?  You don't

17  know that?

18      A.   It's possible that he applied the

19  service brake.

20      Q.   Okay.  Well, the vehicle had to come to

21  a stop somehow, didn't it?

22      A.   I agree.  It was either traveling at a

23  very low speed or he applied the service brake.

24  But that doesn't mean that it was traveling at a



1    fast speed.  You could -- the service brake

2    could stop at a whole number of speeds.

3         Q.   Well, that's a good point.  The service

4    brake being applied can stop that vehicle at a

5    number of speeds, correct?

6         A.   Correct.

7         Q.   Okay.  And you don't know whether the

8    service brake was applied or not, correct?

9         A.   You know, there's -- are we just

10    talking about the physical evidence or --

11         Q.   That's a yes-or-no answer, sir.

12         A.   Are you talking about the physical

13    evidence or the witness testimony?

14         Q.   I'm talking about your understanding of

15    physics and engineering.

16              If that vehicle was traveling 5 miles

17    an hour, 2 miles an hour, 10 miles an hour

18    before that vehicle came to a stop given the

19    distance from the mailbox, the service brake had

20    to be applied?

21         A.   Just the physics for when the area

22    where the truck had to get into the grass, if it

23    was going 5 or 10 miles an hour, it would have

24    rolled past where it came to a rest.



John Stamm, P.E. 09/28/2023

1      Q.   Unless the service brake was applied?

2      A.   Absolutely.  Right.  If it's going

3  slower, then it could stop.

4      Q.   Okay.  If it was going slower, it could

5  stop; if it was going faster, then it would

6  require the service brake to be applied,

7  correct?

8      A.   Correct.

9      Q.   Go over to Page 31 -- back to 31.

10      MS. RAVEENDRAN:  Bill --

11  BY MR. WHITFIELD:

12      Q.   On Item No. 4 --

13      MS. RAVEENDRAN:  Bill --

14      MR. WHITFIELD:  Ma'am?

15      MS. RAVEENDRAN:  I was going to ask, we don't

16  need to stop right this second or anything, but

17  when there's a good stopping point, if we could

18  take a break, that would be appreciated.

19      MR. WHITFIELD:  I'll tell you what, if you'll

20  give me, like, ten minutes -- ten more minutes,

21  I'm probably about done.  If we can do that.

22      MS. RAVEENDRAN:  Yeah.  No, that's fine.

23      THE WITNESS:  It's good with me.

24      MR. WHITFIELD:  Okay.  I'm not -- I'm kind of

Exhibit "B"

John Stamm, P.E. 09/28/2023

 1   close to the end.

 2   BY MR. WHITFIELD:

 3       Q.   No. 4, 25th Street is approximately

 4   flat, nobody's taking issue with that, right, as

 5   far as you know?

 6       A.   As far as I know.  But, you know, I

 7   didn't know what other people would say, so

 8   that's just a --

 9       Q.   Okay.

10       A.   -- fact based on what I analyzed down

11   at the scene.

12       Q.   Well, I guess I'm just -- I'm trying to

13   figure out why that would be a subject of an

14   opinion or a conclusion, the terrain.  I mean,

15   it's certainly an observation that I have no

16   problem with.  I'm just kind of scratching my

17   head as to why that would be --

18       A.   Well, let me tell you.

19       Q.   -- part of your opinion.

20       A.   Let me tell you.  Because when I'm

21   calculating how far the vehicle is going to

22   roll, one of the things I have to consider, is

23   there an incline or not.  So that is --

24       Q.   Right.

John Stamm, P.E. 09/28/2023

1      A.    -- why it's in there.

2      Q.    Well, I'm glad you mentioned that.

3            So an incline has everything to do with

4    the ability of a vehicle to roll in either --

5    one way or the other.  If it's -- if it's an

6    uphill or an incline, the vehicle's not going to

7    roll very efficiently, if at all, and if it's a

8    downhill incline, then the vehicle will roll

9    more efficiently, correct?

10     A.    It has a -- it'll roll, you know,

11   higher -- so the incline is a force retarding

12   the rolling versus --

13     Q.    Right.

14     A.    -- the decline is going to help

15   accelerate the vehicle.

16     Q.    Sure.

17           Let me ask you this just from the

18   standpoint of weight:  If there were a baby

19   grand piano in the back of the bed of this

20   pickup truck, would that vehicle have been more

21   inclined to roll at all with that kind of weight

22   in the back of the pickup --

23     MS. RAVEENDRAN:  Objection to form.

24

1  BY MR. WHITFIELD:

2      Q.   -- if there's no acceleration?

3      A.   So as I state in the report, the

4  rolling resistance coefficient is multiplied by

5  the normal force on each wheel.  So the heavier

6  the vehicle, the more tractive force from the

7  engine to the drivetrain to the wheels required

8  to get the vehicle to roll forward.

9      Q.   Correct.

10          Are you familiar with tuning an engine?

11  Are you familiar with tuning up an engine?

12      A.   Sure.

13      Q.   Have you ever tuned an engine before?

14      A.   I have not personally tuned an engine.

15      Q.   Do you know -- do you know what kind of

16  manufacturers' recommendations there would be

17  for an RPM of a vehicle like this when it's

18  idling?  Do you know what the RPM spec is or the

19  recommendation is?

20      A.   It depends on the vehicle.  But I will

21  tell you that the two exemplars I looked at,

22  they both were in good shape -- well, the one in

23  Chicago was in better shape, but they both idle

24  at 500 RPM.  So all three of the vehicles idle



1    at 500 RPM.

2        Q.    Wouldn't the vehicle idling at 500

3    either way depend upon the condition of the

4    vehicle and the drivetrain?

5        A.    I mean, the idle set is based on a

6    number of sensors and configuration of the

7    vehicle.  But, once again, the exemplars I

8    looked at, they idled at 500 as well.

9        Q.    I got it.  But that's not my question.

10            My question is:  Wouldn't the ability

11    of the car to move forward at 500 RPMs depend

12    upon the efficiency of the drivetrain, including

13    the transmission, driveshaft, differential, all

14    the way out to the rear wheels?

15        A.    What do you mean by "efficiency"?  Is

16    something wrong with the drivetrain?

17        Q.    Well, if you've got -- well, if you've

18    got a wore-out transmission, is that vehicle

19    going to move at 500 RPMs versus a brand-new

20    vehicle off the lot at 500 RPMs?

21        A.    There might be a difference, but I have

22    no evidence that there was anything wrong with

23    this truck.

24        Q.    Okay.  But you don't know that there



John Stamm, P.E. 09/28/2023

1    wasn't anything wrong with the transmission

2    either, do you?  You don't know that, do you?

3        A.    I didn't see anything in the literature

4    I downloaded, and I know he drove there from

5    some distance.

6        Q.    The -- this vehicle had 137 -- I think

7    we agreed that it was 130, 138, maybe 140 --

8    140,000 miles on it, roughly, at the time of

9    this incident.

10            Is it your opinion that that

11    transmission that was in that truck was

12    off-the-lot efficient?

13        MS. RAVEENDRAN:  Objection; calls for

14    speculation.

15        THE WITNESS:  The exemplar --

16    BY MR. WHITFIELD:

17        Q.    Well -- and that's the point.  That's

18    the point.  You're speculating as to whether the

19    transmission was as efficient then as it was off

20    the lot.  You're speculating, aren't you?

21        MS. RAVEENDRAN:  Objection; form, misstating

22    testimony.

23        THE WITNESS:  The exemplar I looked at, I

24    think, had even more miles.  I don't know the

John Stamm, P.E. 09/28/2023

1  exact condition of the truck and --

2  BY MR. WHITFIELD:

3      Q.   I thought the -- I thought the exemplar

4  that you looked at only had, like, 114 on it.

5  Maybe I'm -- maybe I'm misremembering that.

6      A.   No.

7      Q.   The one that you looked at up in

8  Chicago?

9      A.   Yeah, you can -- let's pull that up.

10  I'm not sure how many miles -- I know it was

11  over 100 for sure.

12      Q.   Oh, I know it was over a 100.  But it

13  was 114, 115, wasn't it?  I think I made that an

14  exhibit.  I'll need to find that.

15      MR. WHITFIELD:  I'll tell you what, Bhavani,

16  let's go ahead and take a break because I need

17  to find that, and then we will come back to this

18  topic.

19      MS. RAVEENDRAN:  Okay.  How long do you need,

20  Bill?

21      MR. WHITFIELD:  Okay.  We'll come back to

22  this -- ma'am?

23      MS. RAVEENDRAN:  How long do you need?  When

24  do you want to come back?

John Stamm, P.E. 09/28/2023

1    MR. WHITFIELD:  Let's take about two to three

2  minutes, four minutes maybe.  Because I need to

3  find that document.

4  BY MR. WHITFIELD:

5    Q.   You're talking about that document,

6  John, that you went to Car World or whatever up

7  in Chicago?

8    A.   Yeah, the exemplar I did the force

9  testing on.  Yeah, there was over 100,000.  I

10  don't remember the exact mileage on it.

11    Q.   Well, okay.  Let's just do this:  Let's

12  just let the record speak for itself.  Whatever

13  it is, it is.  Okay?  I can't find it on the

14  stuff that I introduced.  Let's just -- let's

15  let that alone.

16        But I guess here's my point -- and I

17  want to kind to get to -- I'm trying to get

18  done.  Okay?  And if you would kind of be fair

19  with me and give me, you know, a right answer.

20        I mean, are -- you're not telling me

21  and certainly not telling the Court or a jury

22  that a vehicle off the lot with a transmission,

23  like, in a 2014 Sierra was just as efficient in

24  transferring power out to the wheels as a

John Stamm, P.E. 09/28/2023

1    vehicle that had 135- to 140,000 miles on it

2    already?  You're not trying to say that, are

3    you?

