**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
SOUTHERN DIVISION**

**CATINA PARKER, as Personal Representative
of the Estate of Leonard Parker, Jr., Deceased**                    **PLAINTIFF**

**VERSUS**                                               **NO.1:21-cv-00217-HSO-BWR**

**The CITY OF GULFPORT, a municipal
corporation; JASON CUEVAS, in his individual
and official capacity**                                          **DEFENDANTS**

---

**MEMORANDUM BRIEF IN SUPPORT OF MOTION FOR PARTIAL SUMMARY
JUDGMENT ON THE CLAIM FOR PUNITIVE DAMAGES OF DEFENDANT
JASON CUEVAS IN HIS INDIVIDUAL CAPACITY**

---

COMES NOW the Defendant, Officer Jason Cuevas, by and through his counsel of

record, and submits his Memorandum Brief in Support of his Motion for Partial Summary

Judgment on the Claim of the Plaintiff for Punitive Damages against him in his Individual

Capacity as follows:

## I.  INTRODUCTION

In the Third Amended Complaint, the Plaintiff, Catina Parker ("Plaintiff"), as personal

representative of the Estate of Leonard Parker, Jr., has asserted a claim through 42 U.S.C. § 1983

against Officer Cuevas for excessive force as a violation of the Fourth Amendment of the United

States Constitution.  [Doc. 141].  Throughout the Third Amended Complaint, the Plaintiff asserts

that she is entitled to punitive damages on her §1983 claims against Officer Cuevas in his

individual capacity.  The Plaintiff, though, cannot meet her burden of proof on any entitlement to

punitive damages[1] such that Officer Cuevas is entitled to summary judgment as a matter of law.[2]

## II.  FACTUAL BACKGROUND

As background, several individuals, including Parker, were attending a birthday party at the home of Stephanie Baldwin, who resided at 210 25th Street, Gulfport, MS.  The party began during the evening hours of Friday, January 31, 2020.  Everyone at the party agrees that alcohol was served and many of the guests were drinking, including Parker.[3]  (MBI Case File Report,

---

[1] As it pertains to punitive damages in a Section 1983 claim, the standard of proof is somewhat "unclear" in the Fifth Circuit. There doesn't appear to be a case directly on point as to standard of proof. In Mississippi, a plaintiff is required, pursuant to Miss. Code Ann. §11-1-65, to demonstrate an entitlement to punitive damages by "clear and convincing" evidence.  Here, Officer Cuevas would advocate for the adoption of this standard if the matter proceeds to trial.  Some courts appear to have handled it differently but without a specific statute addressing punitive damages.  In Fitzgerald v. Harris Cty. Sheriffs Office, 2018 U.S. Dist. Lexis 74379 (S.D. Tex. 2018), the district court found that an award of punitive damages was proper "by a preponderance of the evidence" when the defendant officer acted with "reckless or callous disregard for the plaintiffs rights."  Other District Courts appear to have adopted a similar approach.  See e.g., Stanley v. Irsa, 2011 U.S. Dist. Lexis 43051 at *3 (N.D. Ind. 2011) (Analysis of various Circuits using preponderance of evidence standard in Section 1983 case); Currie v. Cundiff, 870 F. Supp. 2d 581, 587 (S.D. Ill. 2012) ("[W]hen this Case proceeds to trial, punitive damages . . . have to be proven by a preponderance of the evidence.").  Yet, Mississippi law will be applicable on the ability of the Plaintiff to recover punitive damages given that the issue is specifically dealt with in a specific statute and beyond that, the caps will clearly apply.  Unlike the states in the case law above, Mississippi law, Miss. Code § 11-1-65,  requires punitive damages to be proven by "clear and convincing" evidence.  Even so, regardless of whichever standard this Court employs, the Plaintiff cannot meet that burden.

[2] Following limited discovery on the issue of qualified immunity, Officer Cuevas filed a Motion for Summary Judgment based upon Qualified Immunity and a supporting Memorandum Brief on October 16, 2024, along with a Notice of Conventional Filing.  [Docs. 132, 133, 134].  Instead of re-submitting the same exhibits as before, many of which were submitted via conventional filing, reference to those specific exhibits is made as attached to the original Motion [Doc. 132] and the Notice of Conventional Filing [Doc. 134].  During this last round of discovery, additional depositions were taken, and the relevant testimony of these witnesses has been added to the previous list of exhibits (beginning with the number following the last numbered Exhibit from Doc. 132) and arguments, including testimony of Dr. Staci Turner (State Medical Examiner), Lt. Brad Garrett (MBI Investigator), and Michelle Desroche (disinterested neighbor / witness), all as listed in the Motion.

[3] Parker's Blood Alcohol Concentration after his death was 0.185, well over twice the legal limit in the State of Mississippi.  (MBI Case File Report, Toxicology Report Bates 37, Doc. 132-1; DP Dr. Staci Turner, p. 55, Ex. "20").

Bates 2, 9, 13-14, 16, 19 - Doc. 132-1; DP Markray, pp. 68-73, Doc. 132-13).  As the evening proceeded, one of the guests, Tremaine Markray, became belligerent, obnoxious and aggressive toward several of Baldwin's guests, including Markray's own girlfriend (Kimberly Bonds).  His conduct motivated one of the guests at the party, Maxine Owens, to call 911 [at 2:49:47 a.m.] and ask for police assistance with the escalating situation.  (MBI Case File Report, Bates 102-03, Doc. 132-1; 911 Call, Docs. 132-2, 134; DP Markray, pp. 46-49, 68-69, 73-76, Doc. 132-13).  Maxine stated that "Terrence", a black male, was "fighting everybody", that he was wearing a gray shirt and gray jogging pants, that there had been drinking and she was not aware of any weapons.  (MBI Case File Report, Bates 102-03, Doc. 132-1; 911 Call, Docs. 132-2, 134).  Officer Cuevas and another nearby officer (Brewer) were dispatched to the scene.  (MBI Case File Report, Bates 102-03, Doc. 132-1; Cuevas Audio Interview, Docs. 132-6, 134; Cuevas Video Interview, Docs. 132-7, 134; DP Cuevas, pp. 31-33, Doc. 132-5).  Cuevas was the first to arrive.

Before Officer Cuevas arrived, Parker had convinced Markray to leave with him, with the intent of taking Markray to a hotel to "sleep it off".  (DP Markray, pp. 66, 76-77, 126-27, Doc. 132-13).  Parker was driving a dark colored 2014 GMC Sierra pick up truck.  Markray was in the front passenger seat.  (Id., p. 66).

About five minutes after the 911 call was placed[4], Officer Cuevas arrived and parked his police car several houses east of the intended address.  He was walking to the address so as to assess the threat to himself and others as he approached the call address.  Even before he got out

---

[4] Cuevas arrived on scene at 2:55:19 a.m.  (MBI Case File Report, Bates 103, Doc. 132-1).  Brewer arrived on scene at 2:55:55 a.m., about 36 seconds later than Cuevas.  (Id.).

of his car, he could hear "loud voices" coming from this same direction.  To arrive, Officer Cuevas drove north on Oak Avenue, then turned left (west) on 25th Street, and then parked his patrol car on the north side of 25th Street, just west of its intersection with Oak Avenue.  Officer Cuevas did not activate his blue lights or siren to proceed to the scene or when he parked his car.[5] (Int. Ans. No. 17, Doc. 132-4; Cuevas Audio Interview, Docs. 132-6, 134; Cuevas Video Interview, Docs. 132-7, 134; DP Cuevas, pp. 35-42, 116, Doc. 132-5).

