**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF MISSISSIPPI**
**SOUTHERN DIVISION**

**CATINA PARKER, as Personal Representative**
**Of the Estate of Leonard Parker, Jr., Deceased**

**Plaintiffs,**

v.                                                                    Case No.   :21-cv-00217-HSO-BWR

**The CITY OF GULFPORT, a municipal**
**corporation; JASON CUEVAS, in his individual**
**and official capacity; and JOHN DOE OFFICERS**
**#1-5 in their official and individual capacities**

**Defendants.**
_____

**REPORT OF Jeronimo "Jerry" Rodriguez**

1. My name is Jeronimo "Jerry" Rodriguez.  I have been actively involved in police practices and law enforcement duties since 1986.  I was an active police officer for 35 years and recently retired from active duty.

2. Since my retirement in 2021 as a law enforcement officer, I have been involved in police and law enforcement practices as a private police consultant. Since 2018, I have provided law enforcement training and management insight for various agencies throughout the United States.  I have provided law enforcement training in the following areas:

   - Investigation of critical incidents – officer-involved shootings, use of force.
   - Managing the Internal Affairs function.
   - Police discipline.
   - Use of force and deadly force issues.
   - Investigative procedures and supervision.
   - Policy and procedure development.
   - Police In-Custody Death Investigations.

Exhibit "23"

## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
## SOUTHERN DIVISION

3. While an active law enforcement officer, executive staff officer, and chief, I have been consulted by cities and policing organizations on both the east and west coasts of the United States on matters involving police uses of force, lethal and nonlethal force, in-custody death investigations, police misconduct investigations, and their adjudications.

4. Since 1996, I have been directly involved in investigating, overseeing, and adjudicating several hundred police-involved uses of force, both lethal and non-lethal uses of force, and in-custody death investigations. I have also taken part in and been the architect of new use-of-force investigative policies and procedures that incorporate generally accepted police investigative practices for police agencies, specifically the Los Angeles Police Department, the Baltimore Police Department, and the San Francisco District Attorney's Office, Bureau of Independent Investigations. I also updated and, in some cases, drafted entirely new policies and procedures for agencies such as the Los Angeles Police Department, the Baltimore Police Department, and the San Francisco District Attorney Investigators regarding officer-involved use of force investigations.

### Police Training

5. I am a former Police Captain of the Los Angeles Police Department. I served as a police officer in the Los Angeles Police Department for over twenty-six years until I retired in 2013. During that period, I served as a patrol officer, field training officer, vice undercover investigator, use of force staff researcher, field supervisor, lieutenant, and patrol captain. I have also been involved in police training on subjects such as: investigating allegations of police misconduct, officer-involved uses of force, death investigations, and adjudicating

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF MISSISSIPPI**
**SOUTHERN DIVISION**

police administrative incidents. I helped investigate the Rampart corruption allegations as part of an investigative task force following a highly publicized arrest of active-duty police officers following allegations of drug trafficking, murder, bank robbery, and planting evidence. I also worked in the Office of the Inspector General, where I was tasked with auditing, monitoring, and reviewing the Los Angeles Police Department's use of force and the disciplinary system's investigative and adjudicative practices. I also helped investigate the MacArthur Park "May-Day" incident stemming from a crowd control incident that resulted in a significant police use of force that had Los Angeles Police Officers using force on demonstrators and news media filming the incident within the MacArthur Park area of Los Angeles. This investigation resulted in the forced retirement of a deputy police chief and the reassigning of a police commander, police captains, and several officers within the agency. It also resulted in a sweeping reform in how the Los Angeles Police Department managed and conducted crowd control efforts during public demonstrations. I was also the Chair of the Baltimore Police Department's Use of Force Review Board, responsible for reviewing all major police use of force and in-custody deaths.

6.  My experience, training, and background are more fully described in the attached curriculum vitae (Addendum 1).

7.  I have reviewed the following materials to date regarding this case:

    1.  Defendant Cuevas Interrogatories
    2.  Plaintiff's Response to Defendant Jason Cuevas' first set of interrogatories
    3.  Department of Public Safety Mississippi Highway Patrol Bureau of Investigation Report (PL Parker 000001- 000269
    4.  Second Amended Complaint, *Case 1:21-cv-00217-HSO-RHWR Document 30 Filed 03/15/22 Page 1 of 11*
    5.  Biloxi PD Call Sheet Incode 20002246
    6.  Biloxi PD Case Management Incode 20002246
    7.  Biloxi PD Incident Report Flex 20002246

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF MISSISSIPPI**
**SOUTHERN DIVISION**

