IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
SOUTHERN DIVISION

CATINA PARKER, as Personal Representative
of the Estate of Leonard Parker, Jr., Deceased                    PLAINTIFF

VERSUS                                          NO.1:21-cv-00217-HSO-BWR

The CITY OF GULFPORT, a municipal
corporation and JASON CUEVAS, in his individual
and official capacity                                            DEFENDANTS

---

**MEMORANDUM BRIEF IN SUPPORT OF THE MOTION OF
OFFICER CUEVAS FOR SUMMARY JUDGMENT**

---

The Defendant, Jason Cuevas, hereby submits his Memorandum Brief in Support of his

Motion for Summary Judgment, and would show unto the Court the following, to wit:

## I. <u>INTRODUCTION</u>

Catina Parker, as personal representative of the Estate of Leonard Parker, Jr., has asserted

a 42 U.S.C. §1983 claim against Officer Cuevas for excessive force as a violation of the Fourth

Amendment of the United States Constitution. [Doc. 141]. The Court initially allowed limited

discovery on the issue of qualified immunity after which Officer Cuevas filed a Motion for

Summary Judgment based on Qualified Immunity and a supporting Memorandum Brief on

October 16, 2024, along with a Notice of Conventional Filing. [Docs. 132, 133, 134]. The

Motion and Brief were filed before the Plaintiff filed her Third Amended Complaint on

November 3, 2023. [Doc. 141]. The Court entered a Memorandum Opinion and Order which

denied the Motion on June 5, 2024 on the basis that material fact questions remained for

resolution, including whether Officer Cuevas was in the path of the Parker truck before shooting,

whether the truck accelerated towards him, whether Officer Cuevas identified himself as a police officer, and whether he gave verbal commands to the Parker truck to stop.  [Doc. 157].  On February 4, 2025, the parties commenced discovery of the entirety of the case.  Officer Cuevas renews and updates his arguments with additional testimony and evidence and also requests summary judgment on the Plaintiff's claims of his individual liability under the Mississippi Tort Claims Act.  Instead of re-submitting the same exhibits as before, many of which were submitted via conventional filing, reference is made to those specific exhibits attached to the original Motion [Doc. 132] and Notice of Conventional Filing [Doc. 134].  Relevant testimony of recently deposed witnesses has been added to the previous list of exhibits (beginning with the number following the last numbered Exhibit from Doc. 132), including testimony of Dr. Staci Turner (State Medical Examiner),  Lt. Brad Garrett (MBI Investigator), and Michelle Desroche (disinterested neighbor / witness), all as listed in the Motion.  The testimony of these witnesses further supports Officer Cuevas's continued request for qualified immunity and dismissal of the §1983 claims filed against him.

## II.  <u>BACKGROUND</u>

Several individuals, including Parker, were attending a birthday party at the home of Stephanie Baldwin, who resided at 210 25th Street, Gulfport, MS.  The party began during the evening hours of Friday, January 31, 2020.  Everyone at the party agrees that alcohol was served and many of the guests were drinking, including Parker.[1]  (MBI Case File Report, Bates 2, 9, 13-14, 16, 19 - Doc. 132-1; DP Markray, pp. 68-73, Doc. 132-13).  As the evening proceeded, one

---

[1]  Parker's Blood Alcohol Concentration after his death was 0.185, well over twice the legal limit in the State of Mississippi.  (MBI Case File Report, Toxicology Report Bates 37, Doc. 132-1; DP Dr. Staci Turner, p. 55, Ex. "20").

of the guests, Tremaine Markray, became belligerent, obnoxious and aggressive toward several of Baldwin's guests, including Markray's own girlfriend (Kimberly Bonds). His conduct motivated one of the guests at the party, Maxine Owens, to call 911 [at 2:49:47 a.m.] and ask for police assistance with the escalating situation. (MBI Case File Report, Bates 102-03, Doc. 132-1; 911 Call, Docs. 132-2, 134; DP Markray, pp. 46-49, 68-69, 73-76, Doc. 132-13). Maxine stated that "Terrence", a black male, was "fighting everybody", that he was wearing a gray shirt and gray jogging pants, that there had been drinking and she was not aware of any weapons. (MBI Case File Report, Bates 102-03, Doc. 132-1; 911 Call, Docs. 132-2, 134). Officer Cuevas and another nearby officer (Brewer) were dispatched. (MBI Case File Report, Bates 102-03, Doc. 132-1; Cuevas Audio Interview, Docs. 132-6, 134; Cuevas Video Interview, Docs. 132-7, 134; DP Cuevas, pp. 31-33, Doc. 132-5). Cuevas was the first to arrive.

Before Cuevas arrived, Parker convinced Markray to leave with him, with the intent of taking Markray to a hotel to "sleep it off". (DP Markray, pp. 66, 76-77, 126-27, Doc. 132-13). Parker was driving a dark colored 2014 GMC Sierra pick up truck and Markray was sitting in the front passenger seat. (Id., p. 66).

Officer Cuevas arrived on scene first at 2:55:19 a.m.[2] and parked his patrol car on the north side of 25th Street nearest Oak Avenue. (MBI Case File Report, Bates 103, Doc. 132-1). Even before he got out of his car, he could hear "loud voices" that appeared to be coming from about two houses west of his patrol car. Officer Cuevas did not activate his blue lights or siren to

---

[2] Brewer arrived on scene at 2:55:55 a.m., about 36 seconds later, after the incident. (Doc. 132-1, p. 103).

proceed to the scene or when he parked his car.[3]  (Int. Ans. No. 17, Doc. 132-4; Cuevas Audio

Interview, Docs. 132-6, 134; Cuevas Video Interview, Docs. 132-7, 134; DP Cuevas, pp. 35-42,

116, Doc. 132-5).

Officer Cuevas exited his patrol car and proceeded westbound on foot on 25th Street,

searching for the address of the "drunk and disorderly" call by looking at the numbers on a white

color mailbox located on the north side of the road and listening for any suspicious sounds.  (DP

Cuevas, pp. 42-45, 47, 55-57, Doc. 132-5; MBI Scene Photos, Bates 35, 54, 60, 66, Doc. 132-

14).  The street was dark and Officer Cuevas used his flashlight to illuminate and verify the

address numbers.  (DP Cuevas, pp. 42-45, 47, 55-57, Doc. 132-14).  As he did so, the commotion

ahead became louder and he then noticed a dark colored truck backing out from the north side of

25th Street from what he thought was a driveway.[4]  Officer Cuevas then observed the truck back

directly across the street and into a mailbox located on the south side of the street (later learned

to be 213 25th Street – the home of Michelle Desroche).  It appeared to him that the truck was

leaving from the residence that had reported the "drunk and disorderly" male.  (Id., pp. 48-52, 64-

70).  Officer Cuevas started walking towards the truck to make contact with the driver, thinking

that the driver was going to stop since he had just hit a mailbox.  (Id., pp. 71-73).  At the same

time, Officer Cuevas was shining his flashlight towards the truck to get the driver's attention.

