```
                IN THE UNITED STATES DISTRICT COURT

          FOR THE SOUTHERN DISTRICT OF MISSISSIPPI

                       SOUTHERN DIVISION

   CATINA PARKER, as              )
   Personal Representative        )
   of the Estate of Leonard       )
   Parker, Jr., Deceased,         )
                                  )
                   Plaintiff,     )
                                  )
        vs.                       )  No. 1:21-cv-00217
                                  )
   CITY OF GULFPORT, a            )
   municipal corporation;         )
   JASON CUEVAS, in his           )
   individual and official        )
   capacity; and JOHN DOE         )
   OFFICERS #1-5 in their         )
   official and individual        )
   capacities,                    )
                   Defendants.    )
```

        The deposition of MICHELLE DESROCHE,

called by the Plaintiff for examination, taken

via videoconference, pursuant to notice and

pursuant to the Federal Rules of Civil Procedure

for the United States District Courts pertaining

to the taking of depositions, before Gina M.

Sylvester, Registered Professional Reporter, on

November 19, 2024, at 10:06 a.m.


Reported By:  Gina M. Sylvester, CSR, RPR

License No:  084-004856



McCorkle Litigation Services, Inc.
Chicago, Illinois  (312) 263-0052

Exhibit "19"

1

1  with any police officer?
2      A.   No.
3      Q.   Any correctional officers?
4      A.   No.
5      Q.   Okay.  So I want to jump right into the
6  incident.
7           On February 1st, 2020, I understand
8  that you were standing kind of outside in a
9  screened-in area when you heard a car hit your
10 mailbox and then you heard gunshots; is that
11 fair?
12     A.   Well, I was standing out there smoking
13 a cigarette in the screened-in porch area, and I
14 heard this screaming and hollering before all
15 that happened.
16     Q.   So the reason you had gone outside was
17 to smoke a cigarette, right?
18     A.   Correct.
19     Q.   Do you know about what time that was?
20     A.   From what I can recall, I believe it
21 was probably around 3:00 a.m.  I'm not quite
22 positive, but...
23     Q.   About how long had you been outside
24 before you started hearing all the screaming and

1  hollering?
2      A.   I mean, I'd just went out there, so I
3  wasn't out there very long.
4      Q.   Okay.  Was it quiet when you first went
5  out there and then you started hearing the
6  screaming and hollering?
7      A.   I don't recall.
8      Q.   Okay.  When you heard the screaming and
9  hollering, what did you do?
10     A.   I was sitting there at the screen door,
11 like, listening, trying to figure out what was
12 going on.
13     Q.   But you didn't step outside the screen
14 door to go look and see what was --
15     A.   No.  Sorry.  No.
16     Q.   Okay.  Is there a lot of traffic in
17 your neighborhood?
18     A.   No.  It was -- it's a dead-end street
19 where I lived at the time, and there's not that
20 many houses.  So the traffic's not hardly any at
21 all.
22     Q.   Okay.  Are there any other noises on
23 your street?  Like, I know you guys live in
24 Gulfport, so, like, can you hear the ocean,



1  anything else that might get in the way of you
2  hearing what people are saying?
3       A.   If I'm inside, it's very quiet because
4  the windows were super sealed, but outside
5  doesn't.
6       Q.   Okay.  On February 1st, 2020, what was
7  your address?
8       A.   213 25th Street.
9       Q.   And you lived right across the street
10 from Stephanie Baldwin, correct?
11      A.   Yeah, kind of -- so my house is here
12 (indicating) and hers was forward to the right,
13 so across the street to the right.
14      Q.   Is that east or west?
15      A.   That would have been --
16      MR. WHITFIELD:  Who?  Her or Stephanie?
17      MS. HARTON:  Hold on, Bill.  I got your
18 objection.
19 BY MS. HARTON:
20      Q.   When you say her house was "forward to
21 the right," do you mean her house was east of
22 yours or west of yours?
23      A.   So her house was northeast.
24      Q.   And the smoke -- the screened-in area

1  that you were in, is that on the east side of

2  your house or the west side of your house?

3      A.   ~~East.~~  West

4      Q.   I'm going to show a document that is

5  Exhibit 56.

6              (Desroche Exhibit No. 56 marked

7               for identification.)

8  BY MS. HARTON:

9      Q.   Can you see my screen, Ms. Desroche?

10     A.   I can, but I can't read it.

11     Q.   Yeah, that's fine.  I'm going to move

12 it down.  I'm going to go down to Page 8.

