```
 1              IN THE UNITED STATES DISTRICT COURT

 2        FOR THE SOUTHERN DISTRICT OF MISSISSIPPI

 3

 4   CATINA PARKER, as         )
     Personal Representative   )
 5   of the Estate of          )
     LEONARD PARKER, JR.,      )
 6   Deceased,                 )
                    Plaintiff, )
 7         vs.                 )1:21-CV-217 HSO-RHWR
     THE CITY OF GULFPORT,     )
 8   a municipal corporation;  )
     JASON CUEVAS, in his      )
 9   individual and official   )
     capacity,                 )
10                 Defendants. )

11

12         The Zoom Video Conference Discovery

13   Deposition of STACI TURNER, M.D., called for

14   examination pursuant to the Rules of Civil

15   Procedure for the United States District

16   Courts pertaining to the taking of depositions,

17   taken before MARLENE L. KING, a Certified

18   Shorthand Reporter within and for the County

19   of Cook and State of Illinois, on December 18,

20   2024, at the hour of 10:09 o'clock a.m.

21

22

23         REPORTED BY:  MARLENE L. KING, C.S.R.

24         LICENSE NO.:  084-003326.
```



1  within this document, is that right?
2      A.   Yes.
3      Q.   And you created this document in the
4  course of regular business for the Office of the
5  State of the Medical Examiner?
6      A.   Yes.
7      Q.   I'm looking here at Page 2 of Exhibit 1
8  where there is a bold title Evidence Of Injury
9  near the bottom of the page.  Can you see that?
10     A.   Yes.
11     Q.   What is the purpose of the Evidence Of
12 Injury section?
13     A.   To document the injuries that
14 Mr. Parker had.
15     Q.   And what injuries did you document?
16     A.   Two gunshot wounds, one of the face,
17 one of the left index finger, and then toward
18 the bottom of that section the abrasions and
19 laceration of his face.
20     Q.   Okay.  I'd like to ask you questions
21 first about the gunshot wound of the face and
22 neck that's at the top of Page 3.
23     A.   Yes.
24     Q.   Where was that -- strike that.



1          I believe you identified an entrance
2  wound, is that correct?
3      A.   Yes.
4      Q.   Where was the entrance wound located?
5      A.   It was in the left cheek within his
6  beard.
7      Q.   And it looks like you measured a
8  one-fourth inch in diameter round gunshot wound.
9  Is that the size of the wound itself?
10     A.   Yes.
11     Q.   And then you indicated that there is --
12 that it was located six and a half inches below
13 the top of the head and three and a half inches
14 left of the midline, is that right?
15     A.   Yes.
16     Q.   What's the midline?
17     A.   The middle of the face, if you can
18 picture a line from the forehead to the chin.
19     Q.   You also indicate on Page 3 that there
20 was no soot or stippling on the skin, is that
21 right?
22     A.   That's correct.
23     Q.   What does that mean?
24     A.   When the bullet comes out of the end

```
 1   of the gun, smoke, some flame, and gunpowder
 2   particles also exit.  If those are deposited
 3   on the skin, it can help give an indication how
 4   far away the gun was from the skin when it was
 5   fired.
 6        Q.   And there's no evidence of that for
 7   Mr. Parker, is that right?
 8        A.   That's correct.
 9        Q.   Can you describe the injuries
10   associated with the gunshot wound of the face
11   and neck?
12        A.   Yes.  The bullet went through the left
13   side of his mandible, which is his jawbone.  It
14   then went through soft tissue in the neck, and
15   it penetrated into his cervical spine in the
16   fourth cervical vertebral body.
17        Q.   I'm gonna show you what I'll mark as
18   Exhibit 2.  One second here.  I'm showing you
19   what I have marked as Exhibit 2.  Do you see
20   that?
21        A.   Yes.
22        Q.   Okay.  And will you agree that Exhibit
23   2 is a sample skeleton of a human body from
24   around the chest up to the head?
```



```
 1   BY MS. RAVEENDRAN:
 2       Q.   Generally speaking do you know if the
 3   type of injury that Mr. Parker received from a
 4   bullet wound to his cheek lodging in his spine
 5   could be painful?
 6       A.   It's possible.
 7       Q.   And would you agree that Mr. Parker
 8   could have been aware of the injury immediately
 9   as it was occurring?
10       MR. BRUNI:  Object to the form.
11       MS. LIND:  Join.
12       THE WITNESS:  It's possible.
13   BY MS. RAVEENDRAN:
14       Q.   Were you able to gather any information
15   about the path of the bullet that entered
16   Mr. Parker's cheek?
17       A.   Yes.  It traveled left to right
18   downward and slightly front to back.
19       Q.   Can you describe what is meant by
20   slightly front to back?
21       A.   Not at a sharp angle.
22       Q.   Did you find any evidence within
23   Mr. Parker's body that the bullet was deflected
24   once it entered his body?
```