4        A.   No.  Without -- I can't say how close

5    it would be, but I would be -- I'd be shocked if

6    it didn't roll forward.  You know, I would be

7    surprised if there was any significant

8    difference unless there was something

9    significantly wrong with that vehicle.

10        Q.   Okay.  Well, the vehicle itself was

11   half on and half on roadway -- half off, half on

12   the roadway, and according to you, was idling at

13   500 RPMs and was not moving.

14            Would that suggest to you that a --

15   that the transmission itself was as efficient as

16   it was off the lot?

17        A.   You keep saying "off the lot."

18        Q.   You don't know, do you?

19        A.   You keep saying --

20        Q.   Or brand new?

21        A.   Can I finish?

22        Q.   Sure, you can.

23        A.   A truck -- 2014 truck in 2020 is not

24   going to be exactly the same as it is eight



John Stamm, P.E. 09/28/2023

1    years later, or how many years later,

2    regardless, with that many miles.  It's still

3    going to propel itself forward unless there's

4    something significantly wrong.  And there's no

5    evidence of anything significantly wrong with

6    the transmission or anything with the truck.

7        Q.   But -- okay.  And I appreciate that.

8    But you have no evidence that there wasn't

9    anything wrong with this tran- -- with this

10   vehicle, do you?  You have no evidence that

11   there were problems with the vehicle, problems

12   with the transmission, problems with the engine?

13   You have no evidence of that at all, do you?

14       A.   I know he's driving a lot of miles in

15   the truck based on the CARFAX.

16       Q.   Yep, that's a fact.

17            And the CARFAX shows it's in the shop a

18   lot, too, doesn't it?

19       A.   Well, let's pull it up.  Was it oil

20   change?  I don't remember why it was in the

21   shop.  I mean, could be --

22       Q.   I don't know either, to be honest with

23   you.  I don't know that there's any identity of

24   the work that's done.  But, I mean, you can see

Exhibit "B"

1  that it's --

2      A.   Sometimes they --

3      Q.   -- in the shop.

4      A.   Sometimes they state the work that was

5  done in the CARFAX.  Sometimes they don't.

6      Q.   Yeah, well, okay.  But the fact of the

7  matter is, is that as we sit here today, you

8  don't know whether the car was in good shape or

9  the car was in bad shape or the car was in

10 medium shape?  You don't know that, do you?

11     A.   I can't state the condition of the car

12 other than I know it was in a drivable

13 condition.

14     Q.   Drivable condition.  Okay.

15          But nonetheless, it did come to a stop,

16 even though it was in gear and putting out 500

17 RPMs?

18     A.   Which is consistent with the exemplars

19 I looked at.

20     Q.   Is that a yes?

21     A.   I said, which is consistent with the

22 exemplar trucks I looked at, the 500 RPMs, which

23 you seem to indicate is an issue.

24     Q.   Did you get in the exemplar -- the 2014



John Stamm, P.E. 09/28/2023

1   GMC Sierra exemplar, did you get into that car

2   and go park it on the side of the road somewhere

3   where you had the right drive wheel and the

4   front right steer wheel off the roadway, put it

5   in drive, and get out of it?  Did you do that?

6       A.   I did not.

7       Q.   Look at your -- the last page of your

8   report, 32.  You say, "Under the scenario where

9   the vehicle was brought to an immediate stop

10  after the shooting, Mr. Parker must have applied

11  his service brake."

12          Now, I guess you're giving me an

13  opinion or a conclusion, and I'm kind of

14  wondering where we may very well disagree by you

15  giving that conclusion.  I think that the car

16  came to a stop after the shooting, just like

17  you.

18      A.   That's --

19      Q.   But -- but you say he must have applied

20  the service brake.  Do -- I don't disagree with

21  that.  Why would you disagree with that?

22      MS. RAVEENDRAN:  Objection; misstating the

23  report.

24      MR. WHITFIELD:  Well, let me read it.

Exhibit "B"

1  BY MR. WHITFIELD:

2      Q.   "Under the scenario where the vehicle

3  was brought to an immediate stop after the

4  shooting" -- three shots or four shots --

5  "Mr. Parker must have applied his service

6  brake."

7           Is that your opinion?

8      MS. RAVEENDRAN:  Objecting because you're not

9  reading the report --

10     THE WITNESS:  So, once again --

11  BY MR. WHITFIELD:

12     Q.   Whoa, whoa, stop, stop.  Read your

13  report.  Look at Page 32 of your report.  You

14  tell me if I misspoke one word in that opinion.

15     MS. RAVEENDRAN:  Bill, you added "three shots

16  or four shots."  That was my only objection.

17  You otherwise read it correctly.

18     MR. WHITFIELD:  Oh, okay.

19  BY MR. WHITFIELD:

20     Q.   Well, it says, "after the shooting."

21          Do you know how many shots were fired,

22  Mr. Stamm?

23     A.   So some of the police reports indicate

24  there was three; some, there was four.  I think

1   it's more consistent with four shots.

2       Q.   Okay.

3       A.   But to answer your question, there's

4   two scenarios -- I was calling them two

5   possibilities earlier or two options.

6           So if the truck's brought to an

7   immediate stop where it's rocking back and

8   forth, like Cuevas testified to, he had to apply

9   the service brake.  Otherwise, it would have

10  kept on rolling forward, depending on the speed,

11  of the distances I talk about in the report.

12      Q.   Okay.  I'm good with that.

13          You go on to say at Paragraph 6, "It is

14  unknown if Mr. Parker could have applied the

15  service brake after being shot at and hit."

16          You don't know that, do you?

17      A.   That's why I wrote it's unknown.

18      Q.   So we -- so you don't know whether

19  Mr. Parker applied the service brake after being

20  shot, do you?

21      A.   That's what I stated, right?  I agree.

22      Q.   Okay.  I would be happy with yes,

23  that's what you stated.  Because I think we

24  agree on that.

John Stamm, P.E. 09/28/2023

1           Now, you go on to Paragraph 7, and you

2    say, "Under the scenario where the truck was

3    already stopped prior to the shooting and the

4    service brake was not applied, Mr. Parker must

5    have been traveling at a slow rate of speed and

6    coasted to a stop solely due to rolling

7    resistance force of the vehicle."

8           So you're presenting that as a

9    scenario; you're really -- you're not suggesting

10   to me, as a reader, that you know that, correct?

11       A.   Correct.  I can't say which scenario

12   happened based on the physical evidence.

13       Q.   Sure.  Okay.

14           You go on to say, "Alternatively,

15   Mr. Parker could have utilized the service brake

16   to stop his vehicle prior to the shooting,

17   consistent with the witnesses that testified

18   that they saw his brake lights."  Right?  You

19   say that?

20       A.   Yes.

21       Q.   So you're adopting their particular

22   version of the test- -- of facts based upon them

23   seeing brake lights being applied, which would

24   indicate that Mr. Parker actually did put his



1    foot on the brakes, right?

2        A.    In this scenario, I'm talking about,

3    yeah, the truck being stopped.  And I'm just

4    pointing out that there's two ways to stop the

5    truck prior to the shooting.  It's either

6    traveling very slow or applying the brake prior

7    to the shooting.

8            And I was pointing out that some of the

9    witnesses testified that they saw brake lights,

10   and that's consistent.

11       Q.    Well, other than the witnesses'

12   testimony, if you took them out of the equation,

13   you wouldn't have anything scientific to rely

14   upon to verify that particular account one way

15   or the other, would you?

16       A.    Just the consistent with witnesses that

17   testified they saw his brake lights.  You know,

18   that's the only thing that relates to the

19   witness testimony.

20       Q.    Well, if he put his foot on the brake,

21   the brake lights would come on, wouldn't they?

22       A.    Correct.

23       Q.    Regardless of whether the shooting

24   occurred before, during, or after the brake



1    lights were applied.

2           You don't have anything that you can

3    look at scientifically and say, yep, they're

4    right, they're wrong, do you?

5        A.    I guess I'm a little confused by the

6    question.

7        Q.    So yeah, I -- I saw that in your eyes.

8           So if you take the witnesses' testimony

9    out of the equation, you don't have anything

10   scientific that would suggest that Mr. Parker

11   put his foot on the brake either before, during,

12   or after the shooting?

13       A.    Just the brake?  No, I can't say.

14       Q.    Okay.  And you can't say whether the

15   vehicle stopped before the shooting or after the

16   shooting?  You can't say that other than the

17   witnesses saying that?

18       A.    Right.  The physical evidence says he

19   was either traveling very slow or he applied the

20   service brake.

21       Q.    Right.  And if he applied the service

22   brake, then he would have been going a little

23   bit more than very slow, correct?

24       A.    Not necessarily.



John Stamm, P.E. 09/28/2023

1      Q.   You don't know, do you?

2      A.   I can't say.  There's no evidence one

3  way --

4      Q.   Okay.  No evidence for that.

5           So you're having to basically kind of

6  fill in the blanks a little bit with some of the

7  witnesses that we know most, if not all of them,

8  had been drinking, right?

9      A.   When you say --

10     MS. RAVEENDRAN:  Objection to form.

11     THE WITNESS:  -- "some of the witnesses," I

12  just said -- that last sentence or half sentence

13  in Opinion 7 to saying that's consistent.  So

14  there's no fill in the blanks.  It's just

15  stating that is consistent.