Officer Cuevas exited his patrol car and determined the voices appeared to be coming from about two houses west of his patrol car.  He then proceeded westbound on foot on 25th Street, searching for the address of the "drunk and disorderly" call by looking at the numbers on a white color mailbox located on the north side of the road and listening for any suspicious sounds.  (DP Cuevas, pp. 42-45, 47, 55-57, Doc. 132-5; MBI Scene Photos, Bates 35, 54, 60, 66, Doc. 132-14).  The street was dark and Officer Cuevas had to illuminate the mailboxes of the adjoining neighbors to see the addresses.  (DP Cuevas, pp. 42-45, 47, 55-57, Doc. 132-14). While Officer Cuevas continued on foot westbound on 25th Street, the sound of the commotion ahead became louder and he then noticed a dark colored truck backing out of what he thought was a driveway onto 25th Street.[6]  Officer Cuevas observed the truck back directly across the street and into a mailbox located on the south side of the street (opposite side of the street, later

---

[5] Officer Cuevas testified this was more of a tactical approach so that he could gather more information about the situation that was occurring at the residence and some distance and time to verify the residence since he was not familiar with this street.  (DP Cuevas, pp. 41-42, Doc. 132-5).

[6] According to the investigation records and scene photographs, the truck backed out of the front yard of Stephanie Baldwin based on the tire marks left behind in the grass.  (MBI Biloxi Report, Bates 6, Doc. 132-3; MBI Scene Photos 133, 135, Doc. 132-14).  Since Cuevas did not make it to the call address, his view of the yard and driveway was limited by geography and light.  (DP Cuevas, pp. 50, 55, 64-66, 70-71, Doc. 132-14).

learned to be 213 25th Street – the home of Michelle Desroche).  It appeared to him that the truck was leaving from the residence that had reported the "drunk and disorderly" male.  (Id., pp. 48-52, 64-70).  Officer Cuevas started walking towards the truck to make contact with the driver, thinking that the driver was going to stop since he had just hit a mailbox.  (Id., pp. 71-73).  At the same time, Officer Cuevas was shining his flashlight towards the truck to get the driver's attention. (Id., p. 78).  Cuevas did not know at this point what had occurred in the house or whether the driver of the truck was the person that was the subject of the 911 call.  Officer Cuevas felt that the scene needed to be secured to determine not only the facts of the call but whether a crime had been committed.  (Id., pp. 42, 45, 49, 78).

While Officer Cuevas was in the middle of the street and on a path to the truck that was now on the south side of 25th Street where it struck the mailbox, the truck pulled forward from the mailbox, straightened out and then began to proceed eastbound on 25th Street, now angling in his direction.  (DP Cuevas, pp. 76-78, Doc. 132-5).  Officer Cuevas activated the strobe feature on his flashlight and also removed his firearm from the holster to utilize the weapon light.  This was done in an effort to get the driver's attention, because he assumed that the driver would see him and would stop.  (Id., pp. 78-79, 102-103, 145-46).  Officer Cuevas also identified himself as the **police** and gave several commands for the driver to **stop the vehicle**. Officer Cuevas specifically recalls yelling: *"Stop the vehicle!  Stop the vehicle!  Police! Stop the vehicle*!"  (Id., pp. 81-82, 103, 141).  In spite of his obvious visible presence and verbal commands, the truck continued to drive towards Officer Cuevas.  Cuevas affirms by his testimony that the headlights became brighter as the truck tracked closer and closer to him and that he heard the engine rev up and appeared to pick up speed in his direction, which he perceived was faster than 5 mph.  (Id.,

**MEMORANDUM BRIEF IN SUPPORT OF MOTION FOR PARTIAL SUMMARY JUDGMENT**

pp. 82-83, 103, 141, 146).  Only Cuevas is in a position to establish these facts.

When it became apparent to him that the truck was not slowing,  Officer Cuevas then tried to back peddle away from the middle of the road, moving towards the south side of the road, which was closer to him at that moment.  (Id., pp. 92-94 and Ex. 49 to DP).  He states that the headlights of the truck, which at that point were very bright, followed him towards the south side of the road.  Cuevas believed that the truck constituted a threat of harm or death to himself and he fired his service weapon toward the driver of the truck.  (Id., pp. 94-95, 98, 100, 101, 103-110, 124, 145-149).  Officer Cuevas testified that when he discharged the last shot toward the vehicle, the vehicle came to an abrupt stop.  (Id., p. 118).  "Shots fired" were reported to Dispatch at 2:55:49 a.m., roughly 30 seconds after Officer Cuevas arrived to 25th Street.  (MBI Call Sheet Report, Bates MBI 102-03, Doc. 132-1).

A simulation video was developed that demonstrates the view that Officer Cuevas described in both his post-event interview with the MBI and in his deposition testimony.  (Affidavit Cuevas, Docs. 132-8, 134).   This simulation demonstrates what Officer Cuevas perceived from the time that Parker's truck backed into the  mailbox [at 213 25th Street], and then pulled forward and eastbound on 25th Street, until the truck had come to a stop on the south side of the road, with its passenger side wheels now on the grass and its driver side wheels on the pavement.  (Id.).  The Court should note the darkness of the night depicted in the simulation video that Officer Cuevas faced, as well as the headlights coming at him from the Parker truck. (Id.).

In the Third Amended Complaint, the Plaintiff now alleges that at the time Officer Cuevas fired his weapon, Parker's vehicle "*was at a full stop*."  [Doc. 141, ¶ 51].  The Plaintiff further alleges that prior to stopping the truck, Parker never exceeded 5 mph and he was not

driving recklessly.  [Id., ¶¶ 54, 55].  The Plaintiff goes on to allege that "prior to making his full stop, he was driving eastbound on the south side of the road, while Defendant Cuevas walked westbound on the north side of the road."  [Id., ¶56].  The Plaintiff alleges that at no time prior to the shooting did the truck accelerate towards Officer Cuevas, did not "pick up" or make a "vroom" sound indicating it was accelerating, and did not track in Officer Cuevas's direction at any time. [Id., ¶¶ 59-62].  The Plaintiff alleges that Officer Cuevas "was standing to the north side of the truck and not immediately in front of the truck when he opened fire on Mr. Parker," such that the truck did not pose "a significant threat of death or serious physical injuries" to Officer Cuevas. [Id., ¶¶ 59, 63].  Officer Cuevas would show that based on the forensic evidence collected from the scene and the information learned at autopsy, Cuevas was clearly in front of the moving truck at the time the shots were fired, all as demonstrated below.  This evidence is forensic and indisputable, notwithstanding the self-serving and impaired statements of the "witnesses" asserted by the Plaintiff.

The issues in this case boil down to what occurred in the 30 seconds following Officer Cuevas' arrival to 25th Street.  Specifically, the location of Officer Cuevas in relation to Parker's truck at the time the shots were fired and whether Parker's truck was moving in the direction of Officer Cuevas or if it was stopped.  Other than perhaps Tremaine Markray, Parker's passenger, no other alleged eye witness can testify as to what Officer Cuevas would have seen from his perspective as all of the Plaintiffs alleged "witnesses" were standing, more or less, either on the front lawn or the front porch of Stephanie Baldwin's house, and their view would have been limited to the rear and/or driver's side of Parker's truck.  And, no matter how the Plaintiff tries to reshape or morph her claims, the objective, physical evidence collected at the scene clearly demonstrates that Officer Cuevas was at the front of the truck and that the truck was moving at

**MEMORANDUM BRIEF IN SUPPORT OF MOTION FOR PARTIAL SUMMARY JUDGMENT**

him at the time the shots were fired.