8. Biloxi PD Incident Report Flex 20002246
9. Biloxi PD Property Room Report 20002246
10. Deft Jason Cuevas' Answers to Plttf's Interrogatories re Qualified Immunity – 2-3-23 42300
11. Filed – Plaintiff's Second "Amended" Complaint at law -62770
12. Final Parker ROG Responses Cuevas
13. Mississippi Forensics Lab Responses to Defendant's Subpoena 4-25-23 42932
14. PL Parker 000001-000269
15. PL Parker 000496-714
16. PL Parker 000270-375-43003
17. MBI – Case File Report
18. Biloxi Police Department's Response to Defendant's Subpoenas 4-6-23-42789
19. RMS photos
20. Crash Data Retrieval
21. Crime Scene Sketch
22. Digital Case file
23. Evidence Log Young
24. Evidence Log
25. PADtrax Evidence Log
26. Photo Log Newell
27. Photo Log Teates
28. Preservation Letter Response
29. Preservation Request
30. Search Warrant and return Allen
31. Subpoena
32. Markray Deposition Certified Report
33. Markray Deposition Full Report
34. Markray Deposition photographs 5-22-23(Parker) exhibit 1 – 12 pdf
35. Officer Cuevas' deposition report rough draft
36. Officer Cuevas' Video of Depo, 041423 1of1.mp4
37. Michelle Desroche Audio Interview
38. Angela Jackson's Deposition
39. Stephanie Baldwin Deposition
40. Geraldine McNair Deposition
41. Brandon Teates Deposition
42. Maxine Owens Deposition
43. All exhibits to depositions

Exhibit "23"

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF MISSISSIPPI**
**SOUTHERN DIVISION**

**METHODOLOGY: APPLICATION OF INDUSTRY STANDARDS AND MY**
**POLICE TRAINING, KNOWLEDGE, SKILLS, EXPERIENCE**

8.  These opinions are based on the totality of my specialized knowledge in police practices. This experience derives from my police experience, knowledge, skills, and training. This expertise has been developed during my 35 years of involvement in law enforcement in various capacities as a practitioner and my continued experience as an investigator, trainer, auditor, and now consultant. This experience has provided me with extensive personal and specialized training, experience, and knowledge of police operations and generally accepted police practices. The body of knowledge that I have been exposed to over the years, coupled with my personal and professional experiences, along with my continued reviewing of police agencies, my constant training of police supervisors, managers, and executives, my continuous interaction with other police professionals, organizations, and training of personnel, contributed to the foundation for the opinions I am rendering in this matter.

There is a large body of knowledge and literature about the practices and standards that modern, reasonably managed, and administered police agencies across the U.S. should follow and apply to their operations.  These generally accepted practices have developed over time to encourage and assist police agencies in delivering police services to communities serviced that are professional, reasonable, effective, and legal. Many of these generally accepted practices have been developed from law enforcement's critical analysis of field incidents and examinations of incidents reported to cause police liability, deficiencies, and employee misconduct.  These generally accepted practices have been a response to reported cases of police misconduct and liability and a desire by law

Exhibit "23"

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF MISSISSIPPI**
**SOUTHERN DIVISION**

enforcement to create a system to ensure that police conduct remains within acceptable legal and constitutional bounds. I stay familiar with this body of knowledge through training in this requirement for reasonable and lawful police response to field incidents and continuous improvement.

My examination of the factors involved in this lethal use of force incident embodies the fundamentals I employ in my professional examination of police uses of force. My opinions are provided based on my specialized skills, experience, knowledge, and training within the fields of law enforcement, police activity, and police administration and supervision.

The terminology I use in my Expert Report is not meant to invade the court's purview or the final jury determination. I use these terms in my training of police supervisors, managers, and command officers when instructing on administrative investigations and civil liability. These are products of my continuous review of cases and laws that should guide a police agency in the use of force by its employees. These terms have become standard terms within law enforcement supervision, management, and risk management, just as the terms of probable cause, reasonable suspicion, and the prima facie elements of crimes have become common terminology for police field personnel and detectives.

9. I have been similarly involved in about a hundred uses of force incidents where my agency and the involved city consulted me for their civil litigation defense dating back to early 2013. Since reaching the police manager and executive ranks, I have reviewed hundreds of police-involved uses of force, both lethal and non-lethal, as a police use of force expert to guide the agency in its investigation, findings, and ultimate adjudication of the cases. I also assisted in the post-incident reviews to consider updating and or

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF MISSISSIPPI**
**SOUTHERN DIVISION**

changing police policy, training, and equipment to assist officers in their future handling

of similar situations and to mitigate potential risks resulting from similar future police

incidents.

10. In addition to my expertise in police uses of force, specifically lethal uses of force, I have

been involved in three officer-involved shooting incidents.  While all have been off-duty

incidents, I was the primarily involved officer in all three incidents. This is important in

shaping my understanding of police officers involved in using force and gives me a

unique perspective of the emotions and contributing factors involved when officers go

through these highly emotional and stressful situations. I have participated in use-of-force

investigations from multiple perspectives, including the involved officer, the investigator,

administrators, and executive reviewers' and adjudicator's perspectives. This has allowed

me a much more robust understanding of the entire process.