(Id., p. 78).  Cuevas did not know at this point what had occurred in the house or whether the

---

[3]  This was more of a tactical approach so that he could gather more information about the
situation that was occurring at the residence and give him some distance and time to verify the residence
since he was not familiar with this street.  (DP Cuevas, pp. 41-42, Doc. 132-5).

[4]  The truck backed out of the front yard of Stephanie Baldwin based on the tire marks left
behind in the grass.  (MBI Biloxi Report, Bates 6, Doc. 132-3; MBI Scene Photos 133, 135, Doc. 132-
14).  Cuevas's view of the yard and driveway was limited by geography and light.  (DP Cuevas, pp. 50,
55, 64-66, 70-71, Doc. 132-14).

driver of the truck was the person that was the subject of the 911 call.  Officer Cuevas felt that the scene needed to be secured to determine not only the facts of the call but whether a crime had been committed.  (Id., pp. 42, 45, 49, 78).

While Officer Cuevas was in the middle of the street and on a path to the truck that was now on the south side of 25th Street where it struck the mailbox, the truck pulled forward from the mailbox, straightened out and then began to proceed eastbound on 25th Street, now angling in his direction.  (DP Cuevas, pp. 76-78, Doc. 132-5).  Officer Cuevas activated the strobe feature on his flashlight and also removed his firearm from the holster to utilize the weapon light, all in an effort to get the driver's attention, because he assumed that the driver would see him and would stop.  (Id., pp. 78-79, 102-103, 145-46).  Officer Cuevas also identified himself as the **police** and gave several commands for the driver to **stop the vehicle**, yelling: *"Stop the vehicle! Stop the vehicle!  Police! Stop the vehicle*!"  (Id., pp. 81-82, 103, 141).  Despite his obvious visible presence and verbal commands, the truck did not stop and continued to drive towards Officer Cuevas.  The headlights became brighter as the truck tracked closer and closer to him and he heard the engine rev up and appeared to pick up speed in his direction, which he perceived was faster than 5 mph.  (Id., pp. 82-83, 103, 141, 146).  Only Cuevas is in a position to establish these facts.

When it became apparent to him that the truck was not slowing, Officer Cuevas tried to back peddle away from the middle of the road to the south side of the road, which was closer at that moment.  (Id., pp. 92-94 and Ex. 49 to DP).  The headlights of the truck were very bright and followed him towards the south side of the road.  Cuevas believed that the truck constituted a threat of harm or death to himself and he fired his service weapon in response toward the driver

of the truck.  (Id., pp. 94-95, 98, 100, 101, 103-110, 124, 145-149).  After he discharged the last

shot toward the truck, it came to an abrupt stop.  (Id., p. 118).  "Shots fired" were reported to

Dispatch at 2:55:49 a.m., essentially 30 seconds after Officer Cuevas arrived to 25th Street.  (MBI

Call Sheet Report, Bates MBI 102-03, Doc. 132-1).

 A simulation video was developed that demonstrates the view that Officer Cuevas

described in both his post-event interview with the MBI and his deposition testimony.  (Affidavit

Cuevas, Docs. 132-8, 134).  This simulation demonstrates what Officer Cuevas saw from the

time that Parker's truck backed into the  mailbox [at 213 25th Street], and then pulled forward and

eastbound on 25th Street, until the truck had come to a stop on the south side of the road, with its

passenger side wheels now on the grass and its driver side wheels on the pavement.  (Id.).  The

Court should note the darkness of the night depicted in the simulation video that Officer Cuevas

faced, as well as the headlights coming at him from the Parker truck.  (Id.).

 In the Third Amended Complaint, the Plaintiff now alleges that at the time Officer

Cuevas fired his weapon, Parker's vehicle "*was at a full stop*."[5]  [Doc. 141, ¶ 51].  The Plaintiff

further alleges prior to stopping the truck, Parker never exceeded 5 mph and he was not driving

recklessly.  [Id., ¶¶ 54, 55].  The Plaintiff goes on to allege that "prior to making his full stop, he

was driving eastbound on the south side of the road, while Defendant Cuevas walked westbound

on the north side of the road."  [Id., ¶56].  The Plaintiff alleges that at no time prior to the

shooting did the truck accelerate towards Office Cuevas, nor did it track in Officer Cuevas's

---

 [5]  Plaintiff has filed four different versions of a Complaint over a period of one (1) year and eight
(8) months and has altered and re-worded the factual assertions that form the basis of her claims
("creeping forward at a low rate of speed without acceleration" [Docs. 1 and 4 ¶25]; "creeping forward in
a neutral gear at a low rate of speed - approximately two to three mph" [Doc. 30 ¶ 28]; "truck came to a
full stop once the brake lights came on" [Doc. 141 ¶ 44]).

**MEMORANDUM BRIEF**

direction at any time. [Id., ¶¶ 59-62]. Significantly, Plaintiff bases these assertions on accounts of persons who were intoxicated, positioned at least 20 to 40 yards away from the scene, were located north of the truck and closer to its rear truck bed area, and who could not have seen what was importantly relevant to the issues now before the Court. Equally undisputable is that none of these persons were located anywhere facing the truck shortly before Officer Cuevas had to discharge his weapon to protect his life.

The Plaintiff also **alleges** that Officer Cuevas "was standing to the north side of the truck and not immediately in front of the truck when he opened fire on Mr. Parker," such that the truck did not pose "a significant threat of death or serious physical injuries" to Officer Cuevas. [Id., ¶¶ 59, 63]. This allegation is contrary to the physical evidence and cannot form the basis of evidence to counter the pending summary judgment motion. Based on the forensic evidence collected from the scene and the information learned at autopsy, Cuevas was clearly **in front of a moving truck** at the time the shots were fired, all as demonstrated below. This evidence is indisputable, notwithstanding the self-serving, rank denials of these facts by the Plaintiff.

Other than perhaps Tremaine Markray, Parker's passenger, no other alleged eye witness can testify as to what Officer Cuevas would have seen from his perspective as all of the Plaintiffs alleged "witnesses" were standing, more or less, either on the front lawn or the front porch of Stephanie Baldwin's house, and their view would have been limited to the rear and/or driver's side of Parker's truck. And, no matter how the Plaintiff tries to reshape her claims, the objective, physical evidence collected at the scene clearly demonstrates that Officer Cuevas was at the front of the truck and that the truck was moving at him at the time the shots were fired.

A.      **On Scene Evidence.**

The investigation of this matter was spearheaded by the Mississippi Bureau of Investigation ("MBI"). (MBI Case File Report, pp. 1-21, 28, 37, 85-88, 89, 92-93, 99-100, 102-105, Doc. 132-1). The Biloxi Police Department Crime Scene Unit ("BPD CSU") processed the scene and collected and examined the physical evidence, including the truck driven by Parker. (MBI Biloxi Report, pp. 1-3, 6-12, 33, 37-38, 43, 46-48, Doc. 132-3). On scene, investigators noticed that even though the 2014 GMC Sierra truck driven by Parker was stopped with its passenger side wheels on the grass [off road] and its driver side wheels on the pavement, the truck was in "D" [ "Drive"] with the front doors open and not moving forward. (Id., pp. 5-6). The radio was playing at a moderate volume. (Id., p. 7). CSU Investigators noted that the truck was stopped off the roadway in the yard of 207 25th Street, which would have been east-southeast of the address from where the truck had departed previously and east-southeast of where the witnesses who claimed to be outside in the yard or on the porch of 210 25th Street, with the passenger side tires in the grass and the truck touching a large bush on the back passenger side. (Id.). Numerous photographs were taken by Biloxi CSU both on scene and at the CSU Garage, some of which are referenced. (MBI Scene Photos, Doc. 132-14; MBI CSU Garage Photos, Doc. 132-15). In addition, based on the physical evidence locations and measurements taken at the scene, Biloxi CSU Investigators prepared a Scene Diagram. (MBI Biloxi Report, 66, Doc. 132-3).