13          And you see how there's one picture, a

14 little small picture, right?

15     A.   I can barely see that.

16     MR. WHITFIELD:  What is that?  I need to find

17 that.  What is that?

18     MS. HARTON:  This is her affidavit with all

19 your exhibits.

20     THE WITNESS:  Can I have --

21     MR. WHITFIELD:  Affidavit of Michelle

22 Desroche, right?

23     MS. HARTON:  Yeah.

24     MR. WHITFIELD:  So I've got a clean copy of



1  it here.
2      THE WITNESS:  Can I look at it?
3      MR. WHITFIELD:  And it's Exhibit 56?
4      MS. HARTON:  Yes.
5      MR. WHITFIELD:  Okay.  Do you mind if she
6  sees it?
7      MS. HARTON:  Not at all.
8      MR. WHITFIELD:  56.  Now, there's a picture
9  that you wanted her to see.  Is that --
10     MS. HARTON:  Page 8.
11     MR. WHITFIELD:  I don't have the pictures
12 attached -- oh, I do have the pictures attached.
13 So --
14     THE WITNESS:  Okay.  I'm looking at it.
15 BY MS. HARTON:
16     Q.   Okay.  Can you tell me what -- this is
17 a single picture on Page 8 of your affidavit.
18 Can you tell me what this picture is of?
19     A.   So that is a picture of the carport
20 where you pull into my carport that I live at.
21 And you can see the screened-in porch area.
22 That's those two windows and the door going to
23 the screened porch.
24     Q.   Okay.  So the carport is -- what you



1  referred to as the carport, that's, like, the

2  overhang coming out of the house and

3  underneath -- a car can fit under that overhang;

4  is that what you're saying?

5      A.   Yes.

6      Q.   Okay.  And then the screened-in area is

7  right behind the car door with those kind of

8  horizontal windows up to the right, and then it

9  looks like there's a door right there, right?

10     A.   Yes, the door is to the left of the

11 windows.

12     Q.   Yeah.  And the screened-in part are

13 those windows and the door, but there is a solid

14 wall closing in that screened-in area, right?

15     A.   There's a solid wall on the right-hand

16 side of those windows.  On the left-hand side

17 where the door is, there's a door going to the

18 inside of my house.

19     Q.   But below those windows, that is like a

20 -- below those windows that you can see -- the

21 part of the picture that's kind of covered up by

22 the car, that's a wall, right?  That's not more

23 windows, right?

24     A.   Correct.



1    Q.   Okay.  So to the extent that sound can
2  get into that room, it's coming through the door
3  and those three windows, right?
4    A.   Correct.
5    Q.   Okay.  And so this is on the east side
6  of your home, and so Stephanie Baldwin's house
7  would be across the street and even further east
8  than this, right?
9    A.   Across the street to the ~~west~~. east
10   Q.   Oh, to the west?
11   A.   The opposite side of my screened porch.
12   Q.   Okay.  So you'd have to cross through
13 your yard, past your house in order to get to
14 Stephanie Baldwin's home, right?
15   A.   Well, I mean, I don't know how exactly
16 to describe it other than, like, my house wasn't
17 directly across from her house, it was across
18 the street and to the right.  So kind of a
19 little kitty-corner, if that makes sense.
20   Q.   So when you go out the front door to
21 your house, in order to go towards the carport,
22 you would turn left, right, when you walk out
23 the door of your house?
24   A.   My door?



McCorkle Litigation Services, Inc.
Chicago, Illinois  (312) 263-0052

20

Exhibit "19"

1    Q.   Yes.

2    A.   Yes.

3    Q.   But if you wanted to go to Stephanie

4  Baldwin's house, when you walk out the front

5  door of your house, you would take a right,

6  right?

7    A.   Not necessarily a right.  I would go

8  straight across the street and veer to the right

9  somewhat.

10   Q.   Okay.  Thank you.  That's helpful.

11        So why don't you just -- once you were

12 in there smoking and you started hearing people

13 screaming and hollering, why don't you just walk

14 me through what you heard?

15   A.   So basically -- I wasn't out there very

16 long because I was smoking a cigarette.  And

17 then I heard the screaming and hollering, so I

18 was standing by the door and listening.  And

19 there was one guy screaming, you know, F her, F

20 her, that's why I treat her like I do.  Just

21 screaming.  And everybody was hollering at each

22 other.