1    A.   No.
2    Q.   Were you able to tell if the bullet
3 followed a straight line path after entering
4 Mr. Parker's body?
5    A.   Yes, it did.
6    Q.   Would the wound path created from
7 Mr. Parker's left cheek to his C-4 vertebrae be
8 consistent with Mr. Parker receiving a gunshot
9 from someone to his left?
10        MS. LIND:  Object to form.
11        THE WITNESS:  Yes.
12 BY MS. RAVEENDRAN:
13   Q.   Would the wound path created by the
14 injury from Mr. Parker's left cheek to his C-4
15 be consistent with Mr. Parker being shot with
16 a muzzle to his left, if you can tell?
17        MR. BRUNI:  Object to the form.
18        THE WITNESS:  Yes.
19 BY MS. RAVEENDRAN:
20   Q.   Would the path from the left cheek
21 to the C-4 vertebrae be inconsistent with
22 Mr. Parker being shot with a muzzle being fired
23 directly at him without an angle to the left or
24 right?

1        MS. LIND:  Object to form.
2        MR. BRUNI:  Same.
3        THE WITNESS:  No.
4  BY MS. RAVEENDRAN:
5     Q.   It would be inconsistent with being
6  shot directly at.  Is that fair?
7     A.   No, it would not.
8     Q.   I'm sorry.  I feel like maybe did
9  you hear my word?  I said inconsistent.
10    A.   I heard your word.
11    Q.   I just wanted to make sure.  I don't
12 know if I'm missing that.
13         Would the path of the bullet from
14 the left cheek to the C-4 be inconsistent with
15 Mr. Parker being fired at from his right side?
16    A.   Yes.
17    Q.   Based on your autopsy did you observe
18 any other significant natural medical conditions
19 for Mr. Parker?
20    A.   His heart was enlarged at 410 grams.
21    Q.   And based on your review did that have
22 any effect on the cause or manner of death that
23 you determined?
24    A.   No.



McCorkle Litigation Services, Inc.
Chicago, Illinois  (312) 263-0052

49

Exhibit "20"

1    Q.  Was there any other condition other
2 than the gunshot wounds that you believe caused
3 his death?
4    A.  No.
5    Q.  Is shooting a person an act in your
6 experience that can be fatal to human life?
7    A.  Yes.
8    Q.  Do you have an opinion to a reasonable
9 degree of medical certainty as to the manner and
10 cause of Leonard Parker's death on February 1,
11 2020 based on the autopsy you performed?
12    A.  Yes.
13    Q.  And what is that?
14    A.  His cause of death is a gunshot wound
15 of the face and neck.  His manner of death is
16 homicide.
17    MS. RAVEENDRAN:  Okay.  Thank you so much.
18 I don't have further questions pending any
19 followup I might have.
20    MS. LIND:  We'd like to take a short break
21 to confer and see what if any questions we need
22 to ask of this witness.
23    MS. RAVEENDRAN:  Want to take five minutes?
24 If that's okay with Dr. Turner, that's fine with