16  BY MR. WHITFIELD:

17     Q.   Well, the fill in the blanks basically

18  are, I think, by your -- you're implying that

19  the vehicle came to a stop before the shooting,

20  and you can't get there unless you believe the

21  witnesses that were in the same household that

22  Parker and Markray were in?

23     A.   I mean, I think I've testified a number

24  of times here that based on the physical

Exhibit "B"

 1  evidence, I can't say if it was stopped or not.

 2      Q.   Okay.  Let me real quickly run through

 3  these photographs with you that I had that I've

 4  sent to the court reporter.

 5      MR. WHITFIELD:  Ms. Court Reporter, I'm

 6  probably going to have to pull these things up

 7  one at a time.

 8          But I just want to get you to kind of

 9  acknowledge these with me, John.  Okay?

10          Ms. Court Reporter, you can print these

11  out.  They're all the pictures that I've sent to

12  you.

13      MS. RAVEENDRAN:  We have them printed --

14      MR. WHITFIELD:  Ma'am?

15      MS. RAVEENDRAN:  We have them printed, Bill.

16      MR. WHITFIELD:  Oh, good.  Okay.  Great.

17  Okay.  So we can attach them to the deposition.

18  It looks like it's going to be Exhibit 58.  Am I

19  right?

20      THE COURT REPORTER:  Yes.

21      MR. WHITFIELD:  Okay, 58.  So Exhibit 58, all

22  right.

23               (Stamm Exhibit No. 58 marked.)

24      MS. RAVEENDRAN:  And that -- do you want to



John Stamm, P.E. 09/28/2023

1  just verify for us, Bill, what is the bottom

2  right Bates number of the first picture so we

3  make sure we have got the same thing in front of

4  us?

5       MR. WHITFIELD:  Okay.  The first number on

6  the first page is MBI CSU Garage Photos 075.

7       THE WITNESS:  That's what's in front of me.

8  BY MR. WHITFIELD:

9       Q.   Okay.  It should be a bottle of beer.

10      A.   That's what I see.

11      Q.   Do you see that?

12      A.   I do.

13      Q.   That's it.  Okay.

14           So do you remember seeing this picture

15  in looking at the other MBI pictures that you

16  were provided?

17      A.   Yeah, it looks familiar.

18      Q.   Okay.  So this particular bottle came

19  out of Mr. Parker's truck.

20           Are you aware of that?

21      A.   I assume so.

22      Q.   Okay.  You indicated a minute ago that

23  you weren't aware of the tox screen, so you

24  don't know exactly what level of intoxication

John Stamm, P.E. 09/28/2023

1  Mr. Parker was in at the time of the shooting,

2  do you?

3      A.   I don't remember the number.

4      Q.   Okay.  Would the level of sobriety of a

5  driver, would that -- would that have an effect

6  on the ability of the driver himself to function

7  -- to operate a vehicle properly?

8      A.   Just my general knowledge, you know, I

9  would assume so, but I don't have specific

10 training on intoxication driving.

11     Q.   Would an impaired driver be able to

12 operate a vehicle as efficiently as a

13 non-impaired vehicle -- a non-impaired person?

14 Maybe you can answer that question for me.

15     A.   I mean, potentially.  I don't know

16 what --

17     Q.   Potentially?

18     A.   What do you mean by "efficiently"?

19     Q.   I'm talking about if I went out sober

20 as a judge and operated my vehicle -- drove my

21 vehicle home, which would take me 40 miles to

22 get there, am I going -- am I going to operate

23 my vehicle just as efficiently and properly as I

24 would had I had -- had I had enough alcohol to



1  put me twice the level of intoxication in the

2  state of Mississippi?

3      MS. RAVEENDRAN:  Objection; calls for

4  speculation.

5      THE WITNESS:  I don't know -- I don't know

6  how the alcohol affected his driving.

7  BY MR. WHITFIELD:

8      Q.   Okay.  All right.  So do you know how

9  alcohol affects anybody's driving?

10     A.   Generally negatively.

11     Q.   Generally negatively.

12          Would that -- would your knowledge of

13  the sobriety of Mr. Parker, would that affect

14  your opinions in any form or fashion about his

15  operation of the vehicle and maybe his relative

16  ability to apply the brake if you knew -- if you

17  knew the state of his sobriety?

18     A.   So the question is:  Can he apply the

19  brake based on the state of his sobriety?

20     Q.   No, that's not my question.  That's not

21  my question.

22          My question is:  If you knew the level

23  of intoxication of Mr. Parker at the time all

24  this happened, would that affect his operation

1    of his vehicle --

2        MS. RAVEENDRAN:  Objection --

3    BY MR. WHITFIELD:

4        Q.   -- and your opinions?

5        MS. RAVEENDRAN:  Objection; calls for

6    speculation.

7        THE WITNESS:  So I know he wasn't sober, I

8    just don't remember what the number was.  And it

9    didn't affect my opinions about the physical

10   evidence and --

11   BY MR. WHITFIELD:

12       Q.   But the -- what is -- what is the blood

13   alcohol content -- like, the maximum level that

14   you can be, you know, tested for in Illinois if

15   you're intoxicated?  Do you know what it is?

16       A.   I think it's .08.

17       Q.   Yeah, that's what it is in Mississippi.

18           If he -- if I told you that Mr. Parker

19   was .18, do you understand what that means?

20       A.   Yes, more alcohol.

21       Q.   Well, he's twice -- he's twice the

22   legal limit of being intoxicated in the state of

23   Mississippi.

24       MS. RAVEENDRAN:  Objection; calls for

1    speculation, foundation.

2         MR. WHITFIELD:  So apparently, we haven't

3    shared the tox screen with you, Bhavani, so I

4    don't know that's speculative.

5         MS. RAVEENDRAN:  No, he did that --

6    BY MR. WHITFIELD:

7         Q.   I mean, do you think --

8         MS. RAVEENDRAN:  Bill, he got the tox screen,

9    but you're asking him for a medical opinion.

10         MR. WHITFIELD:  Okay.  So he's giving an

11    opinion about somebody operating a vehicle.  I

12    would think that somebody that gives an opinion

13    as an expert in the operation of a vehicle would

14    understand the implications of somebody that was

15    over twice the limit of -- legal limit of

16    intoxication in my state and your state.

17         MS. RAVEENDRAN:  He's giving you opinions

18    within his expertise of engineering.  He can't

19    give you opinions on human factors evidence or

20    how a body reacts to alcohol.  He has tested the

21    vehicle under the different --

22         MR. WHITFIELD:  Okay.  Well --

23         MS. RAVEENDRAN:  -- scenarios presented by

24    witness testimony.  He's not allowed to decide



1  which witness is correct.

2      MR. WHITFIELD:  I understand that.  But you

3  know what?  Maybe next year when he gets a case

4  that's involved and he's opposite of somebody

5  that was intoxicated, then Mr. Defense Lawyer's

6  going to be pulling this deposition out.

7  BY MR. WHITFIELD:

8      Q.   Do you not understand, Mr. Stamm, the

9  impact of alcohol and intoxication upon the

10  ability of a driver to properly operate a

11  vehicle?  Do you not understand that?

12      MS. RAVEENDRAN:  Objection; calls for

13  opinions outside of his expertise.

14          But you can answer the question.

15      THE WITNESS:  I think I said earlier it's

16  generally negatively, but I have no idea how

17  much it affected him.

18  BY MR. WHITFIELD:

19      Q.   Okay.  Okay.  That's fine.  I'm okay

20  with it.

21      MR. WHITFIELD:  Go to the next one, please,

22  Kaara.

23      MS. RAVEENDRAN:  You've got the next one,

24  right?

John Stamm, P.E. 09/28/2023

 1        MR. WHITFIELD:  Hang on.  There we go.

 2    BY MR. WHITFIELD:

 3        Q.   So we're -- do you see that picture up

 4    there, John?  It's a picture of the Sierra

 5    vehicle with the bullet holes in it.

 6             Do you see that?

 7        A.   Yeah, 76.  Yes.

 8        Q.   Okay.  Yes, it's Picture No. 76.

 9             You know, the only reason that I have

10    this picture that I wanted to show you, as well

11    as the next one and the next one after that, all

12    the way to the end of this line of pictures,

13    which shows the impact of the ammunition onto

14    the vehicle --

15        MR. WHITFIELD:  If you would, Kaara, can you

16    just scroll through until you get to the end

17    of --

18        MS. LIND:  I can't do it with that exhibit.

19        MR. WHITFIELD:  Oh, you can't just, like,

20    walk them through?  Okay.

21    BY MR. WHITFIELD:

22        Q.   Yeah, this is -- this the next pic,

23    which is 77.  And I just have one question to

24    ask you about -- about ten of these, okay, at

Exhibit "B"

John Stamm, P.E. 09/28/2023

1   one time.

2           As she pulls them up, just take note of

3   the image that you're looking at when she pulls

4   them up one at a time.

5           That's No. 77.

6           No. 78 is the hood.  That's what we

7   call the defect, the defect...

8           That would be 79.

9                   (Brief discussion off the

10                  record.)

11      MR. WHITFIELD:  Picture 84.  That's

12   Picture 80 there.

13          Then Picture 81 would be next.

14          And then Picture 84 would be last at

15   least in that series of pictures.

16   BY MR. WHITFIELD:

17      Q.   As you're looking at those, John,

18   here's my question to you:  There is nothing

19   about the impact damage to the windshield or

20   even to the hood that would suggest to you if

21   the vehicle was moving at the time that the

22   damage was done?  There's nothing about that

23   that would suggest that to you, is there?

24      A.   So there's -- you know, based on the



1    location of the defects --

2        Q.    Yeah.

3        A.    Yeah, I'm not a ballistics expert.  I

4    know Investigator Teates testified that he

5    couldn't determine the trajectory.  So, you

6    know, it doesn't really mean a lot to me.