The investigation of this matter was spearheaded by the Mississippi Bureau of Investigation ("MBI").  (MBI Case File Report, pp. 1-21, 28, 37, 85-88, 89, 92-93, 99-100, 102-105, Doc. 132-1).  The Biloxi Police Department Crime Scene Unit ("BPD CSU") processed the scene and collected and examined the physical evidence, including the truck driven by Parker.  (MBI Biloxi Report, pp. 1-3, 6-12, 33, 37-38, 43, 46-48, Doc. 132-3).  On scene, investigators noticed that even though the 2014 GMC Sierra truck driven by Parker was stopped with its passenger side wheels on the grass [off road] and the driver side wheels on the pavement, the truck was still in "D" [ "Drive"] with the driver's side door open and not moving forward.  (Id., pp. 5-6).  The radio was playing at a moderate volume.  (Id., p. 7).  CSU Investigators noted that the truck was stopped off the roadway in the yard at 207 25th Street, which would have been east-southeast of the address from where the truck had departed previously and east-southeast of where the witnesses who claimed to be outside in the yard or on the porch of 210 25th Street, with the passenger side tires in the grass and the truck touching a large bush on the back passenger side.  (Id.).  Numerous photographs were taken by Biloxi CSU both on scene and at the CSU Garage, some of which are being used for this Motion.  (MBI Scene Photos, 33, 35, 45, 54, 60, 66, 68-69, 80, 82, 84, 87, 91, 94, 99, 105, 107, 109, 113-14, 119, 120, 122, 127, 129, 131, 133, 135-36, 139, 159, 173, 178, 181, 186, 197, 202, 204, 206, 208, 213, 214, 218, 224, 226, 232-33, 238, 239, 241-42, 247, Doc. 132-14; MBI CSU Garage Photos, 2, 11, 77-90, 96, 98, 102, 105-06, Doc. 132-15).  In addition, based on the physical evidence locations and measurements taken at the scene, Biloxi CSU Investigators prepared a Scene Diagram.  (MBI Biloxi Report, 66, Doc. 132-3).

Investigator Brandon Teates with the BPD CSU testified about his investigation at the

scene and his findings with regard to the bullet "defects" in Parker's truck.  (DP Teates, pp. 31-44 and Ex. 35, Doc. 132-9).  Teates testified, based on the flight path rods, that the bullet that struck the truck's hood was moving, based on the officer's perspective, from the front of the vehicle at an angle of 5 degrees from driver's side to passenger's side. (Id., pp. 48-79, 81, 83-84, 100-101 and Exs. 36, 37, 38, 39).  Bullet casings were found at the front of the truck in the street, with one being found under the bumper of the passenger side of the vehicle.  (Id., pp. 84-86, 90-92 and Ex. 41).  Typically, bullet casings will eject to the right of the weapon.  (Id., pp. 93-94).  Establishing a 5 degree cone from the defect in the hood at the front of the vehicle, the casings were found to the left of the 5 degree cone /angle [more to the middle of the vehicle] explained above.  (Id., pp. 94-95 and Ex. 38).  Teates testified that Parker's truck was moving during the shooting, but he could not determine where Parker's truck was pointing or where Officer Cuevas was located when the shooting started.  (Id., pp. 96-101).  Nor could he determine the speed of Parker's truck.  (Id., pp. 101-102).

Because Teates is not a ballistics reconstructionist, Officer Cuevas retained James P. Molinaro and Howard Ryan as experts in the fields of shooting incident and/or crime scene reconstruction and ballistics.[7]  (Affidavit Molinaro, Doc. 132-10; Affidavit Ryan, Doc. 132-11). Molinaro and Ryan are of the opinion that:  (1) Officer Cuevas's location and position were at the front of Parker's truck at the time he fired four shots (same as Teates); (2) The location of the three cartridge cases found on scene are consistent with the forward movement of the truck during the shooting and/or immediately after the shooting before the truck came to a complete stop with the vehicle transmission in DRIVE as its final position; (3) The physical evidence at

---

[7]  The Plaintiff did not retain an expert in the field of shooting incident and/or crime scene reconstruction or ballistics.

the scene and the bullet defects on the truck, together with the location of the gunshot wounds to Parker, are consistent with Officer Cuevas directing his gunfire at the truck's driver to stop the threat perceived by Officer Cuevas of the truck driving directly at him; and, (4) The physical evidence at the scene and the bullet defects on the truck produced as a result of the shots fired by Officer Cuevas, together with the location of the gunshot wounds to Parker, are consistent with the description of the shooting incident given by Officer Cuevas to investigating authorities, with the exception of the number of shots fired (he recalls three shots fired).  (Affidavit Molinaro, Doc. 132-10; Affidavit Ryan, Doc. 132-11).

Michelle Desroche, a disinterested witness that lived across the street from Stephanie Baldwin at the time of the February 1, 2020 incident, heard some of the events as set forth in her Affidavit testimony where she states:  (1) She was at home during the evening hours of January 31, 2020 and witnessed several vehicles parked at the home located at 210 25th Street, which was directly across the street; (2) During the early morning hours of February 1, 2020, she was standing in the screened-in porch area of her house, smoking a cigarette; (3) From there, she could not see the house or the yard of 210 25th Street; (4) She heard a male screaming at someone, so she propped open the screen door at her carport to see if she could figure out what was going on as it was well after 2:00 a.m. and she was worried that the screaming would wake her elderly neighbors; (5) The man was screaming "Fu_k that bi_ch ... fu_k that bi_ch ... that's why I treat you like I do ..."; (6) She could also hear women's voices, but could not make out what they were saying; (7) She heard a different male voice trying to diffuse the situation and said something to the effect of "come on, man ... get in the car ..."; (8) She heard vehicle doors shutting; (9) She heard a vehicle back out quickly and then heard a loud "wham!" noise; (10) She thought the vehicle hit the light pole located near one of her neighbors, which is the direction the

**MEMORANDUM BRIEF IN SUPPORT OF MOTION FOR PARTIAL SUMMARY JUDGMENT**

sound came from; (11) She later learned that her mailbox had actually been hit and may have been knocked over; (12) She then heard the vehicle immediately accelerate to leave and proceed eastbound on 25th Street and as it did so, it made a louder than normal revving sound when it pulled out, where it made a slightly gravelly sound of a tire moving quickly over gravel; and, (13) Seconds later, she heard four gunshots. (Affidavit Desroche, Docs. 132-12, 134). The Plaintiff deposed Ms. Desroche and she testified similar to that of her Affidavit. (DP Desroche, pp. 14-25, 34-35, 41, Ex. "19").