### Incident

11. On the evening of January 31, 2020, Officer Jason Cuevas (Officer Cuevas) of the

Gulfport Police Department received a radio call of a disorderly male at a residential

party. The address of the disorderly party was 210 25th Street, Gulfport. Upon his arrival

near the residence, Officer Cuevas could hear a commotion but was uncertain which

house it was coming from[1]. Officer Cuevas exited his vehicle, which he had parked down

the street from the radio call location[2], and walked toward the sound of the commotion.

Officer Cuevas stated he did not turn on his police vehicle's overhead emergency lights

or siren as he approached and had also turned his vehicle headlights off as he exited his

---

[1] This is according to Officer Cuevas' statement to investigators on February 6, 2020.
[2] Disorderly party radio call address 210 25th Street Gulfport.

**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
SOUTHERN DIVISION**

vehicle. As he approached on foot, Officer Cuevas searched for the address of the residence where the call for service had been generated. Officer Cuevas looked at the addresses on the mailboxes as he walked toward the radio call location. As he was walking, Officer Cuevas noted a black pickup truck "back out of a driveway up ahead." Officer Cuevas said the pickup truck backed into a mailbox directly across the street as it backed out of the driveway. Officer Cuevas believed the black pickup truck was exiting from the residence where the radio call for service was generated. According to Officer Cuevas, he was walking down the middle of the road, heading towards the pickup truck, but then began to move towards the south side of the road.

> **Note:** According to the investigative diagram, addendum 2B, the north side of the road is the westbound traffic lanes and also where Officer Cuevas parked his police vehicle. The eastbound travel lane is the south side of the street, where Officer Cuevas stated he moved toward as he approached the pickup truck. Which is the same travel lane the black pickup truck was about to travel on. In short, Officer Cuevas walked onto the oncoming travel lane of traffic[3].

According to Officer Cuevas, he had his handheld flashlight in his hand and was shining it at the truck, while commanding to "stop the vehicle, stop the vehicle, police, stop the vehicle!" Further, Officer Cuevas advised that his flashlight was in strobe mode[4]. According to Officer Cuevas, the pickup truck continued to drive toward him. During his deposition statement, Officer Cuevas stated he was walking toward the pickup truck thinking it would "pull up next to him" (page 81 line 5). Also, in his deposition statement, Officer Cuevas acknowledged that the pickup truck was "going slow at the time" (page 81, line 12). However, Officer Cuevas stated that he later heard the engine

---

[3] Officer Cuevas should have known that by moving toward the south side of the street, he was essentially walking onto the oncoming traffic lane. Which is the same lane the black pickup truck was backing into.
[4] Although not described in the report, I understand strobe mode to be a flash of intermittent light that turns on and off.

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF MISSISSIPPI**
**SOUTHERN DIVISION**

pick up "vroom." According to Officer Cuevas, that is when he began to back pedal from

the south side of road[5]. Per Officer Cuevas' statement, the truck turned toward him on the

south side of the road, and that is when he discharged his weapon at the pickup truck[6].

According to Officer Cuevas, after the shooting, the pickup truck came to a complete stop

"as if it were thrown into park immediately[7]." Following the shooting, Officer Cuevas

pointed his gun toward the driver and shouted, "Let me see your hands, let me see your

hands!"  Officer Cuevas then broadcast over the police radio that shots had been fired.

Officer Cuevas noted that the passenger in the pickup truck, later identified as Mr.

Tremain Markray (Mr. Markray), had his hands up. However, the driver, later identified

as Mr. Leonard Parker (Mr. Parker), did not move and appeared injured. Another officer

arrived and assisted Officer Cuevas in removing Mr. Markray from the vehicle and

handcuffed him. Officer Cuevas advised that he tried to help the driver, Mr. Parker, exit

via the driver's side door of the pickup when "his legs gave way, and Mr. Parker fell out

of the truck and faced down almost." At this point, Officer Cuevas broadcasted a medical

assistance request over his police radio. Officer Cuevas then walked back to the rear of

the pickup truck to obtain the vehicle tag number. Officer Cuevas believed Mr. Parker

was still breathing, handcuffed him, and then rolled him onto his back.  Officer Cuevas

---

[5] According to Officer Cuevas, he parked his vehicle on the north side of the street, exited, and approached the residence while walking in a southwest direction on the roadway.
[6] According to Officer Cuevas, he believed he heard the pickup truck pick up speed and he was thinking "This is it." This is in direct conflict with the witnesses' statement who all say the pickup truck was traveling at a slow speed, estimated to be 2 to 5 miles per hour, but had stopped prior to the shooting. There were no skid marks left by the pickup truck on the roadway.
[7] The pickup truck was still running and in "drive" following the shooting, according to the investigation on page no. 6, "I was advised that the vehicle was still in drive but would not roll forward because the doors were open." Officer Cuevas and Officer Brewer reported opening the doors after the shooting.

## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
## SOUTHERN DIVISION

was escorted away from the shooting location shortly after Sergeant Krauss arrived. Mr.

Parker was eventually pronounced dead as a result of his sustained gunshot wounds.

### Analysis of Incident

1. Officer Cuevas received a call of a disorderly male at a residence during a party.

    According to Officer Cuevas' statement, he was advised that a male at the party was

    disorderly. However, there was no additional information provided that would have led

    Officer Cuevas to believe anyone at the party was armed or had committed any violent

    crimes. Maxine Owens specifically advised the 911 dispatcher that no one at the party

    was armed. These types of disturbance radio calls, in my specialized training, skills,

    experience, and knowledge, sometimes escalate due to the number of potentially

    inebriated occupants in attendance. For this reason, many agencies will dispatch two

    officers to respond to these types of radio calls[8]. It has been my experience that assigning

    and ensuring that two officers respond and handle these types of radio calls, more likely

    than not, can lead to a greater chance of a successful resolution. According to the

    Gulfport Police Department Call Sheet Report, Officer Brewer arrived on scene

    approximately 36 seconds after Officer Cuevas's arrival and shortly after the shooting

    (2:55:19 vs. 2:55:55). However, rather than waiting for his partner or inquiring how far

    away Officer Brewer was from arriving, Officer Cuevas approached on foot and alone.

    This despite hearing what he described as a "commotion" coming from the believed radio

    call location. Had Officer Cuevas waited for Officer Brewer's arrival, both officers could

    have developed a plan to approach in a coordinated manner that incorporated the contact

---

[8] On this particular radio call, Gulfport Police Department dispatched two officers to the call (Officer Cuevas and Officer Brewer) as per the Gulfport Police Department Call Sheet Report, pg. 2 of 19.

Exhibit "23"

## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
## SOUTHERN DIVISION

and cover concept[9].  It is my professional opinion that had Officer Cuevas waited for his partner's arrival, both officers could have approached as a team and in accordance with industry standards.

2. Officer Cuevas did not activate his vehicle's overhead emergency lights signaling the police's arrival. Often, for these types of disorderly conduct radio calls, it has been my experience that it is to the police officers' benefit to announce their arrival. I have experienced and benefited from the residents knowing or becoming aware of the officers' arrival. In my experience as a police officer, partygoers usually elect to leave or cease any unruly behavior that could direct the officers' attention toward them.

3. According to the Mississippi Highway Patrol Bureau of Investigation's report, Officer Cuevas was interviewed on February 6, 2020,[10]. During that interview, Officer Cuevas stated that his "body camera and dash camera were not on during the incident" (page 7)[11]. Officer Cuevas went on to state to investigators during his February 2020 interview that he thought he had turned them on but that he had not[12]. However, during his deposition taken several years later, Officer Cuevas advised that he had pushed the button on a watch-like device on his wrist to activate the body-worn camera (Officer Cuevas' deposition statement page 133, lines 7-11). Officer Cuevas later stated during his deposition statement that he believed it was activated and recorded during the entire

---

[9] This is an industry standard practice when officers conduct an investigation, one officer takes the lead as the contact officer, the partner officer will be responsible taking a guarding position.

[10] This interview of Officer Cuevas was taken a few days following the shooting incident.

[11] This is a very definitive statement from Officer Cuevas compared to his later deposition statement where he alleges that he thought it was recording.

[12] This statement more likely than not shows that Officer Cuevas knew that the incident had not been recorded on either camera and that more likely than not it was because he did not activate the equipment.

Exhibit "23"

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF MISSISSIPPI**
**SOUTHERN DIVISION**

incident[13]. National best practices call for officers to activate their in-car video and body-worn cameras during public contact and responses to a community member's call for services. Accordingly, it is my opinion that Officer Cuevas violated industry standards by not activating his in-car video and body-worn cameras. I found the investigation deficient by not addressing or explaining Officer Cuevas' initial claim that he did not activate these valuable tools, which are designed to capture officers' actions. National best practice for such neglect or oversight could result in a personnel complaint against an officer for not following department policy. It is my opinion that, more often than not, the individuals who usually benefit from the lack of video footage capturing the incident would be the involved officer(s). Neither the department nor the community members interested in this incident usually benefited from this missing video evidence.