Investigator Brandon Teates with the BPD CSU testified about his scene investigation and findings with regard to the bullet "defects" in Parker's truck. (DP Teates, pp. 31-44 and Ex. 35, Doc. 132-9). Teates testified, based on the flight path rods, that the bullet that struck the truck's hood was moving, based on the officer's perspective, from the front of the vehicle at an

angle of 5 degrees from driver's side to passenger's side. (Id., pp. 48-79, 81, 83-84, 100-101 and Exs. 36, 37, 38, 39). Bullet casings were found at the front of the truck in the street, with one being found under the bumper of the passenger side of the vehicle. (Id., pp. 84-86, 90-92 and Ex. 41). Typically, bullet casings will eject to the right of the weapon. (Id., pp. 93-94). Establishing a 5 degree cone from the defect in the hood at the front of the vehicle, the casings were found to the left of the 5 degree cone /angle [more to the middle of the vehicle] explained above. (Id., pp. 94-95 and Ex. 38). Teates testified that Parker's truck was moving during the shooting, but he could not determine where Parker's truck was pointing or where Officer Cuevas was located when the shooting started. (Id., pp. 96-101). Nor could he determine the speed of Parker's truck. (Id., pp. 101-102).

**B.    Ballistics Reconstruction.**

Because Teates is not a ballistics reconstructionist, Officer Cuevas retained James P. Molinaro and Howard Ryan as experts in the fields of shooting incident and/or crime scene reconstruction and ballistics.[6]  (Affidavit Molinaro, Doc. 132-10; Affidavit Ryan, Doc. 132-11). Molinaro and Ryan are of the opinion that:  (1) Officer Cuevas's location and position were at the front of Parker's truck at the time he fired four shots (same as Teates); (2) The location of the three cartridge cases found on scene are consistent with the forward movement of the truck during the shooting and/or immediately after the shooting before the truck came to a complete stop with the vehicle transmission in DRIVE as its final position; (3) The physical evidence at the scene and the bullet defects on the truck, together with the location of the gunshot wounds to

---

[6]  The Plaintiff did not retain an expert in the field of shooting incident and/or crime scene reconstruction or ballistics.

Parker, are consistent with Officer Cuevas directing his gunfire at the truck's driver to stop the threat perceived by Officer Cuevas of the truck driving directly at him; and, (4) The physical evidence at the scene and the bullet defects on the truck produced as a result of the shots fired by Officer Cuevas, together with the location of the gunshot wounds to Parker, are consistent with the description of the shooting incident given by Officer Cuevas to investigating authorities, with the exception of the number of shots fired (he recalls three shots fired). (Affidavit Molinaro, Doc. 132-10; Affidavit Ryan, Doc. 132-11).

**C.    Testimony of Disinterested Witness.**

Michelle Desroche, a disinterested witness that lived across the street from Stephanie Baldwin at the time of the February 1, 2020 incident, heard some of the events as set forth in her Affidavit testimony where she states: (1) She was at home during the evening hours of January 31, 2020 and witnessed several vehicles parked at the home located at 210 25th Street, which was directly across the street; (2) During the early morning hours of February 1, 2020, she was standing in the screened-in porch area of her house, smoking a cigarette; (3) From there, she could not see the house or the yard of 210 25th Street; (4) She heard a male screaming at someone, so she propped open the screen door at her carport to see if she could figure out what was going on as it was well after 2:00 a.m. and she was worried that the screaming would wake her elderly neighbors; (5) The man was screaming "Fu_k that bi_ch ... fu_k that bi_ch ... that's why I treat you like I do ..."; (6) She could also hear women's voices, but could not make out what they were saying; (7) She heard a different male voice trying to diffuse the situation and said something to the effect of "come on, man ... get in the car ..."; (8) She heard vehicle doors shutting; (9) She heard a vehicle back out quickly and then heard a loud "wham!" noise; (10) She

thought the vehicle hit the light pole located near one of her neighbors, which is the direction the sound came from; (11) She later learned that her mailbox had actually been hit and may have been knocked over; (12) She then heard the vehicle immediately accelerate to leave and proceed eastbound on 25th Street and as it did so, it made a louder than normal revving sound when it pulled out, where it made a slightly gravelly sound of a tire moving quickly over gravel; and, (13) Seconds later, she heard four gunshots. (Affidavit Desroche, Docs. 132-12, 134). The Plaintiff deposed Ms. Desroche and she testified similar to that of her Affidavit. (DP Desroche, pp. 14-25, 34-35, 41, Ex. "19").

**D.    Testimony of Passenger of Parker's Truck.**

Tremaine Markray, who was sitting in the passenger seat of Parker's truck, has given three different versions of his "story", ruining any credibility he may have.[7] Following the incident, Markray was placed in the back of a patrol car assigned to Officer Cook with the Gulfport Police Department, until he could be brought to the station to meet with the MBI Investigators. While in the back of the patrol car, Markray told Officer Cook: "I don't mean no disrespect man, ... I told that dude to stop. I said man slow down the police standing right there. He kept going, that's why he's shot... man. They wasn't wrong man. He kept going. I told him

---

[7] Markray gave a statement to Lt. Garret, an MBI Investigator, on February 1, 2020. Markray was deposed on May 22, 2023. On August 18, 2023, Plaintiff's counsel produced a "recording" of a conversation had between Catina and Markray by telephone that occurred between his statement to the MBI and his deposition (i.e., some time during those three (3) years). Catina testified she talked to Markray after she retained counsel via Text and Facebook Messenger and later recorded the telephone conversation she had with him (without his knowledge) because she wanted to know his side of the story. (DP Catina Parker, pp. 108-114, 125-26, 157-158, and Exhibits 53 and 54 to Deposition, Ex. "22" ). Because Catina was not there, she has no personal knowledge of the events and essentially relies on what Markray told her. (Id., pp. 120-122, 124-125). She didn't talk to any police officers about what happened – only Markray. (Id., pp. 126, 159). Catina has never been shown the comments that Tremaine made to himself in the back seat of the patrol car or in the witness room. (Id., pp. 116-117).

to stop." (Cook Dash Camera at 49:04, Docs. 132-16, 134).  Later, while Markray was alone and sitting/waiting in the back seat of the patrol car (with all of its doors closed and the windows rolled up) **by himself**, he voluntarily uttered similar statements several times outloud **to himself**, including: "I told that ... to stop man", "I done told him to stop though", "But they weren't wrong, I told that ... to stop".  (Cook Dash Camera at 56:01, 57:22, 1:05:55, Docs. 132-16, 134).