23        And there was another guy's voice

24 saying, you know, stop it, you know, come on



McCorkle Litigation Services, Inc.
Chicago, Illinois  (312) 263-0052
Exhibit "19"

21

1  man, stop it.  So it sounded like to me just
2  from what I could hear -- I couldn't see
3  anything -- that he was trying to, you know,
4  defuse the situation and get the guy out of
5  there.
6      Q.   Okay.  And then what happened?
7      A.   After that, you know, he kept saying --
8  trying to get the guy to stop and get him to
9  leave.  So I heard a car door shut and then them
10 quickly backing out.  And I thought they hit my
11 neighbor -- my other neighbor's pole, but
12 apparently they hit my mailbox.  I didn't know
13 that because I couldn't see anything.
14          And then very quickly after that, I
15 heard gunshots and I threw my cigarette down on
16 the carport and ran inside.
17     Q.   Why did you run inside?
18     A.   Because I heard gunshots.
19     Q.   Okay.  And you heard four?
20     A.   Yes.
21     Q.   And you ran inside, you heard gunshots.
22 About how long until you walked outside to see
23 what was going on?
24     A.   Never walked outside.



1  Q.  So you never actually saw the scene,
2  right?
3  A.  No.
4  Q.  Okay.  Even after everything had
5  already happened, you never saw anyone laying on
6  the ground, you never saw, you know, the police
7  come and do their investigation, anything like
8  that?
9  A.  Well, after the incident happened, I
10 went inside and I was looking out the front door
11 window -- or, excuse me, my living room window.
12 And I could see, you know, police officers and
13 screaming and commotion from the girl that lived
14 across the street from me.  I didn't know what
15 happened at that point because it was right at
16 the end of my property, so there was bushes and
17 trees blocking it.  So I couldn't see anything
18 as far as, you know, any kind of vehicle.
19 Q.  Did you see anyone laying in the street
20 after the shooting?
21 A.  No.
22 Q.  Okay.  Did you see any vehicles?
23 A.  No.  That was past my line of vision.
24 Q.  And just to be clear, I know you've



1  said this multiple times in other interviews,
2  but you -- prior to the gunshots, you had no
3  vision of the street at all, right?
4      A.   Correct.
5      Q.   And you didn't hear anyone issue any
6  commands or warnings before the gunshots went
7  off, right?
8      A.   No, because it was -- I mean, it all
9  happened so quickly and there was so much
10 screaming and hollering going on, and then
11 hitting what I later found out was my mailbox.
12 It happened so quickly, so...
13     Q.   But when they got into the vehicle, it
14 had quieted down, right?
15     MR. BRUNI:  Objection to form.
16     MR. WHITFIELD:  Join.
17     MS. HARTON:  Do you not understand the
18 question?
19     THE WITNESS:  No, could you repeat it?
20     MS. HARTON:  Yeah.
21 BY MS. HARTON:
22     Q.   At some point shortly before they
23 struck -- the vehicle struck the mailbox, you
24 heard two car doors shut, correct?

1    A.   Correct.
2    Q.   Okay.  And when those car doors shut,
3  you kind of thought, okay, this is -- you know,
4  the whole commotion is over, it's quieting down,
5  right?
6    A.   No, that is not --
7    Q.   Okay.  And that's not what you told
8  investigators on the day that you were
9  interviewed?
10   A.   No, that's not what I'm saying.  I'm
11 just saying it happened so quickly that I don't
12 feel like there was enough time for the
13 commotion to die down before they hit my
14 mailbox.  Like, it was all within a very, very
15 short period of time.
16   Q.   When --
17   A.   And it --
18   Q.   Go ahead.
19   A.   I'm sorry.
20   Q.   No, go ahead.
21   A.   It's a very -- I mean, the area we're
22 talking about is very small too.  It's not like,
23 you know, a huge street or anything like that.
24 So it all happened very quickly.