1  up to his death, correct?
2      A.   Correct.
3      Q.   Were you aware that Mr. Parker was the
4  driver of a truck in the period of time leading
5  up to his death?
6      A.   Not that I recall.
7      Q.   Okay.  As to the -- I think you
8  testified earlier that the legal limit of
9  alcohol in the State of Mississippi is 0.08,
10 correct?
11     A.   Yes.
12     Q.   And Mr. Parker's blood alcohol
13 concentration, the result, was 0.185, is that
14 correct?
15     A.   Yes.
16     Q.   Would it be fair to say that based
17 on this result Mr. Parker's blood alcohol
18 concentration was over twice the legal limit
19 in the State of Mississippi?
20     A.   Yes.
21        MS. RAVEENDRAN:  Objection.  Foundation.
22 BY MS. LIND:
23     Q.   Are you able to comment at all as to
24 whether Mr. Parker's blood alcohol concentration

1  0.185 had any effect on his ability to drive a
2  vehicle that evening?
3      A.   No.
4      Q.   Would you need additional information
5  to provide that opinion?
6      A.   No.
7      Q.   There were some questions toward the
8  end of your testimony by the questions of
9  Ms. Raveendran relating to the path of the
10 gunshot wound to the left cheek.  Do you recall
11 those questions?
12     A.   Yes.
13     Q.   I think you were asked -- and I don't
14 know how else to do this because I don't have
15 the court reporter here with me to go back and
16 look at the testimony about whether or not the
17 path of that bullet was inconsistent from him
18 being shot straight on.  Am I repeating that
19 correctly?
20     A.   As I recall that was the question.
21     Q.   And I think you said -- what was your
22 answer?
23     A.   It was not inconsistent.
24     Q.   Can you explain your answer?



1      A.   The degree to which it traveled left
2  to right was small, and so it would have just --
3  it could have either come from the front with a
4  slight variation or it could have come more from
5  the left or the head could be turning or the
6  hand holding the gun could be moving.
7      Q.   Understood.  So it's even possible that
8  he could have been -- Mr. Parker could have been
9  turned and looking at a passenger in his
10 vehicle.
11     A.   That's --
12     MS. RAVEENDRAN:  Objection.  Speculation,
13 foundation.
14     THE WITNESS:  I guess it would depend on
15 where the vehicle was and where he was in
16 relation to it.  I don't have any way of knowing
17 that.
18 BY MS. LIND:
19     Q.   Understood.  So if Mr. -- I'm sorry.
20 If Mr. Parker was the driver of the vehicle and
21 he had a passenger sitting to his right, is it
22 possible that he could have been turning and
23 looking at his passenger at the time the shot
24 was fired?



1  A. Yes.
2  Q. Okay.  You had also answered certain
3  questions about pain or being aware, those types
4  of questions prior to Mr. Parker's death.
5  Do you recall that line of questioning?
6  A. Yes.
7  Q. And I believe you testified that
8  it would have only been possible that he
9  experienced pain or that it is possible that he
10 could have been aware.  Did I hear you correctly
11 on your testimony?
12 A. It is possible that he was aware and
13 did experience pain.
14 Q. But you cannot state that to a
15 reasonable degree of medical probability,
16 correct?
17 MS. RAVEENDRAN:  Objection to form.
18 THE WITNESS:  I would imagine gunshot wounds
19 are very painful.  I have never had one.
20 BY MS. LIND:
21 Q. Do you have any evidence that he
22 was awake and aware for any length of time?
23 A. Nothing specific, no.
24 Q. And your testimony on those particular



McCorkle Litigation Services, Inc.
Chicago, Illinois  (312) 263-0052

58

Exhibit "20"

1  STATE OF ILLINOIS       )

2                          )    SS:

3  COUNTY OF C O O K       )

4          I, MARLENE L. KING, a Certified Shorthand

5  Reporter within and for the County of Cook

6  and State of Illinois, do hereby certify

7  that heretofore, to-wit, on December 18, 2024,

8  personally appeared before me via Zoom,

9  STACI TURNER, M.D., in a cause now pending

10 and undetermined in the United States District

11 Court for the Southern District of Mississippi,

12 wherein CATINA PARKER, as Personal

13 Representative of the Estate of LEONARD PARKER,

14 JR., deceased is the Plaintiff, and THE CITY OF

15 GULFPORT, a municipal corporation; JASON CUEVAS,

16 in his individual and official capacity are the

17 Defendants.

18         I further certify that the said STACI

19 TURNER, M.D. was first duly sworn to testify the

20 truth, the whole truth and nothing but the truth

21 in the cause aforesaid; that the testimony then

22 given by said witness was reported

23 stenographically by me in the presence of the

24 said witness via Zoom, and afterwards reduced to



McCorkle Litigation Services, Inc.
Chicago, Illinois   (312) 263-0052

Exhibit "20"

71

1  manner of speak.  I'm sorry, Marlene.  So we're
2  gonna turn up our volume here.  There we go.
3  BY MR. BRUNI:
4     Q.   With respect to consistency, Doctor,
5  the path of the bullet, there are some questions
6  asked by both attorneys previously.  Let me ask
7  you this.  With respect to the bullet path that
8  you viewed in your autopsy, would it be also
9  consistent with the muzzle of the gun of the
10 officer being located at the front of the
11 decedent?
12    A.   Yes.
13    Q.   Okay.  And Doctor, I apologize.  I was
14 trying to follow this earlier.  But were you
15 made aware of the fact that at the time that the
16 gunshot occurred, that the decedent was sitting
17 in the driver's seat of a truck?
18    A.   Not that I recall.
19    Q.   Okay.  If I were to tell you that the
20 decedent was in the driver's seat of the truck,
21 would it be consistent on the basis of what you
22 viewed in your autopsy that the officer would
23 have been firing the gunshot or gunshots when
24 in the front of the pickup truck?



1  A.  Yes.
2  Q.  And Doctor, with respect to the autopsy
3 report and the information that appears in your
4 files, correct me if I'm wrong, but you're not
5 being asked to give an opinion or to state any
6 kind of opinion in your reports with respect to
7 the circumstances that led up to the death of
8 the decedent, is that correct?
9  A.  That's correct.
10  Q.  So you've not been asked in -- rather
11 let me restate that.  You cannot give an opinion
12 in your deposition today about whether the
13 person that fired the gun was either justified
14 by law or not justified by law with respect to
15 firing that gun at the time, is that correct?
16  A.  I have no opinion on that.
17  Q.  Yes, ma'am.  Doctor, with respect to
18 the coroner's report do you recall whether the
19 coroner had any conversations with you at any
20 point in time prior to your completion of your
21 autopsy report?
22  A.  I don't recall.
23  Q.  And would that be something that would
24 be routine with respect to conversations with



McCorkle Litigation Services, Inc.
Chicago, Illinois  (312) 263-0052

64

Exhibit "20"

1  typewriting by Computer-Aided Transcription, and
2  the foregoing is a true and correct transcript
3  of the testimony so given by said witness as
4  aforesaid.
5          I further certify that the signature to
6  the foregoing deposition was waived by counsel
7  for the respective parties.
8          I further certify that the taking of this
9  deposition was pursuant to Notice and that there
10 were present at the deposition the attorneys
11 hereinbefore mentioned.
12         I further certify that I am not counsel
13 for nor in any way related to the parties to
14 this suit, nor am I in any way interested in the
15 outcome thereof.
16         IN TESTIMONY WHEREOF:  I have hereunto
17 set my verified digital signature this 30th day
18 of December, 2024.
19
20                *Marlene L King*
21         _____
22              LICENSE NO. 084-003326
23
24



McCorkle Litigation Services, Inc.
Chicago, Illinois  (312) 263-0052    72
Exhibit "20"