7        Q.    Well -- so I'm not talking about

8    trajectory as much as I'm talking about you're

9    -- you've testified that you really aren't

10   saying that the vehicle was moving or not at the

11   time that the impact of the vehicle vis-a-vis

12   the bullets occurred.  Okay?

13           And you don't know that, right?

14       A.    Correct.

15       Q.    So all these pictures were designed to

16   do would be to get you to acknowledge that or to

17   show me if you could tell by -- let's just take

18   84.

19           There's nothing about that impact to

20   the windshield which says that that vehicle was

21   moving at the time that that impact was made?

22       A.    Nothing that I can tell.  I mean,

23   nothing that I know of.

24       Q.    Okay.  All right.  And that's fine.



John Stamm, P.E. 09/28/2023

1    That's okay.

2            So let's then -- we can kind of put

3    that series of pictures aside.

4            The next picture that I want to show

5    you is Picture No. 68.  This is scene pictures

6    now that I'm going to show you.  These are

7    on-scene pictures that night.

8        THE WITNESS:  Do you want these?

9    BY MR. WHITFIELD:

10       Q.   Do you have that in front of you?

11            There you go.

12       A.   I do.

13       Q.   There's the picture of the vehicle that

14   night.  And you can see that it's kind of half

15   on, half off the road.

16            Do you see that?

17       A.   Yes.

18       Q.   All right.  Now, you testified a minute

19   ago that you weren't really able to tell when

20   the tires actually went off the road and at what

21   angle.  I think you -- you did testify to that a

22   little while ago, right?  I don't want to assume

23   something.

24       A.   I could give, like, an area.  But



1    exactly where and exactly what angle, I can't

2    say.

3        Q.    Correct.

4            Did you -- did you ever make any

5    assumptions about how close the vehicle was to

6    the bushes?

7        A.    There's a couple photos that shows

8    that, so...

9        Q.    Look at Picture No. 69, please.

10       A.    Yep.

11       Q.    So you see that picture -- and even 70,

12   69 and 70.

13           Both of those pictures show the vehicle

14   off the road at least on that street, on 25th

15   Avenue, enough to be into the bushes, correct?

16       A.    I would disagree with "into the

17   bushes."  It may have --

18       Q.    Well, in the bushes.

19           Well, the vehicle is in contact with

20   the foliage on the side of the roadway, isn't

21   it?

22       A.    So it's kind of hard to tell in that

23   photo if those bushes are behind the taillight

24   or not.  I think there's other photos that show,

Exhibit "B"

1  you know, those bushes may --

2      Q.   We'll get to those.

3          So when you're driving -- when you're

4  driving down a roadway or -- like on 25th

5  Avenue, I mean, is it normal for somebody to

6  drive halfway -- halfway on and halfway off the

7  road, street?  Is it normal for somebody to

8  drive halfway on and halfway on [sic] the

9  street?

10     A.   Just anywhere?  Like, I'm a little

11 confused by the question.  This obviously wasn't

12 a normal situation.

13     Q.   Well, I mean, the vehicle had to have

14 gotten off the road somehow, assuming it

15 happened before the shooting, you know, like

16 you're adopting some of the witnesses'

17 testimony.

18         Is that an -- is that an appropriate

19 spot for the vehicle to be if the vehicle is

20 operating and using the street properly?

21     MS. RAVEENDRAN:  Objecting to form.

22     THE WITNESS:  You keep saying "adopting" some

23 of the witnesses' testimony.  Yeah, this is

24 where it ended up.  It made a maneuver where it

1  had a right-hand turn, it was arced, and then

2  diagonal towards the south side of the road, and

3  it's, like, a pull-over maneuver is what it

4  looks like to me.

5  BY MR. WHITFIELD:

6      Q.   Okay.  Well, the vehicle, at least by

7  virtue of Photograph 69 -- I mean, you agree

8  with me that the vehicle is halfway on and

9  halfway off the road, right?

10     A.   The right-side tires are in the grass.

11     Q.   Are in the grass.  Okay.

12          Is that normal for a vehicle to be

13  driving -- attempting to navigate a roadway if

14  that vehicle is halfway on and halfway off the

15  street?

16     A.   If he's -- there's nothing else going

17  on and you're just driving down the road,

18  typically vehicles stay on the road.

19     Q.   Right.  So something was going on for

20  that vehicle to be halfway on and halfway off

21  the road when this vehicle came to a stop in

22  gear, correct?  Something was going on?

23     MS. RAVEENDRAN:  Objection to form.

24     THE WITNESS:  I mean, the vehicle pulled

1  over.

2  BY MR. WHITFIELD:

3      Q.   Okay.  Look at Picture No. 78, please.

4  78, it's the next picture.

5      A.   Oh, I was looking at 140.

6      MR. WHITFIELD:  Well, there should be -- that

7  picture right there.

8      MS. LIND:  70.

9      MR. WHITFIELD:  Oh, yeah.  70 was before

10  that.

11  BY MR. WHITFIELD:

12      Q.   Then Picture 78 at the bottom.

13          Do you see that, John?

14      A.   I do see 78.

15      Q.   Do you have that in front of you?

16      A.   In front of me and on the screen.

17      Q.   Okay.  Good.

18          So do you -- would you agree with me

19  when you read the testimony of Officer Cuevas,

20  that that's the view of the vehicle that he had

21  at or prior to the shooting?

22      A.   I don't know where Officer Cuevas was

23  standing.

24      Q.   Look at the next picture, 140 and then

John Stamm, P.E. 09/28/2023

1    141.  140 and 141.  Those are pictures that were

2    taken at night after the incident.

3        A.    Okay.

4        Q.    So one of the reasons that I wanted to

5    talk to you about this picture was this -- is

6    that if you look at the running lights on the

7    vehicle -- now, it's in gear and it's basically

8    rotating at 500 RPMs, that the right side

9    running lights are both illuminated, but the

10   left side running lights are -- only one set is

11   illuminated.

12          Do you see that?

13       A.    Yes.

14       Q.    Now, whenever somebody is operating a

15   vehicle and they put their brakes on, do you --

16   would you expect for another light to come on on

17   the left-hand side if there was a dysfunction in

18   the light itself?

19       A.    Can you state that again?

20       Q.    Well, I'm trying to figure out your

21   position, I guess, one, on the maintenance; and

22   then, two, what the witnesses say they would

23   have seen.

24          The left-side running light is



1  partially dysfunctional, correct?

2      A.   Yeah, it's the -- the left light's not

3  on.

4      Q.   The lower -- the lower grid is out,

5  right?

6      A.   Yes.

7      Q.   Do you know whether the brake lights on

8  this vehicle were completely all the way

9  functional on the back of this vehicle?

10      A.   I never tested the vehicle.  I don't

11  recall if that was part of the investigation

12  report when they looked at the vehicle or not.

13  I don't recall if that was established or not.

14      Q.   Okay.  Look at 20 -- 201 and 202.

15  Those should be the next few pictures.

16      A.   Yep, I see 201 right now.

17      Q.   And then 20 -- 201 and then 202.

18      MR. WHITFIELD:  Kaara, can you pull up 202?

19          And then -- yeah, you have all these in

20  front of you.

21          And then pull up -- pull up 203 or look

22  at 203.

23  BY MR. WHITFIELD:

24      Q.   So you can see a little bit better of a

John Stamm, P.E. 09/28/2023

1    view in the daytime about the bushes and how

2    close they were to the truck, can't you?

3        A.    Well, I think 202 is better than 203.

4        Q.    It is, it is.

5        A.    Yeah.

6        Q.    But you can see in the daytime the

7    truck relative to the bushes better than you can

8    at night -- than the night pictures, right?

9        A.    Arguably.  I think you can see where

10    the bush is at at night as well.

11        Q.    Well, you can see the bushes at night,

12    but relative to the truck, especially if you're

13    in front of the truck and you've got high beams

14    on or light beams on in your face, it's a little

15    difficult to see where the bushes are relative

16    to the truck, correct?

17        A.    High beams?  What do you mean the "high

18    beams"?

19        Q.    Well, I showed you a picture a minute

20    ago about the view that Officer --

21        A.    Cuevas.

22        Q.    -- Cuevas had in front of the vehicle,

23    yeah.

24        A.    Sure.

John Stamm, P.E. 09/28/2023

1      Q.    Those beams.

2      A.    So a person outside of the truck, yeah,

3   it's probably easier to see the bush during the

4   day.  Yeah, a bush or --

5      Q.    Say that again.

6      A.    For a person outside of the truck, it's

7   probably easier to see the bush, tree, branch,

8   whatever is in there, during the day.

9      Q.    During the day?

10     A.    I would think so.  Daylight.

11     Q.    So you can see the bush -- the bushes

12  better during the day than at night, right?  Is

13  that what you're saying?

14     MS. RAVEENDRAN:  Objection; asked and

15  answered.

16     THE WITNESS:  Yeah, unless --

17     MR. WHITFIELD:  I'm just trying to figure out

18  what he just said.

19  BY MR. WHITFIELD:

20     Q.    I mean, was it easier for an officer on

21  the front of the vehicle to see the bushes

22  relative to the truck better in the daytime or

23  the nighttime?

24     A.    Okay.  So you're adding some context

John Stamm, P.E. 09/28/2023

1    there.  From Officer Cuevas's general area, it

2    was probably easier -- well, he wasn't there

3    during the daytime, but it would be easier to

4    see the bush during the daytime versus if he had

5    headlights pointed in his direction -- general

6    direction.