Tremaine Markray, who was sitting in the passenger seat of Parker's truck, has given three different versions of his "story", ruining any credibility he may have.[8] Following the incident, Markray was placed in the back of a patrol car assigned to Officer Cook with the Gulfport Police Department, until he could be brought to the station to meet with the MBI Investigators. While in the back of the patrol car, Markray told Officer Cook: "I don't mean no disrespect man, ... I told that dude to stop. I said man slow down the police standing right there. He kept going, that's why he's shot ... man. They wasn't wrong man. He kept going. I told him to stop." (Cook Dash Camera at 49:04, Docs. 132-16, 134). Later, while Markray was alone and sitting/waiting in the back seat of the patrol car **by himself**, he uttered similar statements several

---

[8] Markray gave a statement to MBI Investigator following the incident. Markray was deposed by counsel during discovery of this matter on May 22, 2023. On August 18, 2023, Plaintiff's counsel produced a "recording" of a conversation that Markray had with Catina Parker by telephone that appears to have occurred between his statement to the MBI and his deposition (i.e., some time in the past three (3) years). Catina testified that after she retained counsel, she talked to Markray via Text and Facebook Messenger and later recorded a conversation she had with him (without his knowledge) because she wanted to know his side of the story. (DP Catina Parker, pp. 108-114, 125-26, 157-158, and Exhibits 53 and 54 to Deposition, Ex. "22"). Because Catina was not there, she has no personal knowledge of the events and essentially relies on what Markray told her. (Id., pp. 120-122, 124-125). She didn't talk to any police officers about what happened – only Markray. (Id., pp. 126, 159). Catina has never been shown the comments that Tremaine made to himself in the back seat of the patrol car or in the witness room. (Id., pp. 116-117).

**MEMORANDUM BRIEF IN SUPPORT OF MOTION FOR PARTIAL SUMMARY JUDGMENT**

times **to himself**, including: "I told that ... to stop man", "I done told him to stop though", "But they weren't wrong, I told that ... to stop". (Cook Dash Camera at 56:01, 57:22, 1:05:55, Docs. 132-16, 134).

Then after all of the above and while he was at the police station, Markray was interviewed by MBI Investigator Brad Garrett. (Audio Markray Interview, Docs. 132-17, 134; Video Markray Interview, Docs. 132-18, 134). Markray's interview can be summarized as follows: (1) After Parker backed out, Markray saw a police officer with a flashlight in the street; (2) From inside the truck, Markray heard the police officer give several commands for Parker to "Stop the vehicle!"; (3) Parker just looked ahead and did not stop; (4) The truck was not going fast, by his estimate maybe 2 or 3 mph; (5) Markray then heard the gun shots; (6) The police officer was in front of the truck, more towards the driver's side, when the shots were fired; and, (7) Markray stated that if he was the police officer, he probably would have thought that he was about to be run over too. (Id.; Id.). The interview then concluded. The video however kept filming from inside the interview room after the investigators left. As before when in the backseat of the patrol car, Markray again began talking to himself. (Video Markray beginning at 32:40, Docs. 132-18, 134). Markray kept repeating to himself that all Parker had to do was stop and that the police officer was not wrong because he was about to get hit with the truck. (Id. at 34:34, 35:28).

Markray's deposition was taken on May 22, 2023, over three (3) years after his extemporaneous and unsolicited comments and his official interview to MBI as part of the State's investigation into this incident. Unbeknownst to counsel, Markray had already discussed the case with Catina Parker via Facebook Messenger and Text, including a recorded conversation. At his deposition, Markray did a complete "180°" on what he said not only to

**MEMORANDUM BRIEF IN SUPPORT OF MOTION FOR PARTIAL SUMMARY JUDGMENT**

himself in the patrol car and in the interview room, but also to what he told MBI Investigator

Garrett.  Markray miraculously "remembered" that after Parker had backed out, he claims to have

seen <u>multiple police officers</u>, but no police cars (which has no basis in the objective evidence).

(DP Markray, pp. 86-87, Doc. 132-13).  He states he knew it was the police because of the

flashlight that he saw.  (<u>Id.</u>, p. 87).  Markray now also testifies that he did not hear the officer

give any commands like "stop", which is odd given that what he previously told Investigator

Garret (and told himself) is that he recalled the officer saying is identical to what Officer Cuevas

told the Investigator that he said to the trucks' passengers [Parker and Markray].  (<u>Id.</u>, pp. 88, 96-

97, 114).  He also stated that he lied to Investigator Garrett and now remembers that Parker was

actually stopped prior to the police officer shooting because miraculously, he saw Parker put the

truck in "Park". (<u>Id.</u>, pp. 35, 92-99, 101) (this is so even though everyone that looked at the shift

on the column verified that the vehicle was in "D" at and after the shooting).  Again, Markray's

new found memory does not even match the physical evidence at the scene.  Markray told

defense counsel at his deposition that he lied to Investigator Garrett because he was "scared" and

was "afraid for his life" even though he admits not one person threatened him.[9]  (<u>Id.</u>, pp. 89-95,

101-13).  Markray does at least admit from the police officer's perspective, it probably looked

like he was going to be hit by the truck, but now back tracks from that admission [at his

deposition] to say that the officer could have gotten out of the way.  (<u>Id.</u>, pp. 117-20, 128).

Markray's new found memory is not credible and Officer Cuevas would show that the most

---

[9]  Markray did not tell Catina that he was "scared" of the police or investigators, but instead told
her he felt like "they hiding something ... I think it was a set up" by Stephanie Baldwin and others with
the police because "it was like it was planned for it to happen to me not Leonard."  (Exhibit 54 to DP
Catina Parker, Ex. "22").  Markray reasoned with Catina that "[b]ecause they the ones called the police
and I think one of them knew that police personally because the police didn't pull their cars in front of
the house they parked around the corner.  they came out on me and Leonard from the bushes ...".  (<u>Id</u>.).
Again, new "story" without any evidence to substantiate his wild theories.

credible words out of Markray's mouth were those recorded as he sat by himself in the back of

the patrol car (with doors closed) and while he sat by himself in the interview room (with doors

closed), where no one could possibly have been any threat to him at all.

The parties took the deposition of Lt. Brad Garrett, who investigated the incident for the

MBI.  He testified that based on his education, training and experience as an investigator and

based on everything he observed at the scene, it is his belief that Officer Cuevas discharged his

weapon from the front of the truck as the bullet holes entered the vehicle through the windshield

from the front.  (DP Garrett, pp. 67-68, 92-94, 97, 131-132, Ex. "21").  Lt. Garrett also

commented and confirmed the Dash Cam Video from Cook's patrol vehicle wherein Markray

made statements to Cook and to himself, as well as his interview of Markray.  Lt. Garrett

testified he had no reason to doubt what Markray said to himself or told Lt. Garrett in the

interview room.  Lt.Garrett testified he never saw Markray being threatened in any way and he

felt like Markray was telling him the truth then, especially since he had said the same things

alone while in the patrol vehicle.  (Id., pp. 105-106-114, 132-134).  Lt. Garrett added that any

threat or intimidation would be absolutely unacceptable and he would not allow for that behavior

on his watch.  (Id., pp. 113-115).

Dr. Staci Turner, the State Medical Examiner, was also deposed.  Dr. Turner testified that

a bullet that entered Parker's left cheek and lodged in his cervical spine is what caused his death.