4. According to Officer Cuevas's statement, he exited his vehicle and was "walking down the middle of the road heading toward the pickup truck, but then began to move towards the south side of the road." Officer Cuevas thus placed himself in the eventual path of the pickup truck. Officer Cuevas parked his patrol vehicle on the north side of the street and was initially walking in the middle of the road toward the location of the radio call location. However, he then began moving toward the south side of the street, Officer Cuevas moved toward the eastbound traffic lane, which was the path that the pickup truck was about to travel on. Following his deposition statement, we learned that Officer

---

[13] I do not understand, and I am somewhat concerned as to how and why Officer Cuevas' statement changed so drastically from his initial interview, taken just days after the incident. This especially when compared to what he later said at the deposition several years later. Based on my specialized training, experience, skills, and knowledge, it appears to me that Officer Cuevas' statement during his deposition was, more likely than not, a self-serving statement after recognizing that it could violate department policy to state that he did not activate the cameras.

**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
SOUTHERN DIVISION**

Cuevas intentionally walked toward the pickup truck expecting to speak with the driver, much like when directing traffic (page 81, lines 11-16).

I was concerned with Officer Cuevas' decision after learning that Officer Cuevas intentionally chose to approach or walk toward the path of an approaching pickup truck during the hours of darkness and while on a darkened residential road. Additionally, it is my opinion that the investigation left some fundamental questions unanswered. For example, what suddenly changed, causing Officer Cuevas, who seconds earlier thought it was safe to approach the slow-moving on-coming pickup truck, to now think it was a threat? This despite all the eyewitnesses stating the vehicle was slow-moving[14]. During his deposition statement, Officer Cuevas was asked about the roadway on 25th Street at the radio call location and whether traffic could travel in both directions (east and west). Officer Cuevas replied that it was a "skinny" street, stating that while vehicles could travel in both directions (east and west), "you just have to be careful when you do it. National best practice recommends that when dealing with a moving vehicle that you believe is coming towards you, and the only threat is the oncoming vehicle, the officer's first consideration should be to get out of the vehicle's path. The fact that Officer Cuevas knew the street was narrow, made his decision to walk on the road toward the truck even more dangerous and tactically unsound.

The use of lethal force at a moving vehicle is discouraged when the <u>only</u> threat posed is that of the approaching vehicle[15]. The reason for this is that shooting at a moving vehicle

---

[14] None of the eyewitnesses reported hearing a change or increase in the pickup truck's speed, most of the witnesses recalled seeing the pickup truck stopped prior to the shooting (this according to their respective deposition statements).

[15] This is especially true when the vehicle in question is moving slow (2-5 mph), thus giving the officer more reactionary time.

Exhibit "23"

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF MISSISSIPPI**
**SOUTHERN DIVISION**

is rarely effective at stopping a moving vehicle. Based on my specialized training, experience, and knowledge, even if the officer is successful in incapacitating the driver, there is no guarantee that the vehicle will always stop its forward momentum[16]. As a result, many departments across the nation have specific policies and procedures prohibiting shooting at a moving vehicle because of its unpredictable outcomes and inherent dangers.

5. Upon seeing the pickup truck approaching his direction, Officer Cuevas stated that he "had his flashlight in his hand shining at the truck, commanding to stop…".  The flashlight was in the strobe mode as it was shining on the truck. Based on Officer Cuevas' testimony that his flashlight was in strobe mode, the intermittent shining of the bright light at the approaching pickup truck may have impaired Mr. Parker's visibility. Based on my specialized training, experience, and knowledge, this is a tactic sometimes used by law enforcement when approaching an individual on foot to shine the light on their face, which can help conceal the officer by limiting the other person's ability to see your approach. However, if done to a motorist during the hours of darkness, it more likely than not may impact the driver's ability to see. Based on my experience, this tactic can be dangerous because it could impair a motorist's sight, especially at night.

6. The Gulfport Police Department's policy on shooting at or from a moving vehicle is, in my professional opinion, vague and limited in providing direction to its officers. As written, in regard to shooting at a moving vehicle, the policy states in part:

*6. Use of Deadly Force - Restrictions*

---

[16] This is especially true when the approaching vehicle is traveling at a significant speed.  The vehicle more likely than not will continue its forward momentum until it comes to rest against an immoveable object or runs out of forward momentum.