Later at the police station, Markray was interviewed by MBI Investigator Lt. Brad Garrett. (Audio Markray Interview, Docs. 132-17, 134; Video Markray Interview, Docs. 132-18, 134). Markray's interview can be summarized as follows:  (1) After Parker backed out, Markray saw a police officer with a flashlight in the street; (2) From inside the truck, Markray heard the police officer give several commands for Parker to "Stop the vehicle!"; (3) Parker just looked ahead and did not stop; (4) The truck was not going fast, by his estimate maybe 2 or 3 mph; (5) Markray then heard the gun shots; (6) The police officer was in front of the truck, more towards the driver's side, when the shots were fired; and, (7) Markray stated that if he was the police officer, he probably would have thought that he was about to be run over too.  (Id.; Id.).  The interview then concluded.  The video however kept filming from inside the interview room after the investigators left and, with the door to the room being closed.  Significantly, as before when in the backseat of the patrol car by himself (and with the doors to the police car all being shut), **Markray began voluntarily talking to himself out loud**.  (Video Markray beginning at 32:40, Docs. 132-18, 134).  Markray repeated to himself that all Parker had to do was stop and that the police officer was not wrong because he was about to get hit with the truck.  (Id. at 34:34, 35:28).

Markray's deposition was taken on May 22, 2023, **over three (3) years after** his extemporaneous, voluntary, and unsolicited verbal comments and his official interview to MBI

as part of the State's investigation into this incident. Unbeknownst to counsel, Markray had already discussed the case with Catina Parker via Facebook Messenger, via Text, and via a recorded telephone conversation. At his deposition, Markray did a complete "180°" on what he said not only to himself in the patrol car and in the interview room, but also to what he told MBI Investigator Garrett. Markray miraculously "remembered" that after Parker had backed out, he claims to have seen <u>multiple police officers</u>, but no police cars (which has no basis in the objective evidence). (DP Markray, pp. 86-87, Doc. 132-13). He states he knew it was the police because of the flashlight that he saw. (<u>Id</u>., p. 87). Markray now also testifies that he did not hear the officer give any commands like "stop", which is odd given that what he previously told Investigator Garret (and told himself) is that he recalled the officer saying is identical to what Officer Cuevas told the Investigator that he said to the truck passengers. (<u>Id</u>., pp. 88, 96-97, 114). He also stated that he lied to Investigator Garrett and now remembers that Parker was actually stopped prior to the police officer shooting because miraculously, he saw Parker put the truck in "Park". (<u>Id</u>., pp. 35, 92-99, 101) (this is so even though everyone that looked at the shift on the column verified that the vehicle was in "D" at and after the shooting). Markray's new found memory does not match the physical evidence at the scene. Markray also told defense counsel at his deposition that he lied to MBI Lt. Garrett because he was "scared" and "afraid for his life" even though he admits not one person threatened him.[8] (<u>Id</u>., pp. 89-95, 101-13).

---

[8] Markray did not tell Catina that he was "scared" of the police or investigators, instead telling her he felt like "they hiding something ... I think it was a set up" by Baldwin and the others with the police because "it was like it was planned for it to happen to me not Leonard." (Exhibit 54 to DP Catina Parker, Ex. "22"). Markray reasoned that "[b]ecause they the ones called the police and I think one of them knew that police personally because the police didn't pull their cars in front of the house they parked around the corner. they came out on me and Leonard from the bushes ...". (<u>Id</u>.). Again, new "story" without any evidence to substantiate his wild theories.

Markray does at least admit from the police officer's perspective, it probably looked like he was going to be hit by the truck, but then back tracks from that admission to say that the officer could have gotten out of the way. (Id., pp. 117-20, 128). Markray's new found memory is not credible and Officer Cuevas would show that the most credible words out of Markray's mouth were those recorded as he sat by himself in the back of the patrol car and while he sat by himself in the interview room, where no one could possibly have been any threat to him at all.

**E.    Testimony of Lt. Garrett and Dr. Turner.**

The parties took the deposition of Lt. Brad Garrett, who investigated the incident for the MBI. He testified that based on his education, training and experience as an investigator and based on everything he observed at the scene, it is his belief that Officer Cuevas discharged his weapon from the front of the truck as the bullet holes entered the vehicle through the windshield from the front. (DP Garrett, pp. 67-68, 92-94, 97, 131-132, Ex. "21"). Lt. Garrett also commented and confirmed the Dash Cam Video from Cook's patrol vehicle wherein Markray made statements to Cook and to himself, as well as his interview of Markray. Lt. Garrett testified he had no reason to doubt what Markray said to himself or told Lt. Garrett in the interview room. Lt.Garrett testified he never saw Markray being threatened in any way and he felt like Markray was telling him the truth then, especially since he had said the same things while he was alone in the patrol vehicle. (Id., pp. 105-106, 114, 132-134). Lt. Garrett added that any threat or intimidation would be absolutely unacceptable and he would not allow for that behavior on his watch. (Id., pp. 113-115).

---

Markray also did not contact the MBI at any point after his official interview to inform the MBI that what he told them as part of this investigation had changed. This is so even when Markray was aware that the fruits of the MBI's investigation would ultimately be presented to a Grand Jury, which would then make a determination regarding the legality or illegality of Officer Cuevas's actions.

Dr. Staci Turner, the State Medical Examiner, also was deposed.  Dr. Turner testified that a bullet that entered Parker's left cheek and lodged in his cervical spine is what caused his death. (DP Turner, pp. 27-29, 50, Ex. "20").  Dr. Turner testified that the bullet entered Parker's body and traveled left to right downward and slightly front to back; i.e., it was not at a sharp angle and followed a straight line path entering his body.  (Id., pp. 47-48).  Dr. Turner explained that the wound path is consistent with Parker receiving a gunshot from someone or a muzzle to his left (Id., p. 48), but she also testified that the path would be consistent with a gun being fired directly at him.  (Id., pp. 48-49, 56-57).  Dr. Turner explained that the degree to which the projectile traveled left to right was small, such that the bullet could have either come from the front with a slight variation, it could have come more from the left, Parker's head could have been turned, or the hand holding the gun could have been moving.  (Id., pp. 56-58).  Again, Dr. Turner testified that the bullet path that she viewed on autopsy was consistent with the muzzle of the gun of the officer being located at the front of Parker's vehicle.  (Id., pp. 63-64).

In sum, after further and additional discovery conducted since qualified immunity was initially presented in this case, the physical evidence, statements given, and the un-controverted expert testimony shows that Officer Cuevas was at the front of a moving truck at the time the shots were fired.  There is simply no credible evidence to the contrary and this Court should find that not only did Officer Cuevas not use excessive force, but that his actions were constitutionally proper and necessary to save and protect his own life.

## III.  SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P.

56(a); <u>Sims v. City of Moss Point</u>, 2022 U.S. Dist. Lexis 50655 *7 (S.D. Miss. 2022). If the movant satisfies this burden, the nonmoving party must "go beyond the pleadings and designate specific facts showing that there is a genuine issue for trial." <u>Sims</u>, 2022 U.S. Dist. Lexis 50655 at *7 (quoting <u>Little v. Liquid Air Corp.</u>, 37 F.3d 1069, 1075 (5th Cir. 1994)) (internal quotes omitted). "A dispute is genuine if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." <u>Id</u>. (quoting <u>Dyer v. Houston</u>, 964 F.3d 374, 379 (5th Cir. 2020) (internal quotes omitted).