1  vehicle accelerate after you heard it strike an
2  object?
3      A.   Yes.
4      Q.   Okay.  But you did not actually see the
5  vehicle move at all, right?  You didn't see
6  anything?
7      A.   I couldn't from where I was standing on
8  the porch, no.
9      Q.   So after you heard the noise that you
10 now know was a vehicle striking a mailbox, tell
11 me exactly the noise that you heard.
12     A.   The best way I can describe it was, you
13 know, car backing out of the drive -- their
14 driveway or wherever they were parked, hitting
15 the mailbox and then "er."  That's the best way
16 I can describe it.
17     Q.   Did it sound like tires squealing?
18     A.   I mean, I don't know how to describe
19 tires squealing other than the noise I heard,
20 which was like an "er" sound.  I know it's --
21 don't know how else to put that into words.
22     Q.   Okay.  So you don't know whether it was
23 the sound of the tires against the ground or the
24 revving of the engine or any other noise that a



McCorkle Litigation Services, Inc.
Chicago, Illinois  (312) 263-0052

Exhibit "19"

34

1  vehicle could make?
2      A.   In my mind, it sounded like tires.  I
3  mean, I know what a revving engine sounds like
4  and I don't recall it sounded like that.
5      Q.   Okay.  So you did not hear the revving
6  of any engine?
7      A.   From what I recall, it sounded like
8  tires, you know, squealing on the pavement.
9  That's the best way I can describe it.
10     Q.   Okay.  So I'm going to play you an
11 exhibit.
12     MS. HARTON:  This is Exhibit 55.
13              (Desroche Exhibit No. 55 marked
14                for identification.)
15              (Audio played.)
16     THE WITNESS:  Am I allowed to see a copy of
17 that?
18     MR. WHITFIELD:  This is just audio.
19              (Audio played.)
20     MR. WHITFIELD:  As you're playing that, give
21 us a couple of seconds so we can make sure that
22 the volume is up so we can hear that.
23              Are you playing that, like, in an open
24 room, or is that being played on the actual

1    A.   Yes.

2    Q.   Okay.

3             (Audio played.)

4  BY MS. HARTON:

5    Q.   So I'm going to pause it there because

6  I want to ask you a question about what you

7  said.

8         You told the officer that you heard him

9  accelerating, but not crazy, crazy, crazy,

10 right?  You heard that?

11   A.   Yes.

12   Q.   Okay.  What did you mean by that?

13   A.   Like I said earlier whenever I was

14 trying to describe the noise that the car made

15 when it was accelerating and I said "er."  You

16 know, I mean, it wasn't like a racetrack

17 acceleration kind of thing, you know, 100 miles

18 an hour or whatever.  It's not that far of a

19 distance.  So I don't know how to elaborate

20 further than that.

21   Q.   So based on what you heard, you didn't

22 hear anything that sounded like aggressive or

23 reckless driving, right?

24   A.   No, I didn't say that.

1  STATE OF ILLINOIS   )
                      ) SS.
2  COUNTY OF COOK     )

3

4        I, GINA M. SYLVESTER, Certified Shorthand

5  Reporter and Registered Professional Reporter,

6  do hereby certify that heretofore, to-wit, on

7  the 19th day of November, 2024,

8  MICHELLE DESROCHE, appeared remotely via

9  videoconference, in a cause now pending and

10 undetermined in the United States District Court

11 for the Southern District of Mississippi,

12 Southern Division, wherein CATINA PARKER is the

13 Plaintiff, and CITY OF GULFPORT, et al., are the

14 Defendants.

15       I further certify that the said,

16 MICHELLE DESROCHE, was first duly sworn to

17 testify the truth, the whole truth and nothing

18 but the truth in the cause aforesaid; that the

19 testimony then given by said witness was

20 reported stenographically by me in the presence

21 of the said witness, and afterwards reduced to

22 typewriting by Computer-Aided Transcription, and

23 the foregoing is a true and correct transcript

24 of the testimony so given by said witness as



McCorkle Litigation Services, Inc.                     91
Chicago, Illinois   (312) 263-0052
Exhibit "19"

1  aforesaid.
2         I further certify that the signature to
3  the foregoing deposition was reserved by counsel
4  for the respective parties.
5         I further certify that the taking of this
6  deposition was pursuant to notice and that there
7  were present at the deposition the attorneys
8  hereinbefore mentioned.
9         I further certify that I am not counsel
10 for nor in any way related to the parties to
11 this suit, nor am I in any way interested in the
12 outcome thereof.
13        IN TESTIMONY WHEREOF: I have hereunto set
14 my verified digital signature on this 6th day of
15 December, 2024.
16
17 _____
18        GINA M. SYLVESTER, CSR, RPR
19        License No. 084-004856
20
21
22
23
24