7        Q.    Okay.

8        A.    Especially if the truck is where it is

9    right now, which is past the bush.

10       Q.    Sure.  Understood.

11             Then go to 213 and 214.

12             And the reason I wanted to show you 213

13   and 214 -- and I promise, I'm about done -- was,

14   you can see in the daytime the dash a lot easier

15   than you can in some of these night pictures.

16   There were a couple of night pictures of the

17   dash.

18             And you've got a hard copy in front of

19   you, and you can clearly see that the vehicle is

20   idling right at or maybe even slightly below 500

21   RPMs.

22             Do you see that?

23       A.    Yes, I can see that.

24       Q.    In the dial?

1        A.    Yep.

2        Q.    Do you see that?

3              Now, you mentioned a little while ago

4   that the vehicle that you did a test drive on up

5   in Chicago, a 2014 Chevy -- Chevy -- I mean, a

6   GMC Sierra, that it idled at 500 RPMs as well?

7        A.    As well as the one down in Louisiana.

8   But yes.

9        Q.    Did you document that?

10       A.    Yeah, that would be in the photos.

11       Q.    Photos of the vehicle?

12       A.    Yeah, when I inspected the two

13   exemplars, I should have taken a photo of the

14   dash.

15       Q.    With the -- with the --

16       A.    Engine on.

17       Q.    -- the car on or off?

18       A.    Yeah, the engine running at idle.

19       Q.    Okay.  You say you should have.

20             So if we look at all your stuff after

21   we get of comm, I should be able to find a

22   picture of the dash of the 2014 and the 2015

23   vehicle that you looked at, and I should be able

24   to see that, consistent with your testimony,

John Stamm, P.E. 09/28/2023

 1  they were both idling at 500 RPMs?

 2      A.   Yeah, I remember they both were, and I

 3  believe I documented it.

 4      Q.   Well, you remembered that they were,

 5  but I didn't see it in your report.  Okay?

 6      A.   How about we pull up the photos?  We

 7  can answer this right now.

 8      Q.   I don't know that I can put my hands on

 9  them as quickly as I would like.  I mean, I know

10  you sent them to us.  So if we have them, then

11  we have them.  That would be -- that would be

12  your confirmation.  If we don't have them, then

13  we don't have them.

14           That would be the confirmation,

15  correct, would be the photos?

16      A.   I mean, I don't need the photos.  I

17  remember that was one thing I was looking for.

18  But I'm pretty sure that it was documented.

19      Q.   Okay.  So the one thing that you were

20  looking for, you didn't put in your report?

21      A.   One of the things.

22      Q.   Well, one of the things that you were

23  looking for, you didn't put in your report?

24      MS. RAVEENDRAN:  I'm going to object.

1    BY MR. WHITFIELD:

2        Q.    Because it's not in your report.

3        MS. RAVEENDRAN:  I'm going to object.  This

4    is -- he has repeatedly testified that he looked

5    for it and he documented it and that he just

6    can't remember off the top of his head, but he

7    believes that there's a picture.  So...

8        MR. WHITFIELD:  Okay.  So I need to put you

9    under oath, Bhavani, because you just told him

10   what to say.

11           Look, I mean, I know we haven't been

12   doing speaking objections until now, but, I

13   mean, I hope we're not going to get to the point

14   that we're going to be prompting our witnesses

15   what to say.

16       MR. MULLINS:  Let's see if we can wrap this

17   up, guys.

18       MR. WHITFIELD:  I don't know who that was.

19       MS. RAVEENDRAN:  I believe that was Chuck.

20       MR. MULLINS:  Chuck.

21       MR. WHITFIELD:  Oh, hey, Chuck.

22       MR. MULLINS:  Bill.

23       MR. WHITFIELD:  Sir?

24       MR. MULLINS:  I said, Bill.

1        MR. WHITFIELD:  Oh, what did you say?

2        MR. MULLINS:  I said, Bill.

3        MR. WHITFIELD:  Yes, that's me.  I'm here.

4        MR. MULLINS:  All right.  Let's go ahead.

5        MR. WHITFIELD:  I'm hoping that we can.

6   BY MR. WHITFIELD:

7        Q.   All I'm saying is, is that one of the

8   things that you were looking for, John, was the

9   RPMs, and it's not in your report, we know that.

10  And you seem to remember having some pictures

11  that you took of the dash on the two exemplars.

12        My point is, is that we should be able

13  to find those pictures and look at the dash of

14  those pictures and confirm that both of those

15  vehicles were idling at 500 because that's one

16  of the things that you were looking for,

17  correct?

18        A.   Oh, here, it is in the report.

19        Q.   Sir?

20        A.   I think it might be in the report.  Let

21  me see.

22        So on Page 26, I'm talking about the

23  2014 GMC Sierra.  I say, "The purpose of this

24  second exemplar inspection was to measure how

Exhibit "B"

John Stamm, P.E. 09/28/2023

1    many pounds of force it would take to prevent

2    the truck from rolling while the engine was

3    running at idle (approximately 500 RPM), and the

4    vehicle was in drive."  Then it talks about the

5    test.

6        Q.    Okay.  Now, are you saying that the

7    vehicle, by that comment, was -- was basically

8    operating at 500 RPMs?  Is that what you're

9    saying?

10       A.    Yes, it was.

11       Q.    Okay.  Well -- so, then, I guess since

12   it did mean something to you, we should be able

13   to go take -- we should be able to look at the

14   photographs of the exemplars and we would see

15   that at idle, both of those vehicles were idling

16   at 500 RPM, right?

17       A.    Yeah, I believe I documented that.

18       MR. WHITFIELD:  Okay.  Good.

19            All right.  If you'll give me, guys,

20   about 30 seconds, I am probably, if not done,

21   close to being done.

22            Can you give me about a minute?

23       MS. RAVEENDRAN:  Bill, I'm going to need a

24   little longer than that.  If you don't mind

Exhibit "B"

1  giving us about ten minutes, I've really got to

2  use the restroom.  That's why I asked about 40

3  minutes ago.

4      MR. WHITFIELD:  You know, I'm so sorry.  Time

5  got away from me.  I thought I was going to be

6  done quicker.

7      MS. RAVEENDRAN:  No problem.

8      MR. WHITFIELD:  But, yes, why don't we take a

9  ten so that I can talk to my colleagues here,

10  and then we'll get back -- let's try to be back

11  as quick as we can because it is -- gosh, it's

12  almost 3:00.  I've been having so much fun.

13      MS. RAVEENDRAN:  You got it, Bill.  We'll be

14  back in 10 minutes.  No problem.

15      MR. MULLINS:  Bill, I think you might be the

16  only one.

17      MR. WHITFIELD:  That's having fun?

18      MR. MULLINS:  That would be correct.

19      MR. WHITFIELD:  Hey, you know what?  I hear

20  that a lot.

21      MR. MULLINS:  I bet you do.

22                    (Whereupon, a short break was

23                     taken.)

24

Exhibit "B"

 1    BY MR. WHITFIELD:

 2        Q.   All right.  Let me pick up where I last

 3    left off.

 4             As far as the exemplar vehicles that

 5    you had a chance to drive, I think you indicated

 6    that you had actually -- I know you said

 7    something about driving the one up in Chicago.

 8             Did you drive the one that you found

 9    down here in Louisiana?

10        A.   I did.

11        Q.   The 2015?

12        A.   I did.

13        Q.   Okay.  Did you get out on the roadway

14    and then drive it back, come back to the dealer?

15        A.   Yeah, I think I went a half mile down,

16    pulled a U-turn, came back.

17        Q.   And came back to the car dealer that

18    you -- that allowed you to drive it?

19        A.   Correct.

20        Q.   Was somebody in the car with you?

21        A.   Yeah, both times, someone from the

22    dealership.

23        Q.   They were with you.

24             Did you ever find a spot that was

Exhibit "B"

John Stamm, P.E. 09/28/2023

1  relatively flat that gave you the ability to

2  mimic the terrain that Mr. Parker was on on that

3  night, and then put it in drive and see whether

4  the vehicle would actually move or not?

5      A.   So when you say "relatively flat," I

6  mean, both -- both parking lots had, you know,

7  slight angles and both of them would roll

8  forward even with the door open.  That's

9  something I definitely checked because that's

10  what the investigating officers thought stopped

11  the vehicle, or at least it was written in their

12  reports.

13      Q.   Well, that's not my question, but since

14  you brought it up, I mean, do you know that GMC

15  ever incorporated that particular feature into

16  their vehicles, where if the door was open, the

17  vehicle would not move forward if it was in

18  drive?  Do you know if they ever did that?

19      A.   It's not a feature on that make and

20  model.  Like, newer vehicles have things like

21  electronic parking brake, electronic shift to

22  park, you know, hill hold, things like that that

23  wasn't on the subject vehicle.

24      Q.   Correct.  I guess I'm just -- kind of



1  just trying to understand whether you knew that

2  GMC incorporated that particular kind of -- you

3  know, kind of an autostop feature in their

4  vehicles, where the car would stop if you had

5  the door open and the car wouldn't move.

6          I mean, are you familiar with that?

7      A.  I --

8      Q.  No?  Yes?  Maybe?

9      A.  I thought I just told you three

10  different systems that would -- that would stop

11  the vehicle is automatic parking brake -- sorry,

12  electronic parking brake so you don't have to

13  push it with your left foot down.

14          Also, the newer vehicles had electronic

15  shift.  So some of them had the knobs, some of

16  them had the stalk you knock up and down, but

17  they don't have, you know, the mechanical shift.

18  So that can electronically shift to park.

19          And then some vehicles have a hill hold

20  to automatically apply the brake if it

21  recognizes a hill.