(DP Turner, pp. 27-29, 50, Ex. "20").  Dr. Turner testified that the bullet entered Parker's body

and traveled left to right downward and slightly front to back; i.e., it was not at a sharp angle and

followed a straight line path entering his body.  (Id., pp. 47-48).  Dr. Turner explained that the

wound path is consistent with Parker receiving a gunshot from someone or a muzzle to his left

(Id., p. 48), but she also testified that the path would be consistent with a gun being fired directly

**MEMORANDUM BRIEF IN SUPPORT OF MOTION FOR PARTIAL SUMMARY JUDGMENT**

at him.  (Id., pp. 48-49, 56-57).  Dr. Turner explained that the degree to which the projectile

traveled left to right was small, such that the bullet could have either come from the front with a

slight variation, it could have come more from the left, Parker's head could have been turned, or

the hand holding the gun could have been moving.  (Id., pp. 56-58).  Again, Dr. Turner testified

that the bullet path that she viewed on autopsy was consistent with the muzzle of the gun of the

officer being located at the front of Parker's vehicle.  (Id., pp. 63-64).

The physical evidence, statements given, and the un-controverted expert testimony shows

that Officer Cuevas was at the front of a moving truck at the time the shots were fired.  There is

simply no credible evidence to the contrary and this Court should find that not only did Officer

Cuevas not use excessive force, but that his actions were constitutionally proper and necessary to

salvage his own life.

## II.  SUMMARY JUDGMENT STANDARD

The  plain language of Rule 56 mandates the entry of summary judgment, after adequate

time for discovery and upon motion, against a party who fails to make a showing sufficient to

establish an element essential to that party's case, and on which the party will bear the burden of

proof at trial.  Fed. R. Civ. P. 56.  In such a situation, there can be "no genuine dispute as to any

material fact" since a complete failure of proof concerning the essential element of the non-

moving party's case necessarily renders all other facts immaterial.  Fed. R. Civ. P. 56(a).  The

moving party has no burden to negate the opponent's claim but merely must inform the court by

use of the pleadings and other discovery documents and demonstrate a complete lack of proof of

an essential element of the opposite party's claim.  Celotex Corp. v. Catrett, 447 U.S. 317, 323-

24 (1986).  When a motion for summary judgment is made and supported as provided in Rule 56,

an adverse party may not rest upon the mere allegations or denials of his pleadings, but rather, his

response must set forth specific facts showing that there is a genuine issue for trial. Fed. R. Civ.

P. Rule 56(c).

### III.  ARGUMENT

With regarding to a 42 U.S.C. § 1983 claim, for the Plaintiff to be awarded punitive

damages, she must make two separate showings: (1) First, she must show that Parker's

constitutional rights were violated by the conduct of Officer Cuevas; and, (2) Second, she must

show that Officer Cuevas's conduct was either "motivated by evil motive or intent" or involved

"reckless or callous indifference to the federally protected rights of others."  See Kohler v.

Johnson, 2010 U.S. App. LEXIS 20160 at *8 (5th Cir. 2010).  As applied in the present case, the

Plaintiff cannot establish that Parker's constitutional rights were ever violated by Officer Cuevas.

Additionally, as to the second prong, there is insufficient proof that Officer Cuevas's conduct

was "motivated by evil motive or intent" or involved "reckless or callous indifference" to justify

an award of punitive damages.

### A.    Officer Cuevas Did Not Violate A Constitutional Right of Parker.

Plaintiff's claim against Cuevas fails initially because she has not proven that Officer

Cuevas used unconstitutionally excessive force when he fired his service weapon at Parker.  "The

Fourth Amendment creates a 'right to be free from excessive force during a seizure.'"  Byrd v.

Cornelius, 52 F.4th 265, 270 (5th Cir. 2022) (quoting Poole v. City of Shreveport, 691 F.3d 624,

627 (5th Cir. 2012).  To establish a claim of excessive force, Plaintiff must demonstrate: "(1)

injury, (2) which resulted directly and only from a **use of force that was clearly excessive**, and

(3) the excessiveness of which was **clearly unreasonable**."  Byrd, 52 F.4th at 270 (emphasis

added); see also, Ramos v. Taylor, 2022 U.S. Dist. Lexis 227519 *18 (W.D. Tex. 2022).  Where,

as here, an injury is uncontested (i.e., death), this Court need only consider the second and third

**MEMORANDUM BRIEF IN SUPPORT OF MOTION FOR PARTIAL SUMMARY JUDGMENT**

elements.  Jackson v. Gautreaux, 3 F.4th 182, 186 (5th Cir. 2021); Tennessee v. Garner, 471 U.S. 1, 7 (1985).

"Inquiry into the reasonableness requirement balances the amount of force used with the need for that force under an objective standard."  Sims, 2022 U.S. Dist. Lexis 50655 at *9 (citing Graham, 490 U.S. at 395)).  Generally, to determine whether a use of force was objectively reasonable under the Fourth Amendment, courts are required to pay careful attention to the facts and circumstances of each particular case, including:  (1) the severity of the crime at issue, (2) whether the suspect poses an immediate threat to the safety of the officers or others, and (3) whether the suspect is actively resisting arrest or attempting to evade arrest by flight.  Byrd, 52 F.4th at 270 (citing Graham v. Connor, 490 U.S. 386, 396 (1989)).  "'[W] here the officer has probable cause to believe that the suspect poses a threat of serious physical harm, either to the officer or to others, it is not constitutionally unreasonable to prevent escape by using deadly force.'"  Sims, 2022 U.S. Dist. Lexis 50655 at *9; see also, Wilson, 26 F.4th at 713.

Because of the difficulty of "split second judgments", "[t]he 'reasonableness' of a particular use of force **must be judged from the perspective of a reasonable officer** on the scene, **rather than with the 20/20 vision of hindsight**."  Sims, 2022 U.S. Dist. Lexis 50655 at *9 (quoting Graham, 490 U.S. at 396) (emphasis added); see also, Wilson, 26 F.4th. at 713.  This means that the "overarching question is 'whether the officers' actions are **objectively reasonable** in light of the facts and circumstances confronting them."  Id. (emphasis added).  Here, the key question facing the Court is whether Officer Cuevas was in imminent danger when he fired his service weapon at Parker's truck.

1.    **Deadly Force in Context of Shooting at Suspect Inside a Vehicle.**

In Irwin v. Santiago, 2021 U.S. App. Lexis 31692 *5 (5th Cir. 2021), the Fifth Circuit

discussed the issue of shooting at a suspect in a "fleeing vehicle", finding that the "most important" factor that is considered is "whether the suspect poses an immediate threat to the safety of the officers or others." Id. at **5-6 (citing Garner, 471 U.S. at 396; Malbrough v. Stelly, 814 F. App'x 798, 803 (5th Cir. 2020)).  In this case, because Officer Cuevas was the only "pedestrian" in the area, the issue is whether Officer Cuevas could reasonably believe that Parker's truck posed a serious threat of harm to him.  Notably, "the threat of harm inquiry does not ask whether the officer was harmed, only **whether he could reasonably perceive a threat of serious physical harm**." Harmon v. City of Arlington, 16 F.4th 1159, 1164 n.3 (5th Cir. 2021) (emphasis added).

In the Fifth Circuit, two particular facts have emerged as highly relevant to determine whether a moving vehicle poses an immediate threat to a police officer: "the limited time the officers had to respond and the closeness of the officers to the projected path of the vehicle." Irwin, 2021 U.S. App. Lexis 31692 at *6 (citing Hathaway v. Bazany, 507 F.3d 312, 321 (5th Cir. 2007)).  Specific evidence examined in the Irwin case included the plaintiff's failure to heed the officers' commands to stop, the officers' positions, and the period of time it took for the officers' to perceive and react to the direction of the plaintiff's vehicle. Irwin, 2021 U.S. App. Lexis 31692 at *7.