Exhibit "23"

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF MISSISSIPPI**
**SOUTHERN DIVISION**

*A. Deadly force may not be used under the following circumstances:*
    *5). At a moving vehicle that does not present a deadly force situation.*

As written, with regards to shooting at a moving vehicle, the provided language is vague and does not follow national best practices where officers are discouraged from shooting at a moving vehicle when the _only_ threat comes from the moving vehicle. National best practice calls for officers who find themselves in the path of a moving vehicle to first consider moving out of the oncoming vehicle's path. The Gulfport Police Department's use of force policy makes no mention for officers to consider moving out of the oncoming vehicle's path, especially when the threat is solely from the moving vehicle. The policy also makes no mention of the officer's tactics leading up to these types of situations and how they should avoid placing themselves in the path of an on-coming vehicle. Based on my specialized training, experience, and knowledge of police practices, shooting at a moving vehicle is rarely effective at stopping the vehicle's forward momentum. Additionally, the rounds fired at the moving vehicle may, at times, ricochet, making the bullet's path unpredictable and a danger to those in the area. Based on Officer Cuevas' statement, he was walking in the middle of the road, in a southwesterly direction, as he walked toward the pickup truck, expecting that it would stop so that he could speak with the driver[17]. This decision by Officer Cuevas raises many concerns for me about his tactical decisions and thought process. I find it tactically unsound for him to purposely walk toward an approaching pickup truck during the hours of darkness and on a darkened roadway, only to soon after perceiving that same pickup truck was now a threat. What changed that caused Officer Cuevas to now think the pickup truck was a

---

[17] This according to Officer Cuevas' deposition statement pg. 78, lines 8-15.

**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
SOUTHERN DIVISION**

threat? When did the pickup truck become a threat to Officer Cuevas after reportedly intentionally choosing to walk in the pickup truck's direction[18]? The investigation notes conflicting statements from the eyewitnesses who refute Officer Cuevas' recollection that the pickup truck accelerated. It has been my experience that in some similar situations, officers at times may become so hyper-focused on stopping a moving vehicle that they place themselves in its path, believing the driver of the vehicle will stop[19]. It has been my experience that officers have done so despite the obvious dangers and against sound tactical judgment and safe deployment. It is further my opinion that reverence for life, as listed in many of today's police use of deadly force policies, should mandate that deadly force be considered a true last resort. During his deposition Officer Cuevas stated that the driver of the pick-up truck (Mr. Parker) backed into the mailbox of another residence as he backed out of the driveway and failed to stop[20]. During his deposition statement, Officer Cuevas cited this action as his reason for stopping Mr. Parker. However, while Officer Cuevas acknowledged seeing Mr. Parker's pickup truck "back into a mailbox" during his initial interview following the shooting, Officer Cuevas never mentioned this as his reasoning for stopping the pickup truck. This alleged backing into the mailbox occurred in front of the radio call location at 210 25th Street Gulfport, where the person requesting the police response was more likely than not still waiting to speak with Officer

---

[18] According to Officer Cuevas' deposition statement, he heard the "vehicle accelerate." However, this was contradicted by all of the witnesses who reported seeing the vehicle traveling at approximately 2-5 miles per hour or stopping before hearing the shots being fired.

[19] It is important to note that Officer Cuevas initially only knew of a disorderly partygoer as the reason for his response. This is an important fact that, in my specialized training, knowledge and experience, should help an officer develop his tactical approach based on the fact that no weapons or violent crimes have been alleged.

[20] Officer Cuevas later alleged that the reason for stopping the pick-up truck was after it committed a misdemeanor crime of attempting to leave the scene of an accident. However, this was not mentioned during his initial statement just days after the incident to the Mississippi Highway Patrol Investigators.

Exhibit "23"

## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
## SOUTHERN DIVISION

Cuevas. Upon having been dispatched to a radio call location at the residence, Officer Cuevas did not have any information linking the black pickup truck with a crime. Based on my specialized training, experience, skills, and background, I find that it went against industry standards for Officer Cuevas to shift his attention to a slow-moving pickup truck that allegedly backed into a mailbox without first speaking with the person(s) calling for police assistance[21]. It is my opinion that without additional information from the partygoers and/or the person requesting police services, it was not consistent with my specialized understanding of police practices to decide to stop the pick-up truck at that moment in time. Officer Cuevas had other viable options at his disposal to stop the pickup truck that did not involve him standing in the pickup's path on a darkened roadway during the hours of darkness. One option was to broadcast over the police radio the description of the pickup truck and its direction of travel for other officers in the area to stop the pickup[22]. The other option was for Officer Cuevas to reenter his police vehicle, follow the truck, and initiate a traffic stop using all of the tools at his disposal[23]. I question how Officer Cuevas, after only approximately 30 seconds on the scene and without any additional information, was able to determine that he needed to stop the black pickup truck before making contact with the person(s) who called for the police and assessed their emergency needs. This, in my opinion, was tactically unsound, especially

---

[21] Additionally, Officer Cuevas had no information of crime committed either inside the residence or by anyone in the black pickup truck. Officer Cuevas was not even sure, at the time, if the black pickup truck was even involved in the original radio call. Had Officer Cuevas witnessed a violent crime committed by the occupants of the black pickup truck, then I could understand shifting his focus on its occupants, however, that was not the case.