## IV.  <u>ARGUMENT</u>

Based on the foregoing facts, Officer Cuevas is entitled to summary judgment as a matter of law on the Plaintiff's §1983 Claims.

**A.    Officer Cuevas is Entitled to Qualified Immunity.**

Officer Cuevas maintains that he is entitled to qualified immunity and that the Plaintiff has failed to provide proof of the necessary elements to establish an excessive force claim. "42 U.S.C. §1983 imposed liability upon any person who, acting under color of state law, deprives another of federally protected rights." <u>Green v. City of Moss Point</u>, 2010 U.S. Dist. Lexis 95206 *11 (S.D. Miss. 2010). "Section 1983 affords a remedy to those who suffer, as a result of state action, deprivation of rights, privileges, or immunities secured by the Constitution and the laws of the United States." <u>Id</u> (citing <u>White v. Thomas</u>, 660 F.2d 680, 683 (5th Cir. 1981). However, "[a] Plaintiff cannot succeed on a § 1983 claim merely by showing any deprivation of his rights; § 1983 was intended to preserve rights protected by federal law." <u>Id</u>.

Government officials performing discretionary functions are accommodated "with a qualified immunity, shielding them from civil damages liability as long as their actions could

reasonably have been thought consistent with the rights they are alleged to have violated."

Anderson v. Creighton, 483 U.S. 635, 638 (1987). "Somewhat more concretely, whether an official protected by qualified immunity may be held personally liable for an allegedly unlawful official action generally turns on the 'objective legal reasonableness' of the action . . . assessed in light of the legal rules that were 'clearly established' at the time it was taken." Id. at 639 (citing Harlow v. Fitzgerald, 457 U.S. 800 (1982). Under this standard, it must be determined whether the Plaintiff has alleged the violation of a clearly established constitutional right. If this Court finds a right to be clearly established, then the Court examines the "objective legal reasonableness" of the officer's conduct under the circumstances, "in light of clearly established law and the information the [] officer[] possessed." Anderson, 483 U.S. at 640; see also, Gutierrez v. City of San Antonio, 139 F.3d 441 (5th Cir. 1998). The order of this test is not mandatory and "judges of the district courts ... [are] permitted to exercise their sound discretion in deciding which of the two prongs of the qualified immunity analysis should be addressed first . . . ." Byrd v. Cornelius, 52 F.4th 265, 271 (5th Cir. 2022)(quoting Pearson v. Callahan, 555 U.S. 223, 236 (2009)).

### 1.    Officer Cuevas Did Not Violate a Constitutional Right of Parker.

The Plaintiff claims Officer Cuevas used unconstitutionally excessive force when he shot and killed Parker in violation of the Fourth Amendment. "The Fourth Amendment creates a 'right to be free from excessive force during a seizure.'" Byrd, 52 F.4th at 270 (quoting Poole v. City of Shreveport, 691 F.3d 624, 627 (5th Cir. 2012). To establish a claim of excessive force under the Fourth Amendment, the Plaintiff must demonstrate: "(1) injury, (2) which resulted directly and only from a **use of force that was clearly excessive**, and (3) the excessiveness of

which was **clearly unreasonable**." Byrd, 52 F.4th at 270 [emphasis added].  See also, Ramos v. Taylor, 2022 U.S. Dist. Lexis 227519 *18 (W.D. Tex. 2022).  Where, as here, an injury is uncontested (i.e., death), this Court need only consider the second and third elements.  Jackson v. Gautreaux, 3 F.4th 182, 186 (5th Cir. 2021).  "There can be no question that apprehension by the use of deadly force is a seizure subject to the reasonableness requirement of the Fourth Amendment."  Tennessee v. Garner, 471 U.S. 1, 7 (1985).

"Inquiry into the reasonableness requirement balances the amount of force used with the need for that force under an objective standard."  Sims, 2022 U.S. Dist. Lexis 50655 at *9 (citing Graham, 490 U.S. at 395)).  Generally, to determine whether a use of force was objectively reasonable under the Fourth Amendment, courts are required to pay careful attention to the facts and circumstances of each particular case, including:  (1) the severity of the crime at issue, (2) whether the suspect poses an immediate threat to the safety of the officers or others, and (3) whether the suspect is actively resisting arrest or attempting to evade arrest by flight.  Byrd, 52 F.4th at 270 (citing Graham v. Connor, 490 U.S. 386, 396 (1989)).  "'[W]here the officer has probable cause to believe that the suspect poses a threat of serious physical harm, either to the officer or to others, it is not constitutionally unreasonable to prevent escape by using deadly force.'"  Sims, 2022 U.S. Dist. Lexis 50655 at *9; see also, Wilson, 26 F.4th at 713.

Because of the difficulty of "split second judgments", "[t]he 'reasonableness' of a particular use of force **must be judged from the perspective of a reasonable officer** on the scene, **rather than with the 20/20 vision of hindsight**."  Sims, 2022 U.S. Dist. Lexis 50655 at *9 (quoting Graham, 490 U.S. at 396) (emphasis added); see also, Wilson, 26 F.4th. at 713.  This means that the "overarching question is 'whether the officers' actions are **objectively reasonable**

in light of the facts and circumstances confronting them." Id. (emphasis added).  Inasmuch as an Officer has as right to protect himself against serious injury or death, any evaluation of "reasonableness" should occur against the backdrop of the facts as testified to by the Officer since it is his life that was being threatened and noone elses'.

Here, the key question facing the Court is whether Officer Cuevas was in imminent danger when he fired his service weapon at Parker's truck.  None of the witnesses proffered by the Plaintiff were in front of a moving vehicle and the only other witness [Markray] that could offer relevant testimony is documented as saying that if he were in Cuevas' shoes, he would have thought he was about to be run over too.

### a.    Deadly Force in Context of Shooting at Suspect Inside a Vehicle.

The Fifth Circuit has recently discussed the issue of shooting at a suspect in a "fleeing vehicle" in Irwin v. Santiago, 2021 U.S. App. Lexis 31692 *5 (5th Cir. 2021).  In this context, the "most important" factor that is considered is "whether the suspect poses an immediate threat to the safety of the officers or others."  Id. at **5-6 (citing Garner, 471 U.S. at 396; Malbrough v. Stelly, 814 F. App'x 798, 803 (5th Cir. 2020)).  Because Officer Cuevas was the only "pedestrian" in the area [in front of a moving vehicle as a "weapon"] at the time he shot at Parker's truck, the issue is whether Officer Cuevas could reasonably have believed that Parker's truck posed a serious threat of harm to him.  Notably, "the threat of harm inquiry does not ask whether the officer was harmed, only **whether he could reasonably perceive a threat of serious physical harm**."  Harmon v. City of Arlington, 16 F.4th 1159, 1164 n.3 (5th Cir. 2021) (emphasis added).