22          So those are three different ways that

23  newer vehicles -- nothing to do with our vehicle

24  -- can do that.

Exhibit "B"

John Stamm, P.E. 09/28/2023

1      Q.   Right.  So are you saying that there is

2    not a feature in GMC's vehicles these days on

3    any of their models that the car would stop

4    automatically with the door open?  Is that what

5    you're saying?  It's only those three that you

6    cited?

7      A.   No, that's not what I'm saying at all.

8    I'm saying that modern vehicles, GMC, other

9    manufacturers, have those features.  The subject

10   vehicle did not.

11     Q.   I understand that.  I'm not talking

12   about this 2014 --

13     A.   I know, but I feel like I've answered

14   the question, like, three times now.

15     Q.   Sir?

16     A.   Yes.

17     Q.   I'm not saying that this 2014 Sierra

18   had a feature where the door would open and come

19   to a stop.  You made some comment about that in

20   your report.

21          But I'm asking you, do you know whether

22   GMC ever incorporated that into any of their

23   models after this year?  Do you know that?

24     A.   I said that -- yes.



John Stamm, P.E. 09/28/2023

 1     Q.   Well, you only cited to three different

 2   examples of it.  Okay?  I didn't hear you say

 3   that you are familiar with GM incorporating a

 4   safety feature into any of their models'

 5   vehicles where if you had the door open, the car

 6   would stop.  I didn't hear you say that.

 7     A.   I'm sure that GM has a feature.  All

 8   modern cars have that feature.  Not necessarily

 9   every make and model, but a lot of them do.

10     Q.   Okay.  I'm happy with that.

11          So I guess what I hear you saying,

12   though, in terms of the exemplar vehicles, 2014

13   and 2015 that you found, that you didn't take

14   that out to any relatively flat terrain, kind of

15   the same terrain on 25th Street that we saw that

16   night, and you parked it half on and half off,

17   half on grass, half on street, and then put the

18   vehicle in drive and let it idle at 500 RPMs and

19   see what it would do.

20          You didn't do that, did you?

21     A.   No specific test, no.  I didn't need

22   to.

23     Q.   Okay.  All right.  Huh?

24     A.   I said I didn't need to.



John Stamm, P.E. 09/28/2023

1    Q.   Well, I mean, wouldn't it make a

2    difference to you whether you had an exemplar

3    vehicle that you could park half on and half off

4    -- half on grass, half on street, put the car in

5    drive, and see whether it would move?  You're

6    saying you didn't need to do that when that's

7    exactly the issue in this case?

8    A.   I measured the tractive force of the

9    engine.  I corrected for the slope on the

10   vehicle I measured on.  I don't know the exact

11   conditions on the day of the accident.  I know

12   that two tires were in the grass.  But, you

13   know, how much moisture was in the grass, you

14   know, it's easier -- it's better to calculate

15   it.

16   Q.   Well, it's a little bit easier for a

17   vehicle to roll on asphalt than it is on grass,

18   isn't it?

19   A.   Yes.  That's why I describe in the

20   report the rolling resistance coefficient --

21   Q.   Okay.

22   A.   -- on asphalt versus grass.

23   Q.   Well, wouldn't you think it would be

24   important for you to take one of those



1   exemplars, and go take it into a neighborhood

2   somewhere, and find some spot where you could

3   part it half on grass, half on pavement, and put

4   it in drive and see whether it would move?  I

5   mean, that didn't kind of just interest you just

6   as a -- as a theoretical alternative?

7        MS. RAVEENDRAN:  Objection; asked and

8   answered.

9        THE WITNESS:  I'm sure I'd find grass that it

10  would roll on and grass that it wouldn't roll

11  on.  It doesn't matter.  It's not -- had no

12  bearing on my opinions.  Not all grass is

13  exactly the same.

14       MS. RAVEENDRAN:  Can you hear us, Bill?

15       MS. LIND:  We can't hear y'all.

16       MS. RAVEENDRAN:  We can't hear Bill anymore.

17       MS. LIND:  Can y'all hear me if I'm talking?

18       MS. RAVEENDRAN:  Yeah, Kaara, we can hear

19  you.

20       MS. LIND:  Can y'all hear me if I'm talking?

21       MS. RAVEENDRAN:  Can you not hear us now?

22       MS. LIND:  Bill got kicked off the call.

23  I'll put it on video on my laptop right now.

24       MR. WHITFIELD:  Tell them I'll call back in.

John Stamm, P.E. 09/28/2023

 1      MS. RAVEENDRAN:  Now we can hear Bill.

 2      MS. LIND:  I'm going to have Bill call back.

 3      MR. WHITFIELD:  I was literally looking at

 4   the phone, and just, like, all of a sudden, it

 5   just stopped.

 6              (Off the record.)

 7   BY MR. WHITFIELD:

 8      Q.   So I think you were in the middle of an

 9   explanation, and I'm trying to remember exactly

10   the nature of it.  I think that I was asking you

11   a question about whether a vehicle would roll

12   easier on pavement than it would on grass, and

13   you were about to tell me something or you were

14   about to testify.

15      A.   Yeah, I said I agree, it's easier to

16   roll -- there's less of a rolling resistance on

17   pavement versus grass.

18      Q.   All right.  Do you know whether a

19   vehicle -- that a vehicle would roll easier with

20   two wheels on grass and two wheels on the

21   pavement?  Do you know that?

22      A.   So two and two versus four on pavement?

23      Q.   Yeah.

24      A.   It would roll easier on just pavement.


Exhibit "B"

John Stamm, P.E. 09/28/2023

1    Q.   Okay.  All right.  It would require

2    additional energy or additional force to make

3    the vehicle overall move if you had two on

4    pavement, two on grass?

5    A.   It depends, I guess -- well, let me

6    think about this.

7         Yeah, your rolling resistance force

8    that's retarding the motion is going to be the

9    weight of the vehicle times the rolling

10   resistance of each wheel.  So the rolling

11   resistance coefficient of the wheels in the

12   grass is going to be higher, so there's going to

13   be a larger force retarding its motion.  So you

14   would need more force from the tractive effort

15   from the engine going through to the wheels to

16   propel it forward.

17        Now, that's --

18   Q.   Right.

19   A.   -- from a stop.  Right?  Obviously,

20   it's different if you're going 5 miles an hour,

21   10 miles an hour, whatever speed you're going.

22   You're going to have momentum on your side.

23   Q.   Right.  Until you hit the brake?

24   A.   I mean, if you hit the brake, you can

Exhibit "B"

1    stop.

2        Q.    Yeah.  So if there were any rolling

3    that were to occur after a stop, it would

4    require the vehicle to generate enough energy to

5    roll all four wheels forward, correct?

6        A.    Right.  After it stops and you release

7    the brake and the vehicle rolls forward, that

8    means the force generated by the vehicle is

9    greater than the rolling resistance which is

10    trying to stop the vehicle.

11        Q.    Correct.

12            Would you think, Mr. Stamm, that it

13    would be better for you to have inspected and

14    possibly even operated the Parker vehicle in

15    this case rather than go get a facsimile or an

16    exemplar vehicle?

17        A.    I don't know if it would be better.

18    It's always easier and I'd say cleaner because

19    you don't have to describe the differences

20    between the vehicles.  But the ones I looked at

21    were good matches for the subject vehicle.

22        Q.    So the ones that you looked at were

23    good matches except for the mileage, right?

24        A.    They had different mileage, yes.



John Stamm, P.E. 09/28/2023

1    Q.    Right.  And the maintenance?

2    A.    I'm sure the history of each vehicle is

3    different.

4    Q.    Correct, it would be.

5         We know that the mileage on the Parker

6    vehicle was something over 135 and something

7    short of 140 at the time of the accident -- or

8    this incident, right?

9    A.    That's what the CARFAX indicated.

10   Q.    And out of all of the vehicles that you

11   used as a facsimile -- well, the two vehicles

12   that you used as a facsimile, none of them had

13   the mileage that this particular vehicle owned

14   by Mr. Parker had, correct?

15   A.    I don't recall the mileage on the one

16   in Louisiana.  The one in the Chicagoland area,

17   I know was over 100,000.  I don't recall if it

18   was above or below the Parker mileage.

19   Q.    So since you didn't have the Parker

20   vehicle to inspect and/or possibly drive, would

21   having that vehicle, driving that vehicle,

22   inspecting that vehicle, looking at that

23   vehicle, would that have been better for you as

24   an expert in terms of giving your opinion?



1    A.   I don't see how it would change any of

2    my opinions.

3        Q.   Well, wouldn't the condition of the

4    vehicle affect your opinion?  Is it your

5    testimony that the condition of the vehicle does

6    not have anything at all to do with your

7    opinions?

8        A.   No.  What I know of the subject vehicle

9    is the make, the model, the fact that it was in

10   drive, it was idling at 500 RPMs, similar -- you

11   know, the same as the exemplar I tested to get

12   my tractive force number.  I utilized that from

13   my calculations in the report, demonstrating how

14   far it would roll.

15        I also was looking at is there any

16   feature with the door being open to bring the

17   vehicle -- to prevent it from rolling forward.

18   There was nothing there.  You know, I don't know

19   how else to answer that.

20        Q.   I understand.

21        Well, what I hear you saying is, is

22   that if you had the original vehicle, knowing

23   what we know about the condition of the vehicle,

24   you're saying it wouldn't have made any



1    difference for your -- in your opinion that you

2    would have had the vehicle involved in this

3    particular event available for your inspection.

4          You're saying it wouldn't have made any

5    difference?