The physical evidence confirms that Parker was intoxicated – over twice the legal limit – behind the wheel and had already hit a mailbox with his truck.  Officer Cuevas testified, and Markray confirmed by his statements to himself and to the MBI investigators, that Parker failed to heed Cuevas' multiple commands to stop.  As it relates to Officer Cuevas' position in relation to Parker's truck, Investigator Teates (crime scene), Lt. Garrett (MBI Investigator), Dr. Turner (medical examiner), and experts Molinaro and Ryan have all confirmed, based on the physical

**MEMORANDUM BRIEF IN SUPPORT OF MOTION FOR PARTIAL SUMMARY JUDGMENT**

evidence at the scene, that Officer Cuevas was at the front of Parker's truck. Further, experts Molinaro and Ryan have shown, based on the physical evidence from the scene, that the Parker truck was moving toward Officer Cuevas, who was moving towards the south side of the road, at the time the shots were fired. Officer Cuevas tried to get out of the way by moving to the south side of the road (as confirmed by the undisputed resting location of the casings), but Parker's truck continued to follow him and Officer Cuevas perceived that he was in immediate danger of harm.

2.    **Fifth Circuit Law Confirms the Position of Officer Cuevas and Plaintiff Has No Evidence to the Contrary.**

Reasonableness of an officer shooting at a vehicle has been discussed by the Fifth Circuit. In Fraire v. City of Arlington, 957 F.2d 1268, 1270-71 (5th Cir. 1992), an officer chased a car until it struck a curb. The driver then backed up toward the officer's car and sped away. Id. at 1271. The officer chased again; the driver crashed again; and, the driver sped away again. Id. Eventually, the driver turned around and drove toward the officer. Id. The officer fired one shot and killed the driver. Id. at 1271-72. The Fifth Circuit held that the officer did not violate the Fourth Amendment because he reasonably attempted to defend himself against the driver. Id. at 1274-77. Similarly, in this case, the evidence shows that Parker drove towards Officer Cuevas.

In Hathaway v. Bazany, 507 F.3d 312 (5th Cir. 2007), an officer stopped a car and started walking to the driver's-side window. Id. at 316. When the officer was about 8 to 10 feet from the car, the driver suddenly accelerated toward him. Id. As soon as the officer realized he wasn't able to get out of the car's path, he drew his firearm and fired one bullet at the car, killing the driver. Id. The vehicle struck the officer on his leg. Id. The officer did not know if he fired the weapon before, during, or immediately after he was struck by the vehicle. Id. The Fifth Circuit

held that the officer responded reasonably "in firing his weapon when threatened by a nearby

accelerating vehicle, even if, owing to the limited time available to respond, the shot was fired

when or immediately after the officer was hit." Id. at 322.  Similar to Officer Cuevas, he

attempted to get out of the path of the driver, but the truck accelerated towards him.

In Hathaway, the Fifth Circuit cited to the case of Herman v. City of Shannon, 296 F.

Supp. 2d 709, 713 (N.D. Miss. 2003).  There, a police officer fired his weapon at a truck that

"gunned" its engine and accelerated towards the officer.  The truck had been pursued by police

after failing to comply with a traffic stop.  The truck ultimately came to rest as it was attempting

to turn around on a county road.  Id. at 711.  Two patrol cars surrounded it, and the officers

exited their patrol cars with their guns drawn.  Id.  The truck then accelerated towards an officer

standing within three feet of the truck.  Id.  The officer was struck by the truck and fired two

shots, injuring the passenger in the truck.  Id.  The district court found the response to be

reasonable, given the officer's limited time to react to an evident threat.  Id. at 713.  Again,

similar to Officer Cuevas, Parker directed his truck towards Officer Cuevas, who attempted to

get out of the way before firing his service weapon.

Sanchez v. Edwards, 433 F. App'x 272, 275-76 (5th Cir. 2011) is another case discussing

the reasonableness of shooting the driver of a vehicle that is being used as a weapon.  There, two

officers surveilling a residence approached Sanchez's vehicle after he pulled into a neighboring

driveway.  Id. at 273.  The officers ordered Sanchez to stop, but he reversed the vehicle into the

street, put the car into drive, and accelerated in the direction of Banquer, one of the officers.  Id.

Both officers fired their service weapons; the vehicle struck Banquer, and three shots struck

Sanchez.  Id. at 274.  The Fifth Circuit affirmed the district court's grant of summary judgment

for the officers, concluding that "the officers['] decision to use deadly force was reasonable under

**MEMORANDUM BRIEF IN SUPPORT OF MOTION FOR PARTIAL SUMMARY JUDGMENT**

the circumstances" because of the "short period of time in which [they] had to react to Sanchez's abrupt change of direction and Banquer's obvious peril given his position in front of the vehicle." Id. at 273, 275-76.  Likewise, this Court can clearly determine that the deadly force was reasonable under the circumstances faced by Officer Cuevas.

The Fifth Circuit was also faced with a situation involving the shooting of an individual in a vehicle in Malbrough v. Stelly, 814 F. App'x 798, 803 (5th Cir. 2020).  There, Campbell was in his GMC Yukon with two friends outside his home when police arrived to execute a search warrant.  Officers surrounded the Yukon, shouted commands for the occupants to exit, and pulled one of Campbell's friends out onto the ground.  Campbell refused to exit, threw the Yukon in reverse, smashed into the police cruiser parked behind him, then switched gears and took a hard left turn, attempting to flee while surrounded by officers.  Officer Ware was either bumped to the ground or fell.  The officers fired and Campbell was hit.  The key question in Malbrough was "whether it would have appeared to a reasonable officer on the scene that Ware, or other officers, or bystanders were in danger."  Id. at 805.  The plaintiff "need[ed] to show that Ware (as well as the other officers and bystanders) were far enough away from the Yukon and its path, as it moved forward, that no reasonable officer could have thought anyone was in danger." Id.  The Fifth Circuit agreed with the district court that it was objectively reasonable to respond with force, even if Ware had not been struck by the vehicle because Ware went to the ground near the Yukon, it was announced an officer was down, and the firing did not take place until the officers saw Ware go to the ground near the fleeing vehicle.  Id.

Applying  Malbrough to the present case, this Court should find that based on the testimony of Cuevas, the physical evidence collected on the scene, the testimony of Investigator Teates, the affidavit and deposition testimony of a disinterested witness (Michelle Desroche), the

affidavit testimony of the ballistics experts, the testimony of Dr. Turner (medical examiner), the testimony of Lt. Garrett (MBI Investigator), and the initial uncorrupted statements [uninfluenced by Catina Parker] of Tremaine Markray, Parker did not respond to the commands of Officer Cuevas to stop, that Officer Cuevas was at the front of Parker's truck and tried to get out of the way, and that Parker continued to drive towards Officer Cuevas, who at that point, felt that his safety was threatened. Even Markray stated that if he was the police officer, he probably would have thought that he was about to be run over too and that the officer was not wrong!

Summary judgment was denied in K.B. Adams, 480 F. Supp. 3d 746 (S.D. Miss. 2020). There, the officers claimed that the decedent turned her vehicle and was headed toward and posed a threat to another officer's life. In opposition, the plaintiff presented expert testimony (of William M. Harmening) to show that none of the shot's trajectories support a claim that the officers shot at the front of the car as it headed towards them. Rather, the trajectory of the six shots were aimed at the rear driver window and were fired from behind as the decedent drove away. Therefore, the district court denied the summary judgment on qualified immunity and held that resolution of this genuine issue was for the jury to decide.