[22] Officer Cuevas had no information at the time of the use of force of any crimes committed by anyone in the pickup truck that required him to prevent it from driving away. I believe that Officer Cueva's decision to position himself in front of the approaching pickup truck was deficient.

[23] The police vehicle allows the officer to use the vehicle's emergency lights to initiate the traffic stop and broadcast, over his police radio, his location and also run the vehicle tags in order to identify any wants or crimes associated with the vehicle.

Exhibit "23"

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
SOUTHERN DIVISION

on foot and alone in the dark. I also believe that allegedly bumping into the mailbox

(which is a non-emergency property crime) would not ordinarily take priority over the

radio call of a disorderly person at a residential party.

7. According to the investigative report, Officer Cuevas was at the scene approximately 30

seconds before the officer-involved shooting occurred. According to his deposition

statement, Officer Cuevas stated that he used deadly force to stop a vehicle traveling at

approximately 2-5 mph because it failed to stop after bumping into a mailbox and that he

feared for his life as it allegedly continued to approach. I find his rational and resulting

actions disproportionate and unnecessary. As previously mentioned above, Officer

Cuevas purposely walked toward the approaching slow-moving pickup truck, thinking he

was going to talk with the driver. Based on my specialized training, experience, skills,

and knowledge, Officer Cuevas should not have made a decision to allow a pickup truck

to approach on the roadway during the hours of darkness. Especially without any

information as to the pickup truck driver's intent or purpose.  To allow this pickup truck

to approach you and possibly engage you in a conversation (as stated by Officer Cuevas)

tells me, based on his actions, that he did not perceive that pickup truck as a threat.

Additionally, we know that according to the witness's statements, the speed of the pickup

truck never increased. On the contrary, the witnesses stated the pickup truck came to a

stop just prior to the shooting, Therefore, based on his own statements and his described

actions, and the totality of the situation, I am left with serious questions as to whether

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF MISSISSIPPI**
**SOUTHERN DIVISION**

Officer Cuevas was, in fact, fearful of the pickup truck as it slowly rolled toward him[24].

After reviewing all of the investigative documents, I am left with serious questions

regarding any identified facts that could have led Officer Cuevas to reasonably believe

the pickup truck was a sudden threat. Based on my review of the aforementioned

investigative materials provided and the totality of the situation, I find Officer Cuevas'

use of deadly force not proportional to the alleged crime of fleeing a traffic accident[25]. It

is further my opinion that Officer Cuevas' belief that a pickup truck moving at 2-5 miles

per hour was capable of causing serious bodily injury or death was disproportionate. In

my opinion, an officer in a similar situation should not consider this a life-threatening

situation and should not use deadly force, given the pickup truck's slow speed. Officer

Cuevas has never been questioned about his belief that a slow-moving vehicle (2-5 miles

per hour or stopped) could pose a life-threatening situation. Additionally, the

investigation never identified the possible distance between Officer Cuevas and the slow-

moving vehicle. Experience has shown that the time and distance between Officer

Cuevas and the pickup truck when he elected to fire should have been identified in order

to make a more informed determination as to the appropriateness of his actions. For

example, a vehicle traveling at a <u>high rate of speed</u> toward an officer will reach the

officer in a much shorter time (than a slow-moving vehicle at the same distance), thus

limiting the officer's reactionary time[26]. As opposed to a slow-moving vehicle (at the

same distance away) that would take longer to reach the officer (because of the slower

---

[24] Since witnesses' statements indicate that the vehicle was traveling at a slow speed and/or possibly stopped before the shooting, I cannot help but wonder what, if anything, caused Officer Cuevas to believe the pickup truck became a threat suddenly.
[25] We do not know if Mr. Parker ever knew of this alleged bumping of the mailbox.
[26] Leaving little to no reactionary time to evade the oncoming threat.

## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
## SOUTHERN DIVISION

speeds), thus allowing more reactionary time before it approaches and ultimately makes contact[27]. There was no attempt to assess or analyze Officer Cuevas' actions based on his available time and distance to the approaching pick-up truck especially given its slow speed. According to the scene diagram, there did not appear to be anything obstructing Officer Cuevas from moving out of the roadway and onto safety on the front yards of the local residences. Additionally, and as previously stated, based on the eyewitnesses' statements, the pickup truck was moving very slowly (2-5 miles per hour) if it was moving at all[28]. The investigation was not able to determine why; according to Officer Cuevas, the pickup truck inexplicably stopped immediately following the shooting[29]. However, according to Officer Cuevas, the vehicle came to a <u>sudden</u> and unexplained stop following the shooting. I am uneasy by Officer Cuevas' statement that the vehicle stopped as though it was placed in "park" immediately following the shooting without any follow-up or explanation as to how this would be possible. This is yet another example of the very important questions that remain unanswered following the investigation.