In the Fifth Circuit, two particular facts have emerged as highly relevant to determine whether a moving vehicle poses an immediate threat to a police officer: "the limited time the officers had to respond and the closeness of the officers to the projected path of the vehicle." Irwin, 2021 U.S. App. Lexis 31692 at *6 (citing Hathaway v. Bazany, 507 F.3d 312, 321 (5th Cir. 2007)).  Specific evidence examined in the Irwin case included the plaintiff's failure to heed the officers' commands to stop, the officers' positions, and the period of time it took for the officers' to perceive and react to the direction of the plaintiff's vehicle.  Irwin, 2021 U.S. App. Lexis 31692 at *7.

The physical evidence confirms that Parker was intoxicated – over twice the legal limit – behind the wheel and had already hit a mailbox with his truck.  Officer Cuevas testified, and Markray confirmed by his statements to himself and to the MBI investigators, that Parker failed to heed Cuevas' multiple commands to stop.  As it relates to Officer Cuevas' position in relation to Parker's truck, Investigator Teates (crime scene), Lt. Garrett (MBI Investigator), Dr. Turner (medical examiner), and experts Molinaro and Ryan have all confirmed, based on the physical evidence at the scene, that Officer Cuevas was at the front of Parker's truck.  Further, experts Molinaro and Ryan have shown, based on the physical evidence from the scene, that the Parker truck was moving toward Officer Cuevas, who was moving towards the south side of the road, at the time the shots were fired.  Officer Cuevas tried to get out of the way by moving to the south side of the road (as confirmed by the undisputed resting location of the casings), but Parker's truck continued to follow him and Officer Cuevas perceived that he was in immediate danger of harm.

       b.    **Fifth Circuit Law Confirms the Position of Officer Cuevas and Plaintiff Has No Evidence to the Contrary.**

Reasonableness of an officer shooting at a vehicle has been discussed by the Fifth Circuit. In Fraire v. City of Arlington, 957 F.2d 1268, 1270-71 (5th Cir. 1992), an officer chased a car until it struck a curb. The driver then backed up toward the officer's car and sped away. Id. at 1271. The officer chased again; the driver crashed again; and, the driver sped away again. Id. Eventually, the driver turned around and drove toward the officer. Id. The officer fired one shot and killed the driver. Id. at 1271-72. The Fifth Circuit held that the officer did not violate the Fourth Amendment because he reasonably attempted to defend himself against the driver. Id. at 1274-77. Similarly, the proof in the case at bar shows that Parker drove towards Officer Cuevas.

In Hathaway v. Bazany, 507 F.3d 312 (5th Cir. 2007), an officer stopped a car and started walking to the driver's-side window. Id. at 316. When the officer was about 8 to 10 feet from the car, the driver suddenly accelerated toward him. Id. As soon as the officer realized he wasn't able to get out of the car's path, he drew his firearm and fired one bullet at the car, killing the driver. Id. The vehicle struck the officer on his leg. Id. The officer did not know if he fired the weapon before, during, or immediately after he was struck by the vehicle. Id. The Fifth Circuit held that the officer responded reasonably "in firing his weapon when threatened by a nearby accelerating vehicle, even if, owing to the limited time available to respond, the shot was fired when or immediately after the officer was hit." Id. at 322. Very similar to Officer Cuevas, he attempted to get out of the path of the driver of an oncoming vehicle, but the truck accelerated towards him.

In Hathaway, the Fifth Circuit cited to the case of Herman v. City of Shannon, 296 F. Supp. 2d 709, 713 (N.D. Miss. 2003). There, a police officer fired his weapon at a truck that had "gunned" its engine and accelerated towards the officer. The truck had been pursued by the

police after it failed to comply with a traffic stop.  The truck ultimately came to rest as it was attempting to turn around on a county road.  Id. at 711.  Two patrol cars surrounded it, and the officers exited their patrol cars with their guns drawn.  Id.  The truck then accelerated towards an officer standing within three feet of the truck.  Id.  The officer was struck by the truck and fired two shots, injuring the passenger in the truck.  Id.  The district court found the response to be reasonable, given the officers' limited time to react to an obvious and immediate threat.  Id. at 713.  Again, similar to Officer Cuevas, Parker directed his truck towards Officer Cuevas, who attempted to get out of the way before firing his service weapon.

Another case discussing the reasonableness of shooting at a vehicle being used as a weapon against an officer is Sanchez v. Edwards, 433 F. App'x 272, 275-76 (5th Cir. 2011).  In Sanchez, two officers surveilling a residence approached Sanchez's vehicle after he pulled into a neighboring driveway.  Id. at 273.  The officers ordered Sanchez to stop, but he reversed the vehicle into the street, put the car into drive, and accelerated in the direction of Banquer, one of the officers.  Id.  Both officers fired their service weapons; the vehicle struck Banquer, and three shots struck Sanchez.  Id. at 274.  The Fifth Circuit affirmed the district court's grant of summary judgment for the officers, concluding that "the officers['] decision to use deadly force was reasonable under the circumstances" because of the "short period of time in which [they] had to react to Sanchez's abrupt change of direction and Banquer's obvious peril given his position in front of the vehicle."  Id. at 273, 275-76.  Likewise, this Court should find that deadly force was reasonable under the circumstances faced by Officer Cuevas.

The Fifth Circuit was also faced with a situation involving the shooting of an individual in a vehicle in Malbrough v. Stelly, 814 F. App'x 798, 803 (5th Cir. 2020).  There, Campbell was

in his GMC Yukon with two friends outside his home when police arrived to execute a search warrant. Officers surrounded the Yukon, shouted commands for the occupants to exit, and pulled one of Campbell's friends out onto the ground. Campbell refused to exit, threw the Yukon in reverse, smashed into the police cruiser parked behind him, then switched gears and took a hard left turn, attempting to flee while surrounded by officers. Officer Ware was either knocked or fell to the ground. The officers fired and Campbell was hit. The key question in Malbrough was "whether it would have appeared to a reasonable officer on the scene that Ware, or other officers, or bystanders were in danger." Id. at 805. The plaintiff "need[ed] to show that Ware (as well as the other officers and bystanders) were far enough away from the Yukon and its path, as it moved forward, that no reasonable officer could have thought anyone was in danger." Id. The Fifth Circuit agreed with the district court that it was objectively reasonable to respond with force, even if Ware had not been struck by the vehicle because Ware went to the ground near the Yukon, it was announced an officer was down, and the firing did not take place until the officers saw Ware go to the ground near the fleeing vehicle. Id.

Applying Malbrough to the present case, this Court should find that based on the testimony of Cuevas, the physical evidence collected on the scene, the testimony of Investigator Teates, the affidavit and deposition testimony of a disinterested witness (Michelle Desroche), the ballistics experts, the testimony of Dr. Turner (medical examiner), the testimony of Lt. Garrett (MBI Investigator), and the initial uncorrupted statements [uninfluenced by Catina Parker] of Tremaine Markray, Parker did not respond to the commands of Officer Cuevas to stop, that Officer Cuevas was at the front of Parker's truck and tried to get out of the way, and that Parker continued to drive towards Officer Cuevas, who at that point, felt that his safety was threatened.