6        A.   I can't think of something that I

7    needed to know for my opinions that I didn't --

8        Q.   I mean, wouldn't it --

9        A.   -- find out from the exemplars.

10       Q.   Wouldn't the condition, though, of the

11   engine and the condition of the transmission and

12   the drivetrain, wouldn't that matter to you?

13       A.   There's no evidence that anything was

14   wrong with it.

15       Q.   There's no evidence everything was

16   right with it, either?

17       A.   I mean, there's evidence that it's

18   being driven on the road.

19       Q.   Sir, if -- what did you just say?

20       A.   I said there's evidence that it's being

21   driven.  I didn't see anything in the CARFAX

22   that indicated there was anything significantly

23   wrong with it.

24       Q.   Okay.  Yeah, but being driven on the



John Stamm, P.E. 09/28/2023

1  road doesn't mean the vehicle's in good

2  condition, does it?

3      A.   So if I reran that test I did in the

4  exemplar when it was brand new, so that's the

5  pull test with the exemplar, I would suspect to

6  get similar numbers.  I can't tell you how

7  close, but it's going to be similar.  It's not

8  like you're going to get double and triple the

9  force numbers.  They're going to be close.

10      Q.   Okay.  Okay.

11      MR. WHITFIELD:  All right.  Well, look, I've

12  had enough of you, which in legal parlance, that

13  means I'm done.

14      THE WITNESS:  Okay.

15      MR. WHITFIELD:  Thank you so much for your

16  patience with me.  I know that at times, it's

17  been a little testy.

18      THE WITNESS:  That's all right.  It's nice to

19  meet you, Bill.

20      MS. RAVEENDRAN:  And, Bill, I just had --

21      MR. WHITFIELD:  Nice to meet you.

22      MS. RAVEENDRAN:  -- a few follow-up questions

23  here.  It should --

24      MR. WHITFIELD:  Ma'am?

Exhibit "B"

 1        MS. RAVEENDRAN:  Can you hear me?  I said I

 2   have a few follow-up questions.  It should be

 3   brief.

 4        MR. WHITFIELD:  Okay.  All right.

 5        MS. RAVEENDRAN:  I'm going to zoom out so you

 6   can see me, too, unless you prefer I stay in on

 7   the witness.  It's your choice.

 8        MR. WHITFIELD:  You're going to have to lean

 9   into the camera so I can see you, Bhavani.

10        MS. RAVEENDRAN:  Yeah, I don't know what it's

11   doing.  Well, I have an idea.  I'll just move it

12   out a little bit.

13           All right.  You can see me?

14        MR. WHITFIELD:  I can see you well.

15        MS. RAVEENDRAN:  Okay.  Great.

16           Yeah, just a couple questions.

17                    EXAMINATION

18   BY MS. RAVEENDRAN:

19        Q.   Okay.  John, are all of the opinions in

20   your report offered to a reasonable degree of

21   certainty within your expertise in engineering?

22        A.   They are.

23        MR. WHITFIELD:  To which I object.  There's

24   not one word in his opinion about a reasonable



1  degree of probability or whatever.  And I asked

2  him that question a zillion times, and he said

3  that they were all possibilities.  So I object

4  and I move to strike it.

5           And let the record reflect also that we

6  took about a 10- or 15-minute break toward the

7  end of my examination and that question.

8      MS. RAVEENDRAN:  Hey, Bill, I'm going to

9  refer you --

10     MR. WHITFIELD:  So I object.

11     MR. RAVEENDRAN:  I'm going to refer you -- I

12  understand your objection, but I'm going to

13  refer you to Page 1 of his report, second

14  paragraph.  "All opinions and conclusions stated

15  in this report are based on my work to date on

16  this matter, as well as my background,

17  education, training, and experience, and are

18  stated to a reasonable degree of engineering

19  certainty."

20     MR. WHITFIELD:  Okay.  So I got it.  And I

21  understand that that's in there, but when you

22  get to the opinions, the specific opinions, that

23  word is not mentioned.  In fact, the qualifier

24  in every opinion that has any relevance at all



1  is, I don't know whether he was pushing the

2  brake.  Okay?  That's the issue of this

3  particular case.  You can't say to a reasonable

4  degree of medical -- engineering probability or

5  possibility that that happened.

6          So you can't just take an umbrella and

7  say everything in my opinion is to a reasonable

8  degree of engineering probability when, in fact,

9  the actual opinion is otherwise.

10     MS. RAVEENDRAN:  Weren't you the one that

11  said --

12     MR. WHITFIELD:  So I object to that.  We can

13  take it up with the judge.  That's fine.  Ask

14  your questions.

15     MS. RAVEENDRAN:  You can file your --

16     MR. WHITFIELD:  He can answer it.

17     MS. RAVEENDRAN:  Hey, Bill, you can file your

18  motion.  You're the one who told me not to do

19  speaking objections.  I misspoke once, talked

20  too much, and so I pulled back after that.  So

21  I'd appreciate the same courtesy.

22          I hear your objection.  It's in his

23  report.  And I'll also point out it's also on

24  Page 31 before all of the opinions and

 1   conclusions.

 2          So you might have a motion you want to

 3   file, but that is not appropriate here.  I'm

 4   asking him what it says in his report.

 5       MR. WHITFIELD:  Look, you -- so, look, I got

 6   it.  I understand that.  I'm not prompting the

 7   witness -- I'm not prompting your witness.  I'm

 8   just simply saying that the specific opinions

 9   that matter in this case, he has rendered them

10   as a possibility only, not only in the report,

11   but by his testimony.

12       MS. RAVEENDRAN:  And I am --

13       MR. WHITFIELD:  So I object to you coming

14   along and taking this one paragraph that's

15   somehow some catchall and saying all of my

16   opinions in this letter are to a reasonable

17   degree of engineering certainty, which is not

18   so.

19          So, yes, I am going to file a motion to

20   strike, and I move to strike that question and

21   the answer.

22   BY MS. RAVEENDRAN:

23       Q.   Okay.  Well, I have another question

24   for you, John.



1          If you could look at your report,

2    Page 31, in the section that says, "10.0

3    Opinions and Conclusions," does it state, "Based

4    on my review and analysis of this case, and my

5    education, training and experience as a

6    professional engineer and an accident

7    reconstructionist, I have the following

8    questions [sic] held to a reasonable degree of

9    engineering certainty," and then you list seven

10   opinions?  Is that right?

11       A.   So just one change.  You said

12   "following questions," it's "following

13   opinions."

14       Q.   I misspoke, yeah.

15       A.   But yes, that's what it says.

16       Q.   Okay.  I'm going to ask you

17   specifically as to Opinions 6 and --

18       MR. WHITFIELD:  Which same objection, by the

19   way.  Same objection.

20   BY MS. RAVEENDRAN:

21       Q.   I'm going to ask you to look at

22   Opinions 6 and 7.

23          Opinions 6 and 7 both describe two

24   different scenarios; is that right?

John Stamm, P.E. 09/28/2023

1      A.   Correct.

2      Q.   Where did you get information regarding

3  two different scenarios on scene?

4      A.   So that was based on my analysis of the

5  vehicle, the path taken, the measurements.  So

6  there is the two different scenarios.

7      Q.   Okay.  And are those two different

8  scenarios scenarios that came from witness

9  testimony?

10     A.   No.

11     Q.   Okay.  So those are the two scenarios

12  under which you tested the probability of

13  something occurring on scene; is that correct?

14     A.   Correct --

15     MR. WHITFIELD:  Object to the leading.

16     THE WITNESS:  These are the two scenarios

17  based on the physics of the scene and the

18  vehicle.

19  BY MS. RAVEENDRAN:

20     Q.   Okay.  And within each scenario, are

21  your opinions to a reasonable degree of

22  engineering certainty?

23     A.   Yes.

24     MR. WHITFIELD:  Same objection, the one I



1    that I made before this one.

2        MS. RAVEENDRAN:  Understood.

3    BY MR. WHITFIELD:

4        Q.   And regarding Opinions 6 and 7, is it

5    your opinion, within a reasonable degree of

6    certainty, that these are the two scenarios

7    under which the truck could come to a stop where

8    it was eventually found after the incident?

9        A.   Yes.

10       Q.   And I recall that you were responding

11   to some questions from Bill about whether there

12   was a possibility or a probability regarding the

13   two scenarios.

14            Is it your testimony that each scenario

15   is possible and that your opinions as to each of

16   those scenarios are probable?

17       A.   Yes.

18       Q.   Okay.  Thank you.

19            Is it your opinion -- strike that.

20            Do you have an opinion whether or not

21   the bush near the grass where the GM -- 2014 GMC

22   driven by Mr. Parker came to a stop has any

23   relevance to the degree in which it stopped or

24   where it stopped?



1        A.    Yeah.

2        Q.    What is that opinion?

3        A.    Possibly scraping the bush is not going

4   to stop the truck.

5        Q.    You provided some calculations and

6   data, pictures, and scans to defendant's counsel

7   with regard to this deposition; is that right?

8        A.    I did.

9        Q.    Is that your work product of your

10  methodology in this matter?

11       A.    It is.

12       Q.    Appendix A of your report indicates a

13  number of documents that you received at the

14  time that you provided this report for your

15  disclosure; is that right?

16       A.    It is.

17       Q.    Is it correct that you have received a

18  couple additional documents as they've been made

19  available?

20       A.    Yes.

21       Q.    Okay.  Do you recall that you received

22  expert reports from the defendants and some

23  discovery responses from Defendant Cuevas?

24       A.    Yes.



John Stamm, P.E. 09/28/2023

1    Q.   And I believe you may have received a

2    recording of Mr. Markray; is that right?