Here, the total opposite is true. First, not only did Investigator Teates, Dr. Turner, and Lt. Garrett agree based on the physical evidence at the scene that Officer Cuevas was in front of Parker's truck at the time the shots were fired, but also, so does retained expert witnesses Molinaro and Ryan. Additionally, based on the physical evidence, expert witnesses Molinaro and Ryan found that the evidence supports Officer Cuevas' account of events that the Parker vehicle was moving towards him at the time the shots were fired. The Plaintiff has presented no expert testimony to the contrary.

More recently, the Fifth Circuit decided the case of Edwards v. Oliver, 31 F.4th 925 (5th

**MEMORANDUM BRIEF IN SUPPORT OF MOTION FOR PARTIAL SUMMARY JUDGMENT**

Cir. 2022), wherein it affirmed the district court's denial of summary judgment based on a factual dispute as to whether the car in question was an actual threat to the officer. The facts of Edwards are important. On April 29, 2017, 15-year-old Edwards attended a house party with his two brothers and two friends. Around 11 p.m., Balch Springs PD officers Oliver and Gross arrived to the house in response to a 911 call about possible underage drinking. The partygoers dispersed and the boys returned to their parked cars on the same street as the house (Baron Drive), but further east, near a T-intersection with Shepherd Lane. Edwards' brother, Vidal, sat in the driver's seat, Edwards sat in the front passenger seat, and then three others sat in the back. While the officers were in the house talking with the party host, gunfire erupted from a parking lot on the east side of the T-intersection. Officer Gross exited the house and walked east. Officer Oliver existed the house and walked to his squad car to retrieve his semi-automatic rifle before walking east. While Vidal drove his car slowly, in reverse, toward the T-intersection, Officer Gross, approaching on foot, yelled at the car to stop. Officer Oliver began jogging toward the intersection where Officer Gross was located. Once Vidal got into the intersection, he put the car in drive and proceeded southbound on Shepherd Lane. What happened next was disputed by the parties.

Officer Oliver argued that Vidal accelerated toward Officer Gross. The Plaintiffs claimed that the vehicle was not close to Officer Gross when it proceeded forward and that Officer Gross was never in the path of the vehicle. When Officer Oliver arrived at the intersection, the car was accelerating past Officer Gross. Officer Oliver then fired five shots at the car's passenger side as it headed southbound on Shepherd Lane, away from the officers in the T-intersection. The first shot by Officer Oliver was made shortly after Officer Gross was close to the back passenger side window to hit it with his pistol, breaking the window. One of the bullets struck 15 year old

Edwards in the head, killing him.

On appeal, the Fifth Circuit stated that the extent of the car's threat to Officer Gross is the factual question at the heart of this case, and was genuinely disputed.  Officer Oliver described that the car accelerated towards/near/by Officer Gross.  The plaintiffs asserted that Officer Gross was never in the path of the vehicle, that he was toward the back of or behind the car, and **that the car was moving away from Officer Gross when Officer Oliver fired his shots**.  The body camera footage also raised a fact question about the car's threat of harm to Officer Gross because it shows the car was moving away from him.  The Fifth Circuit held that the resolution of this factual dispute is material because it affects both whether Oliver's use of force was reasonable and whether the force he used violated clearly established law.

Here though, the objective physical evidence conclusively shows that **Officer Cuevas was in front of Parker's moving truck at the time the shots were fired and at all times prior to the shooting**.  There is no factual dispute of the physical evidence and therefore, summary judgment is appropriate.

**B.**    **Conduct of Cuevas Was Objectively and Legally Reasonable Under the Circumstances**

The Plaintiff must also show that the actions taken by the officer were not "objectively legally reasonable".  Anderson, 483 U.S. at 641.  "The determination whether it was objectively legally reasonable . . . will often require examination of the information possessed by the searching officials."  Anderson, 483 U.S. at 641.  The "relevant question . . . is the objective (albeit fact-specific) question whether a reasonable officer could have believed [the actions] to be lawful, in light of clearly established law and the information the searching officers possessed."  Id.  The subjective beliefs of the officer are not relevant.  Id.  This means that "even when a

defendant's conduct actually violates a plaintiff's constitutional rights, **the defendant is entitled to qualified immunity if the conduct was objectively reasonable**." Fraire v. Arlington, 957 F.2d 1268, 1273 (5th Cir. 1992) (emphasis added).

1.    **Officer in Path of Vehicle May Have Been Clearly Established.**

For the Plaintiff to survive summary judgment here, it must have been clearly established as of February 1, 2020 that the Fourth Amendment *prohibited* Officer Cuevas' conduct in the specific situation he faced; i.e., shooting at a vehicle accelerating towards him. The Plaintiff must point to case law where a defendant police officer was shown to have acted unreasonably under very similar circumstances. The Plaintiff cannot discharge this burden in the case *sub judice*.

As established, the objective physical evidence is clear that Officer Cuevas was in front of Parker's vehicle as it was moving forward and it even followed him towards the south side of the road when Officer Cuevas tried to get out of the way. Fifth Circuit case law in place at the time of the February 1, 2020 events holds that where a police officer shoots at a car moving directly at him, no Fourth Amendment violation occurs. In other words, the Fifth Circuit finds the officer's actions reasonable under those circumstances. The cases that were in place at the time of the February 1, 2020 events were discussed in the Section above and include Hathaway v. Bazany, 507 F.3d 312 (5th Cir. 2007) and Sanchez v. Edwards, 433 F. App'x 272 (5th Cir. 2011). There are factual differences in these cases to the present set of facts. If the Court considers them to be notable differences, then the issue is not clearly established. If the Court does not consider there to be notable differences, then these cases are helpful to the reasonableness argument. Either way, given the facts of Hathaway and Sanchez, this Court should find that the Plaintiff cannot overcome the "clearly established" element in her favor.

**MEMORANDUM BRIEF IN SUPPORT OF MOTION FOR PARTIAL SUMMARY JUDGMENT**

2.      **Objective Legal Reasonableness of Cuevas' Conduct.**

Additionally, this Court must determine whether a reasonable officer would have

believed the actions taken by Officer Cuevas were lawful based on the information he possessed

(in addition to the clearly established law).  The Fifth Circuit has explained that to determine the

objective legal reasonableness of an officer's conduct, the trial court examines whether "a

reasonable officer could have believed [their conduct] to be lawful, in light of clearly established

law and the information the [] officers possessed."  Gutierrez v. City of San Antonio, 139 F.3d

441, 447 (5th Cir. 1998) (quoting Anderson, 483 U.S. at 641).  The Supreme Court has instructed

that "the information an officer possesses when that officer takes an action impacts upon the

objective legal reasonableness of the officer's conduct."  Id. at 449 (citing Anderson, 483 U.S. at

641).