8. According to the Investigative Narrative (20-002246), it states that "the vehicle accelerated east on 25th street..."  However, this is refuted by the eyewitnesses who were out front of the residence and saw the pickup truck pull out of the driveway. According to the eyewitnesses, the pickup truck was traveling very slow (2-5 mph), or it had stopped altogether just prior to the shooting. This discrepancy of whether the pickup truck ever

---

[27] The investigation made no efforts to identify the distance and possible reactionary time Officer Cuevas had when deciding to use deadly force.

[28] During their deposition statements, the eyewitnesses stated the pickup truck had stopped just prior to the shooting.

[29] This according to Officer Cuevas who stated the vehicle stopped as though it had been put into park.  However, the vehicle was allegedly not in park and was still in drive, this is allegedly according to investigators.

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF MISSISSIPPI**
**SOUTHERN DIVISION**

accelerated was never resolved, and no evidence was provided to prove or refute the
eyewitnesses' or Officer Cuevas' statements.

9. The investigation report went on to state that the "vehicle came to a stop, and the officer
gave first aid to the driver until AMR arrived." This is disputed by Officer Cuevas' own
statement. According to Officer Cuevas, after he fired his rounds, he tried to help Mr.
Parker out of his vehicle when his legs gave way, and Mr. Parker fell out of the truck face
down. Officer Cuevas then radioed for medical assistance then walked to the back of the
truck to get the vehicle tags. Officer Cuevas then returned to Mr. Parker and handcuffed
him, and rolled him on his back. Officer Cuevas was then escorted away from the scene
by Sergeant Krauss. At no time does Officer Cuevas advise that he gave Mr. Parker "first
aid" until the arrival of AMR, as listed in the report.  This discrepancy was never clarified
or addressed.

**Opinion:**

10. This was a very rapidly unfolding situation that, in my specialized training, skills,
experience, and knowledge, should not have escalated into a deadly force situation. I
believe an officer should not have walked onto the path of oncoming traffic and would
have taken steps to first move out of the oncoming slow-moving pickup truck's path
rather than escalating to deadly force. Officer Cuevas made a decision to fire three rounds
at the driver of what eyewitnesses described as a slow-moving or fully stopped vehicle
just prior to Officer Cuevas' firing his weapon. According to the investigative report, this
incident took about 30 seconds from the time Officer Cuevas arrived on the scene to
when he broadcast shots fired over his police radio. At the time, Officer Cuevas had not
spoken with anyone at the location and had no knowledge of any serious crimes

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF MISSISSIPPI**
**SOUTHERN DIVISION**

committed by anyone or a reason for ordering the pickup truck to stop and/or prevent the driver from leaving[30]. This, in my professional opinion, makes his actions leading up to and during the use of force inconsistent with industry standards regarding police practices. An officer conforming with industry standards would not have placed themselves in the path of oncoming traffic and should have opted to move out of the way of the slow-moving vehicle rather than shoot and kill the driver who allegedly bumped a mailbox. In short, Officer Cuevas stated he used deadly force to stop an approaching slow-moving pickup truck (which he had voluntarily approached) because it had just backed into a mailbox and, in his opinion, failed to stop[31]. The decision-making process and resulting actions of Officer Cuevas in discharging his weapon at Mr. Parker, in my opinion, were tactically unsound and disproportional.

11. It is my understanding that additional materials may be in the process of being produced or may be requested later. Should any subsequent information be produced and materially affect or alter any of these opinions, I will either submit a supplemental response or be prepared to discuss them during any scheduled deposition.

12. At this point in the development of this case, I plan to possibly use the aforementioned reviewed and listed documents as demonstrative aids during my testimony. Should I decide to use any such tools, I will ensure that they are made available for review, if requested, before their use.

---

[30] It was not until 2023 during his deposition that Officer Cuevas stated that he allegedly stopped the pickup truck for the alleged backing into the mailbox.
[31] According to the eyewitnesses, the slow-moving pickup truck came to a stop prior to Officer Cuevas shooting at and killing Mr. Parker.

Exhibit "23"

**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
SOUTHERN DIVISION**

1. My fees are as follows:

   *Retainer-Non-Refundable- $5,000.00 (must be paid before commencement of any work)*
   *Document review/preparation/report completion- $350.00 per hour*
   *Deposition - Flat fee of $2,500.00 per day, paid before the date of deposition.*
   *Trial Testimony - Flat fee of $2,500.00 per day paid before the date of deposition.*
   *Air Travel, lodging, and transportation (if necessary) to and from the airport, trial, or*
   *scene locations shall be paid for by the client separate from the retainer.*

   I declare under penalty of perjury under the laws of the state of Mississippi that the

   foregoing is true and correct. Executed in Flagler County, Palm Coast, Florida, on the 30th

   day of June 2023.

   Jeronimo "Jerry" Rodriguez

Exhibit "23"