In fact, Markray stated that if he was the police officer, he probably would have thought that he was about to be run over too and that the officer was not wrong!

Summary judgment was denied in K.B. Adams, 480 F. Supp. 3d 746 (S.D. Miss. 2020). There, the officers claimed that the decedent turned her vehicle and was headed toward and posed a threat to another officer's life. In opposition, the plaintiff presented expert testimony (of William M. Harmening) to show that none of the shot's trajectories supported a claim that the officers shot at the front of the car as it headed towards them. Rather, the trajectory of the six shots were aimed at the rear driver window and were fired from behind as the decedent drove away. Therefore, the district court denied the summary judgment on qualified immunity and held that resolution of this genuine issue was for the jury to decide.

Here, the total opposite is true. First, not only did Investigator Teates, Dr. Turner, and Lt. Garrett agree based on the physical evidence at the scene that Officer Cuevas was in front of Parker's truck at the time the shots were fired, but also, so does retained expert witnesses Molinaro and Ryan. Additionally, based on the physical evidence, expert witnesses Molinaro and Ryan found that the evidence supports Officer Cuevas' account of events that the Parker vehicle was moving towards him at the time the shots were fired. The Plaintiff has presented no expert testimony to the contrary.

More recently, the Fifth Circuit decided the case of Edwards v. Oliver, 31 F.4th 925 (5th Cir. 2022), wherein it affirmed the district court's denial of summary judgment based on a factual dispute as to whether the car in question was an actual threat to the officer. The facts of Edwards though are important to understand. On April 29, 2017, 15-year-old Edwards attended a house party with his two brothers and two friends. Around 11 p.m., Balch Springs PD officers Oliver

and Gross arrived to the house in response to a 911 call about possible underage drinking. The partygoers dispersed and the boys returned to their parked cars on the same street as the residence (Baron Drive), but further east, near a T-intersection with Shepherd Lane. Edwards' brother, Vidal, sat in the driver's seat, Edwards sat in the front passenger seat, and then three others sat in the back. While the officers were in the house talking with the party host, gunfire erupted from a parking lot on the east side of the T-intersection. Officer Gross exited the house and walked east. Officer Oliver exited the house and walked to his squad car to retrieve his semi-automatic rifle before walking east. While Vidal drove his car slowly, in reverse, toward the T-intersection, Officer Gross, approaching on foot, yelled at the car to stop. Officer Oliver began jogging toward the intersection where Officer Gross was located. Once Vidal got to the intersection, he put his car in drive and proceeded southbound on Shepherd Lane. What happened next was disputed by the parties.

Officer Oliver argued that Vidal accelerated toward Officer Gross. The plaintiffs claimed that the vehicle was not close to Officer Gross when it proceeded forward and that Officer Gross was never in the path of the vehicle. When Officer Oliver arrived at the intersection, the car was accelerating **past** Officer Gross. Officer Oliver then fired five shots at the car's passenger side as it headed southbound on Shepherd Lane, ***away from the officers in the T-intersection***. The first shot by Officer Oliver was made shortly after Officer Gross was close to the back passenger side window to hit it with his pistol, breaking the window. One of the bullets struck 15 year old Edwards in the head, killing him.

On appeal, the Fifth Circuit stated that the extent of the car's threat to Officer Gross is the factual question at the heart of this case, and was genuinely disputed. Officer Oliver described

that the car accelerated towards/near/by Officer Gross. The plaintiffs asserted that Officer Gross was never in the path of the vehicle, that he was toward the back of or behind the car, and **that the car was moving away from Officer Gross when Officer Oliver fired his shots**. The body camera footage also raised a fact question about the car's threat of harm to Officer Gross because it shows the car was moving away from him. The Fifth Circuit held that the resolution of this factual dispute is material because it affects both whether Oliver's use of force was reasonable and whether the force he used violated clearly established law.

Here, the objective physical evidence conclusively shows that **Officer Cuevas was in front of Parker's moving truck at the time the shots were fired and at all times prior to the shooting**. There is no factual dispute of the physical evidence and therefore, summary judgment is appropriate.

2.    **Conduct of Cuevas Objectively, Legally Reasonable under the Circumstances in Light of the Clearly Established Law as of February 1, 2020.**

This second prong has two sub-parts. First, the Plaintiff must establish that the right in question was "clearly established" at the time of the February 1, 2020 events. Second, the Plaintiff must also show that the actions taken by the officer were "objectively legally reasonable". Anderson, 483 U.S. at 641.

For a right to be "clearly established", "[t]he contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right." Anderson v. Creighton, 483 U.S. 635, 640 (1987). "It is not the defendants' burden to identify clearly established law showing that they *did not* violate the plaintiffs' constitutional rights. Rather, it is the plaintiffs' burden to provide clearly established law that put the officers on notice

that they *did* violate the plaintiffs' constitutional rights – and the plaintiffs' burden is heavy."

Dawes v. City of Dallas, 2022 U.S. Dist. Lexis 143342 *22 (N.D. Tex. 2022) (citing Vann v.

City of Southaven, 884 F.3d 307, 310 (5th Cir. 2018); Harmon v. City of Arlington, 16 F.4th

1159, 1165 (5th Cir. 2021)).  Further the case law cannot define the law at a high level of

generality.   Dawes, 2022 U.S. Dist. Lexis 143342 at *14 (quoting Vann, 884 F.3d at 310).

While this does not mean that "a case directly on point" is required, "existing precedent must

have placed the statutory or constitutional question beyond debate."   Ashcroft v. al-Kidd, 563

U.S. 731, 741 (2011). "[T]he dispositive question is whether the violative nature of particular

conduct is clearly established."  Id.

    As has been explained, "[t]he specificity requirement assumes special significance in

excessive force cases, where officers must make split-second decisions to use force."  Harmon,

16 F.4th at 1165.  "[O]vercoming qualified immunity is especially difficult in excessive-force

cases."  Morrow v. Meachum, 917 F.3d 870, 876 (5th Cir. 2019).  "[P]olice officers are entitled to

qualified immunity unless existing precedent squarely governs the specific facts at issue."

Harmon, 16 F.4th at 1166 (quoting Kisela v. Hughes, 138 S. Ct. 1148, 1153 (2018)).

    As to the second sub-part, "the determination whether it was objectively legally

reasonable . . . will often require examination of the information possessed by the searching

officials."  Anderson, 483 U.S. at 641.  The "relevant question . . . is the objective (albeit fact-

specific) question whether a reasonable officer could have believed [the actions] to be lawful, in

light of clearly established law and the information the searching officers possessed."  Id.  The

subjective beliefs of the officer are not relevant.  Id.  This means that "even when a defendant's

conduct actually violates a plaintiff's constitutional rights, **the defendant is entitled to qualified**

**immunity if the conduct was objectively reasonable**." <u>Fraire v. Arlington</u>, 957 F.2d 1268, 1273 (5th Cir. 1992) (emphasis added).