3    A.   I did.

4    Q.   Okay.  Did any of those documents

5    change your opinions that you provided in this

6    matter?

7    A.   They did not.

8    Q.   You described that you had some

9    assistance creating dep summaries; is that

10   correct?

11   A.   Yes.

12   Q.   For any of the depositions that you

13   yourself did not summarize, did you go back and

14   look at them?

15   A.   Yes.

16   Q.   Why is that?

17   A.   Because I wanted to make sure that the

18   summary was accurate.

19   Q.   When you provided your opinions, were

20   they based on any particular topics of science

21   that you've studied?

22   A.   Yeah, physics and mechanics.

23   Q.   And what about engineering?

24   A.   Yeah, it's all under engineering.

John Stamm, P.E. 09/28/2023

1      Q.    Can you explain in engineering

2   terminology what a radius is?

3      A.    Sure.  All the way across the circle is

4   the diameter.  Halfway across the circle is the

5   radius.

6      Q.    Would it be fair to say that you are

7   not making credibility opinions with your

8   report?  You are not trying to say which

9   witnesses are more or less believable?

10     A.    That's true.

11     MS. RAVEENDRAN:  That's all the questions I

12  have.

13     THE WITNESS:  Okay.

14     MR. WHITFIELD:  I have a few, maybe a few or

15  more than a few.

16                 FURTHER EXAMINATION

17  BY MR. WHITFIELD:

18     Q.    So we took about a 10- or 15-minute

19  break a little while ago before we started into

20  the direct.

21          Did you talk with Counsel about your

22  testimony before you came in the room and

23  answered questions from her on direct?  Did you

24  talk with her about the subject matter that we

Exhibit "B"

John Stamm, P.E. 09/28/2023

1    were about to talk about?

2        A.   We talked to each other.

3        Q.   Did you go over the reasonable degree

4    of medical -- reasonable degree of engineering

5    probability, possibility, and all that?  Did

6    y'all talk about that?

7        A.   I mean --

8        MS. RAVEENDRAN:  I'm going to object to the

9    point that this is confidential.  But I'll

10   advise him that he can -- well, I'm not sure

11   where the line is here.  I think he can talk

12   about, like, the subjects, but not what was

13   spoken to about it.  Right?

14       MR. WHITFIELD:  Well, no, actually, I

15   disagree with that.  I think that to the extent

16   that this witness remained under oath, I don't

17   know that you had the privilege of being able to

18   talk with him about proposed testimony once we

19   got back on the record.

20   BY MR. WHITFIELD:

21       Q.   And that's what I want to know, is

22   whenever we took a break, did you talk with

23   Counsel about the questions that were just asked

24   of you?



John Stamm, P.E. 09/28/2023

1    A.   She told me that we were going to ask
2  my opinions with a reasonable degree of
3  engineering certainty.
4    Q.   Okay.  So that -- you knew that was
5  coming, right?
6    A.   I mean, they obviously are.  I state it
7  multiple times in my report.
8    Q.   You talked with her about the words
9  "reasonable degree of engineering certainty" at
10  a break, and then came in and answered her
11  questions about that particular topic, correct?
12    A.   She said she was going to ask that.
13    Q.   But she told you she was going to ask
14  you some questions about it?
15    A.   I stated in my report that all my
16  opinions are to a reasonable degree of
17  engineering certainty, and she said that she was
18  going to ask about it and that...
19    Q.   So you talked about it, right, John?
20    A.   When you say --
21    Q.   You talked about it?
22    A.   I think I answered the question, did I
23  not?
24    Q.   I think you did.

1          So let me ask you this:  So

2   Ms. Raveendran asked you to look at the last two

3   pages of your opinion on Pages 31 and 32.  And

4   as I appreciate her question, she asked you that

5   your Opinions 1 through 7 represent two

6   different scenarios.  6 and 7 are one set of

7   scenarios and then 1 through 5 are another set.

8       MS. RAVEENDRAN:  Objection.  That was not my

9   question.

10      MR. WHITFIELD:  I'm trying to understand it.

11      MS. RAVEENDRAN:  That was not my question.

12      THE WITNESS:  That's --

13  BY MR. WHITFIELD:

14      Q.   Well -- so 6 and 7 represent scenarios,

15  right?

16      A.   Correct.

17      Q.   Isn't that the question?  Isn't that

18  what she said?

19      MS. RAVEENDRAN:  That was my question.

20  BY MR. WHITFIELD:

21      Q.   6 and 7 represent scenarios.  And I

22  guess one is -- juxtaposed to the other is

23  different, right?  Is that your opinion?  Is --

24  6 is one scenario and 7 is another scenario.  Is

1    that what you wrote?  Is that what she asked you

2    and what you wrote?

3        A.   So what I wrote in the report is

4    there's a scenario where the truck was stopped

5    before the shooting, and there's another

6    scenario where the truck came to an immediate

7    stop after the shooting.

8            Now, the rest of the opinion is based

9    on my -- you know, it's to a reasonable degree

10   engineering of certainty.  It's based on the

11   testing that I did and my calculations.

12       Q.   Well -- so each scenario -- and I don't

13   know that either scenario is particularly

14   juxtaposed.

15           But either scenario, in your mind --

16   both of those scenarios are what you are

17   characterizing to a reasonable degree of

18   engineering probability, right, but that one of

19   them -- neither one of them is probable; they're

20   just both possible, right?  Is that what I heard

21   you say?

22       A.   So I can't say which scenario occurred.

23   I can't say if the truck was stopped or not.

24           But under the scenario where the truck


Exhibit "B"

1  was stopped, I describe -- let's see.  If it was

2  stopped prior to the shooting, the service brake

3  was not applied, he had to be traveling very

4  slow, and that's based on the calculations that

5  I did and the testing.  Alternatively, he could

6  have applied the service brake to stop before

7  the shooting.  That's one scenario.  All that's

8  to a reasonable degree of engineering certainty.

9          The other scenario is if it was brought

10  to an immediate stop after the shooting.  And

11  under that scenario, you had to apply the

12  service brake.  And that's based on my

13  background and testing and everything I describe

14  in the report, and that's to a reasonable degree

15  of engineering certainty as well.

16      Q.   But neither one of them is capable of

17  being opined to a reasonable degree of

18  engineering probability to the exclusion of the

19  other?  Both of them are possibilities, correct?

20      A.   There's two scenarios.  I can't

21  eliminate either scenario.

22      Q.   But both of them are possible, right?

23  One or the other is possible.  One's possible,

24  the other one is possible.



 1              But you're saying both of them are

 2    probable, but this one is possible and this

 3    one's possible under the umbrella of

 4    probability?  Is that what you're saying?

 5        A.   I'm getting lost in your probabilities

 6    and possibilities.

 7        Q.   Okay.  Here's -- I'm having a real hard

 8    time understanding your concept of what is and

 9    what is not probable.

10              No. 7 is not probable to the exclusion

11    of 6, is it?

12        A.   6 and 7 both cannot be true at the same

13    time.  How about that?

14        Q.   But neither one of them -- neither one

15    of them is probable over the other?

16        A.   Just based on the physical evidence,

17    no, I can't say one way or the other.

18        MR. WHITFIELD:  That's all I've got.  Okay.

19    All right.

20        MS. RAVEENDRAN:  All right.  I don't have any

21    follow-up.

22        MR. WHITFIELD:  Ma'am?

23        MS. RAVEENDRAN:  Can you hear me?

24        MR. WHITFIELD:  Okay.



John Stamm, P.E. 09/28/2023

1          MS. RAVEENDRAN:  I just said I don't --

2          MR. WHITFIELD:  I can hear you.  I can see

3     your mouth moving.

4          MS. RAVEENDRAN:  I don't have any follow-up

5     questions.  That's all I'm adding.

6                         (Whereupon, the proceedings

7                          concluded at 3:31 p.m.)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

1  STATE OF ILLINOIS  )
                      ) SS.
2  COUNTY OF COOK     )

3

4        I, GINA M. SYLVESTER, Certified Shorthand

5  Reporter and Registered Professional Reporter,

6  do hereby certify that heretofore, to-wit, on

7  September 28, 2023, JOHN STAMM, P.E., appeared

8  at 321 North Clark Street, Chicago, Illinois, in

9  a cause now pending and undetermined in the in

10  the United States District Court for the

11  Southern District of Mississippi, Southern

12  Division, wherein CATINA PARKER, as Personal

13  Representative of the Estate of Leonard Parker,

14  Jr., Deceased, is the Plaintiff, and the CITY OF

15  GULFPORT, et al., are the Defendants.

16        I further certify that the said

17  JOHN STAMM, P.E., was first duly sworn to

18  testify the truth, the whole truth and nothing

19  but the truth in the cause aforesaid; that the

20  testimony then given by said witness was

21  reported stenographically by me in the presence

22  of the said witness, and afterwards reduced to

23  typewriting by Computer-Aided Transcription, and

24  the foregoing is a true and correct transcript

John Stamm, P.E. 09/28/2023

1    of the testimony so given by said witness as

2    aforesaid.

3          I further certify that the taking of this

4    deposition was pursuant to notice and that there

5    were present at the deposition the attorneys

6    hereinbefore mentioned.

7          I further certify that I am not counsel

8    for nor in any way related to the parties to

9    this suit, nor am I in any way interested in the

10   outcome thereof.

11         IN TESTIMONY WHEREOF, I have hereunto set

12   my verified digital signature on this 12th day

13   of October, 2023.

14

15   _____

16         GINA M. SYLVESTER, CSR, RPR

17         License No. 084-004856

18

19

20

21

22

23

24

Exhibit "B"