In the present case, the information "known" to Officer Cuevas included the information

he received from Dispatch following the 911 call, in which he was advised of a drunk and

disorderly black male.  Additionally, factual information "observed" by Officer Cuevas on the

scene is important, including him hearing loud, argumentative voices and seeing a truck back up

and hit a mailbox- all at 2 AM in the morning.  Also important are all the various ways that

Officer Cuevas tried to get the Parker truck to stop by use of flashlights (1 and then 2) and by

commands.  Officer Cuevas was ultimately faced with what was a non-compliant driver, that was

intoxicated, that had already hit a mailbox, was not following his commands to stop, the engine

revved and the truck moved directly towards him and continued to do so even as Officer Cuevas

tried to get out of the way by backpedaling towards the south side of 25th Street.  In retrospect, it

is clear why Parker attempted to leave the scene because he did not want to get arrested for DUI.

Under all of these circumstances, it is clear that the actions of Parker threatened to cause serious

**MEMORANDUM BRIEF IN SUPPORT OF MOTION FOR PARTIAL SUMMARY JUDGMENT**

bodily injury or death to Officer Cuevas and his response was reasonable and appropriate under the Constitution and case law. Therefore, it cannot be said that Officer Cuevas violated Parker's constitutional rights when he used deadly force on Parker driving directly at him.

**C.    Cuevas Did Not Act with Any Level of Reckless Disregard for Parker's Constitutional Rights.**

In addition to the Plaintiff not establishing that Officer Cuevas violated a constitutional right of Parker or otherwise acted unreasonably, Plaintiff also cannot establish that Officer Cuevas acted with either "evil motive or intent" or with "reckless or callous indifference" of Parker's constitutional rights to warrant a punitive damages award. While it is unnecessary for the Plaintiff to show that Officer Cuevas acted with actual malice, the Plaintiff is required to show, at a minimum, that Officer Cuevas's conduct exhibited a "subjective consciousness of a risk of injury or illegality" as well as "a criminal indifference to civil obligations." See Kohler, 2010 U.S. App. LEXIS 20160 at *8. Neither has been shown in the case at bar.

For this Court to submit the issue of punitive damages to the jury, it is first "required to examine the totality of the circumstances as established by the record, to determine if a reasonable, hypothetical trier of fact could find either malice or gross neglect/reckless disregard". Barnett v. Skelton Truck Lines, LTD, 2006 U.S. Dist. LEXIS 50107, at *7-8 (S.D. Miss. 2006). The Plaintiff cannot meet her burden to permit the issue of punitive damages to be considered by a jury. The Plaintiff must "present competent summary judgment evidence proving the 'evil intent' or 'callous indifference' required to obtain punitive damages." Rivers v. Schiwart, 2020 U.S. Dist. LEXIS 67520, at *18-19 (N.D. Tex. 2020). The Plaintiff is relying on the testimony of party-goers who had been drinking and who had a poor vantage point of what Officer Cuevas was seeing as he approached Parker to speak with him, as well as the testimony of Markray who

has destroyed any credibility he may have had at his deposition by totally contradicting uncontroverted statements made by him to law enforcement subsequent to this incident. This is not "competent summary judgment evidence" to prove punitive damages are proper, even if it may be enough to survive summary judgment on the underlying claim (which is denied). See Davis v. Allstate Ins. Co., 2018 U.S. Dist. LEXIS 61711, at *4 (S.D. Miss. 2018) ("The same factual disputes precluding summary judgment on the [underlying] claim do not automatically preclude summary judgment on claims for . . . punitive damages."). Thus, it is not enough for the Plaintiff to submit enough evidence to simply survive summary judgment in the underlying claim, she must submit evidence that shows (at a minimum by a preponderance of the evidence, but arguably by clear and convincing evidence) that Officer Cuevas acted with "evil motive or intent" or with "reckless or callous indifference". No such evidence has been presented. The Plaintiff's expert testimony has been equally inadequate. In no report has any expert alleged that Officer Cuevas engaged in behavior that had any evil motive or intent, wantonness, or was reckless. At most, the Plaintiff's expert alleges that Officer Cuevas's conduct is "tactically unsound and disproportional." (Rodriguez Report, p. 22, Ex. "23"). There is no scenario in which this alleged conduct, if taken as true, rises to the level needed for punitive damages. Therefore, this Court should decline to allow the issue of punitive damages to go to trial.

## IV. CONCLUSION

Based upon all pleadings, discovery, and exhibits in this cause, including but not limited to the specific documents attached as Exhibits to the Motion for Partial Summary Judgment on the Claim for Punitive Damages against Officer Jason Cuevas in his individual capacity, there is no genuine issue of material fact or law with regarding the claim for punitive damages. This claim is unwarranted and Accordingly, Defendant Cuevas is entitled to partial summary

**MEMORANDUM BRIEF IN SUPPORT OF MOTION FOR PARTIAL SUMMARY JUDGMENT**

judgment on the issue of punitive damages in his individual capacity, as well as any claim for

punitive damages under state law, all pursuant to Rule 56 of the Federal Rules of Civil

Procedure.  Therefore, as a matter of law, partial summary judgment should be entered by this

Court dismissing the Plaintiff's claim for punitive damages against this Defendant.

     WHEREFORE, PREMISES CONSIDERED, Defendant Jason Cuevas moves the Court

to dismiss with prejudice the Plaintiff's claim for punitive damages against him.  This Defendant

prays for such other relief which this Court determines that the he is entitled.

     Respectfully submitted, this the 28th day of February, 2025.

**JASON CUEVAS**

BY:    COPELAND, COOK, TAYLOR & BUSH, P.A.

BY:    /S/ WILLIAM E. WHITFIELD, III
          Mississippi Bar No. 7161
          /S/ KAARA L. LIND
          Mississippi Bar No. 10604

William E. Whitfield, III
Kaara L. Lind
COPELAND, COOK, TAYLOR & BUSH, P.A.
Centennial Plaza
200 East Beach Boulevard, Building #5
Gulfport, Mississippi 39507
P.O. Box 10
Gulfport, Mississippi  39502-0010
telephone (228) 863-6101
telecopier (228) 863-9526
bwhitfield@wewiii.net
klind@cctb.com

**MEMORANDUM BRIEF IN SUPPORT OF MOTION FOR PARTIAL SUMMARY JUDGMENT**

## CERTIFICATE OF SERVICE

I hereby certify that on February 28, 2025, I electronically filed the foregoing with the Clerk of the Court using the ECF system which sent notification of such filing to the following:

Merrida (Buddy) Coxwell, Esq.
Courtney Sanders, Esq.
Coxwell & Associates, PLLC
P.O. Box 1337
Jackson, MS 39215
merridac@coxwelllaw.com
courtneys@coxwelllaw.com
and
Bhavani K. Raveendran, Esq.
Samantha A. Harton, Esq.
Romanucci & Blandin, LLC
321 N. Clark St., Suite 900
Chicago, IL 60654
b.raveendran@rblaw.net
sharton@rblaw.net
**Attorneys for Plaintiff**

Jeffrey S. Bruni, Esq.
P.O. Box 1780
Gulfport, MS 39502
jbruni@gulfport-ms.gov
**Attorney for Defendant,**
**City of Gulfport**

*/S/ WILLIAM E. WHITFIELD, III*
*/S/ KAARA L. LIND*

William E. Whitfield, III
Kaara L. Lind
COPELAND, COOK, TAYLOR & BUSH, P.A.
Centennial Plaza
200 East Beach Boulevard, Building #5
Gulfport, Mississippi 39507
P.O. Box 10
Gulfport, Mississippi  39502-0010
telephone (228) 863-6101
telecopier (228) 863-9526
bwhitfield@wewiii.net
klind@cctb.com