### a.    Officer in Path of Vehicle May Have Been Clearly Established.

For the Plaintiff to survive summary judgment here, it must have been clearly established as of February 1, 2020 that the Fourth Amendment *prohibited* Officer Cuevas' conduct in the specific situation he faced; i.e., shooting at a vehicle accelerating towards him. The Plaintiff must point to case law where a defendant police officer was shown to have acted unreasonably under very similar circumstances. The Plaintiff simply cannot discharge this burden in the case *sub judice*.

As established, the objective physical evidence is clear that Officer Cuevas was in front of Parker's vehicle as it was moving forward and it even followed him towards the south side of the road when Officer Cuevas tried to get out of the way even to the point that the Parker vehicle left the roadway. Fifth Circuit case law in place at the time of the February 1, 2020 events holds that where a police officer shoots at a car moving directly at him, no Fourth Amendment violation occurs. In other words, the Fifth Circuit finds the officer's actions reasonable under those circumstances. The cases that were in place at the time of the February 1, 2020 events were discussed in the Section above and include <u>Hathaway v. Bazany</u>, 507 F.3d 312 (5th Cir. 2007) and <u>Sanchez v. Edwards</u>, 433 F. App'x 272 (5th Cir. 2011). There are factual differences in these cases to the present set of facts. If the Court considers them to be notable differences, then the issue is not clearly established. If the Court does not consider there to be notable differences, then these cases are helpful as to the reasonableness argument. Either way, given the

facts of Hathaway and Sanchez, this Court should find that the Plaintiff cannot overcome the "clearly established" component of the claim.

### b.    Objective Legal Reasonableness of Cuevas' Conduct.

Additionally, this Court must determine whether a reasonable officer would have believed the actions taken by Officer Cuevas were lawful based on the information he possessed (in addition to the clearly established law). The Fifth Circuit has explained that to determine the objective legal reasonableness of an officer's conduct, the trial court examines whether "a reasonable officer could have believed [their conduct] to be lawful, in light of clearly established law and the information the [...] officers possessed." Gutierrez v. City of San Antonio, 139 F.3d 441, 447 (5th Cir. 1998) (quoting Anderson, 483 U.S. at 641). The Supreme Court has instructed that "the information an officer possesses when that officer takes an action impacts upon the objective legal reasonableness of the officer's conduct." Id. at 449 (citing Anderson, 483 U.S. at 641).

In the present case, the information "known" to Officer Cuevas included the information he received from Dispatch following the 911 call in which he was advised of a drunk and disorderly black male [Markray]. Additionally, factual information "observed" by Officer Cuevas on the scene is important, including him hearing loud and argumentative voices and seeing a truck back up from the yard and hit a mailbox. Cuevas has no way of knowing what had transpired at the call address and whether the driver of the vehicle was the subject of the 911 call. Office Cuevas had every right to stop the driver and investigate the nature of the call. Also important are all the various ways that Officer Cuevas tried to get the Parker vehicle to stop by use of flashlights (both of them) and by commands. Officer Cuevas was faced with what he

believed to be a non-compliant driver, that may be drunk, he had already hit a mailbox in his presence, was not following his commands to stop, the engine revved and the truck moved directly towards him and continued to do so even as Officer Cuevas tried to get out of the way by backpedaling towards the south side of 25th Street.  Under all of these circumstances, it is clear that the actions of Parker threatened to cause serious bodily injury or death to Officer Cuevas and his response was reasonable and appropriate under the Constitution and case law.

**B.    Officer Cuevas Is Entitled to Summary Judgment on the MTCA Claims.**

The Plaintiff's Third Amended Complaint also asserts a state law claim entitled "Violation of the Mississippi Tort Claims Act" against Officer Cuevas.  [Doc. 141, ¶¶157-12]. The Mississippi Tort Claims Act protects state employees by providing that "no employee shall be held personally liable for acts or omissions occurring within the course and scope of the employee's duties."  Miss. Code Ann. § 11-46-7.  The Plaintiff specifically alleges that Officer Cuevas was acting in the course and scope of his employment at the time of the events in question and the City should be held liable for his actions.[9]  [Doc. 141, ¶ 159].  Officer Cuevas can have no personal liability under the MTCA and he is entitled to a dismissal as to the Count 4 claims.

**V.  <u>CONCLUSION</u>**

While the incident and death of Parker was tragic, this Court is "obligated, in circumstances such as these – 'tense, uncertain, and rapidly evolving' – to give allowance 'for the fact that police officers are often forced to make split-second judgments' about the amount of

_____

[9]  The Plaintiff allege alleges that Officer Cuevas was acting in the scope of his employment at "UMMC" and that "UMMC is liable for" his actions. [Doc. 141, ¶159].  Officer Cuevas realizes this was a typographical error in the Third Amended Complaint and has assumed the Plaintiff meant to type the City.

force needed to confront a dangerous situation." Malbrough v. Stelly, 814 Fed. Appx. 798, 806 (5th Cir. 2020). Parker was legally intoxicated and should not have been operating his truck on the night in question. Parker's decision to drive his truck while intoxicated is unfortunate as the incident sued upon would not have occurred. Still, all Parker had to do to avoid this tragic event was to bring his truck to a stop when Officer Cuevas was flagging him to do so with his flashlight in the street – even if he may have been arrested for DUI which came at the risk of exposing his affair with Baldwin. There is no doubt, based on the physical evidence and the witness and expert testimony, it was reasonable for Officer Cuevas to believe his life was in danger and the force he used was neither excessive nor unconstitutional. This Court should find that Officer Cuevas is entitled to qualified immunity and a dismissal of the Third Amended Complaint.

 Respectfully submitted, this the 28th day of February, 2025.

**JASON CUEVAS**

BY: COPELAND, COOK, TAYLOR & BUSH, P.A.

BY: /S/ WILLIAM E. WHITFIELD, III
   Mississippi Bar No. 7161
   /S/ KAARA L. LIND
   Mississippi Bar No. 10604

## CERTIFICATE OF SERVICE

I hereby certify that on February 28, 2025, I electronically filed the foregoing with the

Clerk of the Court using the ECF system which sent notification of such filing to the following:

Merrida (Buddy) Coxwell, Esq.
Courtney Sanders, Esq.
Coxwell & Associates, PLLC
P.O. Box 1337
Jackson, MS 39215
merridac@coxwelllaw.com
courtneys@coxwelllaw.com
and
Bhavani K. Raveendran, Esq.
Samantha A. Harton, Esq.
Romanucci & Blandin, LLC
321 N. Clark St., Suite 900
Chicago, IL 60654
b.raveendran@rblaw.net
sharton@rblaw.net
**Attorneys for Plaintiff**

Jeffrey S. Bruni, Esq.
P.O. Box 1780
Gulfport, MS 39502
jbruni@gulfport-ms.gov
**Attorney for Defendant,**
**City of Gulfport**

*/S/ WILLIAM E. WHITFIELD, III*
*/S/ KAARA L. LIND*

William E. Whitfield, III
Kaara L. Lind
COPELAND, COOK, TAYLOR & BUSH, P.A.
Centennial Plaza
200 East Beach Boulevard, Building #5
Gulfport, Mississippi 39507
P.O. Box 10
Gulfport, Mississippi  39502-0010
telephone (228) 863-6101
telecopier (228) 863-9526
bwhitfield@wewiii.net
klind@cctb.com